# COPY

Dan Brecher, Esq.
Law Offices of Dan Brecher
99 Park Avenue, 16th Floor
New York, New York 10016
Tel.: 212-286-0747
Attorney for Plaintiff

# 08 CV 2992

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KATHERINE GRIFFIN, individually and as trustee of the Katherine Griffin Living Trust, | MAR 2 4 2008 U.S.D.C. S.D. N.Y. CASHIERS |
| Plaintiff, | Case No. |
| - against - | COMPLAINT FOR COMMON LAW FRAUD, BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTIES |
| GOLDMAN, SACHS & CO. and SOFIA FRANKEL, | |
| Defendants. | TRIAL BY JURY DEMANDED |

## COMPLAINT

Plaintiff Katherine Griffin, individually and as Trustee of the Katherine Griffin Living

Trust, by her attorneys, Law Offices of Dan Brecher, complains against Defendants Goldman,

Sachs & Co. ("Goldman Sachs") and Sofia Frankel ("Frankel"), as follows:

## INTRODUCTION

1.      Defendants engaged in activities that constitute common law fraud, victimizing

this Plaintiff and a number of other customers of Frankel, a broker employed by Goldman Sachs

from 1994 through 2000, who moved to Lehman Brothers, Inc. ("Lehman Brothers") at the end

of 2000. Frankel generated more than $20 million dollars in commissions at Goldman Sachs and

Lehman Brothers in just the four years from early 1997 through early 2001. And, including $14

million in "up-front" money paid to her by Lehman Brothers when she joined that firm in late

1

2000, Frankel received $22 million from Goldman Sachs and Lehman Brothers in that time. She "earned" this money solely through commissions and her share of markups and markdowns she charged for "investing" the funds in her customers' accounts in high margin in-and-out trading of hundreds of different securities. She justified her high commissions through false representations and fraudulent charts purporting to show the outstanding past performance of her customer accounts: Frankel charged four or more times as much as the average broker at Goldman Sachs and Lehman Brothers because she was presented as a "star" broker who would produce exceptional results for her customers' accounts. The truth is that she had a practice of taking short term profits and letting the losses run, a practice that can have success in rising markets, but which can have disastrous results when markets deteriorate.

2.    Plaintiff is among a number of customers Frankel damaged by overcharging and lying to them, as described in this Complaint. Frankel used the name and reputation of Goldman Sachs, together with false representations and fraudulent performance charts purporting to show the outstanding past performance of her customers' accounts, to obtain and maintain complete discretionary control over her customers' accounts, including Plaintiff's account, which she then traded on high margin, causing massive losses to most of the accounts of her largest customers. Frankel traded these accounts without an evident plan. She traded the accounts so frequently, charging such high commissions, markups/markdowns and other costs, and holding losses while taking profits, that her supervisors had to know she was engaged in improper activity which they failed to properly supervise and curtail.

3.    Plaintiff relied upon the name and reputation of Goldman Sachs, the misrepresentations as to Frankel's education and abilities, and the misrepresentations concerning the performance of accounts under her management, including those made in the fraudulent

charts Defendants prepared and used, and, based upon this reliance, Plaintiff allowed Frankel to maintain discretionary control over her Goldman Sachs account until Frankel left Goldman Sachs and went to Lehman Brothers in December 2000.  Relying upon the representations Frankel made, including her false claims of a Ph.D. and those made through the use of charts, and the credibility and good name of Lehman Brothers, Plaintiff followed Frankel to Lehman Brothers, transferring her account from Goldman Sachs in January 2001, despite the $435,450 in realized losses and the substantial unrealized losses her account incurred under Frankel's management.

4.    As a result of Frankel's fraudulent and tortious actions, Plaintiff suffered out-of-pocket losses totaling approximately $435,450 while the Defendants charged approximately $101,000 in commissions and other excessive charges to the Plaintiff's account.  Plaintiff also suffered damages totaling $300,000 in lost earnings on her out-of-pocket losses.  Plaintiff should recover all $836,450 of her claims, including the charges to her account during Frankel's fraudulent treatment of her account, in which Goldman Sachs is complicit and should also be held responsible.  Plaintiff also seeks punitive damages, based on the extensive, repeated and widespread fraudulent conduct of the Defendants, and also based on the Defendants' improper actions in efforts to cover up the fraudulent acts and to keep Plaintiff from learning of the common law fraud Frankel committed upon her.

## **PARTIES**

5.    Plaintiff Katherine Griffin is a citizen and resident of the State of Maryland and the Trustee of the Katherine Griffin Living Trust.

6.    Defendant Goldman Sachs is a nationally known and established broker/dealer in the securities industry, with a branch office located at 85 Broad Street, New York, New York,

where Plaintiff funded her account with money and securities which are the subject of this Complaint.

7.    On information and belief, Defendant Sofia Frankel is a citizen and resident of the State of Florida.  On information and belief, at the time Plaintiff maintained her account with Goldman Sachs, Defendant Frankel was a citizen and resident of New York.

## JURISDICTION AND VENUE

8.    Subject matter jurisdiction is conferred on this Court through diversity jurisdiction pursuant to 28 U.S.C. §1332.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.    The transactions, statements, practices, and course of conduct alleged herein occurred within the Southern District of New York so that venue is proper in this district pursuant to 28 U.S.C. §1391.

## PRIOR FINRA ARBITRATION

10.    On December 22, 2006, Plaintiff filed a Statement of Claim with NASD Dispute Resolution, Inc. (now known as FINRA Dispute Resolution), bearing Arbitration Number 06-05365 (the "FINRA Arbitration"), and captioned Katherine Griffin, individually and as trustee of the Katherine Griffin Living Trust v. Goldman, Sachs & Co., Lehman Brothers Inc. and Sofia Frankel.

11.    By Settlement Agreement executed by Plaintiff on January 17, 2008, the terms of which are confidential, Plaintiff settled her claims with Respondent Lehman Brothers and with Frankel, but solely for the period Frankel was employed at Lehman Brothers.

12.    By Award dated March 3, 2008, the Panel in the FINRA Arbitration granted Respondents Goldman Sachs and Frankel's motion to dismiss Claimant Griffin's claims, without

prejudice, on the ground that the claims were time-barred under FINRA Rule 10304.  FINRA

Rule 10304, entitled Time Limitation Upon Submission, states that "no dispute, claim, or

controversy shall be eligible for submission to arbitration under this Code where six (6) years

have elapsed from the occurrence or event giving rise to the act or dispute, claim or

controversy."  FINRA Rule 10304 goes on to state that dismissal of a claim under the Rule does

not prohibit a party from pursuing the claim in court.

13.     At the hearings of the FINRA Arbitration held on January 30, 2008[1], the Chair

stated on the record that the Panel's ruling was without prejudice and that the matter could be

pursued by Plaintiff Griffin in court.

## THE DOCUMENTED COMMON LAW FRAUD COMMITTED BY DEFENDANTS

14.     Sofia Frankel is an immigrant from Russia, who came to this country in or about

1994, she joined Goldman Sachs

as a newly registered broker in her first job in the securities industry.  By 1999, she was telling

her customers she was living the "American Dream."  She also told many of her customers,

including the Plaintiff, blatant falsehoods.  She even told her supervisors, fellow employees, and

this Plaintiff that she had a Ph.D. - she doesn't.  Fortunately for Frankel, she entered the

brokerage business in a rising market that encouraged speculation in technology stocks.

Unfortunately for her customers, such as the Plaintiff, Frankel worked for the most highly

regarded firms in the securities industry, so, at the time, her false representations seemed

believable to the Plaintiff, and to Frankel's other customers.

---

[1]  January 30, 2008 constitutes the only day of hearings in the FINRA Arbitration.  On that day, Respondents Goldman Sachs and Frankel's motion to dismiss was heard and decided by the Panel.  No evidentiary hearing took place, and no testimony was ever heard by the Panel.  The Panel's decision to grant Respondents' motion to dismiss was based solely on its determination that Claimant's claims were time-barred under FINRA Rule 10304.

15.    Frankel utilized the same fraudulent methods in dealing with many of her customers that she used to defraud this Plaintiff.  Frankel also told other customers that she had a Ph.D., and she also showed other customers the fraudulent performance charts.  Frankel also insisted upon discretionary control over other customers' accounts, gaining the customers' trust and confidence by promising to treat their assets entrusted to her control as if it was her own money.  Unfortunately, despite all of the many "red flags" created by her fraudulent acts and improper activities, her superiors at Goldman Sachs did nothing, notified no customers, and essentially condoned her outrageous treatment of her customers because Frankel was generating substantial commission income, and had ingratiated herself with the compliance personnel and with her superiors.  The supervisors' behaviors here amount to nothing less than gross neglect of their duties.  What raises Frankel's false statements beyond mere puffery to the level of common law fraud, even at the outset, is that in furtherance of her fraudulent scheme, in which Frankel obtained and maintained control over Plaintiffs' Goldman Sachs account, and to justify her excessively high commissions, Frankel presented Plaintiff and numerous other customers with the performance charts, fraudulently portraying her financial acumen as having resulted in customers' accounts she controlled far outperforming even the strong market that was ongoing prior to the opening of the Plaintiff's Goldman Sachs account.

16.    In July 1999, Katherine Griffin turned over more than $2.4 million to the discretionary control of Defendant Sofia Frankel, by setting up a trust account with Goldman Sachs for the Katherine Griffin Living Trust, bearing account number 001-10030-4 (the "Goldman Sachs Account").  These funds represented a substantial portion of Plaintiff's net worth.  Although initially cautious about transferring funds from an existing account Katherine had maintained with a broker she "adored," David Parks, Katherine was won over by Frankel

after their initial meeting where Frankel falsely represented her education and other credentials,

and provided Katherine with customer performance charts prepared by Goldman Sachs that

purported to show that customers' accounts under Frankel's management and control had very

substantially out-performed the market in the prior three years. Frankel made a practice of

showing her clients performance charts that were titled "Composite Historical Equity

Performance" (hereafter, "the Charts").

17.    The Charts that were shown to Plaintiff, along with Frankel's business card which

Frankel attached to the Charts, are annexed hereto as Exhibit A. The Charts were represented by

the Defendants as being accurate and correct to one one-hundredth of one percent in their

calculations of the performance of "the GS Team portfolio." However, the Charts Frankel used

to obtain and maintain discretionary control over Plaintiff's Account and to justify her high

commission rates were materially false, misleading and substantially inaccurate. The Charts had

been prepared, with knowledge that they were false, (i) to induce customers to turn over their

financial assets to the management and control of Frankel, (ii) to allow Frankel to maintain

control over customers' accounts, and (iii) to justify the materially higher commissions Frankel

charged her customers.

18.    Frankel made highly inaccurate, greatly exaggerated, and materially false and

misleading claims of great success in her use of the Charts. Frankel's claims were false, and her

supervisors knew, or should have known, that she was lying to her customers. For example, the

chart on the second page of the Charts that are annexed hereto as Exhibit A, makes the claim that

$10 million invested at an unidentified point in 1995 in an undefined "GS Team portfolio" was

worth $32,297,891 on 3/31/99. The truth is that the claimed "portfolio" for a "GS Team" was a

fiction, concocted with fraudulent intent, and not one that was truly derived from Frankel's

recommendations. Yet, in the Notes on the bottom of page 2 of <u>Exhibit A</u>, the Charts portray

this as an actual "Past Performance" which "is not indicative of future results." The truth is that

there was no such actual past performance either, and Defendants will not be able to honestly

substantiate the claims in the Charts. Indeed, even the Charts' claimed actual percentage gain of

198.89% in the so-called "portfolio" does not support the growth performance represented to be

$32,297,891 on 3/31/99. Another example of the fraudulent nature of the Charts is on page 3 of

the Charts, in the first paragraph of which the Charts are falsely portrayed as detailing "results

for the equity portion" (which is undefined) "of certain accounts," and then goes on to falsely

claim that the Charts include performance of accounts which "are not discretionary accounts,

however, all or most of the transactions effected therein resulted in Sophia's [*sic*]

recommendations." This representation is also materially false because Frankel did not include

the performance of certain non-discretionary accounts (plural) in compiling the Charts. This

representation is also materially false because Frankel did include the performance of a non-

discretionary account, which she later claimed was not an account which traded based upon her

recommendations. The number of accounts and the performance figures on page 3 of the Charts

are also false representations. For these and other reasons, the Charts are a fraud. The Charts

that are <u>Exhibit A</u> hereto are charts shown to Plaintiff by Frankel to induce the turnover of

Plaintiff's funds to Frankel's control, and that were given to Plaintiff by Frankel prior to Plaintiff

opening her Goldman Sachs Account.

19. Frankel insisted upon discretionary control of the Goldman Sachs Account and

then proceeded to trade the Account, overcharging commissions, markups and markdowns. She

made unauthorized trades, used excessive margin, and then she falsified records to cover-up her

misdeeds.  Frankel's illegal activities caused almost $435,450 in total out-of-pocket losses to Katherine Griffin as a result of Frankel's transactions in her Goldman Sachs Account.

20.     Frankel's deceit included lying to her customers, such as this Plaintiff, about new issues she sold to them.  She lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities.  Frankel violated internal Goldman Sachs rules as to communications with customers and with the back office regarding sales of new issues.  Frankel had a practice of purchasing new issues for these customers without first discussing the details of the purchases with the customers; an improper practice as to new issues, even for discretionary accounts such as the account at issue here.  Frankel would indicate to the Goldman Sachs investment bankers for new issues and then after being informed of the actual allotments, Frankel would allocate them among her customers, without properly discussing the transactions first or without communicating with her customers at all, including the Plaintiff.  And, when her allotment was less than the amount she indicated for, Frankel would change customers' allocations, but not in proportion to the amount indicated for each customer; this was in breach of applicable rules and regulations.

21.     Frankel lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities.  Frankel was thereby allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice.  Supervisors at Goldman Sachs did not take proper cautionary steps, and Frankel was permitted not only to ride out the collapsing market for technology stocks, but, at the end of 2000, having stuck her clients, including the Plaintiff, with

substantial unrealized losses, Frankel then left Goldman Sachs for Lehman Brothers, and she was paid $14,000,000 just to join Lehman Brothers, and she was given an impressive title by Lehman Brothers, serving to further mislead Plaintiff.

22.     Plaintiff lost approximately $70,470 in two specific stocks, WorldCom and Global Crossing, listed in the settlement Goldman Sachs made with the United States Securities and Exchange Commission ("SEC") and with the New York Attorney General regarding the false reports issued by Goldman Sachs analysts.  See Exhibit B.

23.     Plaintiff lost approximately $137,940 in eToys, Inc., a stock which was the subject of a 2005 New York Court of Appeals decision, attached hereto as Exhibit C, in which the Court imposed a fiduciary responsibility on Goldman Sachs to the issuer in an initial public offering of eToys, Inc. for which Goldman Sachs was the lead underwriter, holding that when underwriters serve as expert advisors they are obligated to reveal any conflicts of interest.  The specific conflict of interest that is the subject of EBC I Inc. v. Goldman, Sachs & Co. involved sales by Goldman Sachs of its own eToys stock at a far higher price than the IPO and the related arrangements entered into between Goldman Sachs and certain of its customers whereby such customers were obligated to kick back to Goldman Sachs a portion of any profits that they made from the sale of eToys securities subsequent to the initial public offering.

24.     The unlawfulness of these schemes and the improprieties alleged here is all the more shocking for where they occurred: one of the most respected names on Wall Street - Goldman Sachs.  Indeed, the very success of Frankel's fraudulent activities was dependent on the respected nature of the Goldman Sachs name – Frankel was selling Goldman Sachs' brokerage services, with supposed customized and personal investment advice.  She was not represented to be a typical broker; Goldman Sachs presented Frankel as a "star."

25.    Goldman Sachs specifically knew that Frankel was overcharging her customers and excessively trading customers' accounts while it was happening.  Goldman Sachs not only did nothing to stop her, it supported and encouraged Frankel by knowingly permitting Frankel to tell customers, even those who complained about the high charges, that her educational background, her skills and her performance, as shown in the Charts, among other reasons she gave, justified the high commissions she charged.  Frankel claimed to her customers that it was her right to charge "old rates," that is, extra high commissions, because that was the price of sharing in the success she had created.  Frankel used her false representations and the fraudulent Charts to support her fleecing of customers through overtrading their accounts while charging excessively high commissions, throughout her employment with Goldman Sachs.  All of this was with the knowledge and support of Frankel's laissez-faire supervisors.  In the 18 months from August 1999 to December 2000 that Frankel controlled Plaintiff's Goldman Sachs Account, Goldman Sachs charged the Plaintiff substantially more than $101,000 in commissions, markups, markdowns and margin interest.  The excessive commissions charged by Defendants, who justified such commissions through false representations and the Charts shown to Plaintiff by Frankel, support a claim of common law fraud.

26.    By 1999, through some luck related to the bull market in technology stocks, in which Frankel promoted herself as a specialist and expert, and because she had been producing immense commissions from a limited number of accounts, and had made strong and successful efforts to befriend her supervisors, Frankel was able to bamboozle almost everyone.  Yet, there were co-workers of Frankel who became aware of her excessive commission charges, and did not want to work with her.  Indeed, her excessive charges and the huge commission income she

generated made her behavior particularly notorious at Goldman Sachs, which should have served as a red flag to her supervisors, even in 1999.

27.     Frankel's supervisors at Goldman Sachs ignored a number of warning signs, including Frankel's lack of experience and training, her false claim of having a Ph.D., the Charts that should have been questioned, her excessive commission charges, the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, the high turnover ratios in her customers' accounts, and customer complaints reporting unauthorized transactions by Frankel.  By way of comparison to Frankel's limited experience as a broker, the <u>average</u> Smith Barney Citigroup broker is advertised as having 15 years of experience in the securities brokerage industry.  At the time she gained discretionary control over the Plaintiff's Goldman Sachs Account, Frankel had been in the industry for less than five years.  These were all "red flags" which Frankel's supervisors should have seen and acted upon, which they failed to do.

28.     Instead, Frankel's supervisors at Goldman Sachs promoted Frankel's performance to other brokers as a model to be imitated.  Goldman Sachs' supervisors had Frankel address new associates to promote charging "old rates" and held her up to new associates as a broker to emulate.  While many brokers were charging their customers with active accounts commissions of six cents a share, and less, and even after Goldman Sachs had distributed written instructions to its brokers encouraging lesser commission charges or fixed annual charges, which would have been much lower than the charges visited upon Plaintiffs, or charging a maximum of $.125 a share in transactions for discretionary accounts, Goldman Sachs, nonetheless, encouraged and supported Frankel in charging her customers substantially higher rates than other brokers were charging their regular customers with active accounts.  Frankel would often charge Plaintiff commissions of $.40, $.50, even $1.00 a share or more, and even

$2.00 a share, based on whether Plaintiff made money on a transaction; an improper practice. When Frankel's supervisors asked her questions about customers' positions, the high margin, or the substantial trading, Frankel lied to her supervisors; lies that could have been discovered by her supervisors speaking directly to the customers, such as the Plaintiff, to confirm what Frankel told her supervisors. The supervisors failed to speak to Plaintiff and other customers, as they should have done. One reason for this breakdown in supervision was that Frankel went out of her way to befriend her supervisors, particularly in the compliance department, where Frankel was even able to wangle a job at Goldman Sachs for her son.

29.    But for the fraudulent acts of Defendants, Plaintiff would not have opened, and then maintained, her Account with Frankel at Goldman Sachs. Accordingly, all losses in the Goldman Sachs Account stem from Defendants' fraud, and all of Plaintiff's approximate $435,450 in out-of-pocket losses, and her lost income of $300,000 should be awarded to the Plaintiff. Because of the fraudulent acts of Frankel, and of her employer, Plaintiff should also be awarded the fraudulently obtained commissions, markups, markdowns, margin interest and other charges to her Account, estimated to be approximately $101,000, for a total amount claimed of $836,450. Plaintiff also seeks punitive damages, interest, legal fees and costs in this matter.

## FIRST COUNT
## DEFENDANTS' COMMON LAW FRAUD

30.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 29 above.

31.    Defendants made willful misstatements and/or omissions of material fact in communications with Plaintiff in an effort to deceive Plaintiff into opening an account with the Defendants, and, then, to further deceive Plaintiff as to the wrongful activities effected by Defendants in the Goldman Sachs Account.

13

32.     False and fraudulent statements made to Plaintiff by Defendants include, but are not limited to, those specifically listed immediately below:

(i)     At all times, Defendants represented that Frankel was a knowledgeable, experienced broker;

(ii)    At all times, Frankel represented that she had Plaintiff's best interests at heart;

(iii)   In persuading Plaintiff to open an account with Goldman Sachs in or around July 1999, Frankel falsely represented to Plaintiff, as she had done and would continue to do with other customers, that she would invest her money like it was her own.  Frankel told Plaintiff that she did not need to be working and that she worked as a broker only because she enjoyed making other people money, implying purely altruistic, non-monetary purposes behind her work for Plaintiff and her other customers;

(iv)    In or around July 1999, Frankel used materially false and misleading Charts prepared by Defendants, and false statements regarding her qualifications and past performance, to procure and obtain discretionary control over Plaintiff's Goldman Sachs Account.  The Charts purported to show Frankel's great success with respect to the accounts she handled.  The Charts were highly inaccurate, greatly exaggerated, and materially false and misleading because, among other reasons, they misrepresented the amount of assets under Frankel's management and the performance of her customers' funds under her management. Thereafter, Frankel used these same Charts and false statements to maintain control over Plaintiff's Goldman Sachs Account and to justify her high commissions charges to the Account. Frankel's supervisors knew, or should have known, that these statements, and therefore, the

Charts, were materially false. The Charts are discussed in detail in Paragraphs 17 through 18 of this Complaint;

(v)     Frankel made numerous transactions in Plaintiff's Goldman Sachs Account without first discussing them with Plaintiff, including, but not limited to, purchases of initial public offerings such as Allscripts (500 shares on March 10, 2000), Bookham (1000 shares on September 26, 2000), Level 3 Communications (1000 shares on January 29, 2000) and Global Crossing (1000 shares on April 14, 2000), to name a few. In fact, contrary to what is reported on the internal records of Goldman Sachs, Frankel never spoke to Plaintiff about any of the more than 50 purchases of initial public offerings for Plaintiff's Goldman Sachs Account;

(vi)    From July 1, 1999 through June 20, 2000, Goldman Sachs analysts made false statements in their numerous reports recommending the purchase of "tech" stocks, such as WorldCom and Global Crossing that were recommended and sold to Plaintiff in October 1999 and April 2000, respectively, when they specifically knew, and stated in internal communications within Goldman Sachs and to each other, that their reports and recommendations of these securities contained materially false statements and conclusions, were materially inaccurate, that the companies they were recommending were being recommended to customers because of pressures exerted by investment bankers at the firm, that the projections and forecasts were materially inaccurate, and that certain companies they were recommending were likely to fail;

(vii)   Frankel had a practice, with Plaintiff and with the accounts of her other customers, of not calling to get indications of interest from her customers as to securities offerings, but first made the transactions for customers and then called customers, and had other

15

employees of Goldman Sachs call customers, and then falsified Defendants' records as to the dates when these calls were made. Plaintiff received no such calls.

(viii)    Frankel told others at Goldman Sachs that she had obtained prior authorization from clients to purchase the allocated amounts for which she indicated in Goldman Sachs initial public offerings, when the truth was that she had not discussed such purchases with the customers, including Plaintiff;

(vix)    In or about 1999 through 2000, Frankel was allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice;

(x)    Defendants sold to Plaintiff approximately 3,000 shares of eToys, Inc. stock in or around October 1999, for which Plaintiff paid approximately $215,750. Plaintiff ultimately suffered losses of approximately $137,940 on these shares. In its sale of the eToys, Inc. stock to Plaintiff, Defendants failed to disclose to Plaintiff the conflict of interest existing with respect to agreements entered into by Goldman Sachs with certain Goldman Sachs customers to share in profits made following the initial public offering of eToys, Inc. Such agreements had a manipulative effect on the price of the security, driving it up from its $20 per share offering price to the almost $72 per share price at which the stock was sold to Plaintiff;

(xi)    Frankel had a practice of holding losses while taking profits in Plaintiff's Goldman Sachs Account, and falsely represented to Plaintiff her investment philosophy and practice; and

(xii)    Frankel fraudulently represented to Plaintiff, at their first meeting, that she had a Ph.D.

33.    By reason of the excessive commissions and other charges to Plaintiff's Goldman Sachs Account, the speculative nature of many of the transactions which were solicited and executed in Plaintiff's Account through the fraud and fraudulent misrepresentations of Frankel, the excessive use of margin, and the similar transactions and improprieties in accounts of other customers of Frankel, which should have served as "red flags" to Frankel's supervisors, and all of the transactions having been approved by the principals and/or managers at Goldman Sachs, and by reason of the fraudulent acts of Goldman's analysts and investment bankers with regard to the securities of corporations sold to Plaintiff on Defendants' recommendations, the fraudulent acts of Defendants with respect to the sale to Plaintiff of eToys, Inc., and the fraudulent acts of Frankel with respect to the initial offerings purchased for Plaintiff's Goldman Sachs Account, Goldman Sachs knew of or should have known of the improper and fraudulent behavior of Frankel, and has, therefore, assisted or participated in the common law fraud and in these fraudulent misrepresentations.

34.    Defendants made these misrepresentations and omissions of material fact, and knew, or should have known, they were false and misleading.  Defendants intended that Plaintiff rely upon the misrepresentations and omissions, and Plaintiff did rely upon them in dealing with the Goldman Sachs Account.

35.    Plaintiff reasonably and justifiably relied on Defendants' misrepresentations and omission, and, as a result of Defendants' common law fraud and misrepresentations, Plaintiff has been damaged in the amount of $836,450.

### SECOND COUNT
### BREACH OF CONTRACT

36.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 35 above.

17

37.    The foregoing activities which occurred with respect to Plaintiff's Account while it was maintained and improperly administered at Goldman Sachs constitute breaches of internal standards of conduct applicable to Defendants in dealing with the Plaintiff, which are stated in Goldman Sachs' own policy and procedures manuals or such other internal documents of Goldman Sachs as exist and apply in these circumstances, as well as rules, regulations and procedures pursuant to NASD, NYSE, and other regulatory standards.  These standards and procedures, among other standards and procedures customary in the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure Defendants' improper behavior.[2]

38.    The foregoing wrongful activities, which occurred in connection with the Plaintiff's Account while maintained and improperly administered at Goldman Sachs, constitute breaches of contractual duties owing by the Defendants to the Plaintiff, including, without limitation, the contractual duties of good faith and fair dealing with the Plaintiff, the contractual duty to "know your customer," and the contractual duties set forth in the customer agreements which specifically incorporate, as standards of measure of performance of said contractual duties, the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have not been complied with by Defendants.

39.    Specifically, Defendant Goldman Sachs breached the terms set forth in Paragraph 1 of the Trust, Estate and Guardian Agreement, signed by Plaintiff on July 23, 1999 and by Defendant Goldman on August 25, 1999 (the "Account Agreement").  Pursuant to Paragraph 1, all transactions under the Account Agreement must be "in accordance with the rules and customs of the exchange or market and its clearing house, if any, where the transactions are executed and

---

[2]    Mauriber v. Shearson/American Express, Inc., 567 F.Supp. 1231, 1238 (S.D.N.Y. 1983).  Plaintiff's counsel in Mauriber is Plaintiff's counsel in the instant proceedings.

in conformity with the applicable law and regulations of governmental authorities and future amendments or supplements thereto." The wrongful activities set forth in the Complaint constitute breaches of Paragraph 1 of the Account Agreement.

40.    Defendants breached several provisions of the Trading Authorization Agreement [For Goldman Sachs Representatives] (the "Discretionary Trading Agreement"), dated July 23, 1999. Specifically, pursuant to the Discretionary Trading Agreement, purchases of securities where Goldman Sachs was a participant in any registered public offering were not to be executed on a discretionary basis. Although Defendants executed numerous purchases of initial public offerings for which Goldman Sachs was an underwriter, Defendants did not contact Plaintiff prior to executing such purchases, and did, therefore, execute such purchases with discretion.

41.    Pursuant to the Discretionary Trading Agreement, Defendants agreed to not execute transactions prohibited by Goldman Sachs' other policies and procedures applicable to discretionary and nondiscretionary transactions generally. The wrongful activities set forth in the Complaint, which occurred in connection with the Plaintiff's Account while maintained and improperly administered at Goldman Sachs, constitute breaches of this specific provision of the Discretionary Trading Agreement.

### THIRD COUNT
### BREACH OF FIDUCIARY DUTIES

42.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above.

43.    Defendants owed Plaintiff certain fiduciary duties, including the duty to use due care, to properly supervise Frankel, to know its customers, and not to engage in common law or statutory fraud with respect to Plaintiff's Account and funds. The misconduct upon which Plaintiff's breach of fiduciary duties claim is founded includes the very same misconduct which

underlies Plaintiff's common law and statutory fraud claims.  The fiduciary duties breached by Defendants have their genesis in the express contractual relationship between the parties and are directly related to the common law and statutory fraud asserted by Plaintiff; and, as such, the claim has a six-year statute of limitations.

44.    All of the foregoing activities, which occurred with respect to Plaintiff's Goldman Sachs Account while maintained and improperly administered at Goldman Sachs, constitute breaches of fiduciary duties due and owing to Plaintiff by Defendants, who were in positions of trust with respect to Plaintiff.

45.    Defendants breached their fiduciary duties owed to Plaintiff, and, as a result, Plaintiff has been damaged.

## **PUNITIVE DAMAGES**

46.    It is respectfully submitted that punitive damages are particularly appropriate here, where the pervasive pattern of fraud and the activities of the Defendants in seeking to cover-up their misconduct surely merit economic sanctions.  Indeed, the fraudulent activity that occurred with respect to Plaintiff's Goldman Sachs Account is precisely the type of activity that legislative bodies are seeking to prevent, such as by the direct affirmation of the authority of courts to award punitive and/or treble damages to investor-plaintiffs.  If the Defendants' unlawful behaviors detailed above do not result in proportionate sanctions to deter future violations of this type, then brokers will continue to "borrow" money from their clients by such gross overcharges and fraudulent recommendations, pocket the billions, and return only a small fraction of what they "earned" when challenged by the relatively few victims willing to endure the expenses and inconveniences of proceedings such as these.

## THE DAMAGES

WHEREFORE, Plaintiff prays for judgment as follows:

(i)     As to First Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

(ii)    As the Second Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs; and

(iii)   As to the Third Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

Dated:    New York, New York
          March 21, 2008

                         LAW OFFICES OF DAN BRECHER

                         Dan Brecher (DB-5308)
                         99 Park Avenue, 16th Floor
                         New York, NY 10016
                         (212) 286-0747





# Composite Historical Equity Perfo



■ SF □ S&P 600

(1) See Exhibit A
(2) Through 03/31/99

Note: These performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request. These numbers are net of all commissions and fees. Past performance is not indicative of future results.

Sophia Fraenkel
Vice President
Private Client Services

Goldman, Sachs & Co.
One New York Plaza · New York, NY 10004
Tel: 212-357-1267 / 800-323-5678

# Composite Equity Performance (1) vs. S&P 500

## Assumes: $10,000,000 Initial Investment



GS Team
$32,297,881

S&P 500
$22,201,926

Initial Investment

1996    1997    1998    1999 YTD (2)

$35,000,000
$30,000,000
$25,000,000
$20,000,000
$15,000,000
$10,000,000

(1) See Exhibit A.
(2) Through 03/31/99

Note: These performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request. These numbers are net of all commissions and fees. Past performance is not indicative of future results. Numbers are net of all commissions and fees.

---

Assuming an initial investment of $10MM, the GS Team portfolio would have returned 45% more than the S&P 500 over the same time period

### Cumulative Performance

Goldman
Sachs

1/1/96-03/31/99

1996    2002



**EXHIBIT A**

## Performance Computation

Enclosed herewith are the composite performance results for the equity portion of certain accounts for the years 1996 and the first quarter of 1999 which are serviced by Sophia Frankel. Certain accounts are handled on a discretionary basis wherein investment decisions are generally made by Sophia to whom the client has granted discretion. The remainder of the accounts included in the composite are not discretionary accounts, however, all or most of the transactions effected therein resulted in Sophia's recommendations.

As the summary chart shows, during the period from January 1996 through March 1999, the accounts on average achieved a 199.89% cumulative return [net of all commissions and fees] compared to a 122.02% cumulative return for the S&P 500 index during the same period.

The performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. For the reference years, the composite includes common stock, convertible preferred stock, convertible bonds, options and other equity related instruments (general rights, warrants, REITs, etc.). Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request.

These performance results reflect the activity of the accounts described above, which may not be representative of the activity in your accounts. The results are not, and should not be treated as, a guarantee of future performance. We are, of course, available to discuss any questions which you may have concerning the enclosed material.

| | 1996 | | 1997 | | 1998 | | 1999 | | Accumulated | | Cumulative | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 |
| Number of Accounts in Composite | 16 | | 18 | | 20 | | 20 | | | | | |
| Performance | 29.83 | 23.10 | 38.96 | 33.5 | 39.68 | 28.69 | 20.75 | 4.98 | 40.20 | 27.81 | 199.89 | 122.02 |

(1) Through 03/31/99

The referenced performance measurement uses month-end valuations and time weighted cash flows. The key factors in this calculation are: (i) rates of return and based on market values which are measured monthly and include accruals; income; (ii) all realized income is assumed to be reinvested and (iii) cash flow into and out of an account and between its segments are calculated daily and are time weighted.



Home | Previous Page

U.S. Securities and Exchange Commission

## Securities and Exchange Commission

**Litigation Release No. 18113 / April 28, 2003**

**Securities and Exchange Commission v. Goldman, Sachs & Co., 03 CV 2944 (WHP) (S.D.N.Y.)**

**SEC SUES GOLDMAN SACHS FOR RESEARCH ANALYST CONFLICTS OF INTEREST FIRM TO SETTLE WITH SEC, NASD, NYSE, NY ATTORNEY GENERAL, AND STATE REGULATORS**

The Securities and Exchange Commission announced today that it has settled charges against Goldman, Sachs & Co., a New York-based investment bank and securities firm, arising from an investigation of research analyst conflicts of interest. This settlement, and settlements with nine other brokerage firms, are part of the global settlement the firms have reached with the Commission, NASD, Inc., the New York Stock Exchange, Inc. ("NYSE"), the New York Attorney General, and other state regulators. As part of the settlement, Goldman Sachs has agreed to pay $25 million as disgorgement and an additional $25 million in penalties. One-half of the total of these payments - $25 million - will be paid in connection with the SEC action and related proceedings by the NASD and NYSE and will be placed into a distribution fund for the benefit of customers of the firm. The remainder will be paid to resolve related proceedings by state regulators. In the SEC action, Goldman Sachs has agreed to a federal court order that will enjoin the firm from future violations of NASD and NYSE rules and require the firm to make changes in the operations of its equity research and investment banking divisions. In addition, Goldman Sachs will pay, over five years, $50 million to provide the firm's clients with independent research, and $10 million to be used for investor education.

In connection with this matter, the Commission today filed a Complaint against Goldman Sachs in the U.S. District Court for the Southern District of New York, alleging violations of NASD and NYSE rules. According to the Commission's Complaint, from at least July 1999 through June 2001, research analysts at Goldman Sachs were subject to inappropriate influence by investment banking at the firm. The Complaint also alleges that Goldman Sachs published exaggerated or unwarranted research and failed to maintain appropriate supervision over its research and investment banking operations.

Specifically, the Commission's Complaint alleges that:

- Goldman Sachs compensated its analysts based at least in part upon their participation in the firm's investment banking-related activities. Analysts were required to prepare business plans that discussed, among other things, what steps the analysts planned to take to assist investment banking efforts. In preparing these business plans,

Case 1:08-cv-02992-LMM    Document 1-2    Filed 03/24/2008    Page 5 of 63
Goldman, Sachs & Co.: Lit. Rel. No. 18113 / April 28, 2003

Page 2 of 4

analysts were required to answer such questions as "How much of your time will be devoted to IBD [investment banking division]?" and "How can you work more effectively with IBD to exploit the opportunities available to the firm?" In response to the question "What are the three most important goals for you in 2000?" one analyst replied, "1. Get more investment banking revenue. 2. Get more investment banking revenue. 3. Get more investment banking revenue."

- Goldman Sachs "aligned" its research, equities, and investment banking divisions to work collaboratively in order to fully leverage its limited research resources. In 2000, Goldman Sachs concluded internally that "US Investment Research appears to be on the right track," noting that "research analysts, on 429 different occasions, solicited 328 transactions in the first 5½ months of [the year]" and that "[r]esearch was involved in 82% of all 'won business' solicitations."

- Goldman Sachs analysts participated in investment banking marketing efforts, including working with investment bankers to prepare "pitch" materials and in some cases attending the pitch meetings. For example, in an April 2000 e-mail, an investment banker told an analyst that the company they were about to pitch to "strongly suggested that you guys come prepared to SELL." Some pitchbooks implicitly suggested that Goldman Sachs would provide favorable research coverage after the investment banking transaction.

- In several instances, these conflicts resulted in analysts publishing recommendations that were exaggerated or unwarranted. For example, in August 2000, the business unit leader for U.S. telecommunications research at the firm wrote to his counterpart in Europe: "The plan we have in place now is that in early September we are going to re-rate most of the CLECs [competitive local exchange carriers], which is where the problem is most egregious. The ratings were a residual from [a former analyst], and I never changed them, not wanting to disrupt things too much. But it's ridiculous. I've already met with the bankers, and plan to move most of the companies down to M[arket] O[utperformer], from RL [the highest rating]. For the other segments the situation is not as bad, and where there is a problem, investment banking considerations have prevented me from making a change (i.e. AT&T, WCOM). I don't think I would end up leaving only 7.5% as RL, but the present 68% is ridiculous...."

- Goldman Sachs failed to establish and maintain adequate policies, systems, and procedures reasonably designed to ensure the objectivity of its published research.

Goldman Sachs has agreed to settle the Commission's action and has consented, without admitting or denying the allegations of the Complaint, to the entry of a final judgment that, if approved by the court, permanently enjoins Goldman Sachs from violations of NASD and NYSE rules pertaining to just and equitable principles of trade (NASD Rule 2110; NYSE Rules 401 and 476), advertising (NASD Rule 2210; NYSE Rule 472), and supervisory

procedures (NASD Rule 3010; NYSE Rule 342). The final judgment also orders the firm to make the payments described above, and provides for the appointment of a fund administrator who, subject to court approval, will formulate and administer a plan of distribution for those monies placed into the distribution fund.

In addition, the final judgment orders Goldman Sachs to implement structural reforms and provide enhanced disclosure to investors, including a broad range of changes relating to the operations of its equity research and investment banking operations. Goldman Sachs has agreed to sever the links between research and investment banking, such that: research and investment banking are physically separated with completely separate reporting lines; analysts' compensation cannot be based directly or indirectly upon investment banking revenues; investment bankers may no longer evaluate analysts; investment bankers will have no role in determining what companies are covered by the analysts; and research analysts will be prohibited from participating in efforts to solicit investment banking business, including pitches and roadshows. In addition, Goldman Sachs must disclose on the first page of each research report whether the firm does or seeks to do investment banking business with that issuer, and when Goldman Sachs decides to terminate coverage of an issuer, Goldman Sachs must issue a final research report discussing the reasons for the termination. Each quarter, Goldman Sachs also will publish on its website a chart showing its analysts' performance, including each analyst's name, ratings, price targets, and earnings per share forecasts for each covered company, as well as an explanation of the firm's rating system.

Goldman Sachs also has agreed as part of this settlement to retain, at its own expense, an Independent Monitor to conduct a review to provide reasonable assurance that the firm is complying with the structural reforms. This review will be conducted eighteen months after the date of the entry of the Final Judgment and the Independent Monitor will submit a written report of his or her findings to the SEC, NASD, and NYSE within six months after the review begins. Five years after the entry of the final judgment, Goldman Sachs must certify to the SEC and other regulators that it has complied in all material respects with the requirements and prohibitions of the structural reforms.

\* \* \*

The Commission acknowledges the assistance of NASD, NYSE, the Securities Division of the Utah Department of Commerce, and other state regulators in the investigation of this matter.

> SEC Complaint in this matter
> SEC Final Judgment in this matter
> Final Judgment Appendix A
> Final Judgment Appendix B
> Consent

http://www.sec.gov/litigation/litreleases/lr18113.htm

Home | Previous Page

Modified: 04/28/2003



U.S. Securities and Exchange Commission

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

450 Fifth Street, N.W.

Washington, D.C. 20549,

                   Plaintiff,    :  Civil Action No.

          - against -      :  COMPLAINT

GOLDMAN, SACHS & CO.,
One New York Plaza, 37th Floor
New York, NY 10004,

             Defendant.

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## NATURE OF THE ACTION

1. The Commission brings this action against defendant Goldman, Sachs & Co. ("Goldman Sachs" or "Defendant") to redress its violations of certain rules of NASD Inc. ("NASD") and the New York Stock Exchange, Inc. ("NYSE").

2. From July 1999 through June 2001 (the "relevant period"), Goldman Sachs sought and did investment banking business with many companies covered by its Research Division. Research analysts were encouraged to participate in investment banking activities, and that was a factor considered in the analysts' compensation. In addition, the decision to initiate and maintain research coverage of certain companies was in some cases coordinated with the investment banking department and influenced by investment banking interests.

3. As a result of the foregoing, certain research analysts at Goldman Sachs were subjected to investment banking influences and conflicts of interest between supporting the investment banking business at Goldman Sachs and publishing objective research. The firm had knowledge of these investment banking influences and conflicts of interest yet failed to

establish and maintain adequate policies, systems, and procedures that were reasonably designed to detect and prevent those influences and manage the conflicts.

4. By its conduct, Goldman Sachs violated NASD Rules 2110, 2210(d)(1), 2210(d)(2), and 3010, and NYSE Rules 342, 401, 472, and 476(a)(6).

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to Sections 21(d)(1), 21(e), 21(f), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u(f), and 78aa].

6. Goldman Sachs, directly or indirectly, used the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein.

7. Venue is appropriate in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Goldman Sachs is found, has its headquarters and principal executive offices, and transacts business in this District.

## DEFENDANT

8. Goldman Sachs is a broker-dealer with its principal place of business in New York, New York. Goldman Sachs is a leading global investment banking and securities firm that, among other things, offers underwriting services to companies seeking to offer their securities to the public and merger and acquisitions services. In addition to its investment banking operations, Goldman Sachs also offers extensive services to its institutional investor clients, has an active securities sales and trading business, and maintains a separate division to perform research on equity securities. Goldman Sachs is a member of NYSE and NASD.

## FACTUAL ALLEGATIONS

## I. RESEARCH ANALYST PARTICIPATION IN INVESTMENT BANKING ACTIVITIES

9. Research analysts were responsible for providing analyses of the financial outlook of particular companies in the context of the business sectors in which those companies operated and the securities market as a whole.

10. Research analysts evaluated companies by, among other things, examining financial information contained in public filings, questioning company management, investigating customer and supplier relationships, evaluating companies' business plans and the products or services offered, building financial models, and analyzing competitive trends.

11. After synthesizing and analyzing this information, the research analysts drafted research reports and more abbreviated "notes" summarizing their opinions. These reports or notes typically contained a summary and

analysis of the factors relied upon by the analyst in reaching his conclusions, and some contained a rating and/or a price target.

12. During the Relevant Period, Goldman Sachs' equity research ratings included four investment ratings:

- RL: Recommended List -- expected to provide price gains of at least 10 percentage points greater than the market over the next 6 - 18 months;

- MO: Market Outperformer -- expected to provide price gains of at least 5 - 10 percentage points greater than the market over the next 6 - 18 months;

- MP: Market Performer -- expected to provide price gains similar to the market over the next 6 - 18 months; and

- MU: Market Underperformer -- expected to provide price gains of at least 5 percentage points less than the market over the next 6 - 18 months.

In addition, Goldman Sachs had one shorter-term rating:

- Trading Buy - expected to provide price gains of at least 20 percentage points sometime in the next 6 - 9 months.

13. The percentage of issuers being assigned one of the top two investment ratings (Recommended List or Market Outperformer) ranged from 72% in the first quarter of 1999 to 50% in the last quarter of 2001. The percentage of companies assigned a Market Underperformer rating did not rise above 1.1% during the relevant period.

14. Goldman Sachs published research on publicly traded companies, and this research was made available to Goldman Sachs' institutional and private wealth management clients, principally high net worth individuals. Published research or the content of the research was disseminated by various means, including: by mail; via facsimile; distributions at client meetings; via electronic mail ("e-mail"); via Goldman Sachs' research website for clients; telephone conversations by analysts or salespersons; as part of analysts' appearances on television, at seminars, and industry conferences; and through subscription services provided by Bloomberg and First Call. On occasion, the substance of Goldman Sachs' research reports, in whole or in part, was also reported in the U.S. financial news media. In addition, beginning in December 2000, certain of Goldman Sachs' research was made available to another broker-dealer, who make it available to its retail customers.

15. During the relevant period, analysts made themselves available, via telephone, e-mail, and in person, to Goldman Sachs' institutional sales force to answer questions about industry sectors and covered companies. Analysts also conducted "teach-ins" for Goldman Sachs' institutional sales force to educate the sales force about companies for which Goldman Sachs initiated research coverage. In addition, analysts provided periodic research updates to the institutional sales force through "morning calls" or "morning

notes," which are daily pre-market opening discussions of the sector and/or specific covered companies. Analysts also provided research updates to the institutional sales force through "blast" e-mails and voice-mail messages, which typically provided a more abbreviated analysis than what was contained in a research report and may have contained a rating on a company or sector.

16. In addition to performing research functions, certain research analysts from time to time participated or assisted in connection with investment banking-related activities. These investment banking-related activities included assisting the investment banking department by identifying and/or vetting companies as prospects for investment banking services, participating in "pitches" of investment banking services to companies, participating in "roadshows" (a series of presentations made by the management of a company in conjunction with the marketing of an upcoming underwriting to potential investors) associated with underwriting transactions, speaking to investors to educate them about underwriting transactions, and participating in due diligence activities in connection with underwriting transactions. (Underwriting services included sales of the company's securities to the public through initial or secondary public offerings.) In the context of the capital raising process, research analysts contributed by evaluating businesses that appeared potentially appropriate for public markets and screening out unsuitable candidates.

17. The Investment Banking Division at Goldman Sachs advised corporate clients and helped them execute various financial transactions, including the issuance of stock and other securities. Goldman Sachs frequently served as the lead underwriter in initial public offerings ("IPOs")-the first public issuance of stock of a company that has not previously been publicly traded-and follow-on offerings of securities.

18. During the relevant period, investment banking activities were an important source of revenues and profits for Goldman Sachs. In fiscal year 2000, investment banking generated more than $5.37 billion in revenues, or approximately 32 percent of Goldman Sachs' total net revenues.

19. Goldman Sachs encouraged research analysts to support the investment banking and other businesses of Goldman Sachs, and in some cases, research analysts were expected to participate or assist in the foregoing investment banking-related activities. The level of analyst participation or assistance in the foregoing investment banking-related activities varied widely but was sometimes significant. During 2000, one research analyst self-reported that he spent an estimated 40% of his time on investment banking-related activities, and another analyst self-reported that he spent an estimated 55% of his time on investment banking-related activities.

20. During the relevant period, Goldman Sachs held itself out as generating and providing research reports that were the product of objective research and opinions of Goldman Sachs's Research Division.

## II. PARTICIPATION IN INVESTMENT BANKING ACTIVITIES WAS A FACTOR IN EVALUATING AND COMPENSATING RESEARCH ANALYSTS

21. The compensation system at Goldman Sachs provided an incentive for research analysts to contribute to all areas of Goldman Sachs's business, including participation in investment banking activities and assisting in the generation of investment banking business for Goldman Sachs. Analyst compensation was based on many factors, including the level of compensation the analyst could command in the market for their sector (which might be impacted by the level of investment banking activity in that sector), the analysts' participation in investment banking-related activities, whether an analyst was ranked in the broker polls, Greenwich Survey, Institutional Investor, and performance reviews. Analyst compensation consisted of a salary and a discretionary bonus.

22. During the relevant period, Goldman Sachs gathered information about the analyst's job performance through self-evaluations, business plans completed by the analysts, sales force surveys, and anonymous "360 degree review," evaluation forms completed by supervisors, peers, and subordinates in the Research Division, as well as members of other divisions of Goldman Sachs, including to varying extents the Investment Banking and Equities Divisions. The Head of Research and/or other senior Research Division employees would then evaluate the performance of research analysts as described below.

23. After reviewing all the performance evaluations, analysts rankings, and other indicators of performance such as the analyst's research production, and taking into account his or her own assessment of the analyst's performance, the analyst's supervisor would provide an overall assessment of the analyst's performance. The specific comments in the 360 degree reviews were not shown to the analysts, but certain comments may have been discussed or described in some cases.

24. Some comments in the 360 degree reviews of analysts indicated that some analysts were involved in many aspects of investment banking-related activities and reflected certain employees' beliefs that participating or assisting in investment banking activities was a factor in measuring the analyst's performance. The following comments were submitted through 360 degree reviews about different research analysts:

- "One of my favorite analysts. A real trader's analyst[]. Solid grasp of the industry; well liked by investors ie [sic] well informed as to their intentions, which translates to a ton of business. Aside from a few 'tell it like it is' lapses in judgment to the press, [analyst] leaves very little room for improvement. I'm sincere when I emphasize that many GS [Goldman Sachs] analysts can learn from his model insofar as a trading relationship goes. I realize bringing in the banking bucks is primary to an analysts [sic] success and actually being able to pick a stock takes second, but I wouldn't trade him for anyone. He brings too much business to my table and keeps me from getting hurt P&L wise when he's first with important insight."

- "[needs to] make more of an effort to separate research views from banking views. Like many analysts, he has been known to be swayed by banking to support certain names"

- "he has been in the incredibly awkward position of having the investment bankers have a stronghold over his written work – STOR

[StorageNetworks], LDCL [Loudcloud] to name a few embarrassments" Another review of the same analyst said: "One gets the sense that he's been held captive to the agenda of others within the Firm and that, were he allowed to exercise independent investment thesis, he would have had a decidedly different take of this group's prospects." Another review of the same analyst said: "he works closely with bankers to help their franchise while maintaining research independence."

25. Some analysts' self-evaluations reflected their perception that they were expected to participate or assist in Goldman Sachs' investment banking business. For example, one analyst wrote: "Need to get closure on some key wins. To monetize relationships for Goldman Sachs, both at the corporate and buyside level." Another analyst wrote "has subordinated personal preferences on recommendations [citing two examples] for 'commercial' reasons.

26. Furthermore, a presentation to research analysts in 2000 stated that the performance review process included "Formal Investment Banking Division recognition of Research contribution to business we win and relationships we improve."

## Research Analysts Business Plans

27. During the relevant period, analysts were required to develop business plans that discussed a broad range of areas such as what the analyst's plans were for Global Research with respect to both products and services, what major investment themes the analyst would develop relating to his or her coverage universe, and what investor conference the analyst had planned. One of the many such categories covered by the business plans was how the analyst planned to assist the investment banking efforts of Goldman Sachs. As noted below, the business plans included questions that implied that the research analysts' contribution to Goldman Sachs's investment banking business was part of their job.

28. Business plan questions included:

- How much of your time will be devoted to IBD [Investment Banking Division]? ...Are you using/managing IBD effectively? How can you work more effectively with IBD to exploit the opportunities available to the firm? What specific opportunities do you see? Do you have alignment-do you have counterparts in IBD you work with to approach business in an integrated fashion? How can IBD help you in conferences, client meetings, etc.?

- What will be the three most important IBD transactions in your space not yet mandated (that can be identified now, of course)? How well placed are your IBD relationships with respect to winning this business?...With which corporates can you use IBD's relationship to enhance your own? For which corporates do you have a better relationship with senior management than IBD does? How will you use that to enhance GS business opportunities?

29. In response to these questions, research analysts presented their

investment banking goals, activities, accomplishments, participation in lead- and co-managed underwritings, and sometimes fees associated with the investment banking transactions on which the analyst worked.

30. Business plans asked analysts to estimate how much of their time not devoted to Research would be devoted to each of four divisions of Goldman Sachs, including investment banking and Equities. In 1999, analysts estimated that they would spend between 5% and 75% of their time not devoted to Research on Investment Banking, which includes all merger and acquisition and financing activities.

31. In response to the question: "What are the three most important goals for you in 2000?" one analyst replied: "1. Get more investment banking revenue. 2. Get more investment banking revenue. 3. Get more investment banking revenue."

## III. INVESTMENT BANKING INTERESTS INFLUENCED GOLDMAN SACHS' DECISIONS TO INITIATE AND MAINTAIN RESEARCH COVERAGE

32. In general, the Research Division determined whether to initiate and/or maintain research coverage based upon institutional investors' interest in the company, the company's importance to the sector, and/or the company's importance to the Investment Banking Division or Equities Division.

33. One analyst commented in a business plan: "Since our banking ties are so close to each one of the companies mentioned above along with the fact that these companies are direct competitors with each other, it is incredibly difficult to voice strong opinions in these sectors."

34. In a March 16, 2000 e-mail communication from an analyst to an Investment banker, the analyst wrote: "I wanted to harmonize with you strategically. [Chief Executive Officer at Ventro] suggested that there might be a banking opportunity for us, can we use a carrot and stick approach to win some economics here. I've been successful in the past using my research efforts to cement relationships where we previously had none."

35. A 2000 presentation to research analysts stated that Investment banking and Research Divisions had a "shared mission" that included:

- "Highest ranked Research and Investment Banking teams in our industry";

- "Provide thought leadership; anticipation of trends";

- "Effective coverage and servicing of franchise enhancing or defining companies in each sector";

- "Effective identification of commercial opportunities";

- "Foster superb relationships with senior management of companies";

- "Research-driven success, not simply research-resourced."

## "Research Alignment" Process

36. In 1998-1999, "in order to fully leverage [its] limited Research resources," Goldman Sachs implemented a formalized process called "Research Alignment" whereby the Investment Banking, Equities and Research Divisions "work collaboratively to insure a strategic alignment of [Goldman Sachs'] business - that the biggest opportunities for investment banking and equities were being covered, that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman Sachs's] Research reputation for independent and thoughtful analysts was sustained if not enhanced." The process recognized that "[t]he individual company coverage provided by Global Investment Research helps drive the majority of the Firm's largest businesses, from winning financing deals and advisory business to obtaining orders in the secondary markets."

37. "Research Alignment" was "developed with the goal of quantifying, at the individual company, industry and sector levels, what the available revenue opportunities are to Goldman Sachs on both the Equities (trading) and IBD (equity issuance, high yield issuance and M&A) sides of the business."

38. In 2000, Goldman Sachs' "Global Investment Research IBD Alignment Process" was summarized in part as follows: "US Investment Research appears to be on the right track with our IBD alignment initiative."

   a. "[R]esearch analysts, on 429 different occasions, solicited 328 transactions in the first 5 ½ months of this fiscal year."

   b. "Research was involved in 82% of all 'won business' solicitations."

   c. "Research was involved in 49% of 'lost business' solicitations."

   d. "Only 4.3% of all IBD 'lost business' was attributed to lack of research coverage."

   e. "IR [Investment Research] was involved in 31 mergers amounting to $56 billion. IR was involved in 209 financing transactions amounting to $83 billion."

   f. "In addition to financings, US IR was involved in a significant number of merger advisories, solicitations, and other transactions which have either not yet closed or were not captured [in the] database."

39. In connection with Research Alignment, members of the Investment Banking Division called "Sector Captains" were responsible for coordinating research coverage requests from investment banking, prioritizing research coverage, determining candidates for termination of coverage, and conveying that information to the Research Division. Sector Captains, as representatives of the investment banking division, worked directly with the Research Division on issues relating to candidates for coverage and timing of coverage.

## IV. GOLDMAN SACHS' PITCH MATERIALS CONTAINED DISCUSSIONS OF RESEARCH COVERAGE

40. During the relevant period, research coverage was an important factor many companies considered in selecting a firm for investment banking transactions. In some instances, the reputation of Goldman Sachs' analysts was a factor in winning investment banking business from certain issuers.

41. In competing for investment banking business, Goldman Sachs typically sent representatives to meet with prospective Issuers to discuss why the issuer should select Goldman Sachs as one of the investment bankers to participate in an offering. This meeting was commonly referred to in the securities industry as a "pitch." During the pitch, firm investment banking personnel would present their level of expertise in the company's sector and discuss Goldman Sachs's previous experience with similar companies, as well as their view of the company's merits and likelihood of success.

42. Some investment banking pitches included, among other things, discussion of the benefits the company would receive from Goldman Sachs' research coverage if the company selected Goldman Sachs as its banker. In preparation for each presentation, investment bankers, sometimes with research analyst input, prepared pitch materials including a "pitch book" which was distributed at the meeting. Some firm pitch materials implicitly suggested that Goldman Sachs would provide favorable research coverage after the investment banking transaction.

43. In an April 2000 e-mail, an investment banker wrote: "For next Wednesday's meeting, we have a challenge before us. We have been guided today by Loudcloud that we must show total focus and commitment from a RESEARCH perspective. [Loudcloud representative] strongly suggested that you guys come prepared to SELL.... HERE IS THE SUGGESTION: CAN YOU GUYS PREPARE A BRIEF (3-4 PG) RESEARCH REPORT ON LOUDCLOUD FOR THE MEETING. This is effectively our pitch.... This way we can say we are so excited about the story that we have already begun writing the report..." [emphasis in original]. In response, the analyst wrote: "I want to make this thing the best. WE WILL WIN THIS MANDATE." [Emphasis in original].

44. Pitch books typically contained reference to Goldman Sachs' research ratings for other companies covered by Goldman Sachs' analysts, and suggested that Goldman Sachs would continue to provide research coverage to the issuer after the investment banking transaction. The pitch books identified the analyst who would likely provide coverage by name, and provided information about that research analyst's background and reputation. In addition, some pitch books set forth information juxtaposing an analyst's positive comments about other companies in the same sector with the positive performance of the stock prices of those companies.

45. Some pitch books distributed by Goldman Sachs to potential clients included such factors as the number of lead-managed IPOs currently under research coverage, the average length of research reports, the number of days from the date of the transaction in which research was published, and the frequency that reports were issued.

46. For example, a pitch book included a list of the various ratings provided by the analyst on the companies he covered, and described the benefits the company would receive if it chose Goldman Sachs, including, "a [g]lobal sales effort led by analysts," and contained a diagram of the role of

analysts in an initial public offering.

47. The research analyst(s) who would likely provide coverage of the company after it went public sometimes worked with investment bankers to prepare Goldman Sachs's pitch presentation and, in some cases, attended the pitch meeting. The research analyst would on occasion make a presentation at the pitch in which the analyst typically discussed his/her view of the company and his/her understanding of the market's need for the company's product.

48. In July 2000, a pitch book for Crown Castle said "Goldman Sachs has been a constant bull on the tower sector" and stated the fact that "Goldman Sachs has placed Crown Castle on our Recommended List, our firm's highest investment rating."

49. A pitch book for the Willis Group stated: "[the analyst] has sold more stock than any research analyst in the sector."

50. The Business Unit Head of U.S. Telecommunications research was credited by a Goldman Sachs banker as the determining factor in winning an early 2000 IPO for Crosswave Communications: "[the analyst] was fully involved in pitching this and thanks to him, we received a sole book mandate with joint lead of MS." Moreover, the banker told other analysts: "your input will be critical to the success of this IPO."

51. An October 2000 pitch book for GeneProt explained the "[r]ole of investment research analyst," as "creating the story . . . marketing the story . . . [and] following the story."

## V. RESEARCH ANALYSTS WERE SUBJECT TO PRESSURES FROM COVERED COMPANIES AND INVESTMENT BANKING CONSIDERATIONS

52. Certain research analysts communicated regularly with employees of the companies that they covered, including executive and senior management of those companies. These communications occurred through telephone and e-mail exchanges, company-sponsored events, and analyst calls. As a result, research analysts were sometimes subject to pressure from companies they covered and investment banking considerations regarding their research. This conflict, between investment banking considerations and the publication of objective research, may have resulted in pressures on certain analysts, at times, to use language more favorable to the company or to avoid language which companies construed as negative in their research reports.

53. In an August 22, 2000 e-mail, copied to a research analyst, an investment banker writes: "[analysts] had a meeting with [WebEx] yesterday (which I attended part of). We discussed initiation strategy and decided that likely to initiate (probably MO, no price target) shortly with a note to be followed with a report by end of next week (given additional info from yesterday's meeting and desire to iterate a bit with the company). [WebEx] was more than happy with that approach as felt be beneficial to stock price to stagger good news."

54. Research analysts sometimes allowed covered companies to review drafts of research reports and comment on them. When a research analyst would downgrade or issue a negative comment on a company or sector, the analyst from time to time would receive direct and negative feedback from company management.

55. On February 23, 2001, a research analyst sent a draft of an Internet sector report to Investment banking for review. In the e-mail, the analyst states:

> I have drafted a note that highlights our concerns yet does not translate into the lowering of numbers for specific companies. Considerations include: 1) we believe that most of our cost back-end loaded 2001 numbers have to come down, 2) exds [Exodus] is a major offender of back-end loading, but to lower numbers right after selling equity @ $18.50 could be a problem. It would also be a problem to cut other company's numbers for aforementioned reasons and not exds [Exodus] 3) we have a deal in the market and negative commentary could be a problem or used against us by morgan stanley. Based on these considerations this note is as far as I think we can go and even this might be too aggressive from a perception standpoint.

56. After the report downgrading the sector was issued, one of Goldman Sachs's investment banking clients in the sector, Loudcloud, contacted Goldman Sachs via e-mail: "Are you trying to kill our offering? Or just issuing these reports blindly with no regard to consequences?" The analyst did not change the downgrade. However, the Goldman Sachs bankers and analysts involved apologized to Loudcloud management for not giving them a heads up about the sector downgrade and said that the analysts had been marketing the offering aggressively. The senior analyst also responded directly to Loudcloud management:

> I echo [banker's] apology on not giving you a heads up on these calls. Wanted to reassure you on two fronts: 1) Both [the other analyst] and I continue to view the LDCL [Loudcloud] offering in these difficult markets our highest priority, and remain committed to doing everything we can to get us to a successful outcome over the coming days and beyond. 2) We continue to use every opportunity, including client discussions of the macro environment to highlight LDCL's [Loudcloud's] short and long-term differentiation against a lot of the public models. ...Again, I want to stress that both [the other analyst] and I remain committed to the short and long-term success of Loudcloud.

57. The following communications between WebEx management and an analyst occurred in January 2001:

a. WebEx management wrote to an analyst: "As discussed, I want NO mention of any funding issues in this written report. I told you if people called and asked you why your plan shows a need for modest funding, you can verbally tell them that management believes they have adequate funding and it is probably because management has a less conservative plan than you do." [Emphasis in original.]

b. The analyst responded, with an attached revised report: "the webx [sic] funding issues is a key area of investor concern, as such will remove any mention from the top section of the note, but will address it in a manner this [sic] is consistent with your recommendation for verbal responses to client inquiries in a later section. To exclude it completely detracts from the intention of the note, which is to address key investor concerns upfront and then give them a reason to buy the stock."

c. WebEx management responded: "Thank you. This is much better. The other note said the company has a funding problem, but we think it isn't very big. This says that the company believes it has enough funds, but there could be a problem; and if there is it will be minor. Thanks again for the change." The research report was issued on January 22, 2001.

58. In April 2001, an analyst sent a draft research report to Global Crossing Ltd. in advance of public release of the report. She received "extensive comments" from Global Crossing officials. The analyst wrote her supervising analyst that she had included Global Crossing's extensive comments and "...I also said we had slightly smoothed the negative edge (emphasis section up front and text) from when they saw the report. I said we included throughout the piece technological cost benefit comments and in [sic] up front conclusion section. I also said we still think supply/demand balance is THE near term critical price determinant. I promised them I'd re-email the final report tonight so they could see our changes. Nonetheless, [Global Crossing official] still wants to talk to YOU life [sic] today if possible so that he knows his time was used well and so that `such an important industry report which is going to have profound implications will be to their liking---ALL YOURS [emphasis in original]."

# VI. IN CERTAIN INSTANCES, GOLDMAN SACHS PUBLISHED EXAGGERATED OR UNWARRANTED RESEARCH OR RATINGS

59. On several occasions, the conflicts of interest discussed above resulted in analysts publishing recommendations and/or ratings that were exaggerated or unwarranted, and/or contained opinions for which there was no reasonable basis. The following are examples of how these conflicts affected the research.

60. In August 2000, the Business Unit Leader for European Telecommunications research e-mailed his U.S. counterpart about the "anomalous situation where our sector has been tanking for 3-4 months and we globally still have a majority of stocks as R[ecommended] L[ist] as that is all the salesmen and clients care about." He suggested that his U.S. counterpart consider the approach taken by him: "In Europe, we have found that honour is preserved if we have a stock as an M[arket] O [utperformer] and the companies can't complain because its [sic] better than an M[arket] P[erformer]." In his response, the Business Unit Leader for U.S. Telecommunications research agreed, saying: "The plan we have in place now is that in early September we are going to re-rate most of the CLECs [competitive local exchange carriers], which is where the problem is the most egregious. The ratings were a residual from [a former research analyst], and I never changed them, not wanting to disrupt things too much. But it's ridiculous. I've already met with the bankers, and plan to

move most of the companies down to M[arket] O[utperformer], from R
[ecommended] L[ist] before [another analyst] takes over completely in
September. For the other segments the situation is not as bad, and where
there is a problem, investment banking considerations have prevented me
from making a change (i.e. AT&T, WCOM [Worldcom]). I don't think I would
end up leaving only 7.5% as R[ecommended] L[ist], but the present 68% is
ridiculous...."

61. In an April 27, 2001 e-mail, a research analyst wrote to a supervising
research analyst: "In light of the fact that it is clear that TSIX
[360Networks] is worth 0, do you think we should adjust our rating and
price target? How can we go about doing this?" The supervising analyst
responded: "Maybe the thing to do is to eliminate the price target. Maybe,
put out a note that says, having a price target in this kind of situation is
ludicrous...Changing the rating now is probably not a good idea, because
from an outsider's perspective, who doesn't know anything, it may look like
a belated ratings change. This happened last week to [an analyst],
although he had been appropriately negative on WCII [Winstar
Communications] all the way down, he belatedly dropped the rating from a
M[arket] P[erformer] to an M[arket] U[nderperformer], and cnbc picked it
up and made fun of him on the air."

62. In a March 26, 2000 e-mail with the heading "GBLX [Global Crossing]-I
think they are bullshitting us" an analyst stated that the company's revenue
guidance "does not make any sense....I think the answer is they wanted to
obscure something sucking cash flow out of the company...They are hiding
behind the complexity of their accounting."

63. In May 2001, WorldCom had Goldman Sachs' highest rating,
Recommended List. The Business Unit Leader for U.S. Telecommunications
research told his European counterpart that he "would have loved to have
cut ratings long ago. Unfortunately, we can't cut [AT&T], because we're
essentially restricted there. And without cutting [AT&T], there is no
consistency in cutting WCOM [WorldCom]."

64. Between July 1999 and July 2001, WorldCom had Goldman Sachs'
highest investment recommendation - inclusion on Goldman Sachs's
"Recommended List." Worldcom was downgraded to Market Outperformer
in July 2001. In April 2001, a hedge fund customer that had a very short-
term investment horizon asked the Business Unit Leader of U.S.
Telecommunications research: "wcom...buy sell or hold here at [$]20"? He
responded to the inquiry: "sell."

65. On June 21, 2001, an analyst downgraded the company Exodus from a
Recommended List rating to Market Outperformer. Both ratings have a time
horizon of the next 6 - 18 months. In his April 27, 2001 research report on
Exodus, the analyst discussed "heavy churn and low visibility given...the
current revenue run rate" and further stated that the "EBITDA forecast
looks challenging." In addition, that research report also stated the
following: "Fully Funded Plan. Despite our more conservative EBITDA
estimates for 2001 and 2002, we are confident that EXDS is funded to FCF
positive." Shortly before the downgrade, the analyst met with at least two
institutional investors who e-mailed the analyst after their meetings:

   a. An institutional investor wrote the analyst on June 21, 2001: "I

SEC v. compGoldman
Case 1:08-cv-02992-LMM    Document 1-2    Filed 03/24/2008    Page 21 of 63
Page 14 of 16

wanted to write a quick email to you to THANK you for your candor when you came into our offices and gave me your teach-in on the company. You gave me the unbiased view, told me the negatives I needed to know - - and basically gave me the ammo I needed to prevent my PM from buying the stock." [Emphasis in original.]

b. Another institutional investor wrote the analyst the same day: "I really appreciate your straight forward comments on EXDS [Exodus] during our conversation last week. Looks like our worst concerns were realized yesterday. Fortunately, we were able to get out of our last piece at around $5 and avoid the recent carnage in the shares. Still painful, but it could have been a lot worse. . . thanks."

66. In a sales force survey about this analyst, the writer commented: "His investment recommendations have been abysmal and while I understand he communicates what he really thinks to a sele[c]t few, his public ratings have been an embarrassment to the firm."

## VII. GOLDMAN SACHS FAILED TO ADEQUATELY SUPERVISE ITS RESEARCH AND INVESTMENT BANKING DIVISIONS

67. As set forth above, while one role of research analyst was to produce objective research, Goldman Sachs also encouraged some analysts to participate in investment banking-related activities. As a result of their participation in investment banking-related activities, those analysts were subject to investment banking influences and conflicts of interest between supporting investment banking business for the firm and publishing objective research.

68. Goldman Sachs had knowledge of these investment banking influences and conflicts of interest yet failed to manage them adequately to protect the objectivity of its published research.

69. Goldman Sachs failed to establish and maintain adequate policies, systems, and procedures reasonable designed to ensure the objectivity of its published research. Although Goldman Sachs had some policies governing research analyst activities during the relevant period, these policies were inadequate and did not address the conflicts of interest that existed.

### FIRST CLAIM FOR RELIEF

#### [Violation of NASD and NYSE Conduct Rules Due to Conflicts of Interest Resulting from Investment Banking Influence over Research Analysts]

70. Paragraphs 1-69 are realleged and incorporated by reference.

71. NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade.

72. NYSE Rule 401 states that "[e]very member, allied member and member organization shall at all times adhere to the principles of **good business practice** in the conduct of his or its business affairs."

73. NYSE Rule 476(a)(6) prohibits member organizations, among other things, from engaging in practices that constitute conduct inconsistent with just and equitable principles of trade.

74. During the relevant period, Goldman Sachs engaged in the acts and practices described above that created and/or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts. Goldman Sachs failed to manage these conflicts in an adequate or appropriate manner.

75. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rule 2110 and NYSE Rules 401 and 476(a)(6).

## SECOND CLAIM FOR RELIEF

### [Violation of NASD and NYSE Rules by Publishing Exaggerated or Unwarranted Research]

76. Paragraphs 1-69 and 71-73 are alleged and incorporated by reference herein.

77. NASD Rule 2210 and NYSE Rule 472 require members' communications with the public to be based on principles of fair dealing and good faith, provide a sound basis for evaluating facts, be properly balanced, and/or not contain exaggerated or unwarranted claims and/or opinions for which there was not reasonable basis.

78. As alleged above, in several instances Goldman Sachs issued certain research reports for companies that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about these companies, and/or contained opinions for which there was no reasonable basis.

79. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rules 2110, 2210(d)(1) and 2210(d)(2) and NYSE Rules 401, 472 and 476 (a)(6).

## THIRD CLAIM FOR RELIEF

### [Violation of NASD and NYSE Rules by Failing to Supervise]

80. Paragraphs 1-69 are alleged and incorporated by reference herein.

81. NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with" NASD's own Rules.

82. NYSE Rule 342 requires members, among other things, to maintain "appropriate supervisory control" over all business activities to ensure compliance with securities laws and regulations, including providing a "separate system of follow-up and review to determine that the delegated

authority and responsibility is being properly exercised."

83. Goldman Sachs failed to establish and maintain adequate procedures over research analysts to prevent or manage conflicts of interest.

84. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rule 3010 and NYSE Rule 342.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter final judgment:

a. Permanently restraining and enjoining defendant from violating NASD Conduct Rules 2110, 2210(d)(1), 2210(d)(2), and 3010, and NYSE Rules 342, 401, 472, and 476(a)(6);

b. Ordering defendant to account for and disgorge all proceeds it has obtained as a result of its conduct, plus prejudgment interest thereon;

c. Ordering defendant to pay civil money penalties; and

d. Ordering such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

| Of Counsel: | Kenneth L. Miller (KM 5614) |
|---|---|
| Yuri B. Zelinsky | Antonia Chion (AC 9522) |
| Kara Novaco Brockmeyer | James A. Meyers (JM 5231) |
| | SECURITIES AND EXCHANGE COMMISSION |
| Stacey M. Nahrwold | |
| | 450 Fifth Street, N.W. |
| | Washington, D.C. 20549-0911 |
| | (202) 942-4567 (Chion) |
| | (202) 942-9636 (Chion fax) |
| Date: April 28, 2003 | Attorneys for Plaintiff |

*http://www.sec.gov/litigation/complaints/comp18113.htm*



Home | Previous Page

U.S. Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| -against- | : Civil Action No. |
| GOLDMAN, SACHS & CO., | : |
| Defendant. | : |

### FINAL JUDGMENT AS TO DEFENDANT
### GOLDMAN, SACHS & CO.

Plaintiff Securities and Exchange Commission ("Commission") having filed a Complaint in this action ("Complaint") and Defendant Goldman, Sachs & Co. ("Defendant") having (a) entered a general appearance, (b) consented to the Court's jurisdiction over Defendant and the subject matter of this action, (c) consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction), (d) waived findings of fact and conclusions of law, and (e) waived any right to appeal from this Final Judgment; and the Commission having agreed that, on the basis of this Final Judgment, it will not institute a proceeding against Defendant pursuant to Sections 15(b), 15B, 15C, or 19(h) of the Securities Exchange Act of 1934 (the "Exchange Act");

#### I.
#### Injunctive Relief

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

A. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Rule 2110 of the Conduct Rules of NASD Inc. ("NASD") and Rules 401 and 476 of the New York Stock Exchange, Inc. ("NYSE"), by: (1) engaging in acts or practices that create or maintain inappropriate influence by investment banking over research analysts and therefore impose conflicts of interest on research analysts, and by failing to manage these conflicts in an adequate or appropriate manner; (2) publishing research reports that do not provide a

sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis; or (3) promising, implicitly or explicitly, favorable research coverage to investment banking clients or potential clients.

B. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 2210 and NYSE Rule 472 by issuing communications to the public that do not provide a sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis.

C. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 3010 and NYSE Rule 342 by failing to maintain appropriate supervisory procedures regarding or controls over the following that are reasonably designed to ensure compliance with securities laws and regulations: (1) influence by investment banking over research analysts; (2) compensation and evaluation of research analysts; (3) use of research or research analysts in connection with the solicitation or marketing of investment banking business; and (4) publication of research regarding a securities issuer with which Defendant has, has solicited, or is soliciting an investment banking relationship.

## II.
## Monetary Sanctions

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. As a result of the violations alleged in the Complaint, Defendant shall pay a total amount of $110,000,000 (which amount includes the State Settlement Offer, as defined below, and is subject to the decision of any state securities regulator(s) not to accept the State Settlement Offer). This amount includes:

1. $25,000,000, as a penalty;

2. $25,000,000, as disgorgement of commissions and other monies;

3. $50,000,000, to be used for the procurement of Independent Research, as described in Section VIII below and the undertakings set forth in Addendum A hereto; and

4. $10,000,000, to be used for investor education, as described in Section IX below.

No portion of the payments for Independent Research or investor education shall be considered disgorgement or restitution, and/or used for compensatory purposes.

B. The amount of $50,000,000, which is the sum of the penalty of $25,000,000 and disgorgement of $25,000,000, consists of (1) $25,000,000 in connection with the resolution of this action and related proceedings instituted by NASD and NYSE (the "Federal Payment"); and (2) $25,000,000 that Defendant has offered to pay in connection with the resolution of related proceedings by state securities regulators (which, for these purposes, shall include the District of Columbia and Puerto Rico) (Defendant's offer to the state securities regulators hereinafter shall be called the "State Settlement Offer"). Defendant shall pay the Federal Payment of $25,000,000 by wire transfer within ten business days of the entry of this Final Judgment to the Clerk of this Court, together with a cover letter identifying Goldman, Sachs & Co. as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made to the Court Registry Investment System ("CRIS") Distribution Fund Account pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of its payment and letter to the Clerk of the Court to the SEC's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. The Clerk shall deposit the funds into an interest bearing account with the CRIS, to be designated the "Distribution Fund Account." These funds, together with any interest and income earned thereon (collectively, the "Distribution Fund"), shall be held by the CRIS until further order of the Court. In the event that any portion of the penalty described in Section II.A.1 above is remitted for deposit into the Distribution Fund, such penalty amount shall be added to the Distribution Fund and distributed pursuant to the Fair Funds provisions in Section 308 of the Sarbanes-Oxley Act of 2002; provided, however, that the full penalty amount and such portion shall still be considered a penalty for tax and any other purposes. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Distribution Fund a fee equal to ten (10) percent of the income earned on the Distribution Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States. The Distribution Fund shall be managed in accordance with the terms of this Final Judgment and shall be distributed pursuant to this Final Judgment.

C. Defendant's obligation to make the Federal Payment is not contingent or dependent in any way or part on Defendant's payments to state securities regulators pursuant to the State Settlement Offer. The total amount to be paid by Defendant to state securities regulators pursuant to the State Settlement Offer (and the total amount of the sum of the penalties and disgorgement payable under Section II.A) may be reduced due to the decision of any state securities regulator(s) not to accept the State Settlement Offer. In the event a state securities regulator determines not to accept Defendant's State Settlement Offer, the total amount of the Federal Payment shall not be affected, and shall remain at $25,000,000. The total amount of penalties paid (1) in the Federal Payment ("$P_{Fed}$") and (2) pursuant to that portion of the State Settlement Offer that is accepted by the state securities regulators ("$P_{States}$") shall at all times equal the total amount of disgorgement paid (3) in the Federal Payment ("$D_{Fed}$") and (4) pursuant to that portion of the State Settlement Offer that is accepted by state securities regulators ("$D_{States}$"). Insofar as any amount paid to the state securities regulators pursuant to the State Settlement Offer is

deemed a penalty, the amount of the Federal Payment that is deemed a
penalty shall be adjusted so that $P_{Fed} + P_{States} = D_{Fed} + D_{States}$.

### III.
### Uses of the Distribution Fund

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Distribution
Fund is to be utilized as follows:

A. To pay any taxes on income earned by the Distribution Fund. The
Distribution Fund is intended to be a "qualified settlement fund" pursuant to
Section 468B(g) of the Internal Revenue Code and regulations thereunder.
The Distribution Fund Administrator appointed pursuant to Section IV.A
below of this Final Judgment is designated the administrator of the
Distribution Fund as defined in and for the purpose of Treas. Reg. §
1.468B-2(k)(3)(i), and shall satisfy the administrative requirements
imposed by Treas. Reg. § 1.468B-2 by, e.g., (1) obtaining a taxpayer
identification number; (2) timely filing applicable federal, state, and local
tax returns and paying taxes reported thereon; and (3) satisfying any
information reporting or withholding requirements imposed on distributions
from the Distribution Fund. Defendant shall provide the Distribution Fund
Administrator with relevant information and otherwise cooperate with the
Distribution Fund Administrator in fulfilling the Distribution Fund's
obligations under Treas. Reg. § 1.468B-2.

B. To pay Eligible Distribution Fund Recipients as described in Section V of
this Final Judgment.

C. Restrictions on Use of the Distribution Fund. The Distribution Fund shall
not be used directly or indirectly to pay:

1. Defendant, its predecessors, successors, and their subsidiaries, affiliates,
present or former officers, directors, and their employees, agents, assigns,
members of their immediate households, and those persons in active
concert or participation with them, through subrogation or otherwise.

2. With respect to any investment in its own securities, any issuer of
securities as to which the Distribution Fund Administrator determines that
an investment in such issuer's securities would otherwise provide a basis
for receipt of proceeds from the Distribution Fund and, with respect to such
securities, such issuer's (a) predecessors, successors, subsidiaries, and
affiliates; (b) present or former officers and directors and their agents,
assigns, and members of their immediate households; and (c) those
persons in active concert or participation with them, through subrogation or
otherwise.

3. Any person who has been convicted of a crime substantially related to
any act or practice, or the types of acts or practices, identified in the
Complaint.

4. Any person who has been enjoined by a court or sanctioned by the
Commission or any other regulatory authority for any act or practice, or the
types of acts or practices, identified in the Complaint.

5. Any person named as a defendant in a pending federal criminal or civil enforcement action for any act or practice, or the types of acts or practices, identified in the Complaint.

6. Any judgment or award of punitive or non-compensatory damages.

7. Any administrative fees, costs or expenses related to the Distribution Fund Plan described in this Final Judgment, other than the fee equal to ten percent of the income earned on the Distribution Fund as described in Section II.B above.

8. Any amount denominated as attorneys' fees, costs or disbursements.

## IV.
## Distribution Fund Administrator

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. As soon as is practicable, the Court shall appoint a Distribution Fund Administrator, whom the Commission shall recommend. Subject to the Court's approval, there shall be a single Distribution Fund Administrator with respect to this action and the other actions that the Commission has brought against other broker-dealer firms relating to, among other things, alleged research analyst conflicts of interest and that are identified in Addendum B attached hereto (the "Related Actions"). However, the Distribution Fund in this action shall be separate from the Distribution Funds established in those other actions. The Commission may request that additional actions that it brings against other broker-dealer firms or individuals relating to, among other things, alleged research conflicts of interest be added to the list of Related Actions.

B. Payment of Distribution Fund Administrator. Defendant shall pay all fees, costs, and expenses incurred by the Distribution Fund Administrator and approved by the Court in connection with and incidental to the performance of his duties under the Final Judgment, including the fees, costs, and expenses of any persons engaged to assist him and all administrative fees, costs, and expenses related to the Distribution Fund Plan described below. If the Court approves a single Distribution Fund Administrator for all the Related Actions, Defendant shall pay its proportional share of the payments to the Distribution Fund Administrator approved by the Court for all the Related Actions, such proportional share being the fraction equal to the amount deposited into this Distribution Fund by Defendant divided by the total amount deposited into all Distribution Funds established in connection with the Related Actions.

C. Responsibilities, Powers and Rights of the Distribution Fund Administrator. The Distribution Fund Administrator shall:

1. administer the Distribution Fund Plan described below in accordance with and subject to the conditions and limitations imposed by the terms of this Final Judgment;

2. distribute monies from the Distribution Fund to Eligible Distribution Fund Recipients, as approved by the Court;

3. file tax returns on behalf of the Distribution Fund;

4. submit written quarterly reports to the Court and the Commission commencing three months after entry of this Final Judgment; in such periodic reports, the Distribution Fund Administrator shall provide detailed information on the progress of the implementation of the Distribution Fund Plan described below, fees and expenses incurred, and other matters relevant to the status of the Distribution Fund;

5. submit on a quarterly basis requests to the Court, with copies to the Commission staff and Defendant, for payment by Defendant of his fees and expenses (including the fees and expenses of others retained by him as authorized by this Final Judgment) incurred during the quarterly period; the Commission and Defendant shall have the opportunity to comment on the Distribution Fund Administrator's requests within thirty (30) days after receipt thereof, and the Court shall, after taking into consideration the Commission's and Defendant's comments, order the amount that Defendant is to pay the Distribution Fund Administrator for the quarterly period and, if appropriate, the disposition of such amount by the Distribution Fund Administrator; Defendant shall pay such amount within thirty (30) days of the Court's order setting such amount; and

6. have all appropriate powers and authority to perform his duties as set forth in the Final Judgment including, without limitation, the following powers:

(a) to retain and engage such personnel as he deems necessary, including, without limitation, legal counsel, relevant experts, and other personnel to assist in the preparation or administration of the Distribution Fund Plan; and

(b) to delegate to such persons such duties as he deems appropriate.

D. The Distribution Fund Administrator, his agents, attorneys, and all persons acting on his behalf shall be held harmless against all liabilities, claims and demands, whether civil, criminal, administrative, or investigative arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that it is found that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

E. The Court may remove the Distribution Fund Administrator *sua sponte* or, for good cause shown, upon application of the Commission. If the Distribution Fund Administrator decides to resign, he shall first give sixty (60) days written notice to the Commission and the Court of his intention. Such resignation shall not become effective until the Court has appointed a successor. If the Distribution Fund Administrator is removed by the Court, becomes incapacitated due to illness or death, is otherwise unable to serve, or resigns, the Court shall appoint a successor recommended by the Commission.

F. The Distribution Fund Administrator is entitled to rely on all rules of law and court orders, and shall not be liable to anyone for his own good faith

compliance with any order, rule, law, judgment, or decree. Nor shall he be liable for complying with the orders of this Court. In no event shall he be liable to Defendant for his good faith compliance with his duties and responsibilities under this Final Judgment.

G. The Distribution Fund Administrator shall not enter into any employment, consulting, or attorney-client relationship with Defendant or any of its present or former parents, subsidiaries, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years from the completion of his engagement. Any firm with which the Distribution Fund Administrator is affiliated or of which he is a member and any person engaged to assist the Distribution Fund Administrator in the performance of his duties under this Final Judgment shall not, without the Commission's prior written consent, enter into any employment, consulting, or other professional relationship with Defendant or any of its present or former directors, officers, employees, or agents in their capacity as such for the period of the engagement and for three years after the completion of the engagement.

## V.
### Distribution Fund Plan

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. The Distribution Fund Administrator shall formulate and administer a Distribution Fund Plan in accordance with Sections V.B -- V.F below. The Distribution Fund Plan is intended to provide for the equitable, cost-effective distribution of funds to Eligible Distribution Fund Recipients, as described below. An Eligible Distribution Fund Recipient is not precluded from pursuing, to the extent otherwise available, any other remedy or recourse against Defendant.

B. The Distribution Fund Administrator shall formulate a Distribution Fund Plan that, to the extent practicable, allocates funds to persons who purchased the equity securities of companies referenced in the Complaint. The Distribution Fund Plan need not provide that funds be allocated (i) with respect to purchases of equity securities of *each* company identified in the Complaint or (ii) to *all* purchasers of equity securities of a company identified in the Complaint. The Distribution Fund Plan also may recognize that purchasers of equity securities of companies referenced in connection with one kind (or some kinds) of conduct by Defendant should receive all of the Distribution Fund available for distribution to Eligible Distribution Fund Recipients or a greater proportion than should purchasers of equity securities of companies referenced in connection with another kind (or other kinds) of conduct by Defendant. The Distribution Fund Administrator shall formulate a Distribution Fund Plan that attempts to ensure an equitable (but not necessarily equal) distribution of funds and that those who are allocated funds receive meaningful payments from the Distribution Fund.

C. In formulating the Distribution Fund Plan, the Distribution Fund Administrator shall apply the following criteria to identify Eligible Distribution Fund Recipients:

1. The person must have purchased the equity securities in question

through Defendant during the relevant period identified in the Complaint.

2. The person must have suffered a net loss on his equity securities purchases in question.

D. In formulating the Distribution Fund Plan, the Distribution Fund Administrator may also consider the following criteria in identifying Eligible Distribution Fund Recipients:

1. whether the person was a retail or institutional customer; and

2. the proximity in time between the person's purchase of a company's equity securities and Defendant's publication of the research in question regarding the company (as a threshold matter, however, the purchase must have been made after the publication or receipt of such research; assuming that threshold has been met, in general, the shorter the time period, the more likely the person suffered a loss as a result of conduct alleged in the Complaint).

E. If monies remain in the Distribution Fund after all distributions pursuant to the Distribution Fund Plan have been made, then such remaining monies shall be paid in accordance with a plan of residual distribution to be proposed by the Distribution Fund Administrator after consultation with Commission staff and, in his sole discretion, Defendant, and approved by the Court.

F. As soon as is practicable, and after any consultation with experts that the Distribution Fund Administrator believes is necessary or appropriate, but in no event more than six (6) months after being appointed by the Court, the Distribution Fund Administrator will provide the Commission staff and, in his sole discretion, Defendant for review and comment a Distribution Fund Plan, which shall, among other things, describe a process for (1) identifying and categorizing Eligible Distribution Fund Recipients in accordance with the considerations described above; (2) determining the amount of the Distribution Fund that each Eligible Distribution Fund Recipient shall receive; and (3) distributing the Distribution Fund to Eligible Distribution Fund Recipients. Sixty (60) days after the Distribution Fund Plan has been submitted to the Commission staff, the Distribution Fund Administrator shall present the Plan, with any revisions that the Distribution Fund Administrator deems appropriate, to the Court for its approval. In accordance with the Court's Order approving the Distribution Fund Plan, the Distribution Fund Administrator shall implement the Plan. Upon the completion of the process of identifying the Eligible Distribution Fund Recipients and determining the amount that each should receive, but in no event later than nine (9) months from the Court's approval of the Distribution Fund Plan, the Distribution Fund Administrator shall submit a Distribution Fund Report to the Commission staff and, in his sole discretion, Defendant. The Distribution Fund Report shall set forth (1) the identities of the Eligible Distribution Fund Recipients; (2) the amount of the Distribution Fund that each Eligible Distribution Fund Recipient shall receive; and (3) procedures for distributing the Distribution Fund to Eligible Distribution Fund Recipients. Seven (7) days after submission of the Distribution Fund Report to the Commission staff, the Distribution Fund Administrator shall present the Report to the Court for its approval. The Distribution Fund Administrator and/or the Commission may apply to the Court for extension

of any deadlines set forth above, in the Distribution Fund Plan, or in the Distribution Fund Report, and the Court may grant any such application for good cause shown.

## VI.
## Stay of Proceedings Against the Distribution Fund

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for the purposes of implementing and effectuating the Final Judgment, and upon a finding hereby made that a stay of any proceedings against the Distribution Fund Administrator and the Distribution Fund during the pendency or the existence of the Distribution Fund is necessary to effectuate the Final Judgment, all creditors or claimants of Defendant, and other persons acting on behalf of such creditors, claimants, or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, and attorneys, be and the same hereby are restrained and enjoined during the pendency or the existence of the Distribution Fund from: (1) commencing, prosecuting, continuing, or enforcing any suit or proceeding against the Distribution Fund Administrator or the Distribution Fund; (2) using self help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any monies deposited, or to be transferred, into the Distribution Fund or the Distribution Fund Administrator pursuant to the Final Judgment, wheresoever situated; and/or (3) doing any act or thing whatsoever to interfere with the taking control, possession, or management by the Distribution Fund Administrator of the monies that are or may be transferred to the Distribution Fund, or in any way to interfere with or harass said Distribution Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Distribution Fund.

## VII.
## Duties and Obligations of Defendant
## to the Distribution Fund Administrator

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, in addition to any other duties and obligations described in this Final Judgment:

A. Defendant shall upon request provide the following non-privileged documents, records, and information to the Distribution Fund Administrator: (1) research reports issued by Defendant during the relevant period identified in the Complaint; and (2) documents, records, and information relating to customers' equity securities transactions with or through Defendant, including but not limited to account statements, order tickets, confirmations, and related documents, records and information. Defendant shall also provide the Distribution Fund Administrator with such other documents, records, and information that the Court may order Defendant to provide upon motion by the Distribution Fund Administrator. Defendant shall cooperate in arranging for interviews of Defendant's employees to explain to the Distribution Fund Administrator and otherwise assist the Distribution Fund Administrator in understanding such documents, records, and information and the distribution of such reports. In addition, Defendant shall provide such other cooperation that the Court may order upon motion by the Distribution Fund Administrator. In

performing his duties pursuant to this Final Judgment, the Distribution Fund Administrator shall not make any determination whether any conduct by Defendant violated federal or state securities laws or NASD or NYSE rules or conduct any inquiry for the purpose of making any such determination.

B. Defendant shall take such actions as the Distribution Fund Administrator may require (including, but not limited to, providing any notices to any of Defendant's present or former customers that the Distribution Fund Administrator deems appropriate) to ensure proper implementation of the Distribution Fund Plan.

C. Defendant shall indemnify, defend, and hold harmless the Distribution Fund Administrator, his agents, and his attorneys from and against all liabilities, claims, and demands, whether civil, criminal, administrative, or investigative, judgments, fines, and amounts paid in settlement, and costs and expenses (including attorneys' fees), arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that the Court finds that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

## VIII.
### Financial Obligation Regarding Independent Research

A. As referenced in Section II.A.3 above, Defendant shall pay a total of $50,000,000 for its Independent Consultant to procure Independent Research from the Independent Research Providers over the five-year period set forth in Section III.1 of Addendum A hereto. This amount is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. As used herein, the terms "Independent Consultant," "Independent Research," and "Independent Research Providers" shall have the meanings set forth in Addendum A hereto. Defendant will not be required to spend more than the amount set forth in this Section VIII.A in order to procure Independent Research and will have no obligation to procure additional Independent Research if the Independent Consultant has spent the entire amount of Defendant's financial obligation with regard to Independent Research. Any money that is not spent after the five-year period set forth in Section III.1 of Addendum A hereto will not be retained by Defendant and will be paid one-half to NASD and one-half to NYSE for use in their regulation and enforcement programs.

B. Defendant shall also escrow $1,250,000 within thirty (30) days after entry of this Final Judgment to cover the fees and costs of the Independent Consultant. This obligation is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. In the event that such escrowed amount exceeds the fees and costs of the Independent Consultant, the excess will be returned to Defendant at the conclusion of the five-year period set forth in Section III.1 of Addendum A hereto.

## IX.
### Investor Education

A. Payments to the Investor Education Fund.

1. As referenced in Section II.A.4 above, Defendant shall pay a total amount of $10,000,000 to be used for investor education. Defendant shall pay this amount in five equal installments on an annual basis. Of this amount, $5,000,000 represents the amount Defendant has offered to pay for investor education in five equal annual installments pursuant to the State Settlement Offer. Defendant shall pay the remaining amount of $5,000,000 in five equal annual installment payments pursuant to the terms of this Final Judgment (the "Federal Investor Education Payments"). Defendant's obligation to make the Federal Investor Education Payments is not contingent or dependent in any way or part on Defendant's investor education payments pursuant to the State Settlement Offer. The amount of Defendant's investor education payments pursuant to the State Settlement Offer (and the total amount of $10,000,000 payable for investor education under Section II.A) may be reduced due to the decision of any state securities regulator(s) not to accept the State Settlement Offer. In the event a state securities regulator determines not to accept Defendant's State Settlement Offer, the total amount of Defendant's Federal Investor Education Payments shall not be affected, and shall remain at $5,000,000 to be paid in five equal installments on an annual basis.

2. Defendant shall make the first such installment payment within ninety (90) days after the entry of this Final Judgment by the Court. This payment shall be made by wire transfer to the Clerk of this Court, together with a cover letter identifying Goldman, Sachs & Co. as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made to the CRIS Investor Education Fund Account pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of its payment and letter to the Clerk of the Court to the SEC's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. The Clerk shall deposit the funds into an interest bearing account with the CRIS, to be designated the "Investor Education Fund Account." Any interest and income earned on funds in the Investor Education Fund Account shall be added to and become part of the Investor Education Fund Account. The Investor Education Fund Account shall be held by the CRIS until further order of the Court. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Investor Education Fund Account a fee equal to ten (10) percent of the income earned on the Investor Education Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States. The Investor Education Fund Account shall be administered in accordance with the terms of the Investor Education Plan to be approved by this Court as provided for in this Final Judgment.

3. Defendant shall make subsequent installment payments annually on or before the month and day of the entry of this Final Judgment. Such payments shall be made into the Investor Education Fund by the means to be specified in the Investor Education Plan or in a further order of this Court.

B. Purpose of and Limitations on the Use of the Investor Education Fund.

1. The Investor Education Fund (including all installment payments) shall

Final Judgment: Goldman, Sachs & Co.

be used to support programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions, according to the terms of this Final Judgment and the Investor Education Plan described below.

2. The Investor Education Fund, and any grants awarded from the Investor Education Fund, shall not be used:

(a) to benefit, directly or indirectly:

(i) beyond the payment of his fees and expenses, the Investor Education Fund Administrator (described below) or any person involved in the review or approval of applications for grants from the Investor Education Fund; any entity that employs such a person; any entity that has contributed to the Investor Education Fund; or any entity affiliated with any such contributor;

(ii) Defendant, its predecessors, successors, or their subsidiaries, affiliates, present or former officers, directors, or their employees, agents, assigns, members of their immediate households, or those persons in active concert or participation with them, through subrogation or otherwise;

(iii) any person who has been convicted of a crime substantially related to any act or practice, or the types of acts or practices, identified in the Complaint;

(iv) any person who has been enjoined by a court or sanctioned by the Commission or any other regulatory authority for any act or practice, or the types of acts or practices, identified in the Complaint; or

(v) any person named as a defendant in a pending federal criminal or civil enforcement action for any act or practice, or the types of acts or practices, identified in the Complaint;

(b) to promote, directly or indirectly, the products or services of any single firm or entity;

(c) for any unlawful or unethical purpose; or

(d) for any non-educational purpose.

3. Monies in the Investor Education Fund may also be used to pay any taxes on income earned by such Fund. The Investor Education Fund is intended to be a "qualified settlement fund" pursuant to Section 468B(g) of the Internal Revenue Code and regulations thereunder. The Investor Education Fund Administrator (described below) is designated the administrator of such Fund as defined in and for the purpose of Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2 by, e.g., (1) obtaining a taxpayer identification number; (2) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon; and (3) satisfying any information reporting or withholding requirements imposed on distributions from such Fund. Defendant shall provide the Investor Education Fund Administrator with relevant information and otherwise cooperate with the

Investor Education Fund Administrator in fulfilling such Fund's obligations under Treas. Reg. § 1.468B-2.

C. Appointment and Payment of the Investor Education Fund Administrator.

1. As soon as is practicable, the Court shall appoint an Investor Education Fund Administrator, whom the Commission shall recommend. Subject to the Court's approval, there shall be a single Investor Education Fund Administrator with respect to this action and the Related Actions. However, the Investor Education Fund in this action shall be separate from the Investor Education Funds established in those other actions.

2. All fees, costs, and expenses incurred by the Investor Education Fund Administrator and approved by the Court in connection with and incidental to the performance of his duties under the Final Judgment, including the fees, costs, and expenses of any persons engaged to assist him and all administrative fees, costs, and expenses related to the Investor Education Plan described below, shall be paid out of the Investor Education Fund in this Action and/or the Related Actions.

D. Responsibilities, Powers and Rights of the Investor Education Fund Administrator.

1. The Investor Education Fund Administrator shall:

(a) propose and administer the Investor Education Plan described below in accordance with and subject to the conditions and limitations imposed by the terms of this Final Judgment;

(b) distribute monies from the Investor Education Fund pursuant to the Investor Education Plan;

(c) file all required tax returns on behalf of the Investor Education Fund;

(d) commencing one year after entry of this Final Judgment and continuing through the life of the Investment Education Fund, submit written annual reports to the Court and the Commission providing detailed information on the progress of the implementation of the Investor Education Fund (including a description of all grant applications received and all grants approved), fees and expenses incurred, and other matters relevant to the status of the Investor Education Fund; and

(e) file with the Court on a quarterly basis, with copies to the Commission staff, applications for payment of his fees and expenses (including the fees and expenses of others retained by him as authorized by this Final Judgment) incurred during the quarterly period. At least thirty (30) days before making each such application to the Court, the Investor Education Fund Administrator shall submit the application to the Commission staff, and the Commission may advise the Court whether it has any objection. Upon approval of any such application by the Court, the Clerk of the Court shall pay the approved amounts to the Investment Education Fund Administrator and to those employed by him from the CRIS Investment Education Fund Account or, if applicable, the Investor Education Fund Administrator may pay the approved amounts to himself and to those

employed by him from the Investor Education Fund.

2. The Investment Education Fund Administrator shall have all appropriate powers and authority to perform his duties as set forth in this Final Judgment including, without limitation, the following powers:

(a) to retain and engage such personnel as he deems necessary, including, without limitation, legal counsel, relevant experts, and other personnel to assist in the preparation and administration of the Investor Education Plan; and

(b) to delegate to such persons such duties as he deems appropriate.

3. The Investor Education Fund Administrator, his agents, attorneys and all persons acting on his behalf shall be held harmless against all liabilities, claims and demands, whether civil, criminal, administrative, or investigative arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that it is found that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

4. Defendant shall indemnify, defend, and hold harmless the Investment Education Fund Administrator, his agents, and his attorneys from and against all liabilities, claims, and demands, whether civil, criminal, administrative, or investigative, judgments, fines, and amounts paid in settlement, and costs and expenses (including attorneys' fees), arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that the Court finds that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

5. The Court may remove the Investor Education Fund Administrator *sua sponte* or, for good cause shown, upon application of the Commission. If the Investor Education Fund Administrator decides to resign, he shall first give sixty (60) days written notice to the Commission and the Court of his intention. Such resignation shall not become effective until the Court has appointed a successor. If the Investor Education Fund Administrator is removed by the Court, becomes incapacitated due to illness or death, is otherwise unable to serve, or resigns, the Court shall appoint a successor recommended by the Commission.

6. The Investor Education Fund Administrator is entitled to rely on all rules of law and court orders, and shall not be liable to anyone for his own good faith compliance with any order, rule, law, judgment, or decree. Nor shall he be liable for complying with the orders of this Court. In no event shall he be liable to Defendant for his good faith compliance with his duties and responsibilities under this Final Judgment.

7. The Investor Education Fund Administrator shall not enter into any employment, consulting, or attorney-client relationship with Defendant, or any of its present or former parents, subsidiaries, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years from the completion of his

Final Judgment: Goldman, Sachs & Co.

engagement. Any firm with which the Investor Education Fund Administrator is affiliated or of which he is a member and any person engaged to assist the Investor Education Fund Administrator in the performance of his duties under this Final Judgment shall not, without the Commission's prior written consent, enter into any employment, consulting or other professional relationship with Defendant, or any of its present or former directors, officers, employees, or agents in their capacity as such for the period of the engagement and for three years after the completion of the engagement.

F. The Investor Education Plan.

1. As soon as is practicable, but in no event more than sixty (60) days after being appointed by the Court, the Investor Education Fund Administrator shall provide the Commission staff for its review and comment an Investor Education Plan.

2. The Investor Education Plan shall establish and describe a non-profit grant administration program to fund worthy and cost-efficient programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions. The Investor Education Plan shall state the means by which Defendant shall make all remaining installment payments required by this Final Judgment; may authorize the transfer of the funds in the CRIS Investor Education Fund accounts in this action and in the Related Actions to one or more interest-bearing accounts opened and maintained by the Investor Education Fund Administrator; shall include all provisions necessary to implement the Investor Education Plan; and shall be consistent in all respects with the terms of this Final Judgment.

3. Thirty (30) days after the Investor Education Plan has been submitted to the Commission staff, the Investor Education Fund Administrator shall present such Plan, with any revisions that he deems appropriate, to the Court for its approval. The Investor Education Fund Administrator shall promptly begin to implement such Plan after it has been approved by the Court.

F. Stay of Proceedings. For the purposes of implementing and effectuating the Final Judgment, and upon a finding hereby made that a stay of any proceedings against the Investor Education Fund Administrator and the Investor Education Fund during the pendency or the existence of such Fund is necessary to effectuate the Final Judgment, all creditors or claimants of Defendant, and other persons acting on behalf of such creditors, claimants, or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, and attorneys, be and the same hereby are restrained and enjoined during the pendency or the existence of the Investor Education Fund from: (1) commencing, prosecuting, continuing, or enforcing any suit or proceeding against the Investor Education Fund Administrator or the Investor Education Fund; (2) using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property owned by or in the possession of or to be transferred to the Investor Education Fund or the Investor Education Fund Administrator pursuant to the Final Judgment, wheresoever situated; and/or (3) doing any act or thing whatsoever to

Case 1:08-cv-02992-LMM    Document 1-2    Filed 03/24/2008    Page 39 of 63
Final Judgment; Goldman, Sachs & Co.

Page 16 of 17

interfere with the taking control, possession, or management by the Investor Education Fund Administrator, of the monies that are or may be transferred to the Investor Education Fund, or in any way to interfere with or harass said Investor Education Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Investor Education Fund.

## X.
## Standing

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, notwithstanding any rule or provision of law, nothing herein, including in the Addenda hereto, shall be deemed to confer standing or right of intervention upon any persons other than the Commission, Defendant, and the Distribution Fund Administrator.

## XI.
## Record Retention and Non-Destruction Requirement

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for a period of five years from the effective date of this Final Judgment or such shorter or longer period as the Court may order, Defendant, its officers, directors, agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, are hereby enjoined from destroying, mutilating, concealing, altering, or disposing of (a) any research distributed by Defendant during the relevant period identified in the Complaint; (b) documents sufficient to identify all customers who bought or sold equity securities of the issuers as to which Defendant issued research during the relevant period identified in the Complaint (the "Transactions"), including but not limited to documents sufficient to identify the dates, amounts, and prices of the Transactions; (c) documents sufficient to identify which customers received which research distributed by Defendant during the relevant period identified in the Complaint; (d) order entry information sufficient to identify whether the Transactions were solicited by Defendant; (e) documents sufficient to identify the publicly-traded companies for which Defendant sought to provide, was engaged to provide, or did provide investment banking services during the relevant period identified in the Complaint; and (f) any and all written (including electronic) communication, including communications to and from customers and intra-firm communications, relating to Defendant's investment banking and equity research operations during the relevant period identified in the Complaint; *provided, however*, that Defendant need not retain duplicate identical copies of public documents filed with the Commission or any other regulatory authority.

## XII.
## Defendant's Consent Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and Defendant shall comply with all of the undertakings and agreements set forth therein.

## XIII.
## Attached Undertakings Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant shall comply with the undertakings set forth in Addendum A hereto. Such undertakings and Addendum A are incorporated herein with the same force and effect as if fully set forth herein.

## XIV.
## Definition of Defendant

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that with respect to all injunctive relief and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions, the terms "Defendant" and "Defendant's" as used herein shall include Defendant's successors and assigns (which, for these purposes, shall include a successor or assign to Defendant's investment banking and research operations, and in the case of an affiliate of Defendant, a successor or assign to Defendant's investment banking or research operations).

## XV.
## Court to Retain Jurisdiction

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## XVI.
## Entry of Judgment Forthwith

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, there being no just cause for delay, the Clerk of the Court shall, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, enter this Judgment forthwith and without further notice.

Dated: New York, New York

_____, 2003

_____  _____

UNITED STATES DISTRICT JUDGE

http://www.sec.gov/litigation/litreleases/judg18113.htm

Home | Previous Page                                    Modified: 04/28/2003

==========-- .-=============---- .-=============--- .-=========
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
------------ -------------------- ------------------. ------
1          No.    61
EBC I, Inc., &c .,
                    Respondent,
              v.
Goldman Sachs & Co.,
                    Appellant.

          John L. Warden, for appellant.
          Stanley M. Grossman, for respondent.
          Securities Industry Association, amicus curiae.

CIPARICK, J.:

          Plaintiff, the Official Committee of Unsecured

Creditors of EBC I., Inc., formerly known as eToys, Inc., brought

this action against defendant Goldman, Sachs & Co., the lead

managing underwriter of its initial public stock offering,

alleging five causes of action related to the underwriting

- 1

- 2 -                                          No. 61

agreement: breach of fiduciary duty, breach of contract, fraud,
professional malpractice and unjust enrichment.  We hold that
plaintiff's complaint fails to state claims for breach of
contract, professional malpractice and unjust enrichment.  We
therefore modify the Appellate Division order to dismiss these
claims and, as modified, affirm to allow the fiduciary duty cause
of action to proceed.  Leave to replead the fraud cause of action
was correctly granted;  plaintiff has filed an amended complaint,
but the sufficiency of that pleading is not before us on this
appeal.

                              I.

              This case involves the underwriting process by which
investment banks help take securities to the market in an initial
public offering (IPO).  Companies may decide to make such an
offering for several reasons, including a desire to raise new
capital and to create a public market for their shares
(see Thomas Lee Hazen, The Law of Securities Regulations § 3.1
[2] [5th ed]; see also Larry D. Soderquist, Understanding the
Securities Law  § 2:2 et seq. [Prasticing Law Institute 4th ed]).
A "firm commitment underwriting," at issue here, typically
involves an agreement whereby the "issuer" -- or company seeking
to issue the security (see Securities Act of 1933 § 2 [15 USC §
77b (a) (4)]) -- sells an entire allotment of shares to an
investment firm who purchases the shares with a view to sell them
to the public (see Securities Act of 1933 § 2 [15 USC § 77b (a)

                              2  -

- 3 -                                          No. 61

(11)] [defining an "underwriter"]; see also Hazen, The Law of
Securities Regulations at § 2.1 [2] [B]; Louis Loss and Joel
Seligman, Securities Regulations § 2-A [3d ed]).

            As underwriter, the functions of the investment firm
include negotiating an initial public offering price for the
securities with the issuer, purchasing the securities from the
issuer at a discount and reselling them on the market at the
public offering price.  The difference or "spread" between the
amount the underwriter pays for the securities and the price at
which the securities are sold to the public makes up the
underwriter's compensation for its services.  Because in a firm
commitment underwriting the underwriter owns, and is obligated to
pay the issuer for the securities regardless of whether it can
resell them, it may assemble a group of underwriters, known as a
syndicate, to help absorb the risk.[1]

            As stated in plaintiff's complaint, in the late 1990's,
eToys, Inc., an internet-retailer specializing in the sale of
products for children, sought to go public in order to obtain
financing necessary to further implement its business plan.  In
January 1999, eToys retained Goldman Sachs as lead managing

_____

        [1] see William J. Grant, Jr., Overview of the Underwriting
Process, Securities Underwriting:  A Practitioner's Guide, at 25
45 [Bialkin and Grant eds. 1985]; John S. D'Alimonte, The Letter
of Intent and the Basic Structure of An Offering, supra at 85-98;
David B. Rea and William J. Grant, The Syndication and Marketing
Process, supra at 277-291; Samuel N. Allen, A Lawyer's Guide to
the Operation of Underwriting Syndicates, 26 New Eng L Rev 319,
320-321 [1991]).

                        - 3 -

- 4 -                          No. 61

underwriter of its initial public offering.[2]

Within the context of its engagement, Goldman Sachs met with potential investors, responded to inquiries about eToys' business and gauged investors' indications of interest in eToys' shares. On April 19, 1999, eToys and Goldman Sachs finalized the underwriting agreement. eToys agreed to sell 8,320,000 shares of its stock to Goldman Sachs and the other underwriters for $18.65 per share with the option to buy an additional 1,248,000 shares at the same price to cover overallotments. The agreement also provided that Goldman Sachs would offer the shares for public sale upon the terms and conditions set forth in the Prospectus, which fixed the initial offering price at $20 per share. Thus, Goldman Sachs's potential profit was $1.35 per share or 6.75 % of the offering proceeds. Goldman Sachs was to receive a total of at most $12,916,800 from the sale.

On May 20, 1999, the first day of trading, the stock opened at $79 per share, rose as high as $85 per share and closed at $76.56. By the end of the year, however, the stock closed at $25. Soon thereafter, it fell below $20 and never rose above the initial offering price. Eventually, in March 2001, eToys filed a

_____

[2] Three other co-managing underwriters were BancBoston Robertson Stephens Inc., Donaldson, Lufkin & Jenrette Securities Corp., and Merrill Lynch, Pierce, Fenner & Smith, Inc., who formed the underwriting syndicate, later joined by additional firms. Plaintiff has filed a separate action against the other syndicate underwriters alleging substantially the same claims as here.

- 4 -

- 5 -                                             No. 61

voluntary petition for reorganization under Chapter 11 of the
United States Bankruptcy Code in the District of Delaware.  The
Bankruptcy Court appointed the Official Committee of Unsecured
Creditors and authorized the Committee to bring this action on
behalf of eToys, now known as EBC I, Inc.

The complaint alleges that eToys relied on Goldman
Sachs for its expertise as to pricing the IPO, and that Goldman
Sachs gave advice to eToys without disclosing that it had a
conflict of interest.  Specifically, the complaint alleges that
Goldman Sachs entered into arrangements "where-by its customers
were obligated to kick back to Goldman a portion of any profits
that they made" from the sale of eToys securities subsequent to
the initial public offering.  Because a lower IPO price would
result in a higher profit to these clients upon the resale of the
securities and thus a higher payment to Goldman Sachs for the
allotment, plaintiff alleges Goldman Sachs had an incentive to
advise eToys to underprice its stock.  As a result of this
undisclosed scheme, Goldman Sachs was allegedly paid 20-40% of
the clients' profits from trading the eToys securities.

Relying on these allegations, plaintiff brought five
causes of action against Goldman Sachs: breach of fiduciary duty
(first), breach of contract (second), fraud (third), professional
malpractice (fourth) and unjust enrichment (fifth).[3]  In

---

[3]  Plaintiff also claimed additional damages incurred by
eToys as a result of Goldman Sachs's misconduct causing the
failure of the business and its eventual bankruptcy.  The

- 6 -                                          No. 61

response, Goldman Sachs moved to dismiss the complaint in its
entirety for failure to state any cause of action.

Supreme Court in two orders (one denominated Judgment)
granted the motion to the extent of dismissing the second, third
(with leave to replead), fourth and fifth causes of action.  The
court denied that part of the motion seeking to dismiss the first
cause of action for breach of fiduciary duty, finding that
"[a]lthough the contract did not establish a formal fiduciary
relationship . . . the pleading sufficiently raises an issue as
the existence of an informal one," and noting that Goldman Sachs
had also advised eToys in connection with a preferred stock
offering.

The Appellate Division modified the initial order of
Supreme Court, opining that the breach of fiduciary duty claim
was correctly sustained upon allegations showing a preexisting
relationship between eToys, Inc. and Goldman Sachs that justified
eToys' alleged trust in pricing the shares.  The court further
held that the trial court properly dismissed the fraud cause of
action with leave to replead, reasoning that plaintiff did not
allege with sufficient particularity who made the purported
misrepresentations to eToys, Inc.  The Appellate Division,
however, disagreed with the Supreme Court as to the breach of
contract, professional malpractice and unjust enrichment causes

Appellate Division ruled that the "proximate cause of the damages
claimed is an issue of fact inappropriate for determination at
this juncture" (7 AD3d 418, 421).  We agree.

6 -

- 7 -                                     No. 61

of action, reinstating all three.

Goldman Sachs appeals by leave of the Appellate
Division on a certified question. We now modify the order of the
Appellate Division by dismissing the second, fourth and fifth
causes of action. We agree with the trial court and Appellate
Division that the pleading of the fiduciary duty claim is
sufficient and that leave to replead the fraud claim was proper.

II.

In the context of a motion to dismiss pursuant to CPLR
3211, the court must afford the pleadings a liberal construction,
take the allegations of the complaint as true and provide
plaintiff the benefit of every possible inference (see Goshen v
Mut. Life Ins. Co. of New York, 98 NY2d 314, 326 [2002]).
Whether a plaintiff can ultimately establish its allegations is
not part of the calculus in determining a motion to dismiss.
Applying this standard, we conclude that plaintiff's allegations
of breach of fiduciary duty survive Goldman Sach's motion to
dismiss.

A fiduciary relationship "exists between two persons
when one of them is under a duty to act for or to give advice for
the benefit of another upon matters within the scope of the
relation" (Restatement [Second] of Torts § 874, Comment a). Such
a relationship, necessarily fact-specific, is grounded in a
higher level of trust than normally present in the marketplace
between those involved in arms-length business transactions (see

- 8 -                                          No. 61

Northeast Gen. Corp. v Wellington Adv., Inc., 82 NY2d 158, 162
[1993]).  Generally, where parties have entered into a contract,
courts look to that agreement "to discover . . . the nexus of
[the parties] relationship and the particular contractual
expression establishing the parties' interdependency" (see id. at
163).  "If the parties . . . do not create their own relationship
of higher trust, courts should not ordinarily transport them to
the higher realm of relationship and fashion the stricter duty
for them" (id. at 162).  However, it is fundamental that
fiduciary "liability is not dependent solely upon an agreement or
contractual relation between the fiduciary and the beneficiary
but results from the relation" (Restatement [Second] of Torts
874, Comment b).

          Goldman Sachs argues that the relationship between an
issuer and underwriter is an arms-length commercial relation from
which fiduciary duties may not arise.  It may well be true that
the underwriting contract, in which Goldman Sachs agreed to buy
shares and resell them, did not in itself create any fiduciary
duty.  However, a cause of action for breach of fiduciary duty
may survive, for pleading purposes, where the complaining party
sets forth allegations that, apart from the terms of the
contract, the underwriter and issuer created a relationship of
higher trust than would arise from the underwriting agreement
alone.

          Here, the complaint alleges an advisory relationship

                              8 -

- 9 -                                            No. 61

that was independent of the underwriting agreement.
Specifically, plaintiff alleges eToys was induced to and did
repose confidence in Goldman Sachs's knowledge and expertise to
advise it as to a fair IPO price and engage in honest dealings
with eToy's best interest in mind.  Essentially, according to the
complaint, eToys hired Goldman Sachs to give it advice for the
benefit of the company, and Goldman Sachs thereby had a fiduciary
obligation to disclose any conflict of interest concerning the
pricing of the IPO.  Goldman Sachs breached this duty by
allegedly concealing from eToys its divided loyalty arising from
its profit-sharing arrangements with clients.

        Contrary to Goldman Sachs's contention, recognition of
a fiduciary duty to this limited extent -- requiring disclosure
of Goldman Sachs's compensation arrangements with its customers -
- is not in conflict with an underwriter's general duty to
investors under the Securities Act of 1933 to exercise due
diligence in the preparation of a registration statement.[4]  An
obligation not to conceal from the issuer private arrangements
made with a group of potential investors does not compromise
Goldman Sachs's charge to be truthful in its public disclosure

_____

[4] The underwriter's responsibility with regard to a registration
statement is to provide full and adequate information to investors concerning
the distribution of the securities and the issuing company (see Securities Act
of 1933
§ 7 (15 USC § 77g) (providing in part that any registration statement shall
contain information and documents "necessary or appropriate in the public
interest or for the protection of investors"]; see also id. at Sched. A (15
USC § 77aa) [schedule of information requested in registration statement.]; id.
at § 11 (15 USC 77k) [establishing civil liability on account of false
registration statement]).

- 9 -

- 10 -                                                    No. 61

regarding the issuer's business.  For similar reasons, we do not
share the dissent's concern that upholding an issuer's fiduciary
duty claim against an underwriter "potentially conflicts with a
highly complex regulatory framework designed to safeguard
investors" (dissenting op. at 2).  Recognizing a common law
remedy, under these circumstances, will not hinder the efforts
being expended to regulate in this area.

        Goldman Sachs's additional argument that there could be
no fiduciary duty in this case because eToys and Goldman Sachs
functioned as a typical seller and buyer is also unavailing.
Generally, a buyer purchases a seller's goods at a wholesale
price and attempts to resell those goods at the highest possible
profit.  Such a transaction would negate any fiduciary duty
concerning pricing advice as no rational seller would place trust
in a buyer's pricing given the parties' opposing interests.
Here, in contrast, Goldman Sachs and eToys allegedly agreed to a
fixed profit from the selling of the securities -- Goldman Sachs
was to receive about 7% of the offering proceeds.   Thus eToys
allegedly believed its interests and those of Goldman Sachs were
aligned:  the higher the price, the higher Goldman Sachs's 7%
profit.  Consequently, eToys allegedly had a further reason to
trust that Goldman Sachs would act in eToys interest when
advising eToys on the IPO price.

        Goldman Sachs warns that to find a fiduciary
relationship in this case may have a significant impact on the

- 10 -

underwriting industry. We think its concern is overstated. To the
extent that underwriters function, among other things, as expert
advisors to their clients on market conditions, a fiduciary duty
may exist. We stress, however, that the fiduciary duty we
recognize is limited to the underwriter's role as advisor. We do
not suggest that underwriters are fiduciaries when they are
engaged in activities other than rendering expert advice. When
they do render such advice, the requirement to disclose to the
issuers any material conflicts of interest that render the advice
suspect should not burden them unduly.

    Accepting the complaint's allegations as true, as the
Court must at this stage, plaintiff has sufficiently stated a
claim for breach of fiduciary duty.  This holding is not at odds
with the general rule that fiduciary obligations do not exist
between commercial parties operating at arms' length -- even
sophisticated counseled parties -- and we intend no damage to
that principle.  Under the complaint here, however, the parties
are alleged to have created their own relationship of higher
trust beyond that which arises from the underwriting agreement
alone, which required Goldman Sachs to deal honestly with eToys
and disclose its conflict of interest -- the alleged profit-
sharing arrangement with prospective investors in the IPO.[1]

_____

[1]  Other jurisdictions interpreting New York law have allowed similar
pleadings to go forward and have held that the question of whether an
underwriter had fiduciary obligations to the issuer of an IPO is a fact
specific determination to be made by the fact-finder (see Breakaway Solutions,
Inc. v Morgan Stanley & Co., Inc., 2004 WL 1949300, 2004 Del. Ch. LEXIS 125

- 12 -                                No. 61

### III.

Moving next to plaintiff's other causes of action, we hold that the courts below properly dismissed the claim for breach of contract in the absence of an allegation that Goldman Sachs breached any provisions of the underwriting agreement. It is undisputed that Goldman Sachs fulfilled its commitments as set forth in the parties' contract, purchasing all of the available shares at a total of $178.4 million paid to eToys and reselling them to the public at the initial offering price of $20.00 per share.

Relatedly, plaintiff has also failed to plead a cause of action for breach of an implied covenant of good faith and fair dealing sufficient to survive dismissal under CPLR 3211. The complaint does not adequately allege that Goldman Sachs injured eToys's right to receive the benefits of their agreement (see 511 West 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002]; see also Dalton v Educational Testing Serv., 87 NY2d 384, 389-390 [1995]). As stated in the Prospectus, the principal purposes of the public offering were to increase working capital, to create a public market for the common stock, to facilitate future access to public markets, and to increase eToys's visibility in the retail marketplace. There is no dispute that the contractual objectives were achieved as a result

[Aug. 27, 2004 ; Xpedior Creditor Trust v Credit Suisse First Boston (USA), Inc., 341 F Supp 2d 258 [US Dist Ct, SD NY 2004]; MKM Holdings, Inc. v Credit Suisse First Boston Corp., 216 F Supp 2d 251 [US Dist Ct, SD NY 2002 ].

- 13 -                                                    No. 61

of Goldman Sachs's underwriting services, and the complaint fails
to allege otherwise.

Because this case arises from defendant's appeal, the
issue with respect to plaintiff's fraud claim is limited to
whether the courts below abused their discretion in granting
plaintiff leave to replead.  We find no abuse of discretion as
plaintiff's allegations, if accompanied by sufficient detail,
would be adequate to support a fraud claim at this juncture (see
Lama Holding Co. v Smith Barney, Inc., 88 NY2d 413, 421 [1996];
see also CPC Intl., Inc. v McKesson Corp., 70 NY2d 268, 285
[1987]).

Next is the cause of action for professional
malpractice.  The essence of plaintiff's allegations in this
regard is that Goldman Sachs engaged in intentional misconduct by
underpricing its shares, not that the investment firm acted
negligently in failing to exercise a particular level of skill.
Thus, we hold that the malpractice claim was properly dismissed
as insufficiently pleaded and leave open the question whether a
financial advisor or underwriter may ever be treated as a
professional for purposes of such liability (see Chase Scientific
Research, Inc. v NIA Group, Inc., 96 NY2d 20, 29-30 [2001]).

Lastly, plaintiff fails to state a cause of action for
unjust enrichment as the existence of a valid contract governing
the subject matter generally precludes recovery in quasi contract
for events arising out of the same subject matter (see Clark

- 14 -                                   No. 61

Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 387 [1987]).

Accordingly, the order of the Appellate Division should be modified, without costs, by dismissing the second, fourth and fifth causes of action and as so modified, affirmed. The certified question should be answered in the negative.

EBC I, Inc. v Goldman Sachs

No. 61

READ, J. (dissenting in part):

The majority today holds that the lead managing underwriter in a firm commitment underwriting owes a fiduciary duty to the issuer to disclose conflicts of interest in connection with the pricing of securities.  This new fiduciary obligation wars against our precedent and potentially conflicts

- 1 -

with a highly complex regulatory framework designed to safeguard
investors.  I therefore respectfully dissent.

      "Unless statutory language or public policy dictates
otherwise, the terms of a written agreement define the rights and
obligations of the parties" (Abiele Contr. v New York City School
Constr. Auth., 91 NY2d 1, 9 [1997]).  We have faithfully -- that
is, until today -- declined to second-guess or interpolate
unbargained-for provisions into contracts that are "the product
of an arms-length transaction between sophisticated businessmen,
ably represented" (JMD Holding Corp. v Cong. Fin. Corp., 2005 NY
LEXIS 703, *15 [2005]; see also South Rd. Assoc., LLC v
International Bus. Machs. Corp., 4 NY3d 272, 277 [2005] [the
"instrument was negotiated between sophisticated, counseled
business people negotiating at arm's length" (quoting Matter of
Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995])]; Vermont
Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [same];
Fiore v Oakwood Plaza Shopping Center, 78 NY2d 572, 581 [1991]
["Defendants were sophisticated parties involved in an arm's
length commercial transaction. . . .  The purchase price of the
land alone was well in excess of $1 million, indicating the
magnitude of the project.  Furthermore, the parties were
represented by counsel in negotiating the terms of the
agreement"]; Chimart Assocs. v Paul, 66 NY2d 570, 574 [1986]
["the contract at issue is part of a multimillion dollar
transaction involving sophisticated, counseled parties dealing at

arm's length"]).

More particularly, we have -- again, until today --
refrained from injecting fiduciary obligations into
sophisticated, counseled parties' arms length commercial
dealings.  In refusing to fashion a "newly-notched fiduciary-like
duty" for finders in Northeast Gen. Corp. v Wellington Adv. (82
NY2d 158, 162 [1993]), we remarked that "[i]f the parties find
themselves in the milieu of the 'workaday' mundane marketplace,
and if they do not create their own relationship of higher trust,
courts should not ordinarily transport them to the higher realm
of relationship and fashion the stricter duty for them."

Plaintiff, the committee of unsecured creditors of the
bankrupt eToys, Inc., claims that Goldman, Sachs & Co., the lead
managing underwriter of eToys' initial public offering (IPO),[1]
duped eToys into underpricing its stock at $20 a share.[2]

_____

[1]An IPO is the first public issuance of a stock from a company that has
not previously been traded publicly.  In a "hot" IPO, like eToys', the stock
immediately trades at a premium in the aftermarket, the trading that takes
place after termination of the price and trading restrictions governing the
offering.

[2]"Underpricing" refers to the difference between the price at which
stock is sold to the public in an IPO and the price in the aftermarket.  That
IPOs are underpriced is "as shocking a surprise as Claude Rains' discovery
'Casablanca' that gambling was in progress at Rick's Café," since the
"systematic underpricing of IPO shares [is] probably the most thoroughly
documented empirical fact about IPOs" (Coffee, The IPO Allocation Probe: Who
is the Victim?, NYLJ, Jan 18, 2001, at 5, col 1); see generally Ritter, The
Long Run Performance of Initial Public Offerings, 46 J Fin 3 [1991] [citing
studies showing that IPOs produce 16.4% average positive initial return as
measured from the offering price to the market price at the end of the first
day of trading, and that extent of underpricing is highly cyclical, with much
higher positive initial returns evident during "hot issue" markets; and, using
a sample of 1,526 IPOs that went public in the United States in the 1975-84

- 4 -                                     No. 61

Goldman allegedly carried out this deception so that it might profit from secret side deals with preferred customers who "were obligated to kick back to Goldman a portion of any profits that they made on after[]market sales of eToys['] securities allocated to them at the IPO."[3]  While the pleading does not spell out exactly how underpricing worked in Goldman's favor, plaintiff's theory has to be that Goldman, whose underwriting compensation was a percentage (6.75%) of aggregate offering proceeds, stood to make more money on kickbacks from these secret side deals than it would have earned on its increased compensation from selling shares at some higher, theoretically "correct" price.  Plaintiff further alleges that "[b]ased on communications with Goldman, it was eToys' understanding that the offering price for eToys' common shares was to be set primarily by reference to then

period, documenting this "anomaly," which is "that in the long-run IPOs appear to be overpriced"; see also Griffith, A Legal and Economic Analysis of the Preferential Allocation of Shares in Initial Public Offerings, 69 Brooklyn L. Rev 583, 590-630 (Winter 2004  examining various theories to explain underpricing]).  During the heyday of the Internet stock bubble, when eToys' public offering took place, very large "pops" in first-day IPO prices were commonplace, reaching a zenith (or nadir, depending upon your point of view) with the IPO of VA Linux Systems in December 1999.  VA Linux -- which, like eToys is now bankrupt -- was priced at $30 a share, opened at $300 a share and closed at $242.375 a share, thus snaring 698% in opening day Nasdaq trading (see Fisher, A Tiny Company Without Profits Goes Public With a Bang, NYT, Dec 10, 1999; see also Baker, Who Wants to Be a Millionaire?  Law Firms Investing in Hot High-Tech IPOs Are Making a Fortune, But Some Critics Worry the Stock Craze is Clouding Ethics Matters, 86 Feb ABA J 36 ["The fact that VA Linux hadn't turned a dime in profits and had no expectation of doing so did little to deter trading.  Investors pushed the price upward on a gamble that the public would see the fledgling company . . . as a rival to Microsoft"]).

[4] The practices alleged in the complaint are commonly referred to as "spinning" and "flipping".  Spinning refers to the preferential allocation of the right to buy shares in an IPO, often to company managers or venture capitalists, who may quickly resell or "flip" those shares in the aftermarket for large profits.

- 4 -

- 5 -                                                    No. 61

current market conditions and the anticipated demand of eToys'
shares."

    In allowing plaintiff's claim for breach of fiduciary
duty to go forward, the majority disregards that eToys was a
sophisticated, well-counseled business entity. eToys' major
stockholders included important venture capital and corporate
investors; its largest single stockholder, idealab!, styles
itself as an incubator for successful technology companies (see
<http://www.idealab.com>). eToys was represented by the Venture
Law Group, P.C., which "specializes in representing high
potential technology companies from before their creation through
their public offering or acquisition and beyond," and which in
1999, handled "the fourth largest number of initial public
offerings for technology companies in the country"
(<http://www.venlaw.com/About>).

    Further, the offering price was a key term in the
Underwriting Agreement, a purchase contract between eToys, the
issuer/seller, and Goldman, the underwriter/buyer, who
represented all the underwriters in the syndicate.⁴ How may a
buyer ever owe a duty of the highest trust and confidence to a
seller regarding a negotiated purchase price? The interests of a
buyer and seller are inevitably not the same. Indeed, it is a
longstanding principle of contract law that a buyer may make a

---

    ⁴The syndicate was the ad hoc group of underwriters who banded together
to underwrite — that is, purchase — from eToys, the issuer/seller, at a
fixed price less the discount (6.75%) and to distribute eToys' new securities.

- 5 -

- 6 — No. 61

binding contract to buy something that it knows its seller undervalues (Laidlaw v Organ, 15 US [2 Wheat], 178, 181 n2 [1817]).

Here, eToys' prospectus acknowledged that the "initial public offering price for the common stock has been negotiated among eToys and the representatives of the underwriters" (emphasis added). Contrary to plaintiff's allegation, eToys also represented in the prospectus that the offering price was not driven by anticipated demand alone. The other factors that came into play were "eToys' historical performance, estimates of eToys' business potential and earnings prospects, an assessment of eToys' management and consideration of the above factors in relation to market valuation of companies in related businesses." Further, eToys' prospectus identified four "principal purposes" for the IPO: to increase working capital, create a public market for its stock, facilitate future access to the public capital markets, and increase visibility in the retail marketplace. By selling only 8.2% of its outstanding common stock at $20 a share, eToys raised the capital called for by its business plan.

In short, the offering price was not "set" by Goldman, it was negotiated by sophisticated, represented parties -- the issuer/seller and the underwriter/buyer; the offering price was negotiated with reference to more than "then current market conditions" and "anticipated demand"; and eToys did not seek to negotiate an offering price solely to maximize the proceeds

- 6 -

- 7 -                                                    No. 61

raised in the offering.  Documentary evidence in the record
confirms all these points, and the nature of the contractual
relationship between an issuer and an underwriter is long
established and well-understood (see United States v Morgan, 118
F Supp 621, 635-655 [SDNY 1953]).  While plaintiffs may have
alleged "an advisory relationship that was independent of the
underwriting agreement" (maj op at 9), conclusory allegations are
insufficient to survive a motion to dismiss (see e.g. Caniglia v
Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233, 233-234 [1st
Dept 1994] [on motion to dismiss, facts pleaded are presumed to
be true and accorded every favorable inference, but "allegations
consisting of bare legal conclusions, as well as factual claims
inherently incredible or flatly contradicted by documentary
evidence are not entitled to such consideration"]).

        Finally, I am less sanguine than the majority about the
consequences of recognizing "a fiduciary duty . . . requiring
disclosure of [a lead underwriter's] compensation arrangements
with its customers" (maj op at 9).  The excesses of the market in
the days of the internet high tech mania did not go unnoticed by
regulators.  In addition to a flurry of enforcement actions at
the State and federal levels, the Securities and Exchange
Commission (SEC) in 2002 asked the two major self-regulatory
organizations (SROs),[1] the New York Stock Exchange, Inc. (NYSE)

---

[1] SROs are quasi-governmental entities with "a duty to promulgate and
enforce rules governing the conduct of [their] members" (Barbara v New York
Stock Exch., Inc., 99 F3d 49, 51 [2d Cir 1996]; see 15 USC §§ 78c [a] [26],

- 7 -

- 8 -                                                                  No. 61

and the National Association of Securities Dealers, Inc. (NASD),
to convene a high-level group of business and academic leaders to
review the IPO process in light of the experience of the 1990's,
and to recommend ways to cure the problems exposed during that
period and to improve the underwriting process going forward.
This group produced a report in May 2003 (see NYSE/NASD IPO
Advisory Committee, "Report and Recommendations of a committee
convened by the New York Stock Exchange, Inc. and NASD at the
request of the U.S. Securities and Exchange Commission [May 2003]
[<http://www.nasd.com/web/groups/rules_regs/documents/rules_regs/
nasdw_010373.pdf>]), directly leading, among other things, to
pending proposed NYSE Rule 470 and NASD Rule 2712 (see 69 Federal
Register 77,804 [Dec. 28, 2004]; see also 70 Federal Register
19,672 [Apr. 13, 2005]).  These rather complicated proposed rules
govern allocations and distributions of shares in IPOs.[5]  How our

<hr>

78f [b], 78s [g]).  The SEC must approve or reject any rule, practice, policy
or interpretation proposed by an SRO (see 15 USC § 78s [b]; Barbara, 99 F3d at
5[ [describing the role of SROs in enforcement of federal securities laws and
SRO rules or regulations ]).

[5]Specifically, the proposed rules would (1) prohibit IPO allocations as
a consideration or inducement for the receipt of compensation that is
excessive in relation to the services provided by the member or member
organization (so-called "quid pro quo" allocations); (2) prohibit the awarding
of IPO shares to executive officers and directors and their household members
of issuers that have, or will have, an investment banking relationship with
the member or member organization on the condition that such officers and
directors, on behalf of the issuer, direct future investment banking business
to the member or member organization (i.e., spinning); (3) prohibit the
imposition of a flipping penalty (a "penalty bid") on associated persons whose
customers flipped IPO shares unless such penalty is imposed on the entire
underwriting syndicate; and (4) require the book running lead manager, who is
responsible for assembling pre-price indications of interest in an
underwritten transaction, to provide the issuer's pricing committee (or, if
the issuer has no pricing committee, its board of directors) with (a) a

- 8 -

- 9 -                                    No. 61

new fiduciary duty for underwriters may fit into or conflict with
the developing regulatory scheme is impossible to predict.  We
have, however, at the very least introduced uncertainty into a
complex subject of enormous importance to investors.  This
subject is, in my view, better dealt with by specialized
regulators than by the evolving common law.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order modified, without costs, by dismissing the second, fourth
and fifth causes of action and, as so modified, affirmed.
Certified question answered in the negative.  Opinion by Judge
Ciparick.  Chief Judge Kaye and Judges G.B. Smith, Rosenblatt,
Graffeo and R.S. Smith concur.  Judge Read dissents in part in an
opinion.

Decided June 7, 2005

_____

regular report of indications of interest, including the names of interested
institutional investors and the number of shares indicated by each, and a
report of aggregate demand from retail investors (which the SROs characterized
as conforming the rules to existing practices); and (b) a report on final
allocations within a reasonable time after the IPO's settlement date.  These
proposed rules would also extend lock-up agreements (i.e., formal restrictions
on re-sale of securities) to officers' and directors's issuer-directed shares
(e.g., so called "friends and family" programs) and require the book running
lead manager to notify the issuer and the public (through a major news
service) at least two days prior to the release or waiver of any lock-up or
other restriction on the transfer of the issuer's shares; specify how the
book-running lead manager and other syndicate members must deal with returned
shares; and prohibit members from accepting market orders to purchase IPO
shares in the aftermarket for one trading day following an IPO (see also 59
*Federal Register* at 77,813-77,814 [discussing three possible new approaches
for regulating unseasoned issuers, whose stocks experienced dramatic run ups
and declines in price during the late 1990's and 2000, and the factors, both
objective and subjective, that bear upon establishing an offering price]).