UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

KATHERINE GRIFFIN, individually and as        :
trustee of the Katherine Griffin Living Trust,    :        08 CV 2992 (LMM)
                                                              :
                                Plaintiff,        :        ECF CASE
                                                              :
            v.                                        :
                                                              :        **DECLARATION OF MICHAEL J.**
GOLDMAN, SACHS & CO. and                 :        **DELL IN SUPPORT OF**
SOFIA FRANKEL,                                 :        **DEFENDANTS' MOTION TO**
                                Defendants.    :        **DISMISS THE COMPLAINT**

———————————————————————— x

        I, MICHAEL J. DELL, hereby declare as follows:

        1.        I am a member of the law firm of Kramer Levin Naftalis & Frankel LLP,

attorneys for defendants Goldman, Sachs & Co. ("Goldman") and Sofia Frankel (with respect to

the time she worked at Goldman).  I respectfully submit this declaration in support of

defendants' motion to dismiss the complaint.

        2.        Attached as Exhibit A is a copy of the complaint in this action.

        3.        Attached as Exhibit B are defendants' Notice of Motion for a Permanent Stay of

Arbitration, dated March 12, 2007, and supporting papers, in *Goldman, Sachs & Co. and Sofia*

*Frankel v. Katherine Griffin, Individually and as trustee of the Katherine Griffin Living Trust*, 07

CV 1313 (LMM).

        4.        Attached as Exhibit C is plaintiff's Memorandum of Law in Opposition to

Petitioners' Motion for a Permanent Stay of Arbitration and in Support of Respondent's Cross-

Motion to Dismiss and for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil

Procedure, dated April 4, 2007, in *Goldman, Sachs & Co. and Sofia Frankel v. Katherine Griffin,*

*Individually and as trustee of the Katherine Griffin Living Trust*, 07 CV 1313 (LMM).

5.    Attached as Exhibit D is this Court's Memorandum and Order, dated May 16, 2007, in *Goldman, Sachs & Co. and Sofia Frankel v. Katherine Griffin, Individually and as trustee of the Katherine Griffin Living Trust*, 07 CV 1313 (LMM).

6.    Attached as Exhibit E is the Award issued in *Katherine Griffin, Individually and as trustee of the Katherine Griffin Living Trust v. Goldman, Sachs & Co., Lehman Brothers Inc. and Sofia Frankel* ("the Arbitration"), dated March 3, 2008.

7.    Attached as Exhibit F is a copy of plaintiff's Statement of Claim in the Arbitration, dated December 21, 2006.

8.    Attached as Exhibit G is a redlined comparison of plaintiff's Statement of Claim in the Arbitration and her complaint in this action.

9.    Attached as Exhibit H are copies of the December 2000 and January 2001 account statements for plaintiff's account at Goldman.

10.    Attached as Exhibit I is a copy of the Trust, Estate and Guardian Account Agreement.

11.    Attached as Exhibit J is a copy of the Trading Authorization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2008
New York, New York

_____/s/  Michael J. Dell_____
Michael J. Dell (MD-7714)

KL3 2649460.1

**Exhibit A**

**COPY**

Dan Brecher, Esq.
Law Offices of Dan Brecher
99 Park Avenue, 16th Floor
New York, New York 10016
Tel.: 212-286-0747
Attorney for Plaintiff

**08 CV 2992**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MAR 2 4 2008
U.S.D.C. S.D. N.Y.
CASHIERS

KATHERINE GRIFFIN, individually and as trustee of the
Katherine Griffin Living Trust,

                      Plaintiff,

- against -

GOLDMAN, SACHS & CO. and SOFIA FRANKEL,

                      Defendants.

Case No

COMPLAINT FOR COMMON
LAW FRAUD, BREACH OF
CONTRACT AND BREACH
OF FIDUCIARY DUTIES

TRIAL BY JURY
DEMANDED

## COMPLAINT

Plaintiff Katherine Griffin, individually and as Trustee of the Katherine Griffin Living Trust, by her attorneys, Law Offices of Dan Brecher, complains against Defendants Goldman, Sachs & Co. ("Goldman Sachs") and Sofia Frankel ("Frankel"), as follows:

## INTRODUCTION

1.     Defendants engaged in activities that constitute common law fraud, victimizing this Plaintiff and a number of other customers of Frankel, a broker employed by Goldman Sachs from 1994 through 2000, who moved to Lehman Brothers, Inc. ("Lehman Brothers") at the end of 2000. Frankel generated more than $20 million dollars in commissions at Goldman Sachs and Lehman Brothers in just the four years from early 1997 through early 2001. And, including $14 million in "up-front" money paid to her by Lehman Brothers when she joined that firm in late

1

2000, Frankel received $22 million from Goldman Sachs and Lehman Brothers in that time. She "earned" this money solely through commissions and her share of markups and markdowns she charged for "investing" the funds in her customers' accounts in high margin in-and-out trading of hundreds of different securities. She justified her high commissions through false representations and fraudulent charts purporting to show the outstanding past performance of her customer accounts: Frankel charged four or more times as much as the average broker at Goldman Sachs and Lehman Brothers because she was presented as a "star" broker who would produce exceptional results for her customers' accounts. The truth is that she had a practice of taking short term profits and letting the losses run, a practice that can have success in rising markets, but which can have disastrous results when markets deteriorate.

2.      Plaintiff is among a number of customers Frankel damaged by overcharging and lying to them, as described in this Complaint. Frankel used the name and reputation of Goldman Sachs, together with false representations and fraudulent performance charts purporting to show the outstanding past performance of her customers' accounts, to obtain and maintain complete discretionary control over her customers' accounts, including Plaintiff's account, which she then traded on high margin, causing massive losses to most of the accounts of her largest customers. Frankel traded these accounts without an evident plan. She traded the accounts so frequently, charging such high commissions, markups/markdowns and other costs, and holding losses while taking profits, that her supervisors had to know she was engaged in improper activity which they failed to properly supervise and curtail.

3.      Plaintiff relied upon the name and reputation of Goldman Sachs, the misrepresentations as to Frankel's education and abilities, and the misrepresentations concerning the performance of accounts under her management, including those made in the fraudulent

2

charts Defendants prepared and used, and, based upon this reliance, Plaintiff allowed Frankel to maintain discretionary control over her Goldman Sachs account until Frankel left Goldman Sachs and went to Lehman Brothers in December 2000. Relying upon the representations Frankel made, including her false claims of a Ph.D. and those made through the use of charts, and the credibility and good name of Lehman Brothers, Plaintiff followed Frankel to Lehman Brothers, transferring her account from Goldman Sachs in January 2001, despite the $435,450 in realized losses and the substantial unrealized losses her account incurred under Frankel's management.

4.     As a result of Frankel's fraudulent and tortious actions, Plaintiff suffered out-of-pocket losses totaling approximately $435,450 while the Defendants charged approximately $101,000 in commissions and other excessive charges to the Plaintiff's account. Plaintiff also suffered damages totaling $300,000 in lost earnings on her out-of-pocket losses. Plaintiff should recover all $836,450 of her claims, including the charges to her account during Frankel's fraudulent treatment of her account, in which Goldman Sachs is complicit and should also be held responsible. Plaintiff also seeks punitive damages, based on the extensive, repeated and widespread fraudulent conduct of the Defendants, and also based on the Defendants' improper actions in efforts to cover up the fraudulent acts and to keep Plaintiff from learning of the common law fraud Frankel committed upon her.

## PARTIES

5.     Plaintiff Katherine Griffin is a citizen and resident of the State of Maryland and the Trustee of the Katherine Griffin Living Trust.

6.     Defendant Goldman Sachs is a nationally known and established broker/dealer in the securities industry, with a branch office located at 85 Broad Street, New York, New York,

where Plaintiff funded her account with money and securities which are the subject of this Complaint.

7.    On information and belief, Defendant Sofia Frankel is a citizen and resident of the State of Florida.  On information and belief, at the time Plaintiff maintained her account with Goldman Sachs, Defendant Frankel was a citizen and resident of New York.

## JURISDICTION AND VENUE

8.    Subject matter jurisdiction is conferred on this Court through diversity jurisdiction pursuant to 28 U.S.C. §1332.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.    The transactions, statements, practices, and course of conduct alleged herein occurred within the Southern District of New York so that venue is proper in this district pursuant to 28 U.S.C. §1391.

## PRIOR FINRA ARBITRATION

10.    On December 22, 2006, Plaintiff filed a Statement of Claim with NASD Dispute Resolution, Inc. (now known as FINRA Dispute Resolution), bearing Arbitration Number 06-05365 (the "FINRA Arbitration"), and captioned <u>Katherine Griffin, individually and as trustee of the Katherine Griffin Living Trust v. Goldman, Sachs & Co., Lehman Brothers Inc. and Sofia Frankel</u>.

11.    By Settlement Agreement executed by Plaintiff on January 17, 2008, the terms of which are confidential, Plaintiff settled her claims with Respondent Lehman Brothers and with Frankel, but solely for the period Frankel was employed at Lehman Brothers.

12.    By Award dated March 3, 2008, the Panel in the FINRA Arbitration granted Respondents Goldman Sachs and Frankel's motion to dismiss Claimant Griffin's claims, without

4

prejudice, on the ground that the claims were time-barred under FINRA Rule 10304. FINRA

Rule 10304, entitled Time Limitation Upon Submission, states that "no dispute, claim, or

controversy shall be eligible for submission to arbitration under this Code where six (6) years

have elapsed from the occurrence or event giving rise to the act or dispute, claim or

controversy." FINRA Rule 10304 goes on to state that dismissal of a claim under the Rule does

not prohibit a party from pursuing the claim in court.

13.    At the hearings of the FINRA Arbitration held on January 30, 2008[1], the Chair

stated on the record that the Panel's ruling was without prejudice and that the matter could be

pursued by Plaintiff Griffin in court.

## THE DOCUMENTED COMMON LAW FRAUD COMMITTED BY DEFENDANTS

14.    Sofia Frankel is an immigrant from Russia, who came to this country in or about

1987 in pursuit of what she called the "American Dream." In 1994, she joined Goldman Sachs

as a newly registered broker in her first job in the securities industry. By 1999, she was telling

her customers she was living the "American Dream." She also told many of her customers,

including the Plaintiff, blatant falsehoods. She even told her supervisors, fellow employees, and

this Plaintiff that she had a Ph.D. - she doesn't. Fortunately for Frankel, she entered the

brokerage business in a rising market that encouraged speculation in technology stocks.

Unfortunately for her customers, such as the Plaintiff, Frankel worked for the most highly

regarded firms in the securities industry, so, at the time, her false representations seemed

believable to the Plaintiff, and to Frankel's other customers.

---

[1]    January 30, 2008 constitutes the only day of hearings in the FINRA Arbitration. On that day, Respondents Goldman Sachs and Frankel's motion to dismiss was heard and decided by the Panel. No evidentiary hearing took place, and no testimony was ever heard by the Panel. The Panel's decision to grant Respondents' motion to dismiss was based solely on its determination that Claimant's claims were time-barred under FINRA Rule 10304.

15.    Frankel utilized the same fraudulent methods in dealing with many of her customers that she used to defraud this Plaintiff. Frankel also told other customers that she had a Ph.D., and she also showed other customers the fraudulent performance charts. Frankel also insisted upon discretionary control over other customers' accounts, gaining the customers' trust and confidence by promising to treat their assets entrusted to her control as if it was her own money. Unfortunately, despite all of the many "red flags" created by her fraudulent acts and improper activities, her superiors at Goldman Sachs did nothing, notified no customers, and essentially condoned her outrageous treatment of her customers because Frankel was generating substantial commission income, and had ingratiated herself with the compliance personnel and with her superiors. The supervisors' behaviors here amount to nothing less than gross neglect of their duties. What raises Frankel's false statements beyond mere puffery to the level of common law fraud, even at the outset, is that in furtherance of her fraudulent scheme, in which Frankel obtained and maintained control over Plaintiffs' Goldman Sachs account, and to justify her excessively high commissions, Frankel presented Plaintiff and numerous other customers with the performance charts, fraudulently portraying her financial acumen as having resulted in customers' accounts she controlled far outperforming even the strong market that was ongoing prior to the opening of the Plaintiff's Goldman Sachs account.

16.    In July 1999, Katherine Griffin turned over more than $2.4 million to the discretionary control of Defendant Sofia Frankel, by setting up a trust account with Goldman Sachs for the Katherine Griffin Living Trust, bearing account number 001-10030-4 (the "Goldman Sachs Account"). These funds represented a substantial portion of Plaintiff's net worth. Although initially cautious about transferring funds from an existing account Katherine had maintained with a broker she "adored," David Parks, Katherine was won over by Frankel

after their initial meeting where Frankel falsely represented her education and other credentials, and provided Katherine with customer performance charts prepared by Goldman Sachs that purported to show that customers' accounts under Frankel's management and control had very substantially out-performed the market in the prior three years. Frankel made a practice of showing her clients performance charts that were titled "Composite Historical Equity Performance" (hereafter, "the Charts").

17.    The Charts that were shown to Plaintiff, along with Frankel's business card which Frankel attached to the Charts, are annexed hereto as <u>Exhibit A</u>. The Charts were represented by the Defendants as being accurate and correct to one one-hundredth of one percent in their calculations of the performance of "the GS Team portfolio." However, the Charts Frankel used to obtain and maintain discretionary control over Plaintiff's Account and to justify her high commission rates were materially false, misleading and substantially inaccurate. The Charts had been prepared, with knowledge that they were false, (i) to induce customers to turn over their financial assets to the management and control of Frankel, (ii) to allow Frankel to maintain control over customers' accounts, and (iii) to justify the materially higher commissions Frankel charged her customers.

18.    Frankel made highly inaccurate, greatly exaggerated, and materially false and misleading claims of great success in her use of the Charts. Frankel's claims were false, and her supervisors knew, or should have known, that she was lying to her customers. For example, the chart on the second page of the Charts that are annexed hereto as <u>Exhibit A</u>, makes the claim that $10 million invested at an unidentified point in 1995 in an undefined "GS Team portfolio" was worth $32,297,891 on 3/31/99. The truth is that the claimed "portfolio" for a "GS Team" was a fiction, concocted with fraudulent intent, and not one that was truly derived from Frankel's

recommendations. Yet, in the Notes on the bottom of page 2 of <u>Exhibit A</u>, the Charts portray this as an actual "Past Performance" which "is not indicative of future results." The truth is that there was no such actual past performance either, and Defendants will not be able to honestly substantiate the claims in the Charts. Indeed, even the Charts' claimed actual percentage gain of 198.89% in the so-called "portfolio" does not support the growth performance represented to be $32,297,891 on 3/31/99. Another example of the fraudulent nature of the Charts is on page 3 of the Charts, in the first paragraph of which the Charts are falsely portrayed as detailing "results for the equity portion" (which is undefined) "of certain accounts," and then goes on to falsely claim that the Charts include performance of accounts which "are not discretionary accounts, however, all or most of the transactions effected therein resulted in Sophia's [*sic*] recommendations." This representation is also materially false because Frankel did not include the performance of certain non-discretionary accounts (plural) in compiling the Charts. This representation is also materially false because Frankel did include the performance of a non-discretionary account, which she later claimed was not an account which traded based upon her recommendations. The number of accounts and the performance figures on page 3 of the Charts are also false representations. For these and other reasons, the Charts are a fraud. The Charts that are <u>Exhibit A</u> hereto are charts shown to Plaintiff by Frankel to induce the turnover of Plaintiff's funds to Frankel's control, and that were given to Plaintiff by Frankel prior to Plaintiff opening her Goldman Sachs Account.

19.     Frankel insisted upon discretionary control of the Goldman Sachs Account and then proceeded to trade the Account, overcharging commissions, markups and markdowns. She made unauthorized trades, used excessive margin, and then she falsified records to cover-up her

misdeeds. Frankel's illegal activities caused almost $435,450 in total out-of-pocket losses to Katherine Griffin as a result of Frankel's transactions in her Goldman Sachs Account.

20.    Frankel's deceit included lying to her customers, such as this Plaintiff, about new issues she sold to them. She lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities. Frankel violated internal Goldman Sachs rules as to communications with customers and with the back office regarding sales of new issues. Frankel had a practice of purchasing new issues for these customers without first discussing the details of the purchases with the customers; an improper practice as to new issues, even for discretionary accounts such as the account at issue here. Frankel would indicate to the Goldman Sachs investment bankers for new issues and then after being informed of the actual allotments, Frankel would allocate them among her customers, without properly discussing the transactions first or without communicating with her customers at all, including the Plaintiff. And, when her allotment was less than the amount she indicated for, Frankel would change customers' allocations, but not in proportion to the amount indicated for each customer; this was in breach of applicable rules and regulations.

21.    Frankel lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities. Frankel was thereby allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice. Supervisors at Goldman Sachs did not take proper cautionary steps, and Frankel was permitted not only to ride out the collapsing market for technology stocks, but, at the end of 2000, having stuck her clients, including the Plaintiff, with

substantial unrealized losses, Frankel then left Goldman Sachs for Lehman Brothers, and she was paid $14,000,000 just to join Lehman Brothers, and she was given an impressive title by Lehman Brothers, serving to further mislead Plaintiff.

22.     Plaintiff lost approximately $70,470 in two specific stocks, WorldCom and Global Crossing, listed in the settlement Goldman Sachs made with the United States Securities and Exchange Commission ("SEC") and with the New York Attorney General regarding the false reports issued by Goldman Sachs analysts. See Exhibit B.

23.     Plaintiff lost approximately $137,940 in eToys, Inc., a stock which was the subject of a 2005 New York Court of Appeals decision, attached hereto as Exhibit C, in which the Court imposed a fiduciary responsibility on Goldman Sachs to the issuer in an initial public offering of eToys, Inc. for which Goldman Sachs was the lead underwriter, holding that when underwriters serve as expert advisors they are obligated to reveal any conflicts of interest. The specific conflict of interest that is the subject of EBC I Inc. v. Goldman, Sachs & Co. involved sales by Goldman Sachs of its own eToys stock at a far higher price than the IPO and the related arrangements entered into between Goldman Sachs and certain of its customers whereby such customers were obligated to kick back to Goldman Sachs a portion of any profits that they made from the sale of eToys securities subsequent to the initial public offering.

24.     The unlawfulness of these schemes and the improprieties alleged here is all the more shocking for where they occurred: one of the most respected names on Wall Street - Goldman Sachs. Indeed, the very success of Frankel's fraudulent activities was dependent on the respected nature of the Goldman Sachs name – Frankel was selling Goldman Sachs' brokerage services, with supposed customized and personal investment advice. She was not represented to be a typical broker; Goldman Sachs presented Frankel as a "star."

25.    Goldman Sachs specifically knew that Frankel was overcharging her customers and excessively trading customers' accounts while it was happening. Goldman Sachs not only did nothing to stop her, it supported and encouraged Frankel by knowingly permitting Frankel to tell customers, even those who complained about the high charges, that her educational background, her skills and her performance, as shown in the Charts, among other reasons she gave, justified the high commissions she charged. Frankel claimed to her customers that it was her right to charge "old rates," that is, extra high commissions, because that was the price of sharing in the success she had created. Frankel used her false representations and the fraudulent Charts to support her fleecing of customers through overtrading their accounts while charging excessively high commissions, throughout her employment with Goldman Sachs. All of this was with the knowledge and support of Frankel's laissez-faire supervisors. In the 18 months from August 1999 to December 2000 that Frankel controlled Plaintiff's Goldman Sachs Account, Goldman Sachs charged the Plaintiff substantially more than $101,000 in commissions, markups, markdowns and margin interest. The excessive commissions charged by Defendants, who justified such commissions through false representations and the Charts shown to Plaintiff by Frankel, support a claim of common law fraud.

26.    By 1999, through some luck related to the bull market in technology stocks, in which Frankel promoted herself as a specialist and expert, and because she had been producing immense commissions from a limited number of accounts, and had made strong and successful efforts to befriend her supervisors, Frankel was able to bamboozle almost everyone. Yet, there were co-workers of Frankel who became aware of her excessive commission charges, and did not want to work with her. Indeed, her excessive charges and the huge commission income she

11

generated made her behavior particularly notorious at Goldman Sachs, which should have served as a red flag to her supervisors, even in 1999.

27.    Frankel's supervisors at Goldman Sachs ignored a number of warning signs, including Frankel's lack of experience and training, her false claim of having a Ph.D., the Charts that should have been questioned, her excessive commission charges, the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, the high turnover ratios in her customers' accounts, and customer complaints reporting unauthorized transactions by Frankel.  By way of comparison to Frankel's limited experience as a broker, the average Smith Barney Citigroup broker is advertised as having 15 years of experience in the securities brokerage industry.  At the time she gained discretionary control over the Plaintiff's Goldman Sachs Account, Frankel had been in the industry for less than five years.  These were all "red flags" which Frankel's supervisors should have seen and acted upon, which they failed to do.

28.    Instead, Frankel's supervisors at Goldman Sachs promoted Frankel's performance to other brokers as a model to be imitated.  Goldman Sachs' supervisors had Frankel address new associates to promote charging "old rates" and held her up to new associates as a broker to emulate.  While many brokers were charging their customers with active accounts commissions of six cents a share, and less, and even after Goldman Sachs had distributed written instructions to its brokers encouraging lesser commission charges or fixed annual charges, which would have been much lower than the charges visited upon Plaintiffs, or charging a maximum of $.125 a share in transactions for discretionary accounts, Goldman Sachs, nonetheless, encouraged and supported Frankel in charging her customers substantially higher rates than other brokers were charging their regular customers with active accounts.  Frankel would often charge Plaintiff commissions of $.40, $.50, even $1.00 a share or more, and even

12

$2.00 a share, based on whether Plaintiff made money on a transaction; an improper practice. When Frankel's supervisors asked her questions about customers' positions, the high margin, or the substantial trading, Frankel lied to her supervisors; lies that could have been discovered by her supervisors speaking directly to the customers, such as the Plaintiff, to confirm what Frankel told her supervisors. The supervisors failed to speak to Plaintiff and other customers, as they should have done. One reason for this breakdown in supervision was that Frankel went out of her way to befriend her supervisors, particularly in the compliance department, where Frankel was even able to wangle a job at Goldman Sachs for her son.

29.    But for the fraudulent acts of Defendants, Plaintiff would not have opened, and then maintained, her Account with Frankel at Goldman Sachs. Accordingly, all losses in the Goldman Sachs Account stem from Defendants' fraud, and all of Plaintiff's approximate $435,450 in out-of-pocket losses, and her lost income of $300,000 should be awarded to the Plaintiff. Because of the fraudulent acts of Frankel, and of her employer, Plaintiff should also be awarded the fraudulently obtained commissions, markups, markdowns, margin interest and other charges to her Account, estimated to be approximately $101,000, for a total amount claimed of $836,450. Plaintiff also seeks punitive damages, interest, legal fees and costs in this matter.

### FIRST COUNT
### DEFENDANTS' COMMON LAW FRAUD

30.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 29 above.

31.    Defendants made willful misstatements and/or omissions of material fact in communications with Plaintiff in an effort to deceive Plaintiff into opening an account with the Defendants, and, then, to further deceive Plaintiff as to the wrongful activities effected by Defendants in the Goldman Sachs Account.

13

32.     False and fraudulent statements made to Plaintiff by Defendants include, but are not limited to, those specifically listed immediately below:

(i)     At all times, Defendants represented that Frankel was a knowledgeable, experienced broker;

(ii)     At all times, Frankel represented that she had Plaintiff's best interests at heart;

(iii)     In persuading Plaintiff to open an account with Goldman Sachs in or around July 1999, Frankel falsely represented to Plaintiff, as she had done and would continue to do with other customers, that she would invest her money like it was her own. Frankel told Plaintiff that she did not need to be working and that she worked as a broker only because she enjoyed making other people money, implying purely altruistic, non-monetary purposes behind her work for Plaintiff and her other customers;

(iv)     In or around July 1999, Frankel used materially false and misleading Charts prepared by Defendants, and false statements regarding her qualifications and past performance, to procure and obtain discretionary control over Plaintiff's Goldman Sachs Account. The Charts purported to show Frankel's great success with respect to the accounts she handled. The Charts were highly inaccurate, greatly exaggerated, and materially false and misleading because, among other reasons, they misrepresented the amount of assets under Frankel's management and the performance of her customers' funds under her management. Thereafter, Frankel used these same Charts and false statements to maintain control over Plaintiff's Goldman Sachs Account and to justify her high commissions charges to the Account. Frankel's supervisors knew, or should have known, that these statements, and therefore, the

Charts, were materially false. The Charts are discussed in detail in Paragraphs 17 through 18 of this Complaint;

(v)    Frankel made numerous transactions in Plaintiff's Goldman Sachs Account without first discussing them with Plaintiff, including, but not limited to, purchases of initial public offerings such as Allscripts (500 shares on March 10, 2000), Bookham (1000 shares on September 26, 2000), Level 3 Communications (1000 shares on January 29, 2000) and Global Crossing (1000 shares on April 14, 2000), to name a few. In fact, contrary to what is reported on the internal records of Goldman Sachs, Frankel never spoke to Plaintiff about any of the more than 50 purchases of initial public offerings for Plaintiff's Goldman Sachs Account;

(vi)    From July 1, 1999 through June 20, 2000, Goldman Sachs analysts made false statements in their numerous reports recommending the purchase of "tech" stocks, such as WorldCom and Global Crossing that were recommended and sold to Plaintiff in October 1999 and April 2000, respectively, when they specifically knew, and stated in internal communications within Goldman Sachs and to each other, that their reports and recommendations of these securities contained materially false statements and conclusions, were materially inaccurate, that the companies they were recommending were being recommended to customers because of pressures exerted by investment bankers at the firm, that the projections and forecasts were materially inaccurate, and that certain companies they were recommending were likely to fail;

(vii)    Frankel had a practice, with Plaintiff and with the accounts of her other customers, of not calling to get indications of interest from her customers as to securities offerings, but first made the transactions for customers and then called customers, and had other

15

employees of Goldman Sachs call customers, and then falsified Defendants' records as to the dates when these calls were made. Plaintiff received no such calls.

(viii)    Frankel told others at Goldman Sachs that she had obtained prior authorization from clients to purchase the allocated amounts for which she indicated in Goldman Sachs initial public offerings, when the truth was that she had not discussed such purchases with the customers, including Plaintiff;

(vix)    In or about 1999 through 2000, Frankel was allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice;

(x)    Defendants sold to Plaintiff approximately 3,000 shares of eToys, Inc. stock in or around October 1999, for which Plaintiff paid approximately $215,750. Plaintiff ultimately suffered losses of approximately $137,940 on these shares. In its sale of the eToys, Inc. stock to Plaintiff, Defendants failed to disclose to Plaintiff the conflict of interest existing with respect to agreements entered into by Goldman Sachs with certain Goldman Sachs customers to share in profits made following the initial public offering of eToys, Inc. Such agreements had a manipulative effect on the price of the security, driving it up from its $20 per share offering price to the almost $72 per share price at which the stock was sold to Plaintiff;

(xi)    Frankel had a practice of holding losses while taking profits in Plaintiff's Goldman Sachs Account, and falsely represented to Plaintiff her investment philosophy and practice; and

(xii)    Frankel fraudulently represented to Plaintiff, at their first meeting, that she had a Ph.D.

16

33.    By reason of the excessive commissions and other charges to Plaintiff's Goldman Sachs Account, the speculative nature of many of the transactions which were solicited and executed in Plaintiff's Account through the fraud and fraudulent misrepresentations of Frankel, the excessive use of margin, and the similar transactions and improprieties in accounts of other customers of Frankel, which should have served as "red flags" to Frankel's supervisors, and all of the transactions having been approved by the principals and/or managers at Goldman Sachs, and by reason of the fraudulent acts of Goldman's analysts and investment bankers with regard to the securities of corporations sold to Plaintiff on Defendants' recommendations, the fraudulent acts of Defendants with respect to the sale to Plaintiff of eToys, Inc., and the fraudulent acts of Frankel with respect to the initial offerings purchased for Plaintiff's Goldman Sachs Account, Goldman Sachs knew of or should have known of the improper and fraudulent behavior of Frankel, and has, therefore, assisted or participated in the common law fraud and in these fraudulent misrepresentations.

34.    Defendants made these misrepresentations and omissions of material fact, and knew, or should have known, they were false and misleading. Defendants intended that Plaintiff rely upon the misrepresentations and omissions, and Plaintiff did rely upon them in dealing with the Goldman Sachs Account.

35.    Plaintiff reasonably and justifiably relied on Defendants' misrepresentations and omission, and, as a result of Defendants' common law fraud and misrepresentations, Plaintiff has been damaged in the amount of $836,450.

## SECOND COUNT
## BREACH OF CONTRACT

36.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 35 above.

37.     The foregoing activities which occurred with respect to Plaintiff's Account while it was maintained and improperly administered at Goldman Sachs constitute breaches of internal standards of conduct applicable to Defendants in dealing with the Plaintiff, which are stated in Goldman Sachs' own policy and procedures manuals or such other internal documents of Goldman Sachs as exist and apply in these circumstances, as well as rules, regulations and procedures pursuant to NASD, NYSE, and other regulatory standards.  These standards and procedures, among other standards and procedures customary in the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure Defendants' improper behavior.[2]

38.     The foregoing wrongful activities, which occurred in connection with the Plaintiff's Account while maintained and improperly administered at Goldman Sachs, constitute breaches of contractual duties owing by the Defendants to the Plaintiff, including, without limitation, the contractual duties of good faith and fair dealing with the Plaintiff, the contractual duty to "know your customer," and the contractual duties set forth in the customer agreements which specifically incorporate, as standards of measure of performance of said contractual duties, the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have not been complied with by Defendants.

39.     Specifically, Defendant Goldman Sachs breached the terms set forth in Paragraph 1 of the Trust, Estate and Guardian Agreement, signed by Plaintiff on July 23, 1999 and by Defendant Goldman on August 25, 1999 (the "Account Agreement").  Pursuant to Paragraph 1, all transactions under the Account Agreement must be "in accordance with the rules and customs of the exchange or market and its clearing house, if any, where the transactions are executed and

---

[2]  Mauriber v. Shearson/American Express, Inc., 567 F.Supp. 1231, 1238 (S.D.N.Y. 1983).  Plaintiff's counsel in Mauriber is Plaintiff's counsel in the instant proceedings.

in conformity with the applicable law and regulations of governmental authorities and future amendments or supplements thereto." The wrongful activities set forth in the Complaint constitute breaches of Paragraph 1 of the Account Agreement.

40.    Defendants breached several provisions of the Trading Authorization Agreement [For Goldman Sachs Representatives] (the "Discretionary Trading Agreement"), dated July 23, 1999. Specifically, pursuant to the Discretionary Trading Agreement, purchases of securities where Goldman Sachs was a participant in any registered public offering were not to be executed on a discretionary basis. Although Defendants executed numerous purchases of initial public offerings for which Goldman Sachs was an underwriter, Defendants did not contact Plaintiff prior to executing such purchases, and did, therefore, execute such purchases with discretion.

41.    Pursuant to the Discretionary Trading Agreement, Defendants agreed to not execute transactions prohibited by Goldman Sachs' other policies and procedures applicable to discretionary and nondiscretionary transactions generally. The wrongful activities set forth in the Complaint, which occurred in connection with the Plaintiff's Account while maintained and improperly administered at Goldman Sachs, constitute breaches of this specific provision of the Discretionary Trading Agreement.

## THIRD COUNT
## BREACH OF FIDUCIARY DUTIES

42.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above.

43.    Defendants owed Plaintiff certain fiduciary duties, including the duty to use due care, to properly supervise Frankel, to know its customers, and not to engage in common law or statutory fraud with respect to Plaintiff's Account and funds. The misconduct upon which Plaintiff's breach of fiduciary duties claim is founded includes the very same misconduct which

19

underlies Plaintiff's common law and statutory fraud claims. The fiduciary duties breached by Defendants have their genesis in the express contractual relationship between the parties and are directly related to the common law and statutory fraud asserted by Plaintiff; and, as such, the claim has a six-year statute of limitations.

44.     All of the foregoing activities, which occurred with respect to Plaintiff's Goldman Sachs Account while maintained and improperly administered at Goldman Sachs, constitute breaches of fiduciary duties due and owing to Plaintiff by Defendants, who were in positions of trust with respect to Plaintiff.

45.     Defendants breached their fiduciary duties owed to Plaintiff, and, as a result, Plaintiff has been damaged.

## PUNITIVE DAMAGES

46.     It is respectfully submitted that punitive damages are particularly appropriate here, where the pervasive pattern of fraud and the activities of the Defendants in seeking to cover-up their misconduct surely merit economic sanctions. Indeed, the fraudulent activity that occurred with respect to Plaintiff's Goldman Sachs Account is precisely the type of activity that legislative bodies are seeking to prevent, such as by the direct affirmation of the authority of courts to award punitive and/or treble damages to investor-plaintiffs. If the Defendants' unlawful behaviors detailed above do not result in proportionate sanctions to deter future violations of this type, then brokers will continue to "borrow" money from their clients by such gross overcharges and fraudulent recommendations, pocket the billions, and return only a small fraction of what they "earned" when challenged by the relatively few victims willing to endure the expenses and inconveniences of proceedings such as these.

## THE DAMAGES

WHEREFORE, Plaintiff prays for judgment as follows:

      (i)     As to First Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

      (ii)     As the Second Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs; and

      (iii)     As to the Third Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

Dated:    New York, New York
         March 21, 2008

                              LAW OFFICES OF DAN BRECHER

                              Dan Brecher (DB-5308)
                              99 Park Avenue, 16th Floor
                              New York, NY 10016
                              (212) 286-0747



# Composite Historical Equity Perfo[rmance]

Goldman, Sachs & Co.
One New York Plaza | New York, NY 10004
Tel: 212-357-1287 / 800-323-5678

Sofia Frankel
Vice President
Private Client Services

**% Return**

■ SF  □ S&P 500

| | 1996 | 1997 | 1998 | 1999 YTD (2) |
|---|---|---|---|---|
| SF | 28.83 | 36.95 | 39.68 | 20.75 |
| S&P 500 | 22.10 | 33.5 | 28.69 | 4.98 |

(1) See Exhibit A
(2) Through 03/31/99

Note: These performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request. These numbers are net of all commissions and fees. Past performance is not indicative of future results.

**Compounded Annual Return**

**% Return**

1/1/96 - 03/31/99

SF 43.2  S&P 27.81

Goldman Sachs

# Composite Equity Performance (1) vs. S&P 500

**Assumes: $10,000,000 Initial Investment**



*Assuming an initial investment of $10MM, the GS Team portfolio would have returned 45% more than the S&P 500 over the same time period*

GS Team $32,297,891

S&P 500 $22,201,928

$35,000,000
$30,000,000
$25,000,000
$20,000,000
$15,000,000
$10,000,000

Initial Investment    1996    1997    1998    1999 YTD (2)

(1) See Exhibit A
(2) Through 03/31/99

Note: These performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request. These numbers are net of all commissions and fees. Numbers are net of all commissions and fees. Past performance is not indicative of future results.

**Cumulative Performance**

1/1/96-03/31/99

Goldman Sachs

2403147182

p.7

## EXHIBIT A

## Performance Computation

Enclosed herewith are the composite performance results for the equity portion of certain accounts for the years 1996 and the first quarter of 1999 which are serviced by Sophia Frankel. Certain accounts are handled on a discretionary basis wherein investment decisions are generally made by Sophia to whom the client has granted discretion. The remainder of the accounts included in the composite are not discretionary accounts, however, all or most of the transactions effected therein resulted in Sophia's recommendations.

As the summary chart shows, during the period from January 1996 through March 1999, the accounts on average achieved a 199.89% cumulative return (net of all commissions and fees) compared to a 122.02% cumulative return for the S&P 500 Index during the same period.

The performance measurements have been taken from the Goldman Sachs Portfolio Reporting System. For the reference years, the composite includes: common stock, convertible preferred stock, convertible bonds, options and other equity related instruments (general rights, warrants, REITs, etc.). Further information concerning the transactions reflected in this summary and the methodology used to compute returns is available upon request.

These performance results reflect the activity of the accounts described above, which may not be representative of the activity in your accounts. The results are not, and should not be treated as, a guarantee of future performance. We are, of course, available to discuss any questions which you may have concerning the enclosed material.

| | 1996 | | 1997 | | 1998 | | 1999 | | Annualized | | Cumulative | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 | GS Team | S&P 500 |
| Number of Accounts in Composite | 15 | | 18 | | 20 | | 20 | | | | | |
| Performance | 29.83 | 23.10 | 36.99 | 33.5 | 39.68 | 28.69 | 20.75 | 4.98 | 40.20 | 27.81 | 199.89 | 122.02 |

(1) Through 03/31/99

The referenced performance measurement uses month-end valuations and time weighted cash flows. The key factors in this calculation are: (i) rates of return are based on market values which are measured monthly and include accrued income; (ii) all realized income is assumed to be reinvested and (iii) all cash flow into and out of an account and between its segments are calculated daily and are time weighted.

Goldman Sachs

Home | Previous Page

U.S. Securities and Exchange Commission

## Securities and Exchange Commission

**Litigation Release No. 18113 / April 28, 2003**

**Securities and Exchange Commission v. Goldman, Sachs & Co., 03 CV 2944 (WHP) (S.D.N.Y.)**

### SEC SUES GOLDMAN SACHS FOR RESEARCH ANALYST CONFLICTS OF INTEREST FIRM TO SETTLE WITH SEC, NASD, NYSE, NY ATTORNEY GENERAL, AND STATE REGULATORS

The Securities and Exchange Commission announced today that it has settled charges against Goldman, Sachs & Co., a New York-based investment bank and securities firm, arising from an investigation of research analyst conflicts of interest. This settlement, and settlements with nine other brokerage firms, are part of the global settlement the firms have reached with the Commission, NASD, Inc., the New York Stock Exchange, Inc. ("NYSE"), the New York Attorney General, and other state regulators. As part of the settlement, Goldman Sachs has agreed to pay $25 million as disgorgement and an additional $25 million in penalties. One-half of the total of these payments - $25 million - will be paid in connection with the SEC action and related proceedings by the NASD and NYSE and will be placed into a distribution fund for the benefit of customers of the firm. The remainder will be paid to resolve related proceedings by state regulators. In the SEC action, Goldman Sachs has agreed to a federal court order that will enjoin the firm from future violations of NASD and NYSE rules and require the firm to make changes in the operations of its equity research and investment banking divisions. In addition, Goldman Sachs will pay, over five years, $50 million to provide the firm's clients with independent research, and $10 million to be used for investor education.

In connection with this matter, the Commission today filed a Complaint against Goldman Sachs in the U.S. District Court for the Southern District of New York, alleging violations of NASD and NYSE rules. According to the Commission's Complaint, from at least July 1999 through June 2001, research analysts at Goldman Sachs were subject to inappropriate influence by investment banking at the firm. The Complaint also alleges that Goldman Sachs published exaggerated or unwarranted research and failed to maintain appropriate supervision over its research and investment banking operations.

Specifically, the Commission's Complaint alleges that:

- Goldman Sachs compensated its analysts based at least in part upon their participation in the firm's investment banking-related activities. Analysts were required to prepare business plans that discussed, among other things, what steps the analysts planned to take to assist investment banking efforts. In preparing these business plans,

analysts were required to answer such questions as "How much of your time will be devoted to IBD [investment banking division]?" and "How can you work more effectively with IBD to exploit the opportunities available to the firm?" In response to the question "What are the three most important goals for you in 2000?" one analyst replied, "1. Get more investment banking revenue. 2. Get more investment banking revenue. 3. Get more investment banking revenue."

- Goldman Sachs "aligned" its research, equities, and investment banking divisions to work collaboratively in order to fully leverage its limited research resources. In 2000, Goldman Sachs concluded internally that "US Investment Research appears to be on the right track," noting that "research analysts, on 429 different occasions, solicited 328 transactions in the first 5½ months of [the year]" and that "[r]esearch was involved in 82% of all 'won business' solicitations."

- Goldman Sachs analysts participated in investment banking marketing efforts, including working with investment bankers to prepare "pitch" materials and in some cases attending the pitch meetings. For example, in an April 2000 e-mail, an investment banker told an analyst that the company they were about to pitch to "strongly suggested that you guys come prepared to SELL." Some pitchbooks implicitly suggested that Goldman Sachs would provide favorable research coverage after the investment banking transaction.

- In several instances, these conflicts resulted in analysts publishing recommendations that were exaggerated or unwarranted. For example, in August 2000, the business unit leader for U.S. telecommunications research at the firm wrote to his counterpart in Europe: "The plan we have in place now is that in early September we are going to re-rate most of the CLECs [competitive local exchange carriers], which is where the problem is most egregious. The ratings were a residual from [a former analyst], and I never changed them, not wanting to disrupt things too much. But it's ridiculous. I've already met with the bankers, and plan to move most of the companies down to M[arket] O[utperformer], from RL [the highest rating]. For the other segments the situation is not as bad, and where there is a problem, investment banking considerations have prevented me from making a change (i.e. AT&T, WCOM). I don't think I would end up leaving only 7.5% as RL, but the present 68% is ridiculous...."

- Goldman Sachs failed to establish and maintain adequate policies, systems, and procedures reasonably designed to ensure the objectivity of its published research.

Goldman Sachs has agreed to settle the Commission's action and has consented, without admitting or denying the allegations of the Complaint, to the entry of a final judgment that, if approved by the court, permanently enjoins Goldman Sachs from violations of NASD and NYSE rules pertaining to just and equitable principles of trade (NASD Rule 2110; NYSE Rules 401 and 476), advertising (NASD Rule 2210; NYSE Rule 472), and supervisory

procedures (NASD Rule 3010; NYSE Rule 342). The final judgment also orders the firm to make the payments described above, and provides for the appointment of a fund administrator who, subject to court approval, will formulate and administer a plan of distribution for those monies placed into the distribution fund.

In addition, the final judgment orders Goldman Sachs to implement structural reforms and provide enhanced disclosure to investors, including a broad range of changes relating to the operations of its equity research and investment banking operations. Goldman Sachs has agreed to sever the links between research and investment banking, such that: research and investment banking are physically separated with completely separate reporting lines; analysts' compensation cannot be based directly or indirectly upon investment banking revenues; investment bankers may no longer evaluate analysts; investment bankers will have no role in determining what companies are covered by the analysts; and research analysts will be prohibited from participating in efforts to solicit investment banking business, including pitches and roadshows. In addition, Goldman Sachs must disclose on the first page of each research report whether the firm does or seeks to do investment banking business with that issuer, and when Goldman Sachs decides to terminate coverage of an issuer, Goldman Sachs must issue a final research report discussing the reasons for the termination. Each quarter, Goldman Sachs also will publish on its website a chart showing its analysts' performance, including each analyst's name, ratings, price targets, and earnings per share forecasts for each covered company, as well as an explanation of the firm's rating system.

Goldman Sachs also has agreed as part of this settlement to retain, at its own expense, an Independent Monitor to conduct a review to provide reasonable assurance that the firm is complying with the structural reforms. This review will be conducted eighteen months after the date of the entry of the Final Judgment and the Independent Monitor will submit a written report of his or her findings to the SEC, NASD, and NYSE within six months after the review begins. Five years after the entry of the final judgment, Goldman Sachs must certify to the SEC and other regulators that it has complied in all material respects with the requirements and prohibitions of the structural reforms.

* * *

The Commission acknowledges the assistance of NASD, NYSE, the Securities Division of the Utah Department of Commerce, and other state regulators in the investigation of this matter.

- ➤ SEC Complaint in this matter
- ➤ SEC Final Judgment in this matter
- ➤ Final Judgment Appendix A
- ➤ Final Judgment Appendix B
- ➤ Consent

Home | Previous Page

Modified: 04/28/2003



U.S. Securities and Exchange Commission

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

450 Fifth Street, N.W.

Washington, D.C. 20549,

                                    :
                        Plaintiff,  :    Civil Action No.
                                    :
         - against -                :    COMPLAINT
                                    :
GOLDMAN, SACHS & CO.,               :
One New York Plaza, 37th Floor      :
New York, NY 10004,

                        Defendant.

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## NATURE OF THE ACTION

1. The Commission brings this action against defendant Goldman, Sachs & Co. ("Goldman Sachs" or "Defendant") to redress its violations of certain rules of NASD Inc. ("NASD") and the New York Stock Exchange, Inc. ("NYSE").

2. From July 1999 through June 2001 (the "relevant period"), Goldman Sachs sought and did investment banking business with many companies covered by its Research Division. Research analysts were encouraged to participate in investment banking activities, and that was a factor considered in the analysts' compensation. In addition, the decision to initiate and maintain research coverage of certain companies was in some cases coordinated with the investment banking department and influenced by investment banking interests.

3. As a result of the foregoing, certain research analysts at Goldman Sachs were subjected to investment banking influences and conflicts of interest between supporting the investment banking business at Goldman Sachs and publishing objective research. The firm had knowledge of these investment banking influences and conflicts of interest yet failed to

establish and maintain adequate policies, systems, and procedures that were reasonably designed to detect and prevent those influences and manage the conflicts.

4. By its conduct, Goldman Sachs violated NASD Rules 2110, 2210(d)(1), 2210(d)(2), and 3010, and NYSE Rules 342, 401, 472, and 476(a)(6).

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to Sections 21(d) (1), 21(e), 21(f), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u(f), and 78aa].

6. Goldman Sachs, directly or indirectly, used the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein.

7. Venue is appropriate in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Goldman Sachs is found, has its headquarters and principal executive offices, and transacts business in this District.

## DEFENDANT

8. Goldman Sachs is a broker-dealer with its principal place of business in New York, New York. Goldman Sachs is a leading global investment banking and securities firm that, among other things, offers underwriting services to companies seeking to offer their securities to the public and merger and acquisitions services. In addition to its investment banking operations, Goldman Sachs also offers extensive services to its institutional investor clients, has an active securities sales and trading business, and maintains a separate division to perform research on equity securities. Goldman Sachs is a member of NYSE and NASD.

## FACTUAL ALLEGATIONS

### I. RESEARCH ANALYST PARTICIPATION IN INVESTMENT BANKING ACTIVITIES

9. Research analysts were responsible for providing analyses of the financial outlook of particular companies in the context of the business sectors in which those companies operated and the securities market as a whole.

10. Research analysts evaluated companies by, among other things, examining financial information contained in public filings, questioning company management, investigating customer and supplier relationships, evaluating companies' business plans and the products or services offered, building financial models, and analyzing competitive trends.

11. After synthesizing and analyzing this information, the research analysts drafted research reports and more abbreviated "notes" summarizing their opinions. These reports or notes typically contained a summary and

analysis of the factors relied upon by the analyst in reaching his conclusions, and some contained a rating and/or a price target.

12. During the Relevant Period, Goldman Sachs' equity research ratings included four investment ratings:

- RL: Recommended List -- expected to provide price gains of at least 10 percentage points greater than the market over the next 6 - 18 months;

- MO: Market Outperformer -- expected to provide price gains of at least 5 - 10 percentage points greater than the market over the next 6 - 18 months;

- MP: Market Performer -- expected to provide price gains similar to the market over the next 6 - 18 months; and

- MU: Market Underperformer -- expected to provide price gains of at least 5 percentage points less than the market over the next 6 - 18 months.

In addition, Goldman Sachs had one shorter-term rating:

- Trading Buy - expected to provide price gains of at least 20 percentage points sometime in the next 6 - 9 months.

13. The percentage of issuers being assigned one of the top two investment ratings (Recommended List or Market Outperformer) ranged from 72% in the first quarter of 1999 to 50% in the last quarter of 2001. The percentage of companies assigned a Market Underperformer rating did not rise above 1.1% during the relevant period.

14. Goldman Sachs published research on publicly traded companies, and this research was made available to Goldman Sachs' institutional and private wealth management clients, principally high net worth individuals. Published research or the content of the research was disseminated by various means, including: by mail; via facsimile; distributions at client meetings; via electronic mail ("e-mail"); via Goldman Sachs' research website for clients; telephone conversations by analysts or salespersons; as part of analysts' appearances on television, at seminars, and industry conferences; and through subscription services provided by Bloomberg and First Call. On occasion, the substance of Goldman Sachs' research reports, in whole or in part, was also reported in the U.S. financial news media. In addition, beginning in December 2000, certain of Goldman Sachs' research was made available to another broker-dealer, who make it available to its retail customers.

15. During the relevant period, analysts made themselves available, via telephone, e-mail, and in person, to Goldman Sachs' institutional sales force to answer questions about industry sectors and covered companies. Analysts also conducted "teach-ins" for Goldman Sachs' institutional sales force to educate the sales force about companies for which Goldman Sachs initiated research coverage. In addition, analysts provided periodic research updates to the institutional sales force through "morning calls" or "morning

notes," which are daily pre-market opening discussions of the sector and/or specific covered companies. Analysts also provided research updates to the institutional sales force through "blast" e-mails and voice-mail messages, which typically provided a more abbreviated analysis than what was contained in a research report and may have contained a rating on a company or sector.

16. In addition to performing research functions, certain research analysts from time to time participated or assisted in connection with investment banking-related activities. These investment banking-related activities included assisting the investment banking department by identifying and/or vetting companies as prospects for investment banking services, participating in "pitches" of investment banking services to companies, participating in "roadshows" (a series of presentations made by the management of a company in conjunction with the marketing of an upcoming underwriting to potential investors) associated with underwriting transactions, speaking to investors to educate them about underwriting transactions, and participating in due diligence activities in connection with underwriting transactions. (Underwriting services included sales of the company's securities to the public through initial or secondary public offerings.) In the context of the capital raising process, research analysts contributed by evaluating businesses that appeared potentially appropriate for public markets and screening out unsuitable candidates.

17. The Investment Banking Division at Goldman Sachs advised corporate clients and helped them execute various financial transactions, including the issuance of stock and other securities. Goldman Sachs frequently served as the lead underwriter in initial public offerings ("IPOs")-the first public issuance of stock of a company that has not previously been publicly traded-and follow-on offerings of securities.

18. During the relevant period, investment banking activities were an important source of revenues and profits for Goldman Sachs. In fiscal year 2000, investment banking generated more than $5.37 billion in revenues, or approximately 32 percent of Goldman Sachs' total net revenues.

19. Goldman Sachs encouraged research analysts to support the investment banking and other businesses of Goldman Sachs, and in some cases, research analysts were expected to participate or assist in the foregoing investment banking-related activities. The level of analyst participation or assistance in the foregoing investment banking-related activities varied widely but was sometimes significant. During 2000, one research analyst self-reported that he spent an estimated 40% of his time on investment banking-related activities, and another analyst self-reported that he spent an estimated 55% of his time on investment banking-related activities.

20. During the relevant period, Goldman Sachs held itself out as generating and providing research reports that were the product of objective research and opinions of Goldman Sachs's Research Division.

## II. PARTICIPATION IN INVESTMENT BANKING ACTIVITIES WAS A FACTOR IN EVALUATING AND COMPENSATING RESEARCH ANALYSTS

21. The compensation system at Goldman Sachs provided an incentive for research analysts to contribute to all areas of Goldman Sachs's business, including participation in investment banking activities, generation of investment banking business for Goldman Sachs. Analyst compensation was based on many factors, including the level of compensation the analyst could command in the market for their sector (which might be impacted by the level of investment banking activity in that sector), the analysts' participation in investment banking-related activities, whether an analyst was ranked in the broker polls, Greenwich Survey, Institutional Investor, and performance reviews. Analyst compensation consisted of a salary and a discretionary bonus.

22. During the relevant period, Goldman Sachs gathered information about the analyst's job performance through self-evaluations, business plans completed by the analysts, sales force surveys, and anonymous "360 degree review," evaluation forms completed by supervisors, peers, and subordinates in the Research Division, as well as members of other divisions of Goldman Sachs, including to varying extents the Investment Banking and Equities Divisions. The Head of Research and/or other senior Research Division employees would then evaluate the performance of research analysts as described below.

23. After reviewing all the performance evaluations, analysts rankings, and other indicators of performance such as the analyst's research production, and taking into account his or her own assessment of the analyst's performance, the analyst's supervisor would provide an overall assessment of the analyst's performance. The specific comments in the 360 degree reviews were not shown to the analysts, but certain comments may have been discussed or described in some cases.

24. Some comments in the 360 degree reviews of analysts indicated that some analysts were involved in many aspects of investment banking-related activities and reflected certain employees' beliefs that participating or assisting in investment banking activities was a factor in measuring the analyst's performance. The following comments were submitted through 360 degree reviews about different research analysts:

- "One of my favorite analysts. A real trader's analyst[]. Solid grasp of the industry; well liked by investors ie [sic] well informed as to their intentions, which translates to a ton of business. Aside from a few 'tell it like it is' lapses in judgment to the press, [analyst] leaves very little room for improvement. I'm sincere when I emphasize that many GS [Goldman Sachs] analysts can learn from his model insofar as a trading relationship goes. I realize bringing in the banking bucks is primary to an analysts [sic] success and actually being able to pick a stock takes second, but I wouldn't trade him for anyone. He brings too much business to my table and keeps me from getting hurt P&L wise when he's first with important insight."

- "[needs to] make more of an effort to separate research views from banking views. Like many analysts, he has been known to be swayed by banking to support certain names"

- "he has been in the incredibly awkward position of having the investment bankers have a stronghold over his written work - STOR

[StorageNetworks], LDCL [Loudcloud] to name a few embarrassments" Another review of the same analyst said: "One gets the sense that he's been held captive to the agenda of others within the Firm and that, were he allowed to exercise independent investment thesis, he would have had a decidedly different take of this group's prospects." Another review of the same analyst said: "he works closely with bankers to help their franchise while maintaining research independence."

25. Some analysts' self-evaluations reflected their perception that they were expected to participate or assist in Goldman Sachs' investment banking business. For example, one analyst wrote: "Need to get closure on some key wins. To monetize relationships for Goldman Sachs, both at the corporate and buyside level." Another analyst wrote "has subordinated personal preferences on recommendations [citing two examples] for 'commercial' reasons.

26. Furthermore, a presentation to research analysts in 2000 stated that the performance review process included "Formal Investment Banking Division recognition of Research contribution to business we win and relationships we improve."

## Research Analysts Business Plans

27. During the relevant period, analysts were required to develop business plans that discussed a broad range of areas such as what the analyst's plans were for Global Research with respect to both products and services, what major investment themes the analyst would develop relating to his or her coverage universe, and what investor conference the analyst had planned. One of the many such categories covered by the business plans was how the analyst planned to assist the investment banking efforts of Goldman Sachs. As noted below, the business plans included questions that implied that the research analysts' contribution to Goldman Sachs's investment banking business was part of their job.

28. Business plan questions included:

- How much of your time will be devoted to IBD [Investment Banking Division]? ...Are you using/managing IBD effectively? How can you work more effectively with IBD to exploit the opportunities available to the firm? What specific opportunities do you see? Do you have alignment-do you have counterparts in IBD you work with to approach business in an integrated fashion? How can IBD help you in conferences, client meetings, etc.?

- What will be the three most important IBD transactions in your space not yet mandated (that can be identified now, of course)? How well placed are your IBD relationships with respect to winning this business?...With which corporates can you use IBD's relationship to enhance your own? For which corporates do you have a better relationship with senior management than IBD does? How will you use that to enhance GS business opportunities?

29. In response to these questions, research analysts presented their

investment banking goals, activities, accomplishments, participation in lead- and co-managed underwritings, and sometimes fees associated with the investment banking transactions on which the analyst worked.

30. Business plans asked analysts to estimate how much of their time not devoted to Research would be devoted to each of four divisions of Goldman Sachs, including investment banking and Equities. In 1999, analysts estimated that they would spend between 5% and 75% of their time not devoted to Research on Investment Banking, which includes all merger and acquisition and financing activities.

31. In response to the question: "What are the three most important goals for you in 2000?" one analyst replied: "1. Get more investment banking revenue. 2. Get more investment banking revenue. 3. Get more investment banking revenue."

## III. INVESTMENT BANKING INTERESTS INFLUENCED GOLDMAN SACHS' DECISIONS TO INITIATE AND MAINTAIN RESEARCH COVERAGE

32. In general, the Research Division determined whether to initiate and/or maintain research coverage based upon institutional investors' interest in the company, the company's importance to the sector, and/or the company's importance to the Investment Banking Division or Equities Division.

33. One analyst commented in a business plan: "Since our banking ties are so close to each one of the companies mentioned above along with the fact that these companies are direct competitors with each other, it is incredibly difficult to voice strong opinions in these sectors."

34. In a March 16, 2000 e-mail communication from an analyst to an investment banker, the analyst wrote: "I wanted to harmonize with you strategically. [Chief Executive Officer at Ventro] suggested that there might be a banking opportunity for us, can we use a carrot and stick approach to win some economics here. I've been successful in the past using my research efforts to cement relationships where we previously had none."

35. A 2000 presentation to research analysts stated that investment banking and Research Divisions had a "shared mission" that included:

- "Highest ranked Research and Investment Banking teams in our industry";

- "Provide thought leadership; anticipation of trends";

- "Effective coverage and servicing of franchise enhancing or defining companies in each sector";

- "Effective identification of commercial opportunities";

- "Foster superb relationships with senior management of companies";

- "Research-driven success, not simply research-resourced."

### "Research Alignment" Process

36. In 1998-1999, "in order to fully leverage [its] limited Research resources," Goldman Sachs implemented a formalized process called "Research Alignment" whereby the Investment Banking, Equities and Research Divisions "work collaboratively to insure a strategic alignment of [Goldman Sachs'] business - that the biggest opportunities for investment banking and equities were being covered, that [Goldman Sachs] had the right Research resources in the right places, and that [Goldman Sachs's] Research reputation for independent and thoughtful analysts was sustained if not enhanced." The process recognized that "[t]he individual company coverage provided by Global Investment Research helps drive the majority of the Firm's largest businesses, from winning financing deals and advisory business to obtaining orders in the secondary markets."

37. "Research Alignment" was "developed with the goal of quantifying, at the individual company, industry and sector levels, what the available revenue opportunities are to Goldman Sachs on both the Equities (trading) and IBD (equity issuance, high yield issuance and M&A) sides of the business."

38. In 2000, Goldman Sachs' "Global Investment Research IBD Alignment Process" was summarized in part as follows: "US Investment Research appears to be on the right track with our IBD alignment initiative."

   a. "[R]esearch analysts, on 429 different occasions, solicited 328 transactions in the first 5 ½ months of this fiscal year."

   b. "Research was involved in 82% of all `won business' solicitations."

   c. "Research was involved in 49% of `lost business' solicitations."

   d. "Only 4.3% of all IBD `lost business' was attributed to lack of research coverage."

   e. "IR [Investment Research] was involved in 31 mergers amounting to $56 billion. IR was involved in 209 financing transactions amounting to $83 billion."

   f. "In addition to financings, US IR was involved in a significant number of merger advisories, solicitations, and other transactions which have either not yet closed or were not captured [in the] database."

39. In connection with Research Alignment, members of the Investment Banking Division called "Sector Captains" were responsible for coordinating research coverage requests from investment banking, prioritizing research coverage, determining candidates for termination of coverage, and conveying that information to the Research Division. Sector Captains, as representatives of the investment banking division, worked directly with the Research Division on issues relating to candidates for coverage and timing of coverage.

## IV. GOLDMAN SACHS' PITCH MATERIALS CONTAINED DISCUSSIONS OF RESEARCH COVERAGE

40. During the relevant period, research coverage was an important factor many companies considered in selecting a firm for investment banking transactions. In some instances, the reputation of Goldman Sachs' analysts was a factor in winning investment banking business from certain issuers.

41. In competing for investment banking business, Goldman Sachs typically sent representatives to meet with prospective issuers to discuss why the issuer should select Goldman Sachs as one of the investment bankers to participate in an offering. This meeting was commonly referred to in the securities industry as a "pitch." During the pitch, firm investment banking personnel would present their level of expertise in the company's sector and discuss Goldman Sachs's previous experience with similar companies, as well as their view of the company's merits and likelihood of success.

42. Some investment banking pitches included, among other things, discussion of the benefits the company would receive from Goldman Sachs' research coverage if the company selected Goldman Sachs as its banker. In preparation for each presentation, investment bankers, sometimes with research analyst input, prepared pitch materials including a "pitch book" which was distributed at the meeting. Some firm pitch materials implicitly suggested that Goldman Sachs would provide favorable research coverage after the investment banking transaction.

43. In an April 2000 e-mail, an investment banker wrote: "For next Wednesday's meeting, we have a challenge before us. We have been guided today by Loudcloud that we must show total focus and commitment from a RESEARCH perspective. [Loudcloud representative] strongly suggested that you guys come prepared to SELL.... HERE IS THE SUGGESTION: CAN YOU GUYS PREPARE A BRIEF (3-4 PG) RESEARCH REPORT ON LOUDCLOUD FOR THE MEETING. This is effectively our pitch.... This way we can say we are so excited about the story that we have already begun writing the report..." [emphasis in original]. In response, the analyst wrote: "I want to make this thing the best. WE WILL WIN THIS MANDATE." [Emphasis in original].

44. Pitch books typically contained reference to Goldman Sachs' research ratings for other companies covered by Goldman Sachs' analysts, and suggested that Goldman Sachs would continue to provide research coverage to the issuer after the investment banking transaction. The pitch books identified the analyst who would likely provide coverage by name, and provided information about that research analyst's background and reputation. In addition, some pitch books set forth information juxtaposing an analyst's positive comments about other companies in the same sector with the positive performance of the stock prices of those companies.

45. Some pitch books distributed by Goldman Sachs to potential clients included such factors as the number of lead-managed IPOs currently under research coverage, the average length of research reports, the number of days from the date of the transaction in which research was published, and the frequency that reports were issued.

46. For example, a pitch book included a list of the various ratings provided by the analyst on the companies he covered, and described the benefits the company would receive if it chose Goldman Sachs, including, "a [g]lobal sales effort led by analysts," and contained a diagram of the role of

analysts in an initial public offering.

47. The research analyst(s) who would likely provide coverage of the company after it went public sometimes worked with investment bankers to prepare Goldman Sachs's pitch presentation and, in some cases, attended the pitch meeting. The research analyst would on occasion make a presentation at the pitch in which the analyst typically discussed his/her view of the company and his/her understanding of the market's need for the company's product.

48. In July 2000, a pitch book for Crown Castle said "Goldman Sachs has been a constant bull on the tower sector" and stated the fact that "Goldman Sachs has placed Crown Castle on our Recommended List, our firm's highest investment rating."

49. A pitch book for the Willis Group stated: "[the analyst] has sold more stock than any research analyst in the sector."

50. The Business Unit Head of U.S. Telecommunications research was credited by a Goldman Sachs banker as the determining factor in winning an early 2000 IPO for Crosswave Communications: "[the analyst] was fully involved in pitching this and thanks to him, we received a sole-book mandate with Joint lead of MS." Moreover, the banker told other analysts: "your input will be critical to the success of this IPO."

51. An October 2000 pitch book for GeneProt explained the "[r]ole of investment research analyst," as "creating the story . . . marketing the story . . . [and] following the story."

## V. RESEARCH ANALYSTS WERE SUBJECT TO PRESSURES FROM COVERED COMPANIES AND INVESTMENT BANKING CONSIDERATIONS

52. Certain research analysts communicated regularly with employees of the companies that they covered, including executive and senior management of those companies. These communications occurred through telephone and e-mail exchanges, company-sponsored events, and analyst calls. As a result, research analysts were sometimes subject to pressure from companies they covered and investment banking considerations regarding their research. This conflict, between investment banking considerations and the publication of objective research, may have resulted in pressures on certain analysts, at times, to use language more favorable to the company or to avoid language which companies construed as negative in their research reports.

53. In an August 22, 2000 e-mail, copied to a research analyst, an investment banker writes: "[analysts] had a meeting with [WebEx] yesterday (which I attended part of). We discussed initiation strategy and decided that likely to initiate (probably MO, no price target) shortly with a note to be followed with a report by end of next week (given additional info from yesterday's meeting and desire to iterate a bit with the company). [WebEx] was more than happy with that approach as felt be beneficial to stock price to stagger good news."

54. Research analysts sometimes allowed covered companies to review drafts of research reports and comment on them. When a research analyst would downgrade or issue a negative comment on a company or sector, the analyst from time to time would receive direct and negative feedback from company management.

55. On February 23, 2001, a research analyst sent a draft of an Internet sector report to investment banking for review. In the e-mail, the analyst states:

> I have drafted a note that highlights our concerns yet does not translate into the lowering of numbers for specific companies. Considerations include: 1) we believe that most of our cost back-end loaded 2001 numbers have to come down, 2) exds [Exodus] is a major offender of back-end loading, but to lower numbers right after selling equity @ $18.50 could be a problem. It would also be a problem to cut other company's numbers for aforementioned reasons and not exds [Exodus] 3) we have a deal in the market and negative commentary could be a problem or used against us by morgan stanley. Based on these considerations this note is as far as I think we can go and even this might be too aggressive from a perception standpoint.

56. After the report downgrading the sector was issued, one of Goldman Sachs's investment banking clients in the sector, Loudcloud, contacted Goldman Sachs via e-mail: "Are you trying to kill our offering? Or just issuing these reports blindly with no regard to consequences?" The analyst did not change the downgrade. However, the Goldman Sachs bankers and analysts involved apologized to Loudcloud management for not giving them a heads up about the sector downgrade and said that the analysts had been marketing the offering aggressively. The senior analyst also responded directly to Loudcloud management:

> I echo [banker's] apology on not giving you a heads up on these calls. Wanted to reassure you on two fronts: 1) Both [the other analyst] and I continue to view the LDCL [Loudcloud] offering in these difficult markets our highest priority, and remain committed to doing everything we can to get us to a successful outcome over the coming days and beyond. 2) We continue to use every opportunity, including client discussions of the macro environment to highlight LDCL's [Loudcloud's] short and long-term differentiation against a lot of the public models. ...Again, I want to stress that both [the other analyst] and I remain committed to the short and long-term success of Loudcloud.

57. The following communications between WebEx management and an analyst occurred in January 2001:

a.  WebEx management wrote to an analyst: "As discussed, I want NO mention of any funding issues in this written report. I told you if people called and asked you why your plan shows a need for modest funding, you can verbally tell them that management believes they have adequate funding and it is probably because management has a less conservative plan than you do." [Emphasis in original.]

b.  The analyst responded, with an attached revised report: "the webx [sic] funding issues is a key area of investor concern, as such will remove any mention from the top section of the note, but will address it in a manner this [sic] is consistent with your recommendation for verbal responses to client inquiries in a later section. To exclude it completely detracts from the intention of the note, which is to address key investor concerns upfront and then give them a reason to buy the stock."

c.  WebEx management responded: "Thank you. This is much better. The other note said the company has a funding problem, but we think it isn't very big. This says that the company believes it has enough funds, but there could be a problem; and if there is it will be minor. Thanks again for the change." The research report was issued on January 22, 2001.

58.  In April 2001, an analyst sent a draft research report to Global Crossing Ltd. in advance of public release of the report. She received "extensive comments" from Global Crossing officials. The analyst wrote her supervising analyst that she had included Global Crossing's extensive comments and "...I also said we had slightly smoothed the negative edge (emphasis section up front and text) from when they saw the report. I said we included throughout the piece technological cost benefit comments and in [sic] up front conclusion section. I also said we still think supply/demand balance is THE near term critical price determinant. I promised them I'd re-email the final report tonight so they could see our changes. Nonetheless, [Global Crossing official] still wants to talk to YOU life [sic] today if possible so that he knows his time was used well and so that `such an important industry report which is going to have profound implications will be to their liking---ALL YOURS [emphasis in original]."

## VI.  IN CERTAIN INSTANCES, GOLDMAN SACHS PUBLISHED EXAGGERATED OR UNWARRANTED RESEARCH OR RATINGS

59.  On several occasions, the conflicts of interest discussed above resulted in analysts publishing recommendations and/or ratings that were exaggerated or unwarranted, and/or contained opinions for which there was no reasonable basis. The following are examples of how these conflicts affected the research.

60.  In August 2000, the Business Unit Leader for European Telecommunications research e-mailed his U.S. counterpart about the "anomalous situation where our sector has been tanking for 3-4 months and we globally still have a majority of stocks as R[ecommended] L[ist] as that is all the salesmen and clients care about." He suggested that his U.S. counterpart consider the approach taken by him: "In Europe, we have found that honour is preserved if we have a stock as an M[arket] O [utperformer] and the companies can't complain because its [sic] better than an M[arket] P[erformer]." In his response, the Business Unit Leader for U.S. Telecommunications research agreed, saying: "The plan we have in place now is that in early September we are going to re-rate most of the CLECs [competitive local exchange carriers], which is where the problem is the most egregious. The ratings were a residual from [a former research analyst], and I never changed them, not wanting to disrupt things too much. But it's ridiculous. I've already met with the bankers, and plan to

move most of the companies down to M[arket] O[utperformer], from R[ecommended] L[ist] before [another analyst] takes over completely in September. For the other segments the situation is not as bad, and where there is a problem, investment banking considerations have prevented me from making a change (i.e. AT&T, WCOM [Worldcom]). I don't think I would end up leaving only 7.5% as R[ecommended] L[ist], but the present 68% is ridiculous...."

61. In an April 27, 2001 e-mail, a research analyst wrote to a supervising research analyst: "In light of the fact that it is clear that TSIX [360Networks] is worth 0, do you think we should adjust our rating and price target? How can we go about doing this?" The supervising analyst responded: "Maybe the thing to do is to eliminate the price target. Maybe, put out a note that says, having a price target in this kind of situation is ludicrous...Changing the rating now is probably not a good idea, because from an outsider's perspective, who doesn't know anything, it may look like a belated ratings change. This happened last week to [an analyst], although he had been appropriately negative on WCII [Winstar Communications] all the way down, he belatedly dropped the rating from a M[arket] P[erformer] to an M[arket] U[nderperformer], and cnbc picked it up and made fun of him on the air."

62. In a March 26, 2000 e-mail with the heading "GBLX [Global Crossing]-I think they are bullshitting us" an analyst stated that the company's revenue guidance "does not make any sense....I think the answer is they wanted to obscure something sucking cash flow out of the company...They are hiding behind the complexity of their accounting."

63. In May 2001, WorldCom had Goldman Sachs' highest rating, Recommended List. The Business Unit Leader for U.S. Telecommunications research told his European counterpart that he "would have loved to have cut ratings long ago. Unfortunately, we can't cut [AT&T], because we're essentially restricted there. And without cutting [AT&T], there is no consistency in cutting WCOM [WorldCom]."

64. Between July 1999 and July 2001, WorldCom had Goldman Sachs' highest investment recommendation - inclusion on Goldman Sachs's "Recommended List." Worldcom was downgraded to Market Outperformer in July 2001. In April 2001, a hedge fund customer that had a very short-term investment horizon asked the Business Unit Leader of U.S. Telecommunications research: "wcom...buy sell or hold here at [$]20"? He responded to the inquiry: "sell."

65. On June 21, 2001, an analyst downgraded the company Exodus from a Recommended List rating to Market Outperformer. Both ratings have a time horizon of the next 6 - 18 months. In his April 27, 2001 research report on Exodus, the analyst discussed "heavy churn and low visibility given...the current revenue run rate" and further stated that the "EBITDA forecast looks challenging." In addition, that research report also stated the following: "Fully Funded Plan. Despite our more conservative EBITDA estimates for 2001 and 2002, we are confident that EXDS is funded to FCF positive." Shortly before the downgrade, the analyst met with at least two institutional investors who e-mailed the analyst after their meetings:

   a.   An institutional investor wrote the analyst on June 21, 2001: "I

wanted to write a quick email to you to THANK you for your candor when you came into our offices and gave me your teach-in on the company. You gave me the unbiased view, told me the negatives I needed to know - - and basically gave me the ammo I needed to prevent my PM from buying the stock." [Emphasis in original.]

b.  Another institutional investor wrote the analyst the same day: "I really appreciate your straight forward comments on EXDS [Exodus] during our conversation last week. Looks like our worst concerns were realized yesterday. Fortunately, we were able to get out of our last piece at around $5 and avoid the recent carnage in the shares. Still painful, but it could have been a lot worse. . . thanks."

66. In a sales force survey about this analyst, the writer commented: "His investment recommendations have been abysmal and while I understand he communicates what he really thinks to a sele[c]t few, his public ratings have been an embarrassment to the firm."

## VII. GOLDMAN SACHS FAILED TO ADEQUATELY SUPERVISE ITS RESEARCH AND INVESTMENT BANKING DIVISIONS

67. As set forth above, while one role of research analyst was to produce objective research, Goldman Sachs also encouraged some analysts to participate in investment banking-related activities. As a result of their participation in investment banking-related activities, those analysts were subject to investment banking influences and conflicts of interest between supporting investment banking business for the firm and publishing objective research.

68. Goldman Sachs had knowledge of these investment banking influences and conflicts of interest yet failed to manage them adequately to protect the objectivity of its published research.

69. Goldman Sachs failed to establish and maintain adequate policies, systems, and procedures reasonable designed to ensure the objectivity of its published research. Although Goldman Sachs had some policies governing research analyst activities during the relevant period, these policies were inadequate and did not address the conflicts of interest that existed.

### FIRST CLAIM FOR RELIEF

#### [Violation of NASD and NYSE Conduct Rules Due to Conflicts of Interest Resulting from Investment Banking Influence over Research Analysts]

70. Paragraphs 1-69 are realleged and incorporated by reference.

71. NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade.

72. NYSE Rule 401 states that "[e]very member, allied member and member organization shall at all times adhere to the principles of **good business practice** in the conduct of his or its business affairs."

73. NYSE Rule 476(a)(6) prohibits member organizations, among other things, from engaging in practices that constitute conduct inconsistent with just and equitable principles of trade.

74. During the relevant period, Goldman Sachs engaged in the acts and practices described above that created and/or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts. Goldman Sachs failed to manage these conflicts in an adequate or appropriate manner.

75. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rule 2110 and NYSE Rules 401 and 476(a)(6).

## SECOND CLAIM FOR RELIEF

### [Violation of NASD and NYSE Rules by Publishing Exaggerated or Unwarranted Research]

76. Paragraphs 1-69 and 71-73 are alleged and incorporated by reference herein.

77. NASD Rule 2210 and NYSE Rule 472 require members' communications with the public to be based on principles of fair dealing and good faith, provide a sound basis for evaluating facts, be properly balanced, and/or not contain exaggerated or unwarranted claims and/or opinions for which there was not reasonable basis.

78. As alleged above, in several instances Goldman Sachs issued certain research reports for companies that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about these companies, and/or contained opinions for which there was no reasonable basis.

79. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rules 2110, 2210(d)(1) and 2210(d)(2) and NYSE Rules 401, 472 and 476 (a)(6).

## THIRD CLAIM FOR RELIEF

### [Violation of NASD and NYSE Rules by Failing to Supervise]

80. Paragraphs 1-69 are alleged and incorporated by reference herein.

81. NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with" NASD's own Rules.

82. NYSE Rule 342 requires members, among other things, to maintain "appropriate supervisory control" over all business activities to ensure compliance with securities laws and regulations, including providing a "separate system of follow-up and review to determine that the delegated

authority and responsibility is being properly exercised."

83. Goldman Sachs failed to establish and maintain adequate procedures over research analysts to prevent or manage conflicts of interest.

84. By reason of the foregoing, Goldman Sachs violated NASD Conduct Rule 3010 and NYSE Rule 342.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter final judgment:

a. Permanently restraining and enjoining defendant from violating NASD Conduct Rules 2110, 2210(d)(1), 2210(d)(2), and 3010, and NYSE Rules 342, 401, 472, and 476(a)(6);

b. Ordering defendant to account for and disgorge all proceeds it has obtained as a result of its conduct, plus prejudgment interest thereon;

c. Ordering defendant to pay civil money penalties; and

d. Ordering such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Of Counsel:
Yuri B. Zelinsky
Kara Novaco Brockmeyer

Stacey M. Nahrwold

Date: April 28, 2003

Kenneth L. Miller (KM 5614)
Antonia Chion (AC 9522)
James A. Meyers (JM 5231)
SECURITIES AND EXCHANGE COMMISSION

450 Fifth Street, N.W.
Washington, D.C. 20549-0911
(202) 942-4567 (Chion)
(202) 942-9636 (Chion fax)
Attorneys for Plaintiff

*http://www.sec.gov/litigation/complaints/comp18113.htm*

Modified: 04/28/2003



Home | Previous Page

**U.S. Securities and Exchange Commission**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

              Plaintiff,

      -against-

GOLDMAN, SACHS & CO.,

              Defendant.

---

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

## FINAL JUDGMENT AS TO DEFENDANT
## GOLDMAN, SACHS & CO.

Plaintiff Securities and Exchange Commission ("Commission") having filed a Complaint in this action ("Complaint") and Defendant Goldman, Sachs & Co. ("Defendant") having (a) entered a general appearance, (b) consented to the Court's jurisdiction over Defendant and the subject matter of this action, (c) consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction), (d) waived findings of fact and conclusions of law, and (e) waived any right to appeal from this Final Judgment; and the Commission having agreed that, on the basis of this Final Judgment, it will not institute a proceeding against Defendant pursuant to Sections 15(b), 15B, 15C, or 19(h) of the Securities Exchange Act of 1934 (the "Exchange Act"):

### I.
### Injunctive Relief

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

A. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Rule 2110 of the Conduct Rules of NASD Inc. ("NASD") and Rules 401 and 476 of the New York Stock Exchange, Inc. ("NYSE"), by: (1) engaging in acts or practices that create or maintain inappropriate influence by investment banking over research analysts and therefore impose conflicts of interest on research analysts, and by failing to manage these conflicts in an adequate or appropriate manner; (2)_publishing research reports that do not provide a

sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis; or (3) promising, implicitly or explicitly, favorable research coverage to investment banking clients or potential clients.

B. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 2210 and NYSE Rule 472 by issuing communications to the public that do not provide a sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis.

C. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 3010 and NYSE Rule 342 by failing to maintain appropriate supervisory procedures regarding or controls over the following that are reasonably designed to ensure compliance with securities laws and regulations: (1) influence by investment banking over research analysts; (2) compensation and evaluation of research analysts; (3) use of research or research analysts in connection with the solicitation or marketing of investment banking business; and (4) publication of research regarding a securities issuer with which Defendant has, has solicited, or is soliciting an investment banking relationship.

## II.
## Monetary Sanctions

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. As a result of the violations alleged in the Complaint, Defendant shall pay a total amount of $110,000,000 (which amount includes the State Settlement Offer, as defined below, and is subject to the decision of any state securities regulator(s) not to accept the State Settlement Offer). This amount includes:

1. $25,000,000, as a penalty;

2. $25,000,000, as disgorgement of commissions and other monies;

3. $50,000,000, to be used for the procurement of Independent Research, as described in Section VIII below and the undertakings set forth in Addendum A hereto; and

4. $10,000,000, to be used for investor education, as described in Section IX below.

No portion of the payments for Independent Research or investor education shall be considered disgorgement or restitution, and/or used for compensatory purposes.

B. The amount of $50,000,000, which is the sum of the penalty of $25,000,000 and disgorgement of $25,000,000, consists of (1) $25,000,000 in connection with the resolution of this action and related proceedings instituted by NASD and NYSE (the "Federal Payment"); and (2) $25,000,000 that Defendant has offered to pay in connection with the resolution of related proceedings by state securities regulators (which, for these purposes, shall include the District of Columbia and Puerto Rico) (Defendant's offer to the state securities regulators hereinafter shall be called the "State Settlement Offer"). Defendant shall pay the Federal Payment of $25,000,000 by wire transfer within ten business days of the entry of this Final Judgment to the Clerk of this Court, together with a cover letter identifying Goldman, Sachs & Co. as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made to the Court Registry Investment System ("CRIS") Distribution Fund Account pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of its payment and letter to the Clerk of the Court to the SEC's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. The Clerk shall deposit the funds into an interest bearing account with the CRIS, to be designated the "Distribution Fund Account." These funds, together with any interest and income earned thereon (collectively, the "Distribution Fund"), shall be held by the CRIS until further order of the Court. In the event that any portion of the penalty described in Section II.A.1 above is remitted for deposit into the Distribution Fund, such penalty amount shall be added to the Distribution Fund and distributed pursuant to the Fair Funds provisions in Section 308 of the Sarbanes-Oxley Act of 2002; provided, however, that the full penalty amount and such portion shall still be considered a penalty for tax and any other purposes. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Distribution Fund a fee equal to ten (10) percent of the income earned on the Distribution Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States. The Distribution Fund shall be managed in accordance with the terms of this Final Judgment and shall be distributed pursuant to this Final Judgment.

C. Defendant's obligation to make the Federal Payment is not contingent or dependent in any way or part on Defendant's payments to state securities regulators pursuant to the State Settlement Offer. The total amount to be paid by Defendant to state securities regulators pursuant to the State Settlement Offer (and the total amount of the sum of the penalties and disgorgement payable under Section II.A) may be reduced due to the decision of any state securities regulator(s) not to accept the State Settlement Offer. In the event a state securities regulator determines not to accept Defendant's State Settlement Offer, the total amount of the Federal Payment shall not be affected, and shall remain at $25,000,000. The total amount of penalties paid (1) in the Federal Payment ("$P_{Fed}$") and (2) pursuant to that portion of the State Settlement Offer that is accepted by the state securities regulators ("$P_{States}$") shall at all times equal the total amount of disgorgement paid (3) in the Federal Payment ("$D_{Fed}$") and (4) pursuant to that portion of the State Settlement Offer that is accepted by state securities regulators ("$D_{States}$"). Insofar as any amount paid to the state securities regulators pursuant to the State Settlement Offer is

deemed a penalty, the amount of the Federal Payment that is deemed a penalty shall be adjusted so that $P_{Fed} + P_{States} = D_{Fed} + D_{States}$.

## III.
## Uses of the Distribution Fund

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Distribution Fund is to be utilized as follows:

A. To pay any taxes on income earned by the Distribution Fund. The Distribution Fund is intended to be a "qualified settlement fund" pursuant to Section 468B(g) of the Internal Revenue Code and regulations thereunder. The Distribution Fund Administrator appointed pursuant to Section IV.A below of this Final Judgment is designated the administrator of the Distribution Fund as defined in and for the purpose of Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2 by, e.g., (1) obtaining a taxpayer identification number; (2) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon; and (3) satisfying any information reporting or withholding requirements imposed on distributions from the Distribution Fund. Defendant shall provide the Distribution Fund Administrator with relevant information and otherwise cooperate with the Distribution Fund Administrator in fulfilling the Distribution Fund's obligations under Treas. Reg. § 1.468B-2.

B. To pay Eligible Distribution Fund Recipients as described in Section V of this Final Judgment.

C. Restrictions on Use of the Distribution Fund. The Distribution Fund shall not be used directly or indirectly to pay:

1. Defendant, its predecessors, successors, and their subsidiaries, affiliates, present or former officers, directors, and their employees, agents, assigns, members of their immediate households, and those persons in active concert or participation with them, through subrogation or otherwise.

2. With respect to any investment in its own securities, any issuer of securities as to which the Distribution Fund Administrator determines that an investment in such issuer's securities would otherwise provide a basis for receipt of proceeds from the Distribution Fund and, with respect to such securities, such issuer's (a) predecessors, successors, subsidiaries, and affiliates; (b) present or former officers and directors and their agents, assigns, and members of their immediate households; and (c) those persons in active concert or participation with them, through subrogation or otherwise.

3. Any person who has been convicted of a crime substantially related to any act or practice, or the types of acts or practices, identified in the Complaint.

4. Any person who has been enjoined by a court or sanctioned by the Commission or any other regulatory authority for any act or practice, or the types of acts or practices, identified in the Complaint.

5. Any person named as a defendant in a pending federal criminal or civil enforcement action for any act or practice, or the types of acts or practices, identified in the Complaint.

6. Any judgment or award of punitive or non-compensatory damages.

7. Any administrative fees, costs or expenses related to the Distribution Fund Plan described in this Final Judgment, other than the fee equal to ten percent of the income earned on the Distribution Fund as described in Section II.B above.

8. Any amount denominated as attorneys' fees, costs or disbursements.

## IV.
## Distribution Fund Administrator

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. As soon as is practicable, the Court shall appoint a Distribution Fund Administrator, whom the Commission shall recommend. Subject to the Court's approval, there shall be a single Distribution Fund Administrator with respect to this action and the other actions that the Commission has brought against other broker-dealer firms relating to, among other things, alleged research analyst conflicts of interest and that are identified in Addendum B attached hereto (the "Related Actions"). However, the Distribution Fund in this action shall be separate from the Distribution Funds established in those other actions. The Commission may request that additional actions that it brings against other broker-dealer firms or individuals relating to, among other things, alleged research conflicts of interest be added to the list of Related Actions.

B. Payment of Distribution Fund Administrator. Defendant shall pay all fees, costs, and expenses incurred by the Distribution Fund Administrator and approved by the Court in connection with and incidental to the performance of his duties under the Final Judgment, including the fees, costs, and expenses of any persons engaged to assist him and all administrative fees, costs, and expenses related to the Distribution Fund Plan described below. If the Court approves a single Distribution Fund Administrator for all the Related Actions, Defendant shall pay its proportional share of the payments to the Distribution Fund Administrator approved by the Court for all the Related Actions, such proportional share being the fraction equal to the amount deposited into this Distribution Fund by Defendant divided by the total amount deposited into all Distribution Funds established in connection with the Related Actions.

C. Responsibilities, Powers and Rights of the Distribution Fund Administrator. The Distribution Fund Administrator shall:

1. administer the Distribution Fund Plan described below in accordance with and subject to the conditions and limitations imposed by the terms of this Final Judgment;

2. distribute monies from the Distribution Fund to Eligible Distribution Fund Recipients, as approved by the Court;

3. file tax returns on behalf of the Distribution Fund;

4. submit written quarterly reports to the Court and the Commission commencing three months after entry of this Final Judgment; in such periodic reports, the Distribution Fund Administrator shall provide detailed information on the progress of the implementation of the Distribution Fund Plan described below, fees and expenses incurred, and other matters relevant to the status of the Distribution Fund;

5. submit on a quarterly basis requests to the Court, with copies to the Commission staff and Defendant, for payment by Defendant of his fees and expenses (including the fees and expenses of others retained by him as authorized by this Final Judgment) incurred during the quarterly period; the Commission and Defendant shall have the opportunity to comment on the Distribution Fund Administrator's requests within thirty (30) days after receipt thereof, and the Court shall, after taking into consideration the Commission's and Defendant's comments, order the amount that Defendant is to pay the Distribution Fund Administrator for the quarterly period and, if appropriate, the disposition of such amount by the Distribution Fund Administrator; Defendant shall pay such amount within thirty (30) days of the Court's order setting such amount; and

6. have all appropriate powers and authority to perform his duties as set forth in the Final Judgment including, without limitation, the following powers:

(a) to retain and engage such personnel as he deems necessary, including, without limitation, legal counsel, relevant experts, and other personnel to assist in the preparation or administration of the Distribution Fund Plan; and

(b) to delegate to such persons such duties as he deems appropriate.

D. The Distribution Fund Administrator, his agents, attorneys, and all persons acting on his behalf shall be held harmless against all liabilities, claims and demands, whether civil, criminal, administrative, or investigative arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that it is found that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

E. The Court may remove the Distribution Fund Administrator *sua sponte* or, for good cause shown, upon application of the Commission. If the Distribution Fund Administrator decides to resign, he shall first give sixty (60) days written notice to the Commission and the Court of his intention. Such resignation shall not become effective until the Court has appointed a successor. If the Distribution Fund Administrator is removed by the Court, becomes incapacitated due to illness or death, is otherwise unable to serve, or resigns, the Court shall appoint a successor recommended by the Commission.

F. The Distribution Fund Administrator is entitled to rely on all rules of law and court orders, and shall not be liable to anyone for his own good faith

compliance with any order, rule, law, judgment, or decree. Nor shall he be liable for complying with the orders of this Court. In no event shall he be liable to Defendant for his good faith compliance with his duties and responsibilities under this Final Judgment.

G. The Distribution Fund Administrator shall not enter into any employment, consulting, or attorney-client relationship with Defendant or any of its present or former parents, subsidiaries, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years from the completion of his engagement. Any firm with which the Distribution Fund Administrator is affiliated or of which he is a member and any person engaged to assist the Distribution Fund Administrator in the performance of his duties under this Final Judgment shall not, without the Commission's prior written consent, enter into any employment, consulting, or other professional relationship with Defendant or any of its present or former directors, officers, employees, or agents in their capacity as such for the period of the engagement and for three years after the completion of the engagement.

## V.
## Distribution Fund Plan

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

A. The Distribution Fund Administrator shall formulate and administer a Distribution Fund Plan in accordance with Sections V.B — V.F below. The Distribution Fund Plan is intended to provide for the equitable, cost-effective distribution of funds to Eligible Distribution Fund Recipients, as described below. An Eligible Distribution Fund Recipient is not precluded from pursuing, to the extent otherwise available, any other remedy or recourse against Defendant.

B. The Distribution Fund Administrator shall formulate a Distribution Fund Plan that, to the extent practicable, allocates funds to persons who purchased the equity securities of companies referenced in the Complaint. The Distribution Fund Plan need not provide that funds be allocated (i) with respect to purchases of equity securities of *each* company identified in the Complaint or (ii) to *all* purchasers of equity securities of a company identified in the Complaint. The Distribution Fund Plan also may recognize that purchasers of equity securities of companies referenced in connection with one kind (or some kinds) of conduct by Defendant should receive all of the Distribution Fund available for distribution to Eligible Distribution Fund Recipients or a greater proportion than should purchasers of equity securities of companies referenced in connection with another kind (or other kinds) of conduct by Defendant. The Distribution Fund Administrator shall formulate a Distribution Fund Plan that attempts to ensure an equitable (but not necessarily equal) distribution of funds and that those who are allocated funds receive meaningful payments from the Distribution Fund.

C. In formulating the Distribution Fund Plan, the Distribution Fund Administrator shall apply the following criteria to identify Eligible Distribution Fund Recipients:

1. The person must have purchased the equity securities in question

through Defendant during the relevant period identified in the Complaint.

2. The person must have suffered a net loss on his equity securities purchases in question.

D. In formulating the Distribution Fund Plan, the Distribution Fund Administrator may also consider the following criteria in identifying Eligible Distribution Fund Recipients:

1. whether the person was a retail or institutional customer; and

2. the proximity in time between the person's purchase of a company's equity securities and Defendant's publication of the research in question regarding the company (as a threshold matter, however, the purchase must have been made after the publication or receipt of such research; assuming that threshold has been met, in general, the shorter the time period, the more likely the person suffered a loss as a result of conduct alleged in the Complaint).

E. If monies remain in the Distribution Fund after all distributions pursuant to the Distribution Fund Plan have been made, then such remaining monies shall be paid in accordance with a plan of residual distribution to be proposed by the Distribution Fund Administrator after consultation with Commission staff and, in his sole discretion, Defendant, and approved by the Court.

F. As soon as is practicable, and after any consultation with experts that the Distribution Fund Administrator believes is necessary or appropriate, but in no event more than six (6) months after being appointed by the Court, the Distribution Fund Administrator will provide the Commission staff and, in his sole discretion, Defendant for review and comment a Distribution Fund Plan, which shall, among other things, describe a process for (1) identifying and categorizing Eligible Distribution Fund Recipients in accordance with the considerations described above; (2) determining the amount of the Distribution Fund that each Eligible Distribution Fund Recipient shall receive; and (3) distributing the Distribution Fund to Eligible Distribution Fund Recipients. Sixty (60) days after the Distribution Fund Plan has been submitted to the Commission staff, the Distribution Fund Administrator shall present the Plan, with any revisions that the Distribution Fund Administrator deems appropriate, to the Court for its approval. In accordance with the Court's Order approving the Distribution Fund Plan, the Distribution Fund Administrator shall implement the Plan. Upon the completion of the process of identifying the Eligible Distribution Fund Recipients and determining the amount that each should receive, but in no event later than nine (9) months from the Court's approval of the Distribution Fund Plan, the Distribution Fund Administrator shall submit a Distribution Fund Report to the Commission staff and, in his sole discretion, Defendant. The Distribution Fund Report shall set forth (1) the identities of the Eligible Distribution Fund Recipients; (2) the amount of the Distribution Fund that each Eligible Distribution Fund Recipient shall receive; and (3) procedures for distributing the Distribution Fund to Eligible Distribution Fund Recipients. Seven (7) days after submission of the Distribution Fund Report to the Commission staff, the Distribution Fund Administrator shall present the Report to the Court for its approval. The Distribution Fund Administrator and/or the Commission may apply to the Court for extension

of any deadlines set forth above, in the Distribution Fund Plan, or in the Distribution Fund Report, and the Court may grant any such application for good cause shown.

## VI.
### Stay of Proceedings Against the Distribution Fund

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for the purposes of implementing and effectuating the Final Judgment, and upon a finding hereby made that a stay of any proceedings against the Distribution Fund Administrator and the Distribution Fund during the pendency or the existence of the Distribution Fund is necessary to effectuate the Final Judgment, all creditors or claimants of Defendant, and other persons acting on behalf of such creditors, claimants, or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, and attorneys, be and the same hereby are restrained and enjoined during the pendency or the existence of the Distribution Fund from: (1) commencing, prosecuting, continuing, or enforcing any suit or proceeding against the Distribution Fund Administrator or the Distribution Fund; (2) using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any monies deposited, or to be transferred, into the Distribution Fund or the Distribution Fund Administrator pursuant to the Final Judgment, wheresoever situated; and/or (3) doing any act or thing whatsoever to interfere with the taking control, possession, or management by the Distribution Fund Administrator of the monies that are or may be transferred to the Distribution Fund, or in any way to interfere with or harass said Distribution Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Distribution Fund.

## VII.
### Duties and Obligations of Defendant
### to the Distribution Fund Administrator

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, in addition to any other duties and obligations described in this Final Judgment:

A. Defendant shall upon request provide the following non-privileged documents, records, and information to the Distribution Fund Administrator: (1) research reports issued by Defendant during the relevant period identified in the Complaint; and (2) documents, records, and information relating to customers' equity securities transactions with or through Defendant, including but not limited to account statements, order tickets, confirmations, and related documents, records and information. Defendant shall also provide the Distribution Fund Administrator with such other documents, records, and information that the Court may order Defendant to provide upon motion by the Distribution Fund Administrator. Defendant shall cooperate in arranging for interviews of Defendant's employees to explain to the Distribution Fund Administrator and otherwise assist the Distribution Fund Administrator in understanding such documents, records, and information and the distribution of such reports. In addition, Defendant shall provide such other cooperation that the Court may order upon motion by the Distribution Fund Administrator. In

performing his duties pursuant to this Final Judgment, the Distribution Fund Administrator shall not make any determination whether any conduct by Defendant violated federal or state securities laws or NASD or NYSE rules or conduct any inquiry for the purpose of making any such determination.

B. Defendant shall take such actions as the Distribution Fund Administrator may require (including, but not limited to, providing any notices to any of Defendant's present or former customers that the Distribution Fund Administrator deems appropriate) to ensure proper implementation of the Distribution Fund Plan.

C. Defendant shall indemnify, defend, and hold harmless the Distribution Fund Administrator, his agents, and his attorneys from and against all liabilities, claims, and demands, whether civil, criminal, administrative, or investigative, judgments, fines, and amounts paid in settlement, and costs and expenses (including attorneys' fees), arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that the Court finds that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

## VIII.
## Financial Obligation Regarding Independent Research

A. As referenced in Section II.A.3 above, Defendant shall pay a total of $50,000,000 for its Independent Consultant to procure Independent Research from the Independent Research Providers over the five-year period set forth in Section III.1 of Addendum A hereto. This amount is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. As used herein, the terms "Independent Consultant," "Independent Research," and "Independent Research Providers" shall have the meanings set forth in Addendum A hereto. Defendant will not be required to spend more than the amount set forth in this Section VIII.A in order to procure Independent Research and will have no obligation to procure additional Independent Research if the Independent Consultant has spent the entire amount of Defendant's financial obligation with regard to Independent Research. Any money that is not spent after the five-year period set forth in Section III.1 of Addendum A hereto will not be retained by Defendant and will be paid one-half to NASD and one-half to NYSE for use in their regulation and enforcement programs.

B. Defendant shall also escrow $1,250,000 within thirty (30) days after entry of this Final Judgment to cover the fees and costs of the Independent Consultant. This obligation is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. In the event that such escrowed amount exceeds the fees and costs of the Independent Consultant, the excess will be returned to Defendant at the conclusion of the five-year period set forth in Section III.1 of Addendum A hereto.

## IX.
## Investor Education

A. Payments to the Investor Education Fund.

1. As referenced in Section II.A.4 above, Defendant shall pay a total amount of $10,000,000 to be used for investor education. Defendant shall pay this amount in five equal installments on an annual basis. Of this amount, $5,000,000 represents the amount Defendant has offered to pay for investor education in five equal annual installments pursuant to the State Settlement Offer. Defendant shall pay the remaining amount of $5,000,000 in five equal annual installment payments pursuant to the terms of this Final Judgment (the "Federal Investor Education Payments"). Defendant's obligation to make the Federal Investor Education Payments is not contingent or dependent in any way or part on Defendant's investor education payments pursuant to the State Settlement Offer. The amount of Defendant's investor education payments pursuant to the State Settlement Offer (and the total amount of $10,000,000 payable for investor education under Section II.A) may be reduced due to the decision of any state securities regulator(s) not to accept the State Settlement Offer. In the event a state securities regulator determines not to accept Defendant's State Settlement Offer, the total amount of Defendant's Federal Investor Education Payments shall not be affected, and shall remain at $5,000,000 to be paid in five equal installments on an annual basis.

2. Defendant shall make the first such installment payment within ninety (90) days after the entry of this Final Judgment by the Court. This payment shall be made by wire transfer to the Clerk of this Court, together with a cover letter identifying Goldman, Sachs & Co. as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made to the CRIS Investor Education Fund Account pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of its payment and letter to the Clerk of the Court to the SEC's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. The Clerk shall deposit the funds into an interest bearing account with the CRIS, to be designated the "Investor Education Fund Account." Any interest and income earned on funds in the Investor Education Fund Account shall be added to and become part of the Investor Education Fund Account. The Investor Education Fund Account shall be held by the CRIS until further order of the Court. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Investor Education Fund Account a fee equal to ten (10) percent of the income earned on the Investor Education Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States. The Investor Education Fund Account shall be administered in accordance with the terms of the Investor Education Plan to be approved by this Court as provided for in this Final Judgment.

3. Defendant shall make subsequent installment payments annually on or before the month and day of the entry of this Final Judgment. Such payments shall be made into the Investor Education Fund by the means to be specified in the Investor Education Plan or in a further order of this Court.

B. <u>Purpose of and Limitations on the Use of the Investor Education Fund.</u>

1. The Investor Education Fund (including all installment payments) shall

be used to support programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions, according to the terms of this Final Judgment and the Investor Education Plan described below.

2. The Investor Education Fund, and any grants awarded from the Investor Education Fund, shall not be used:

(a) to benefit, directly or indirectly:

(i) beyond the payment of his fees and expenses, the Investor Education Fund Administrator (described below) or any person involved in the review or approval of applications for grants from the Investor Education Fund; any entity that employs such a person; any entity that has contributed to the Investor Education Fund; or any entity affiliated with any such contributor;

(ii) Defendant, its predecessors, successors, or their subsidiaries, affiliates, present or former officers, directors, or their employees, agents, assigns, members of their immediate households, or those persons in active concert or participation with them, through subrogation or otherwise;

(iii) any person who has been convicted of a crime substantially related to any act or practice, or the types of acts or practices, identified in the Complaint;

(iv) any person who has been enjoined by a court or sanctioned by the Commission or any other regulatory authority for any act or practice, or the types of acts or practices, identified in the Complaint; or

(v) any person named as a defendant in a pending federal criminal or civil enforcement action for any act or practice, or the types of acts or practices, identified in the Complaint;

(b) to promote, directly or indirectly, the products or services of any single firm or entity;

(c) for any unlawful or unethical purpose; or

(d) for any non-educational purpose.

3. Monies in the Investor Education Fund may also be used to pay any taxes on income earned by such Fund. The Investor Education Fund is intended to be a "qualified settlement fund" pursuant to Section 468B(g) of the Internal Revenue Code and regulations thereunder. The Investor Education Fund Administrator (described below) is designated the administrator of such Fund as defined in and for the purpose of Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2 by, e.g., (1) obtaining a taxpayer identification number; (2) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon; and (3) satisfying any information reporting or withholding requirements imposed on distributions from such Fund. Defendant shall provide the Investor Education Fund Administrator with relevant information and otherwise cooperate with the

Investor Education Fund Administrator in fulfilling such Fund's obligations under Treas. Reg. § 1.468B-2.

C. Appointment and Payment of the Investor Education Fund Administrator.

1. As soon as is practicable, the Court shall appoint an Investor Education Fund Administrator, whom the Commission shall recommend. Subject to the Court's approval, there shall be a single Investor Education Fund Administrator with respect to this action and the Related Actions. However, the Investor Education Fund in this action shall be separate from the Investor Education Funds established in those other actions.

2. All fees, costs, and expenses incurred by the Investor Education Fund Administrator and approved by the Court in connection with and incidental to the performance of his duties under the Final Judgment, including the fees, costs, and expenses of any persons engaged to assist him and all administrative fees, costs, and expenses related to the Investor Education Plan described below, shall be paid out of the Investor Education Fund in this Action and/or the Related Actions.

D. Responsibilities, Powers and Rights of the Investor Education Fund Administrator.

1. The Investor Education Fund Administrator shall:

(a) propose and administer the Investor Education Plan described below in accordance with and subject to the conditions and limitations imposed by the terms of this Final Judgment;

(b) distribute monies from the Investor Education Fund pursuant to the Investor Education Plan;

(c) file all required tax returns on behalf of the Investor Education Fund;

(d) commencing one year after entry of this Final Judgment and continuing through the life of the Investment Education Fund, submit written annual reports to the Court and the Commission providing detailed information on the progress of the implementation of the Investor Education Fund (including a description of all grant applications received and all grants approved), fees and expenses incurred, and other matters relevant to the status of the Investor Education Fund; and

(e) file with the Court on a quarterly basis, with copies to the Commission staff, applications for payment of his fees and expenses (including the fees and expenses of others retained by him as authorized by this Final Judgment) incurred during the quarterly period. At least thirty (30) days before making each such application to the Court, the Investor Education Fund Administrator shall submit the application to the Commission staff, and the Commission may advise the Court whether it has any objection. Upon approval of any such application by the Court, the Clerk of the Court shall pay the approved amounts to the Investment Education Fund Administrator and to those employed by him from the CRIS Investment Education Fund Account or, if applicable, the Investor Education Fund Administrator may pay the approved amounts to himself and to those

employed by him from the Investor Education Fund.

2. The Investment Education Fund Administrator shall have all appropriate powers and authority to perform his duties as set forth in this Final Judgment including, without limitation, the following powers:

(a) to retain and engage such personnel as he deems necessary, including, without limitation, legal counsel, relevant experts, and other personnel to assist in the preparation and administration of the Investor Education Plan; and

(b) to delegate to such persons such duties as he deems appropriate.

3. The Investor Education Fund Administrator, his agents, attorneys and all persons acting on his behalf shall be held harmless against all liabilities, claims and demands, whether civil, criminal, administrative, or investigative arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that it is found that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment. ·

4. Defendant shall indemnify, defend, and hold harmless the Investment Education Fund Administrator, his agents, and his attorneys from and against all liabilities, claims, and demands, whether civil, criminal, administrative, or investigative, judgments, fines, and amounts paid in settlement, and costs and expenses (including attorneys' fees), arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that the Court finds that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

5. The Court may remove the Investor Education Fund·Administrator *sua sponte* or, for good cause shown, upon application of the Commission. If the Investor Education Fund Administrator decides to resign, he shall first give sixty (60) days written notice to the Commission and the Court of his intention. Such resignation shall not become effective until the Court has appointed a successor. If the Investor Education Fund Administrator is removed by the Court, becomes incapacitated due to illness or death, is otherwise unable to serve, or resigns, the Court shall appoint a successor recommended by the Commission.

6. The Investor Education Fund Administrator is entitled to rely on all rules of law and court orders, and shall not be liable to anyone for his own good faith compliance with any order, rule, law, judgment, or decree. Nor shall he be liable for complying with the orders of this Court. In no event shall he be liable to Defendant for his good faith compliance with his duties and responsibilities under this Final Judgment.

7. The Investor Education Fund Administrator shall not enter into any employment, consulting, or attorney-client relationship with Defendant, or any of its present or former parents, subsidiaries, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of three years from the completion of his

engagement. Any firm with which the Investor Education Fund Administrator is affiliated or of which he is a member and any person engaged to assist the Investor Education Fund Administrator in the performance of his duties under this Final Judgment shall not, without the Commission's prior written consent, enter into any employment, consulting or other professional relationship with Defendant, or any of its present or former directors, officers, employees, or agents in their capacity as such for the period of the engagement and for three years after the completion of the engagement.

E. The Investor Education Plan.

1. As soon as is practicable, but in no event more than sixty (60) days after being appointed by the Court, the Investor Education Fund Administrator shall provide the Commission staff for its review and comment an Investor Education Plan.

2. The Investor Education Plan shall establish and describe a non-profit grant administration program to fund worthy and cost-efficient programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions. The Investor Education Plan shall state the means by which Defendant shall make all remaining installment payments required by this Final Judgment; may authorize the transfer of the funds in the CRIS Investor Education Fund accounts in this action and in the Related Actions to one or more interest-bearing accounts opened and maintained by the Investor Education Fund Administrator; shall include all provisions necessary to implement the Investor Education Plan; and shall be consistent in all respects with the terms of this Final Judgment.

3. Thirty (30) days after the Investor Education Plan has been submitted to the Commission staff, the Investor Education Fund Administrator shall present such Plan, with any revisions that he deems appropriate, to the Court for its approval. The Investor Education Fund Administrator shall promptly begin to implement such Plan after it has been approved by the Court.

F. Stay of Proceedings. For the purposes of implementing and effectuating the Final Judgment, and upon a finding hereby made that a stay of any proceedings against the Investor Education Fund Administrator and the Investor Education Fund during the pendency or the existence of such Fund is necessary to effectuate the Final Judgment, all creditors or claimants of Defendant, and other persons acting on behalf of such creditors, claimants, or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, and attorneys, be and the same hereby are restrained and enjoined during the pendency or the existence of the Investor Education Fund from: (1) commencing, prosecuting, continuing, or enforcing any suit or proceeding against the Investor Education Fund Administrator or the Investor Education Fund; (2) using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property owned by or in the possession of or to be transferred to the Investor Education Fund or the Investor Education Fund Administrator pursuant to the Final Judgment, wheresoever situated; and/or (3) doing any act or thing whatsoever to

interfere with the taking control, possession, or management by the Investor Education Fund Administrator, of the monies that are or may be transferred to the Investor Education Fund, or in any way to interfere with or harass said Investor Education Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Investor Education Fund.

## X.
## Standing

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, notwithstanding any rule or provision of law, nothing herein, including in the Addenda hereto, shall be deemed to confer standing or right of intervention upon any persons other than the Commission, Defendant, and the Distribution Fund Administrator.

## XI.
## Record Retention and Non-Destruction Requirement

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for a period of five years from the effective date of this Final Judgment or such shorter or longer period as the Court may order, Defendant, its officers, directors, agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, are hereby enjoined from destroying, mutilating, concealing, altering, or disposing of (a) any research distributed by Defendant during the relevant period identified in the Complaint; (b) documents sufficient to identify all customers who bought or sold equity securities of the issuers as to which Defendant issued research during the relevant period identified in the Complaint (the "Transactions"), including but not limited to documents sufficient to identify the dates, amounts, and prices of the Transactions; (c) documents sufficient to identify which customers received which research distributed by Defendant during the relevant period identified in the Complaint; (d) order entry information sufficient to identify whether the Transactions were solicited by Defendant; (e) documents sufficient to identify the publicly-traded companies for which Defendant sought to provide, was engaged to provide, or did provide investment banking services during the relevant period identified in the Complaint; and (f) any and all written (including electronic) communication, including communications to and from customers and intra-firm communications, relating to Defendant's investment banking and equity research operations during the relevant period identified in the Complaint; *provided, however,* that Defendant need not retain duplicate identical copies of public documents filed with the Commission or any other regulatory authority.

## XII.
## Defendant's Consent Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and Defendant shall comply with all of the undertakings and agreements set forth therein.

## XIII.
## Attached Undertakings Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant shall comply with the undertakings set forth in Addendum A hereto. Such undertakings and Addendum A are incorporated herein with the same force and effect as if fully set forth herein.

## XIV.
### Definition of Defendant

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that with respect to all injunctive relief and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions, the terms "Defendant" and "Defendant's" as used herein shall include Defendant's successors and assigns (which, for these purposes, shall include a successor or assign to Defendant's investment banking and research operations, and in the case of an affiliate of Defendant, a successor or assign to Defendant's investment banking *or* research operations).

## XV.
### Court to Retain Jurisdiction

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## XVI.
### Entry of Judgment Forthwith

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, there being no just cause for delay, the Clerk of the Court shall, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, enter this Judgment forthwith and without further notice.

Dated: New York, New York

_____, 2003

_____
UNITED STATES DISTRICT JUDGE

http://www.sec.gov/litigation/litreleases/judg18113.htm

```
===================================================================
```
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
```
-------------------------------------------------------------------
```
1        No.    61
EBC I, Inc., &c .,
                        Respondent,
            v.
Goldman Sachs & Co.,
                  Appellant.



            John L. Warden, for appellant.
            Stanley M. Grossman, for respondent.
            Securities Industry Association, <u>amicus curiae</u>.




CIPARICK, J.:

            Plaintiff, the Official Committee of Unsecured

Creditors of EBC I., Inc., formerly known as eToys, Inc., brought

this action against defendant Goldman, Sachs & Co., the lead

managing underwriter of its initial public stock offering,

alleging five causes of action related to the underwriting

                        - 1 -

- 2 -                                                      No. 61

agreement: breach of fiduciary duty, breach of contract, fraud,
professional malpractice and unjust enrichment.  We hold that
plaintiff's complaint fails to state claims for breach of
contract, professional malpractice and unjust enrichment.  We
therefore modify the Appellate Division order to dismiss these
claims and, as modified, affirm to allow the fiduciary duty cause
of action to proceed.  Leave to replead the fraud cause of action
was correctly granted;  plaintiff has filed an amended complaint,
but the sufficiency of that pleading is not before us on this
appeal.

I.

This case involves the underwriting process by which
investment banks help take securities to the market in an initial
public offering (IPO).  Companies may decide to make such an
offering for several reasons, including a desire to raise new
capital and to create a public market for their shares
(see Thomas Lee Hazen, The Law of Securities Regulations § 3.1
[2] [5th ed]; see also Larry D. Soderquist, Understanding the
Securities Law  § 2:2 et seq. [Prasticing Law Institute 4th ed]).
A "firm commitment underwriting," at issue here, typically
involves an agreement whereby the "issuer" -- or company seeking
to issue the security (see Securities Act of 1933 § 2 [15 USC §
77b (a) (4)]) -- sells an entire allotment of shares to an
investment firm who purchases the shares with a view to sell them
to the public (see Securities Act of 1933 § 2 [15 USC § 77b (a)

- 2 -

- 3 -                                No. 61

(11)] [defining an "underwriter"]; see also Hazen, The Law of

Securities Regulations at § 2.1 [2] [B]; Louis Loss and Joel

Seligman, Securities Regulations § 2-A [3d ed]).

As underwriter, the functions of the investment firm

include negotiating an initial public offering price for the

securities with the issuer, purchasing the securities from the

issuer at a discount and reselling them on the market at the

public offering price.  The difference or "spread" between the

amount the underwriter pays for the securities and the price at

which the securities are sold to the public makes up the

underwriter's compensation for its services.  Because in a firm

commitment underwriting the underwriter owns, and is obligated to

pay the issuer for the securities regardless of whether it can

resell them, it may assemble a group of underwriters, known as a

syndicate, to help absorb the risk.[1]

As stated in plaintiff's complaint, in the late 1990's,

eToys, Inc., an internet-retailer specializing in the sale of

products for children, sought to go public in order to obtain

financing necessary to further implement its business plan.  In

January 1999, eToys retained Goldman Sachs as lead managing

---

[1]   see William J. Grant, Jr., Overview of the Underwriting
Process, Securities Underwriting:  A Practitioner's Guide, at 25-
45 [Bialkin and Grant eds. 1985]; John S. D'Alimonte, The Letter
of Intent and the Basic Structure of An Offering, supra at 85-98;
David B. Rea and William J. Grant, The Syndication and Marketing
Process, supra at 277-291; Samuel N. Allen, A Lawyer's Guide to
the Operation of Underwriting Syndicates, 26 New Eng L Rev 319,
320-321 [1991]).

- 3 -

- 4 -                                         No. 61

underwriter of its initial public offering.[2]

Within the context of its engagement, Goldman Sachs met with potential investors, responded to inquiries about eToys' business and gauged investors' indications of interest in eToys' shares. On April 19, 1999, eToys and Goldman Sachs finalized the underwriting agreement. eToys agreed to sell 8,320,000 shares of its stock to Goldman Sachs and the other underwriters for $18.65 per share with the option to buy an additional 1,248,000 shares at the same price to cover overallotments. The agreement also provided that Goldman Sachs would offer the shares for public sale upon the terms and conditions set forth in the Prospectus, which fixed the initial offering price at $20 per share. Thus, Goldman Sachs's potential profit was $1.35 per share or 6.75 % of the offering proceeds. Goldman Sachs was to receive a total of at most $12,916,800 from the sale.

On May 20, 1999, the first day of trading, the stock opened at $79 per share, rose as high as $85 per share and closed at $76.56. By the end of the year, however, the stock closed at $25. Soon thereafter, it fell below $20 and never rose above the initial offering price. Eventually, in March 2001, eToys filed a

---

[2] Three other co-managing underwriters were BancBoston Robertson Stephens Inc., Donaldson, Lufkin & Jenrette Securities Corp., and Merrill Lynch, Pierce, Fenner & Smith, Inc., who formed the underwriting syndicate, later joined by additional firms. Plaintiff has filed a separate action against the other syndicate underwriters alleging substantially the same claims as here.

- 4 -

- 5 -                                        No. 61

voluntary petition for reorganization under Chapter 11 of the
United States Bankruptcy Code in the District of Delaware.  The
Bankruptcy Court appointed the Official Committee of Unsecured
Creditors and authorized the Committee to bring this action on
behalf of eToys, now known as EBC I, Inc.

     The complaint alleges that eToys relied on Goldman
Sachs for its expertise as to pricing the IPO, and that Goldman
Sachs gave advice to eToys without disclosing that it had a
conflict of interest.  Specifically, the complaint alleges that
Goldman Sachs entered into arrangements "where-by its customers
were obligated to kick back to Goldman a portion of any profits
that they made" from the sale of eToys securities subsequent to
the initial public offering.  Because a lower IPO price would
result in a higher profit to these clients upon the resale of the
securities and thus a higher payment to Goldman Sachs for the
allotment, plaintiff alleges Goldman Sachs had an incentive to
advise eToys to underprice its stock.  As a result of this
undisclosed scheme, Goldman Sachs was allegedly paid 20-40% of
the clients' profits from trading the eToys securities.

     Relying on these allegations, plaintiff brought five
causes of action against Goldman Sachs: breach of fiduciary duty
(first), breach of contract (second), fraud (third), professional
malpractice (fourth) and unjust enrichment (fifth).[3]  In

_____

   [3] Plaintiff also claimed additional damages incurred by
eToys as a result of Goldman Sachs's misconduct causing the
failure of the business and its eventual bankruptcy.  The

- 5 -

- 6 -                                                    No. 61

response, Goldman Sachs moved to dismiss the complaint in its

entirety for failure to state any cause of action.

Supreme Court in two orders (one denominated Judgment)

granted the motion to the extent of dismissing the second, third

(with leave to replead), fourth and fifth causes of action.  The

court denied that part of the motion seeking to dismiss the first

cause of action for breach of fiduciary duty, finding that

"[a]lthough the contract did not establish a formal fiduciary

relationship . . . the pleading sufficiently raises an issue as

the existence of an informal one," and noting that Goldman Sachs

had also advised eToys in connection with a preferred stock

offering.

The Appellate Division modified the initial order of

Supreme Court, opining that the breach of fiduciary duty claim

was correctly sustained upon allegations showing a preexisting

relationship between eToys, Inc. and Goldman Sachs that justified

eToys' alleged trust in pricing the shares.  The court further

held that the trial court properly dismissed the fraud cause of

action with leave to replead, reasoning that plaintiff did not

allege with sufficient particularity who made the purported

misrepresentations to eToys, Inc.  The Appellate Division,

however, disagreed with the Supreme Court as to the breach of

contract, professional malpractice and unjust enrichment causes

Appellate Division ruled that the "proximate cause of the damages
claimed is an issue of fact inappropriate for determination at
this juncture" (7 AD3d 418, 421).  We agree.

- 6 -

- 7 -                                        No. 61

of action, reinstating all three.

Goldman Sachs appeals by leave of the Appellate Division on a certified question.  We now modify the order of the Appellate Division by dismissing the second, fourth and fifth causes of action.  We agree with the trial court and Appellate Division that the pleading of the fiduciary duty claim is sufficient and that leave to replead the fraud claim was proper.

II.

In the context of a motion to dismiss pursuant to CPLR 3211, the court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference (see Goshen v Mut. Life Ins. Co. of New York, 98 NY2d 314, 326 [2002]). Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss. Applying this standard, we conclude that plaintiff's allegations of breach of fiduciary duty survive Goldman Sach's motion to dismiss.

A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (Restatement [Second] of Torts § 874, Comment a).  Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arms-length business transactions (see

- 7 -

- 8 -                                                                No. 61

Northeast Gen. Corp. v Wellington Adv., Inc., 82 NY2d 158, 162

[1993]).  Generally, where parties have entered into a contract,

courts look to that agreement "to discover . . . the nexus of

[the parties] relationship and the particular contractual

expression establishing the parties' interdependency" (see id. at

160).  "If the parties . . . do not create their own relationship

of higher trust, courts should not ordinarily transport them to

the higher realm of relationship and fashion the stricter duty

for them" (id. at 162).  However, it is fundamental that

fiduciary "liability is not dependent solely upon an agreement or

contractual relation between the fiduciary and the beneficiary

but results from the relation" (Restatement [Second] of Torts

874; Comment b).

         Goldman Sachs argues that the relationship between an

issuer and underwriter is an arms-length commercial relation from

which fiduciary duties may not arise.  It may well be true that

the underwriting contract, in which Goldman Sachs agreed to buy

shares and resell them, did not in itself create any fiduciary

duty.  However, a cause of action for breach of fiduciary duty

may survive, for pleading purposes, where the complaining party

sets forth allegations that, apart from the terms of the

contract, the underwriter and issuer created a relationship of

higher trust than would arise from the underwriting agreement

alone.

         Here, the complaint alleges an advisory relationship

- 8 -

- 9 -

that was independent of the underwriting agreement.
Specifically, plaintiff alleges eToys was induced to and did
repose confidence in Goldman Sachs's knowledge and expertise to
advise it as to a fair IPO price and engage in honest dealings
with eToy's best interest in mind.  Essentially, according to the
complaint, eToys hired Goldman Sachs to give it advice for the
benefit of the company, and Goldman Sachs thereby had a fiduciary
obligation to disclose any conflict of interest concerning the
pricing of the IPO.  Goldman Sachs breached this duty by
allegedly concealing from eToys its divided loyalty arising from
its profit-sharing arrangements with clients.

　　　　Contrary to Goldman Sachs's contention, recognition of
a fiduciary duty to this limited extent -- requiring disclosure
of Goldman Sachs's compensation arrangements with its customers -
- is not in conflict with an underwriter's general duty to
investors under the Securities Act of 1933 to exercise due
diligence in the preparation of a registration statement.[4]  An
obligation not to conceal from the issuer private arrangements
made with a group of potential investors does not compromise
Goldman Sachs's charge to be truthful in its public disclosure

---

[4] The underwriter's responsibility with regard to a registration
statement is to provide full and adequate information to investors concerning
the distribution of the securities and the issuing company (see Securities Act
of 1933
§ 7 [15 USC § 77g] [providing in part that any registration statement shall
contain information and documents "necessary or appropriate in the public
interest or for the protection of investors"]; see also id. at Sched. A [15
USC § 77aa] [schedule of information requested in registration statement]; id.
at § 11 [15 USC 77k] [establishing civil liability on account of false
registration statement]).

- 10 -                                                    No. 61

regarding the issuer's business.  For similar reasons, we do not share the dissent's concern that upholding an issuer's fiduciary duty claim against an underwriter "potentially conflicts with a highly complex regulatory framework designed to safeguard investors" (dissenting op. at 2).  Recognizing a common law remedy, under these circumstances, will not hinder the efforts being expended to regulate in this area.

Goldman Sachs's additional argument that there could be no fiduciary duty in this case because eToys and Goldman Sachs functioned as a typical seller and buyer is also unavailing. Generally, a buyer purchases a seller's goods at a wholesale price and attempts to resell those goods at the highest possible profit.  Such a transaction would negate any fiduciary duty concerning pricing advice as no rational seller would place trust in a buyer's pricing given the parties' opposing interests. Here, in contrast, Goldman Sachs and eToys allegedly agreed to a fixed profit from the selling of the securities -- Goldman Sachs was to receive about 7% of the offering proceeds.   Thus eToys allegedly believed its interests and those of Goldman Sachs were aligned:  the higher the price, the higher Goldman Sachs's 7% profit.  Consequently, eToys allegedly had a further reason to trust that Goldman Sachs would act in eToys interest when advising eToys on the IPO price.

Goldman Sachs warns that to find a fiduciary relationship in this case may have a significant impact on the

- 10 -

- 11 -                                          No. 61

underwriting industry. We think its concern is overstated. To the
extent that underwriters function, among other things, as expert
advisors to their clients on market conditions, a fiduciary duty
may exist. We stress, however, that the fiduciary duty we
recognize is limited to the underwriter's role as advisor. We do
not suggest that underwriters are fiduciaries when they are
engaged in activities other than rendering expert advice. When
they do render such advice, the requirement to disclose to the
issuers any material conflicts of interest that render the advice
suspect should not burden them unduly.

Accepting the complaint's allegations as true, as the
Court must at this stage, plaintiff has sufficiently stated a
claim for breach of fiduciary duty. This holding is not at odds
with the general rule that fiduciary obligations do not exist
between commercial parties operating at arms' length -- even
sophisticated counseled parties -- and we intend no damage to
that principle. Under the complaint here, however, the parties
are alleged to have created their own relationship of higher
trust beyond that which arises from the underwriting agreement
alone, which required Goldman Sachs to deal honestly with eToys
and disclose its conflict of interest -- the alleged profit-
sharing arrangement with prospective investors in the IPO.[5]

---

[5] Other jurisdictions interpreting New York law have allowed similar
pleadings to go forward and have held that the question of whether an
underwriter had fiduciary obligations to the issuer of an IPO is a fact
specific determination to be made by the fact-finder (see Breakaway Solutions,
Inc. v Morgan Stanley & Co., Inc., 2004 WL 1949300, 2004 Del. Ch. LEXIS 125

- 12 -                                   No. 61

III.

Moving next to plaintiff's other causes of action, we hold that the courts below properly dismissed the claim for breach of contract in the absence of an allegation that Goldman Sachs breached any provisions of the underwriting agreement.  It is undisputed that Goldman Sachs fulfilled its commitments as set forth in the parties' contract, purchasing all of the available shares at a total of $178.4 million paid to eToys and reselling them to the public at the initial offering price of $20.00 per share.

Relatedly, plaintiff has also failed to plead a cause of action for breach of an implied covenant of good faith and fair dealing sufficient to survive dismissal under CPLR 3211. The complaint does not adequately allege that Goldman Sachs injured eToys's right to receive the benefits of their agreement (see 511 West 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002]; see also Dalton v Educational Testing Serv., 87 NY2d 384, 389-390 [1995]).  As stated in the Prospectus, the principal purposes of the public offering were to increase working capital, to create a public market for the common stock, to facilitate future access to public markets, and to increase eToys's visibility in the retail marketplace.  There is no dispute that the contractual objectives were achieved as a result

[Aug. 27, 2004]; Xpedior Creditor Trust v Credit Suisse First Boston (USA), Inc., 341 F Supp 2d 258 [US Dist Ct, SD NY 2004]; MDCM Holdings, Inc. v Credit Suisse First Boston Corp., 216 F Supp 2d 251 [US Dist Ct, SD NY 2002]).

- 12 -

No. 61

of Goldman Sachs's underwriting services, and the complaint fails
to allege otherwise.

Because this case arises from defendant's appeal, the
issue with respect to plaintiff's fraud claim is limited to
whether the courts below abused their discretion in granting
plaintiff leave to replead.  We find no abuse of discretion as
plaintiff's allegations, if accompanied by sufficient detail,
would be adequate to support a fraud claim at this juncture (see
Lama Holding Co. v Smith Barney, Inc., 88 NY2d 413, 421 [1996];
see also CPC Intl., Inc. v McKesson Corp., 70 NY2d 268, 285
[1987]).

Next is the cause of action for professional
malpractice.  The essence of plaintiff's allegations in this
regard is that Goldman Sachs engaged in intentional misconduct by
underpricing its shares, not that the investment firm acted
negligently in failing to exercise a particular level of skill.
Thus, we hold that the malpractice claim was properly dismissed
as insufficiently pleaded and leave open the question whether a
financial advisor or underwriter may ever be treated as a
professional for purposes of such liability (see Chase Scientific
Research, Inc. v NIA Group, Inc., 96 NY2d 20, 29-30 [2001]).

Lastly, plaintiff fails to state a cause of action for
unjust enrichment as the existence of a valid contract governing
the subject matter generally precludes recovery in quasi contract
for events arising out of the same subject matter (see Clark-

- 14 -                                                No. 61

Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 387 [1987]).

Accordingly, the order of the Appellate Division should be modified, without costs, by dismissing the second, fourth and fifth causes of action and as so modified, affirmed.  The certified question should be answered in the negative.

EBC I, Inc. v Goldman Sachs

No. 61

READ, J. (dissenting in part):

     The majority today holds that the lead managing underwriter in a firm commitment underwriting owes a fiduciary duty to the issuer to disclose conflicts of interest in connection with the pricing of securities. This new fiduciary obligation wars against our precedent and potentially conflicts

- 1 -

with a highly complex regulatory framework designed to safeguard investors.  I therefore respectfully dissent.

"Unless statutory language or public policy dictates otherwise, the terms of a written agreement define the rights and obligations of the parties" (Abiele Contr. v New York City School Constr. Auth., 91 NY2d 1, 9 [1997]).  We have faithfully -- that is, until today -- declined to second-guess or interpolate unbargained-for provisions into contracts that are "the product of an arms-length transaction between sophisticated businessmen, ably represented" (JMD Holding Corp. v Cong. Fin. Corp., 2005 NY LEXIS 703, *15 [2005]; see also South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005] [the "instrument was negotiated between sophisticated, counseled business people negotiating at arm's length" (quoting Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995])]; Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [same]; Fiore v Oakwood Plaza Shopping Center, 78 NY2d 572, 581 [1991] ["Defendants were sophisticated parties involved in an arm's length commercial transaction. . . .  The purchase price of the land alone was well in excess of $1 million, indicating the magnitude of the project.  Furthermore, the parties were represented by counsel in negotiating the terms of the agreement"]; Chimart Assocs. v Paul, 66 NY2d 570, 574 [1986] ["the contract at issue is part of a multimillion dollar transaction involving sophisticated, counseled parties dealing at

- 3 -                                    No. 61

arm's length"]).

        More particularly, we have -- again, until today --
refrained from injecting fiduciary obligations into
sophisticated, counseled parties' arms-length commercial
dealings.  In refusing to fashion a "newly-notched fiduciary-like
duty" for finders in Northeast Gen. Corp. v Wellington Adv. (82
NY2d 158, 162 [1993]), we remarked that "[i]f the parties find
themselves in the milieu of the 'workaday' mundane marketplace,
and if they do not create their own relationship of higher trust,
courts should not ordinarily transport them to the higher realm
of relationship and fashion the stricter duty for them."

        Plaintiff, the committee of unsecured creditors of the
bankrupt eToys, Inc., claims that Goldman, Sachs & Co., the lead
managing underwriter of eToys' initial public offering (IPO),[1]
duped eToys into underpricing its stock at $20 a share.[2]

_____

    [1]An IPO is the first public issuance of a stock from a company that has
not previously been traded publicly.  In a "hot" IPO, like eToys', the stock
immediately trades at a premium in the aftermarket, the trading that takes
place after termination of the price and trading restrictions governing the
offering.

    [2]"Underpricing" refers to the difference between the price at which
stock is sold to the public in an IPO and the price in the aftermarket.  That
IPOs are underpriced is "as shocking a surprise as Claude Rains' discovery in
'Casablanca' that gambling was in progress at Rick's Café," since the
"systematic underpricing of IPO shares [is] probably the most thoroughly
documented empirical fact about IPOs" (Coffee, The IPO Allocation Probe:  Who
Is the Victim?, NYLJ, Jan 18, 2001, at 5, col 1); see generally Ritter, The
Long-Run Performance of Initial Public Offerings, 46 J Fin 3 [1991] [citing
studies showing that IPOs produce 16.4% average positive initial return as
measured from the offering price to the market price at the end of the first
day of trading, and that extent of underpricing is highly cyclical, with much
higher positive initial returns evident during "hot issue" markets; and, using
a sample of 1,526 IPOs that went public in the United States in the 1975-84

- 3 -

Goldman allegedly carried out this deception so that it might profit from secret side deals with preferred customers who "were obligated to kick back to Goldman a portion of any profits that they made on after[]market sales of eToys['] securities allocated to them at the IPO."[3]  While the pleading does not spell out exactly how underpricing worked in Goldman's favor, plaintiff's theory has ₊to be that Goldman, whose underwriting compensation was a percentage (6.75%) of aggregate offering proceeds, stood to make more money on kickbacks from these secret side deals than it would have earned on its increased compensation from selling shares at some higher, theoretically "correct" price.  Plaintiff further alleges that "[b]ased on communications with Goldman, it was eToys' understanding that the offering price for eToys' common shares was to be set primarily by reference to then

---

period, documenting third "anomaly," which is that in the long-run IPOs appear to be overpriced]; see also Griffith, A Legal and Economic Analysis of the Preferential Allocation of Shares in Initial Pubic Offerings, 69 Brooklyn L Rev 583, 590-630 [Winter 2004] [examining various theories to explain underpricing]).  During the heyday of the internet stock bubble, when eToys' public offering took place, very large "pops" in first-day IPO prices were commonplace, reaching a zenith (or nadir, depending upon your point of view) with the IPO of VA Linux Systems in December 1999.  VA Linux -- which, like eToys is now bankrupt -- was priced at $30 a share, opened at $300 a share and closed at $242.375 a share, thus soaring 698% in opening day Nasdaq trading (see Fisher, A Tiny Company Without Profits Goes Public With a Bang, NYT, Dec 10, 1999; see also Baker, Who Wants to Be a Millionaire?  Law Firms Investing in Hot High-Tech IPOs Are Making a Fortune, But Some Critics Worry the Stock Craze is Clouding Ethics Matters, 86 Feb ABA J 36 ["The fact that VA Linux hadn't turned a dime in profits and had no expectation of doing so did little to deter trading.  Investors pushed the price upward on a gamble that the public would see the fledgling company . . . as a rival to Microsoft"]).

[3]The practices alleged in the complaint are commonly referred to as "spinning" and "flipping."  Spinning refers to the preferential allocation of the right to buy shares in an IPO, often to company managers or venture capitalists, who may quickly resell or "flip" these shares in the aftermarket for large profits.

- 4 -

No. 61

current market conditions and the anticipated demand of eToys'

shares."

In allowing plaintiff's claim for breach of fiduciary

duty to go forward, the majority disregards that eToys was a

sophisticated, well-counseled business entity.  eToys' major

stockholders included important venture-capital and corporate

investors; its largest single stockholder, idealab!, styles

itself as an incubator for successful technology companies (<u>see</u>

<<u>http://www.idealab.com</u>>).  eToys was represented by the Venture

Law Group, P.C., which "specializes in representing high

potential technology companies from before their creation through

their public offering or acquisition and beyond," and which in

1999, handled "the fourth largest number of initial public

offerings for technology companies in the country"

(<<u>http://www.venlaw.com/About</u>>).

Further, the offering price was a key term in the

Underwriting Agreement, a purchase contract between eToys, the

issuer/seller, and Goldman, the underwriter/buyer, who

represented all the underwriters in the syndicate.[4]  How may a

buyer ever owe a duty of the highest trust and confidence to a

seller regarding a negotiated purchase price?  The interests of a

buyer and seller are inevitably not the same.  Indeed, it is a

longstanding principle of contract law that a buyer may make a

---

[4]The syndicate was the ad hoc group of underwriters who banded together
to underwrite -- that is, purchase -- from eToys, the issuer/seller, at a
fixed price less the discount (6.75%) and to distribute eToys' new securities.

- 6 -                                             No. 61

binding contract to buy something that it knows its seller

undervalues (Laidlaw v Organ, 15 US [2 Wheat], 178, 181 n2

[1817]).

          Here, eToys' prospectus acknowledged that the "initial

public offering price for the common stock has been negotiated

among eToys and the representatives of the underwriters"

(emphasis added).  Contrary to plaintiff's allegation, eToys also

represented in the prospectus that the offering price was not

driven by anticipated demand alone.  The other factors that came

into play were "eToys' historical performance, estimates of

eToys' business potential and earnings prospects, an assessment

of eToys' management and consideration of the above factors in

relation to market valuation of companies in related businesses."

Further, eToys' prospectus identified four "principal purposes"

for the IPO:  to increase working capital, create a public market

for its stock, facilitate future access to the public capital

markets, and increase visibility in the retail marketplace.  By

selling only 8.2% of its outstanding common stock at $20 a share,

eToys raised the capital called for by its business plan.

          In short, the offering price was not "set" by Goldman,

it was negotiated by sophisticated, represented parties -- the

issuer/seller and the underwriter/buyer; the offering price was

negotiated with reference to more than "then current market

conditions" and "anticipated demand"; and eToys did not seek to

negotiate an offering price solely to maximize the proceeds

- 6 -

raised in the offering.  Documentary evidence in the record confirms all these points, and the nature of the contractual relationship between an issuer and an underwriter is long-established and well-understood (see United States v Morgan, 118 F Supp 621, 635-655 [SDNY 1953]).  While plaintiffs may have alleged "an advisory relationship that was independent of the underwriting agreement" (maj op at 9), conclusory allegations are insufficient to survive a motion to dismiss (see e.g. Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233, 233-234 [1st Dept 1994] [on motion to dismiss, facts pleaded are presumed to be true and accorded every favorable inference, but "allegations consisting of bare legal conclusions, as well as factual claims inherently incredible or flatly contradicted by documentary evidence are not entitled to such consideration"]).

Finally, I am less sanguine than the majority about the consequences of recognizing "a fiduciary duty . . . requiring disclosure of [a lead underwriter's] compensation arrangements with its customers" (maj op at 9).  The excesses of the market in the days of the internet high-tech mania did not go unnoticed by regulators.  In addition to a flurry of enforcement actions at the State and federal levels, the Securities and Exchange Commission (SEC) in 2002 asked the two major self-regulatory organizations (SROs),[5] the New York Stock Exchange, Inc. (NYSE)

---

[5]SROs are quasi-governmental entities with "a duty to promulgate and enforce rules governing the conduct of [their] members" (Barbara v New York Stock Exch., Inc., 99 F3d 49, 51 [2d Cir 1996]; see 15 USC §§ 78c [a] [26],

and the National Association of Securities Dealers, Inc. (NASD),

to convene a high-level group of business and academic leaders to

review the IPO process in light of the experience of the 1990's,

and to recommend ways to cure the problems exposed during that

period and to improve the underwriting process going forward.

This group produced a report in May 2003 (see NYSE/NASD IPO

Advisory Committee, "Report and Recommendations of a committee

convened by the New York Stock Exchange, Inc. and NASD at the

request of the U.S. Securities and Exchange Commission [May 2003]

[<http://www.nasd.com/web/groups/rules_regs/documents/rules_regs/

nasdw_010373.pdf>]), directly leading, among other things, to

pending proposed NYSE Rule 470 and NASD Rule 2712 (see 69 Federal

Register 77,804 [Dec. 28, 2004]; see also 70 Federal Register

19,672 [Apr. 13, 2005]).  These rather complicated proposed rules

govern allocations and distributions of shares in IPOs.[6]  How our

---

78f [b], 78s [g]).  The SEC must approve or reject any rule, practice, policy
or interpretation proposed by an SRO (see 15 USC § 78s [b]; Barbara, 99 F3d at
51 [describing the role of SROs in enforcement of federal securities laws and
SRO rules or regulations]).

[6]Specifically, the proposed rules would (1) prohibit IPO allocations as
a consideration or inducement for the receipt of compensation that is
excessive in relation to the services provided by the member or member
organization (so-called "quid pro quo" allocations); (2) prohibit the awarding
of IPO shares to executive officers and directors and their household members
of issuers that have, or will have, an investment banking relationship with
the member or member organization on the condition that such officers and
directors, on behalf of the issuer, direct future investment banking business
to the member or member organization (i.e., spinning); (3) prohibit the
imposition of a flipping penalty (a "penalty bid") on associated persons whose
customers flipped IPO shares unless such penalty is imposed on the entire
underwriting syndicate; and (4) require the book-running lead manager, who is
responsible for assembling pre-price indications of interest in an
underwritten transaction, to provide the issuer's pricing committee (or, if
the issuer has no pricing committee, its board of directors) with (a) a

- 9 -                                                    No. 61

new fiduciary duty for underwriters may fit into or conflict with

the developing regulatory scheme is impossible to predict.  We

have, however, at the very least introduced uncertainty into a

complex subject of enormous importance to investors.  This

subject is, in my view, better dealt with by specialized

regulators than by the evolving common law.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified, without costs, by dismissing the second, fourth
and fifth causes of action and, as so modified, affirmed.
Certified question answered in the negative.  Opinion by Judge
Ciparick.  Chief Judge Kaye and Judges G.B. Smith, Rosenblatt,
Graffeo and R.S. Smith concur.  Judge Read dissents in part in an
opinion.


Decided June 7, 2005

_____

regular report of indications of interest, including the names of interested
institutional investors and the number of shares indicated by each, and a
report of aggregate demand from retail investors (which the SROs characterized
as conforming the rules to existing practices); and (b) a report on final
allocations within a reasonable time after the IPO's settlement date.  These
proposed rules would also extend lock-up agreements (i.e., formal restrictions
on re-sale of securities) to officers' and directors's issuer-directed shares
(e.g., so-called "friends and family" programs) and require the book-running
lead manager to notify the issuer and the public (through a major news
service) at least two days prior to the release or waiver of any lock-up or
other restriction on the transfer of the issuer's shares; specify how the
book-running lead manager and other syndicate members must deal with returned
shares; and prohibit members from accepting market orders to purchase IPO
shares in the aftermarket for one trading day following an IPO (see also 69
Federal Register at 77,813-77,814 [discussing three possible new approaches
for regulating unseasoned issuers, whose stocks experienced dramatic run-ups
and declines in price during the late 1990's and 2000, and the factors, both
objective and subjective, that bear upon establishing an offering price]).

**Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

GOLDMAN, SACHS & CO., and            :
SOFIA FRANKEL,                       :
                  Petitioners,       :      07 CV  1313 (LMM)
                                     :
            v.                       :      ECF CASE
                                     :
KATHERINE GRIFFIN, individually and as   :   **NOTICE OF MOTION FOR A**
trustee of the Katherine Griffin Living Trust,   :   **PERMANENT STAY OF**
                                     :      **ARBITRATION**
                  Respondent.        :
---------------------------------------------------- x

        PLEASE TAKE NOTICE that upon the Affidavit of Randell Fryman, sworn to March

March 12, 2007, and the exhibits annexed thereto, the Declaration of Michael J. Dell, sworn to

March 12, 2007, and the accompanying memorandum of law, petitioners Goldman, Sachs & Co.

("Goldman") and Sofia Frankel will move this Court before the Honorable Lawrence M.

McKenna, in Courtroom 15D, at the United States Court House, 500 Pearl Street, New York,

New York, 10007, as soon as counsel may be heard, for (1) a permanent stay of NASD

Arbitration No. 06-05365 commenced by Respondent Katherine Griffin to the extent it asserts

claims against Goldman; (2) a permanent stay of that arbitration to the extent it asserts claims

against Ms. Frankel and those claims relate to the period in which she worked at Goldman;  and

(3) such other relief as the Court deems just and proper.

Dated: New York, New York
　　　　March 12, 2007

　　　　　　　　　　　　　KRAMER LEVIN NAFTALIS & FRANKEL LLP


　　　　　　　　　　　　　_____/s/ Michael J. Dell_____
　　　　　　　　　　　　　　　Michael J. Dell (MD-7714)
　　　　　　　　　　　　　　　Elaine Golin (EG-2523)
　　　　　　　　　　　　　1177 Avenue of the Americas
　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　(212) 715-9100

　　　　　　　　　　　　　Attorneys for Petitioners


To:　　LAW OFFICES OF DAN BRECHER
　　　　99 Park Avenue, 16th Floor
　　　　New York, NY 10016

　　　　Attorneys for Respondent

KL3 2578860.2



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

GOLDMAN, SACHS & CO., and
SOFIA FRANKEL,

       Petitioners,

     v.

KATHERINE GRIFFIN, individually and as
trustee of the Katherine Griffin Living Trust,

       Respondent.

—————————————————————— x

:   07 CV 1313 (LMM)

:   ECF CASE

:   **DECLARATION OF MICHAEL J.**
:   **DELL IN SUPPORT OF**
:   **PETITIONERS' MOTION FOR A**
:   **PERMANENT STAY OF**
:   **ARBITRATION**

MICHAEL J. DELL declares as follows:

1.  I am a member of the law firm of Kramer Levin Naftalis & Frankel LLP, attorneys for Petitioners Goldman, Sachs & Co. ("Goldman") and Sofia Frankel (with respect to the time she worked at Goldman). I respectfully submit this declaration in support of Petitioners' Motion for: (1) a permanent stay of NASD Arbitration No. 06-05365 commenced by Respondent Katherine Griffin to the extent it asserts claims against Goldman; (2) a permanent stay of that arbitration to the extent it asserts claims against Ms. Frankel and those claims relate to the period in which she worked at Goldman; and (3) such other relief as the Court deems just and proper.

2.  As set forth in the accompanying Memorandum of Law, the stay should be granted because all of Ms. Griffin's claims against Goldman, and all of her claims against Ms. Frankel with respect to the period in which she worked at Goldman, are time-barred.

3.  On January 25, 2007, Goldman and Ms. Frankel commenced this case in New York state court by filing a special proceeding seeking a permanent stay of arbitration pursuant to CPLR 7502(b) and 7503(b).

KL3 2578865 2

4.    On February 6, 2007, the parties entered into a stipulation extending Griffin's time to oppose the petition until "on or before February 23, 2007." On February 22, 2007, rather than responding to the petition, Griffin removed the action to this Court.

5.    For the reasons set forth in the accompanying memorandum of law, NASD Arbitration No. 06-05365 commenced by Respondent Katherine Griffin should be permanently stayed to the extent that it asserts claims against Goldman and to the extent that it asserts claims against Ms. Frankel and those claims relate to the period in which she worked at Goldman.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of March, 2007.

_____ /s/ Michael J. Dell
                    Michael J. Dell

KL3 2578465.2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

GOLDMAN, SACHS & CO., and
SOFIA FRANKEL,

              Petitioners,

        v.

KATHERINE GRIFFIN, individually and as
trustee of the Katherine Griffin Living Trust,

              Respondent.

---------------------------------------------------------x

07 CV 1313 (LMM)

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR A PERMANENT STAY OF ARBITRATION

# TABLE OF CONTENTS

                                                                                    Page

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT .......................................................................................1

PROCEDURAL HISTORY .............................................................................................2

STATEMENT OF FACTS ...............................................................................................2

    A.    The Parties ...........................................................................................................2

        1.    Ms. Frankel and Goldman ......................................................................2

        2.    Ms. Griffin ..............................................................................................3

    B.    Ms. Griffin's Account with Goldman..................................................................3

    C.    The Arbitration ....................................................................................................4

Argument    THE ARBITRATION SHOULD BE PERMANENTLY STAYED AS
TO GOLDMAN AND AS TO MS. FRANKEL WITH RESPECT TO
THE PERIOD IN WHICH SHE WORKED AT GOLDMAN ...............................5

    A.    This Court is the Appropriate Forum in Which to Determine the
Application of any Limitations Period .................................................................5

    B.    Ms. Griffin's Claims Against Goldman, and Against Ms. Frankel with
Respect to the Period in Which She Worked There, Are Time-Barred ................6

        1.    The Limitations Period With Respect to Each Trade Began
Running on the Trade Date And, With Respect to The Last
Trade in Ms. Griffin's Goldman Account Expired on
December 19, 2006, Six Years Later.......................................................6

        2.    Ms. Griffin Commenced her Arbitration No Earlier than
December 27, 2006..................................................................................7

CONCLUSION ................................................................................................................8

# TABLE OF AUTHORITIES

## CASES

*Avon Prods., Inc. v. Solow,*
   150 A.D.2d 236, 541 N.Y.S.2d 406 (1st Dep't 1989) .............................................................. 6

*Carlingford Ctr. Point Assoc. v. MR Realty Assoc.,*
   4 A.D.3d 179, 772 N.Y.S.2d 273 (1st Dep't 2004) ....................................................... 7 & n.6

*In re Diamond Waterproofing Systems, Inc.,*
   4 N.Y.3d 247, 826 N.E.2d 802 (NY 2005) ............................................................................ 6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ohnuma,*
   161 Misc. 2d 423, 613 N.Y.S.2d 811 (N.Y. Sup. 1994), rev'd on other grounds, 218
   A.D.2d 572, 630 N.Y.S.2d 724 (1st Dep't 1995) ................................................................... 7

*Shaw Group, Inc. v. Triplefine Int'l Corp.,*
   322 F.3d 115 (2d Cir. 2003) ................................................................................................... 6

*Transport Workers Union v. Schwartz,*
   32 A.D.3d 710, 821 N.Y.S.2d 53 (1st Dep't 2006) ................................................................ 7

*Weilwood Fabrics Intern. Inc. v. Zerbi,*
   90 A.D.2d 453, 454 N.Y.S.2d 439 (1st Dep't 1982) ............................................................. 8

## NASD CODE

NASD Code § 10314 ...................................................................................................................... 8

KL3 2578815.4

Petitioners Goldman, Sachs & Co. ("Goldman") and Sofia Frankel ("Ms. Frankel") respectfully submit this memorandum of law in support of their motion: (1) for a permanent stay of NASD Arbitration No. 06-06365 commenced by Respondent Katherine Griffin to the extent it asserts claims against Goldman; and (2) for a permanent stay of that arbitration to the extent it asserts claims against Ms. Frankel and those claims relate to the period in which she worked at Goldman. The stay should be granted because all of Ms. Griffin's claims against Goldman, and all of her claims against Ms. Frankel with respect to the period in which she worked at Goldman, are time-barred.[1]

## PRELIMINARY STATEMENT

This motion concerns an arbitration recently commenced by Ms. Griffin, a former brokerage client of Goldman, against Goldman and Ms. Frankel, the stockbroker who handled her brokerage account at Goldman.  Ms. Frankel left Goldman for Lehman Brothers Inc. ("Lehman") at the end of December 2000; and Ms. Griffin followed Ms. Frankel to Lehman on January 18, 2001. Ms. Griffin has asserted claims of common law fraud, breach of fiduciary duty, and breach of contract against Goldman and Ms. Frankel.  As a matter of law, those claims were brought too late. The last trade in Ms. Griffin's Goldman account indisputably occurred on December 19, 2000. Ms. Griffin did not commence her arbitration, however, until on or after December 27, 2006, more than six years later.  Therefore, Ms. Griffin's claims against Goldman, and against Ms. Frankel with respect to the period in which she worked there, are time-barred.

---

[1] Griffin's Statement of Claim also asserts claims against Lehman Brothers Inc. and against Ms. Frankel for the period in which she worked at Lehman after she left Goldman in late December 2000. All references herein to Ms. Frankel are to the period in which she worked at Goldman, unless otherwise noted.

## PROCEDURAL HISTORY

On January 25, 2007, Goldman and Ms. Frankel commenced this case in New York state court by filing a special proceeding seeking a stay of arbitration pursuant to CPLR 7502(b) and 7503(b).  On February 6, 2007, the parties entered into a stipulation extending Griffin's time to oppose the petition until "on or before February 23, 2007."  On February 22, 2007, rather than responding to the petition, Griffin removed the action to this court.  On March 5, 2007, Griffin finally responded to the petition.[2]

## STATEMENT OF FACTS

The relevant facts are set forth in the accompanying Affidavit of Randell Fryman, Vice President, Legal Department of Goldman, and the exhibits annexed thereto (the "Fryman Aff.").  We summarize those facts here for the Court's convenience.

A.    **The Parties**

### 1. Ms. Frankel and Goldman

Ms. Frankel is a stockbroker who started work at Goldman in April 1994.  Ms. Frankel worked out of Goldman's New York City office, and performed all her business there.  Fryman Aff. ¶ 4.  On December 30, 2000, Ms. Frankel left Goldman and joined Lehman.  Fryman Aff. ¶ 5.

Goldman is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and

---

[2] Griffin's removal petition characterizes this action as a "dilatory tactic" and "bad faith harassment." (Removal Petition, ¶ 7).  That is disingenuous.  It is Griffin who waited more than *six years* before commencing the arbitration.  Indeed, before filing the arbitration she *never raised any complaint or concern about the handling of her account at Goldman.*  Moreover, it is Griffin who has delayed this proceeding.  Rather than seeking a swift resolution in state court, Griffin first asked for an extension of time, and then, at the very end of that period, removed to federal court instead of responding.

KL3 2578815 4

diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals. Fryman Aff. ¶ 3.

### 2. Ms. Griffin

On August 26, 1999, Ms. Griffin, an extremely wealthy and sophisticated investor, placed $2.3 million in a discretionary account with Ms. Frankel at Goldman. Fryman Aff. ¶ 6. At the time Griffin was married to Fred Shulman, a very sophisticated and highly successful businessman and investor with technology expertise. When he opened his own account at Goldman on July 22, 1999, Shulman was the co-CEO and co-founder of AETEA Information Technology Inc., a rapidly growing $100 million company with more than 900 employees.

### B.    Ms. Griffin's Account with Goldman

Ms. Griffin signed her Goldman Account Agreement on July 23, 1999. Representatives of Goldman then signed the Account Agreement on August 19, 1999 and August 25, 1999. Paragraph 11, under the heading "Governing Law, Successor and Assigns, Waiver," sets out, in bold type, "**This agreement and its enforcement shall be governed by the law of the State of New York ....**" Fryman Aff. Ex. B.

Griffin stated her primary investment objectives on her Account Agreement and Trading Authorization, which she signed on July 23, 1999. Her highest priority for the account was "**trading profits**", followed by "**growth**" and "**speculation.**" Fryman Aff., Ex. B.[3] Ms.

---

[3] "**Trading profits**" are defined as taking "advantage of short-term trading opportunities, which may involve establishing and then liquidating positions quickly;" "**growth**" is defined as client "is more interested in having the market value of the portfolio grow over the long term than in current income from the portfolio" and "is prepared to accept additional risk to principal to achieve this growth;" "**speculation**" is defined as "taking above-average risks to principal in an attempt to achieve above-average returns." Ms. Griffin's next-to-lowest priority was "**safety of principal.**" *See* Fryman Aff., Ex. B.

- 3 -

Griffin granted Ms. Frankel the discretionary authority to make purchases and sales for her account. Fryman Aff. ¶ 8.

During the period from July 1999 until Ms. Griffin closed her Goldman account, both she and her advisors at the Private Consulting Group received monthly account statements as well as trade confirmations on a regular basis. Fryman Aff. ¶ 8. Every trade confirmation clearly disclosed each trade, the per share commission, and the total commission for the trade. Fryman Aff. ¶ 8.

It is indisputable that the *last* trade in Respondent's account at Goldman occurred on December 19, 2000. Fryman Aff. ¶ 9 and Ex. C. On December 30, 2000, Ms. Frankel left Goldman and went to work for Lehman. On January 18, 2001, Ms. Griffin transferred the entire balance of her Goldman account over to Ms. Frankel's management at Lehman. Fryman Aff. ¶ 10.

C.     **The Arbitration**

Ms. Griffin commenced her arbitration by submitting her Statement of Claim to the NASD on December 27, 2006. Fryman Aff. ¶ 2.[4] The Statement of Claim asserts three claims against Petitioners: (1) common-law fraud (Fryman Aff., Ex. A at ¶¶ 23-31); (2) breach of contract (*Id.* at ¶¶ 32-34); and (3) breach of fiduciary duty (*Id.* at ¶¶ 35-38). All of these claims are time-barred, as set out below.[5]

---

[4] Griffin's counsel has strenuously contended to the NASD that the Statement of Claim was actually filed on December 22, 2006, not December 27, 2006, the date reflected in the NASD's records. To date, the NASD has not accepted counsel's contentions and the filing date remains December 27, 2006. However, the legal analysis set forth below would not change: even if counsel's contentions that the NASD erred were true, and the Statement of Claim was filed on December 22, 2006 -- all of Ms. Griffin's claims against the Goldman Petitioners are still time-barred.

[5] Ms. Griffin also alleges these and other claims against Lehman and against Ms. Frankel with respect to her period of employment with Lehman. *Id.* at ¶¶ 39-56. Those claims are not addressed in this motion.

- 4 -

### Argument

## THE ARBITRATION SHOULD BE PERMANENTLY STAYED AS TO GOLDMAN AND AS TO MS. FRANKEL WITH RESPECT TO THE PERIOD IN WHICH SHE WORKED AT GOLDMAN

A.    **This Court is the Appropriate Forum in Which to Determine the Application of any Limitations Period**

Under New York law, an arbitration should be stayed if the party seeking arbitration cannot prevail on the "threshold issue[] ... [of] whether the claim sought to be arbitrated is time barred." *Avon Prods., Inc. v. Solow*, 150 A.D.2d 236, 238-39, 541 N.Y.S.2d 406, 409 (1st Dep't 1989). "[A]s federal case law makes plain," absent *"clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability should by decided by the arbitrator," the question of arbitrability should be decided by the court. *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-21 (2d Cir. 2003) (emphasis in original; internal quotations omitted). Moreover, the New York Court of Appeals has repeatedly held that "[a] choice of law provision, which states that New York law shall govern both 'the agreement *and its enforcement*,' adopts as binding New York's rule that threshold Statute of Limitations questions are for the courts." *In re Diamond Waterproofing Systems, Inc.*, 4 N.Y.3d 247, 253, 826 N.E.2d 802, 806 (NY 2005) (emphasis in original); *see also Shaw Group*, 322 F.3d at 121 ("federal law and New York law are the same" with respect to who determines arbitrability).

Here, there is no "clear and unmistakable evidence" that the parties wished the arbitrator to decided threshold issues of arbitrability such as the state statutes of limitations. To the contrary, the parties entered into an Account Agreement that specifically provides that New York law shall govern both the "agreement and its enforcement." Fryman Aff., Ex. B at ¶ 11. Therefore, this Court is the appropriate forum to resolve any statute of limitations question.

- 5 -

KL3 2578815.4

B.    **Ms. Griffin's Claims Against Goldman, and Against Ms. Frankel with**
      **Respect to the Period in Which She Worked There, Are Time-Barred**

The statute of limitations for fraud and breach of contract is six years. CPLR §

213. Since the last trade in Ms. Griffin's account at Goldman occurred on December 19, 2000,

all of her fraud claims and breach of contract claims against Goldman and all fraud and breach of

contract claims against Ms. Frankel with respect to the period in which she worked there became

time-barred as of December 19, 2006.

A breach of fiduciary duty claim that seeks money damages, like Ms. Griffin's

here, is governed by a three-year statute of limitations. *See, e.g., Transport Workers Union v.*

*Schwartz*, 32 A.D.3d 710, 714 n. 3, 821 N.Y.S.2d 53, 57 n. 3 (1st Dep't 2006); *Carlingford Ctr.*

*Point Assoc. v. MR Realty Assoc.*, 4 A.D.3d 179, 180, 772 N.Y.S.2d 273, 274 (1st Dep't 2004).

Accordingly, all breach of fiduciary duty claims against Goldman and against Ms. Frankel with

respect to the period in which she worked at Goldman became time-barred as of December 19,

2003.[6]

1.    **The Limitations Period With Respect to Each Trade Began Running on the**
      **Trade Date And, With Respect to The Last Trade in Ms. Griffin's Goldman**
      **Account, Expired on December 19, 2006, Six Years Later**

The last trade in Ms. Griffin's account at Goldman was a transaction involving

1,000 shares of Commerce One Inc. that had a "Trade Date" of December 19, 2000, and

"settled" on December 22, 2000.    Fryman Aff., Ex. C.    "The trade date controls" when

determining the date upon which a stock broker's actions give rise to a potential claim because

"the settlement date was simply the fulfillment of respondents' earlier promise to pay." *Merrill*

---

[6] Ms. Griffin's Statement of Claim asserts that her claims against Petitioners "have six-year statutes of
limitations." Statement of Claim ¶ 22. This misstates the law with respect to the statute of limitations for
breach of fiduciary duty claims that seek money damages. Only breach of fiduciary duty claims that seek
equitable relief have a six-year statute of limitations. *See, e.g., Carlingford Ctr. Point Assoc.*, 4 A.D.3d at
180, 772 N.Y.S.2d at 274. Ms. Griffin has not sought any equitable relief.

- 6 -

*Lynch, Pierce, Fenner & Smith, Inc. v. Ohnuma*, 161 Misc. 2d 423, 430, 613 N.Y.S.2d 811, 815 (N.Y. Sup. 1994), *rev'd on other grounds*, 218 A.D.2d 572, 630 N.Y.S.2d 724 (1st Dep't 1995). In *Ohnuma*, the court stayed an arbitration because the claims were time-barred as the Uniform Submission Agreements and Statements of Claim had been filed just over six year after the trade date, even though the filing was within six years of the settlement date. Here, the NASD's records reflect that the Statement of Claim was filed on December 27, 2006 -- more than six years after *both* the last "trade date" *and* the last "settlement date." Fryman Aff., ¶ 2 and Ex. C.

   2.   **Ms. Griffin Commenced her Arbitration
          No Earlier than December 27, 2006**

         The NASD's rules make clear that Ms. Griffin commenced her arbitration no earlier than December 27, 2006. The Account Agreement between Ms. Griffin and Goldman, Fryman Aff., Ex. B, provides that "[a]ny controversy . . . shall be settled by arbitration, in accordance with the rules then obtaining of . . . the NASD." New York courts have held that such an agreement governs the procedure relating to the demand for arbitration. *See Weilwood Fabrics Intern. Inc. v. Zerbi*, 90 A.D.2d 453, 553, 454 N.Y.S.2d 439, 440 (1st Dep't 1982). The NASD's Code of Arbitration Procedure (the "NASD Code") provides that an arbitration proceeding is initiated when the claimant files a deposit, a Submission Agreement, and "a Statement of Claim of the controversy in dispute, together with the documents in support of the Claim." NASD Code § 10314, available at http://www.nasd.com/ArbitrationMediation/index.htm.

         Here, Ms. Griffin's Statement of Claim is dated December 21, 2006. Fryman Aff., Ex. A at 32. However, the NASD's records reflect that the Statement of Claim was actually

filed, and the arbitration therefore commenced, on December 27, 2006. Fryman Aff. ¶ 2.[7] The Statement of Claim was received by Petitioners from the NASD by mail on January 5, 2007. Fryman Aff. ¶ 1. As the last trade in Ms. Griffin's account at Goldman occurred on December 19, 2000, and her arbitration was commenced *no earlier than* December 27, 2006, more than six years later, Ms. Griffin's claims are all time barred.

## CONCLUSION

For all of the foregoing reasons, this Court should grant Petitioners' motion for: (1) a permanent stay of NASD Arbitration No. 06-05365 commenced by Ms. Griffin to the extent it asserts claims against Goldman; (2) a permanent stay of that arbitration to the extent it asserts claims against Ms. Frankel and those claims relate to the period in which she worked at Goldman; and (3) such other and further relief as the Court determines is proper.

Dated: New York, New York

    March 12, 2007

                         KRAMER LEVIN NAFTALIS & FRANKEL LLP


                    By: /s/ Michael J. Dell

                        Michael J. Dell (MD-7714)
                        Elaine Golin (EG-2523)
                        1177 Avenue of the Americas
                        New York, New York 10036
                        Tel: (212) 715-9100

                        Attorneys for Petitioners Goldman, Sachs & Co.
                          and Sofia Frankel (with respect to the period
                          in which she worked at Goldman)

---

[7] Because the trade date of December 19, 2006 "controls," even if the NASD were to accept -- which it has not -- Petitioner's contention that the Statement of Claim was actually filed on December 22, 2006, all claims against Goldman and against Ms. Frankel with respect to the period she worked at Goldman would still be time barred.

KL3 2578815.4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

GOLDMAN, SACHS & CO., and
SOFIA FRANKEL,

                                        Petitioners,

v.

KATHERINE GRIFFIN, individually and as
trustee of the Katherine Griffin Living Trust,

                                        Respondent.

---------------------------------------------------------------x

:
:
:
:    07 CV 1313 (LMM)
:
:    ECF CASE
:
:    **AFFIDAVIT OF RANDELL**
:    **FRYMAN**
:
:

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

Randell Fryman, being duly sworn, deposes and says:

1.      I am a Vice President in the Legal Department of Goldman, Sachs & Co.
("Goldman"), and respectfully submit this affidavit in support of Petitioners' motion (1) for a
permanent stay of NASD Arbitration No. 06-05365 commenced by Respondent Katherine
Griffin to the extent it asserts claims against Goldman; and (2) for a permanent stay of that
arbitration to the extent it asserts claims against Ms. Frankel and those claims relate to the period
in which she worked at Goldman.

2.      Goldman is a leading global investment banking, securities and investment
management firm that provides a wide range of services worldwide to a substantial and
diversified client base that includes corporations, financial institutions, governments and high-
net-worth individuals.

3.    Annexed hereto as Exhibit A is a copy of Ms. Griffin's Statement of Claim, dated December 21, 2006. The NASD has informed me that the Statement of Claim was filed at the NASD by Ms. Griffin on December 27, 2006.

4.    Ms. Frankel is a stockbroker who joined Goldman in April 1994. Ms. Frankel worked out of Goldman's New York City office. All transactions in Ms. Griffin's account were performed through Goldman's New York City office.

5.    On December 30, 2000, Ms. Frankel left Goldman and joined Lehman Bros. Inc. ("Lehman").

6.    On August 26, 1999, Ms. Griffin placed $2.3 million in a discretionary account with Ms. Frankel at Goldman. Ms. Griffin's husband, Fred Shulman, had an acount at Goldman at that time.

7.    Ms. Griffin's primary investment objectives are set forth on her Account Agreement and Trading Authorization, which she signed on July 23, 1999. They are "trading profits," followed by "growth "and "speculation." Ms. Griffin's lowest priority was "safety of principal." Copies of Ms. Griffin's Account Agreement and Trading Authorization are annexed hereto as Exhibit B. Ms. Griffin granted Ms. Frankel the discretionary authority to make purchases and sales for her account.

8.    During the period from July 1999 until Ms. Griffin closed her Goldman account, both she and her advisors at the Private Consulting Group received from Goldman monthly account statements and trade confirmations on a rolling basis. Every trade confirmation clearly disclosed the trade and both the per share commission and the total commission for the trade.

9.    The last trade in Respondent's account at Goldman occurred on December 19, 2000.  Annexed as Exhibit C hereto is a log of all equity transactions in Ms. Griffin's Goldman account during the time it was active.  The last line shows a trade of 1000 shares of Commerce One Inc. with a trade date of December 19, 2000 and a settlement date of December 22, 2000.

10.    On January 18, 2001, after Ms. Frankel had left Goldman and gone to work for Lehman, Ms. Griffin transferred the entire balance of her Goldman account to Ms. Frankel's management at Lehman.

11.     Goldman never received any complaints or questions about Ms. Griffin's Goldman Account, prior to receipt of the arbitration Statement of Claim on January 5, 2007.

_____
                                    Randell Fryman

State of New York
County of New York

Sworn to before me this
12 day of March, 2007

_____
        Notary Public

Janet A. Capo
Notary Public, State of New York
No. 01CA5041080 Qualified in Richmond County
Certificate Filed in New York County
Commission Expires 3-27-07

**Exhibit C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GOLDMAN, SACHS & CO., and
SOFIA FRANKEL,

                                    Petitioners,                    07 CV 1313 (LMM)

                    v.                                              ECF CASE

KATHERINE GRIFFIN, individually and as
Trustee of the Katherine Griffin Living Trust,

                                    Respondent.


**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION
FOR A PERMANENT STAY OF ARBITRATION AND IN SUPPORT OF
RESPONDENT'S CROSS-MOTION TO DISMISS AND FOR SANCTIONS
<u>PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDUR</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................3

PRELIMINARY STATEMENT..........................................................5

ARGUMENT

THE UNITED STATES SUPREME COURT HAS DECIDED THAT
QUESTIONS OF "PROCEDURAL ARBITRABILITY" ARE FOR THE
ARBITRATOR, NOT THE COURT, TO DECIDE...................................7

THE SECOND CIRCUIT HAS DETERMINED THAT WHERE AN
AGREEMENT CONTAINS BOTH A CHOICE OF LAW PROVISION AND
AN ARBITRATION PROVISION, IT IS FOR THE ARBITRATORS, AND
NOT THE COURTS, TO DECIDE NON-SUBSTANTIVE ISSUES OF

ARBITRABILITY.................................................................10

NEW YORK STATE COURTS HAVE HELD THAT WHERE FACTUAL
ISSUES CONCERNING STATUTE OF LIMITATIONS ARE INTERTWINED
WITH SUBSTANTIVE ALLEGATIONS OF FRAUD, IT IS FOR THE
ARBITRATOR TO DECIDE, AND NOT THE COURTS........................13

RESPONDENT'S CLAIMS ARE NOT TIME BARRED PURSUANT TO THE
DOCTRINES OF CONTINUING REPRESENTATION AND EQUITABLE
TOLLING BASED UPON FRAUDULENT CONCEALMENT..................16

CROSS-MOTION TO DISMISS AND FOR RULE 11 SANCTIONS.............................22

## TABLE OF AUTHORITIES

### CASE LAW

*In re Acquino*
    186 Misc. 7 (Sup. Ct. Bx. Co. 1945)..................................................20

*Alevizopoulos and Assoc., Inc., v. Comcast International Holdings, Inc.*
    100 F.Supp.2d 178 (S.D.N.Y. 2000)................................................20

*Cohen v. Goodfriend*
    642 F. Supp. 95 (E.D.N.Y. 1986)...................................................19

*Coleman & Co. Securities, Inc. v. Giaquinto Family Trust*
    No. 00 Civ. 1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov. 9, 2000)...............12 & 20

*Corbo v. Les Chateau Associates*
    127 AD2d 657 (2d Dept 1987)........................................................15

*In re: Diamond Waterproofing Systems*
    4 N.Y. 247, 826 N.E.2d 802, 793 N.Y.S.2d 831 (2005)............................10

*Goldberg v. Parker*
    221 A.D.2d 267, 634 N.Y.S.2d 81 (1st Dept 1995)................................15

*Duker v. Duker*
    6 S.E.C. 386 (1939)..................................................................19

*Dymm v. Cahill*
    730 F. Supp. 1245, 1263-64 (S.D.N.Y. 1990).....................................19-21

*Gruamman Allied Ind., Inc. v. Rohr Ind., Inc.*
    748 F.2d 729, 738-39 (2d Cir 1984)................................................21

*HD Brous & Co. v. Mrzyglocki*
    03 Civ. 8385 (CSH), 2004 U.S. Dist. LEXIS 3095 (S.D.N.Y. Feb. 25, 2004)..............6

*Howsam v. Dean Witter Reynolds, Inc.*
    537 U.S. 79 (2002)............................................................7-10 & 13

*Hughes v. J.P. Morgan Chase Co.*
    01 Civ. 6087 (BSJ), 2004 U.S. Dist. Lexis 11497 (S.D.N.Y. 2004)........................19

*Klein v. Spear, Leeds & Kellog*
    360 F. Supp. 743, 749 (S.D.N.Y. 1969)...........................................21

*In re Mac Robbins Co.*
    1962 SEC 555 (1962)..................................................................17-18

*Mastrobuono v. Shearson Lehman Hutton, Inc.*
    514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)......................................11-13

*McDaniel v. Bear Stearns Co., Inc.*
    196 F. Supp. 2d 343 (S.D.N.Y. 2002)......................................................17 & 19

*Mulvaney Mech., Inc. v. Sheet Metal Workers Intl. Assn., Local 38*
    351 F3d 43, 45 (2d Cir 2003)....................................................................9-10

*PaineWebber, Incorporated v. Michael J. Bybyk and Joyce O. Bybyk*
    81 F3d 1193 (2nd Cir. 1996) (Graafeiland, dissenting)....................................10-13

*Matter of Prudential Securities Inc. (Purello)*
    206 AD2d 713 (3d Dept 1994)........................................................................15

*SEC v. Jones*
    2006 U.S. Dist.Lexis 22800, at *16-17 (S.D.N.Y. 2006).......................................21

*Shaw Group Inc. v. Triplefine Intern Corp.*
    322 F.3d 115, 120-21 (2d Cir. 2003)...................................................6 & 12-13

*Spallholz v. Sheldon*
    216 N.Y. 205 (1915)....................................................................................20

*Standish-Parkin v. Lorillard Tobacco Co.*
    12 A.D. 3d 301, 303 (1st Dep't 2004)............................................................21

*In re Sumitomo Copper Litigation*
    120 F.Supp.2d 328, 346 (S.D.N.Y. 2000).......................................................21

## STATUTES

Rule 11(b) of the Federal Rules of Civil Procedure..............................................5-7 & 23

## NASD AND NYSE RULES

NASD Code of Arbitration Procedure § 2310-2 (2007).........................................17-20

NASD Code of Arbitration Procedure § 10304 (2007)................................................8

New York Stock Exchange Rule 405...................................................................13

## PRELIMINARY STATEMENT

Respondent Katherine Griffin respectfully submits this Memorandum of Law in opposition to Petitioners' motion to stay a pending National Association of Securities Dealers ("NASD") arbitration proceeding instituted by Respondent Griffin, a former customer of Petitioners, alleging a pattern of fraudulent conduct visited on Respondent by a broker who lied to her customers about her education and qualifications, presented them with phony performance charts and then used the discretionary control she gained over customers' accounts by these fraudulent means to grossly overcharge her customers, among other deceptive practices. The federal and state case law cited below, which was not referenced, let alone discussed, in Petitioners' Memorandum of Law, clearly calls for denial of the motion to stay arbitration and for dismissal of the proceedings.

In a 2003 decision by a Southern District of New York court in which a petition to enjoin arbitration based upon agreements similar to those present in the instant matter was denied, Judge Haight, considered the imposition of Rule 11(b), Fed. R.Civ.P. sanctions upon counsel for Petitioners based upon, among other things, misleading use of authority by such counsel: "These citations to authority are problematic because they might support an inference that counsel attempted to mislead the Court." HD Brous & Co. v. Mrzyglocki, 03 Civ. 8385 (CSH), 2004 U.S. Dist. LEXIS 3095 (S.D.N.Y. Feb. 25, 2004). As will be discussed below, here, too, Petitioners have tried to mislead this Court in their discussion of case law. Petitioners failed to discuss a controlling Supreme Court decision and controlling federal court decisions that hold that a petition to stay arbitration based on the issue of timeliness of the filing of the Statement of Claim is a matter presumptively for the arbitrator and not the courts. Petitioners also failed to cite to or discuss New York case law which holds that arbitrators, and not courts, should decide

5

statute of limitations eligibility if factual issues regarding the statutes of limitations are intertwined with substantive issues of fraud. Petitioners grossly misconstrued the one federal case to which they did cite, Shaw Group Inc. v. Triplefine Intern Corp., 322 F.3d 115, 120-21 (2d Cir. 2003), a case which is in line with Respondent's argument and not with that of Petitioners. Respondent submits that Petitioners' counsel are well-known experts in the fields of securities law, appellate law and securities arbitration, who have, at the least, been grossly negligent, if not willful, in the misleading use and omissions of authority described herein.

In the Statement of Claim, Respondent has asserted specific allegations of fraud against Petitioners, including, without limitation, the phony credentials, the phony charts, the gross overcharges and the fraudulent concealment, as well as allegations of breach of contract, failure to know the customer and failure to supervise, all of which, on this motion, must be viewed in the light most favorable to Respondent. In deciding this motion, the Court would have to decide issues related to when Respondent's claim accrued, and because Respondent has asserted fraudulent concealment and continuing representation, as discussed herein below, the Court would have to hold evidentiary hearings to determine these disputed facts. It is respectfully submitted that these are issues for the arbitrator to decide, and not this Court.

Respondent cross-moves to dismiss the proceedings, and for sanctions, based upon Petitioners' misleading use of authority, and upon the controlling case law set forth below. Even assuming the "facts" presented in Petitioners' moving papers, which Respondent does not agree are fully correct, the disputed facts do not change the applicable law. Respondent argues that any evidentiary hearings are for the NASD arbitrator, not this Court.

6

### ARGUMENT

## THE UNITED STATES SUPREME COURT HAS DECIDED THAT QUESTIONS OF "PROCEDURAL ARBITRABILITY" ARE FOR THE ARBITRATOR, NOT THE COURT, TO DECIDE

In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), pursuant to the brokerage firm's client agreement, the respondent brokerage firm's customer chose to arbitrate her dispute with the company before the NASD. In Howsam, the broker filed suit asking the court to declare the dispute ineligible for arbitration because more than six years had passed, and sought an injunction to prohibit Howsam from proceeding in arbitration. The court dismissed the action, stating the NASD arbitrator should interpret and apply the NASD time limit rule. The Tenth Circuit reversed, but the Supreme Court held that the lower court had decided the issue correctly and that "[a]n NASD arbitrator should apply the time limit rule to the underlying dispute." See Howsam, 537 U.S. at 83-86. In support of its holding, the Supreme Court stated:

> [W]e find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability."

Id., at 85. The Howsam Court went on to state:

> Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding.

Id.

The facts in Howsam are strikingly similar to those in the instant matter. Howsam is controlling law on the issues for which Petitioners Goldman, Sachs and Frankel seek relief here. Here, as in Howsam, the issue before the Court is whether a court or an NASD arbitrator should determine issues of timeliness, including the six-year rule of the NASD, which states that no

dispute "shall be eligible for submission to arbitration . . . where six (6) years have elapsed from the occurrence or event giving rise to the . . . dispute." NASD Code of Arbitration Procedure § 10304 (2007). Here, as in Howsam, the underlying controversy falls within the arbitration clause contained in the standard account agreement which was signed by Respondent Griffin and is attached to the Declaration of Dan Brecher, dated April 4, 2007 (the "Brecher Declaration") as Exhibit A, which provides:

> Any controversy between you . . . and Client or Client's agents . . . arising out of or relating to this agreement, the transactions contemplated hereby, or the accounts established hereunder, shall be settled by arbitration, in accordance with the rules then obtaining of any one of the American Arbitration Association or The New York Stock Exchange, Inc., or any other exchange of which you are a member, or the National Association of Securities Dealers, Inc. or The Municipal Securities Rulemaking Board, as Client may elect. (emphasis added).

Exhibit A, ¶ 12. The arbitration clause in Exhibit A also provides that the parties "are waiving their right to seek remedies in court . . ." Exhibit A, ¶ 12 (b).

As in Howsam, Respondent signed the NASD's Uniform Submission Agreement, attached to the Brecher Declaration as Exhibit B, which specifies that the "present matter in controversy" was submitted for arbitration "in accordance with the Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration Procedure" of NASD Dispute Resolution, Inc. The Code of Arbitration Procedure contains the six-year eligibility provision applicable here, and discussed in Howsam. After Respondent executed the Uniform Submission Agreement, Petitioners filed a petition for a permanent stay of arbitration in New York Supreme Court, County of New York.

In Howsam, the Supreme Court distinguished between the threshold issues of "substantive arbitrability," which are for a court to decide, and those of "procedural arbitrability," which are for the arbitrator to resolve. Id., at 85-86. The category of substantive

arbitrability is limited to disputes about "whether the parties are bound by a given arbitration clause" and whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Mulvaney Mech., Inc. v. Sheet Metal Workers Intl. Assn., Local 38, 351 F3d 43, 45 (2d Cir 2003), quoting Howsam 537 U.S. at 84. The second category is of other gateway matters, including issues of procedural arbitrability such as time limits, notice, laches, estoppel, and other conditions precedent, and these are for the arbitrators to decide. Howsam 537 U.S. at 85. The Howsam court found that disputes pertaining to time limits were questions of "procedural arbitrability" and, therefore, for the arbitrator to interpret and apply.

Here, there is no dispute about whether there is a binding contract, or whether that contract to arbitrate applies to the controversy. Petitioners are asking this Court to determine the very type of "gateway matter" that has already been determined to be for the arbitrator to resolve as stated by the Supreme Court in Howsam, and as interpreted by the Second Circuit in Mulvaney, 351 F.3d at 45.

In their Memorandum of Law, Petitioners fail to cite to Howsam, which is clearly controlling here, nor do Petitioners cite to Mulvaney. In Howsam, the court stated: "...we find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." Howsam, 537 U.S. at 85.

Throughout Howsam, the Supreme Court stated its preference that arbitration be the forum for deciding all "gateway" procedural disputes, such as the one issue raised by Petitioners here: whether or not Respondent's claims are time-barred. Yet Petitioners do not so much as mention, let alone distinguish, Howsam in their moving papers. Petitioners seek their requested

dismissal and injunctive relief relying on New York CPLR §§ 7502(b) and 7503(b) as the basis

for the relief they request.

### THE SECOND CIRCUIT HAS DETERMINED THAT WHERE AN AGREEMENT CONTAINS BOTH A CHOICE OF LAW PROVISION AND AN ARBITRATION PROVISION, IT IS FOR THE ARBITRATORS, AND NOT THE COURTS, TO DECIDE NON-SUBSTANTIVE ISSUES OF ARBITRABILITY SUCH AS TIMELINESS

The Second Circuit has already determined an issue that Petitioners can be expected to

argue here, in that Petitioners cite to the New York State Court of Appeals decision In re:

Diamond Waterproofing Systems, 4 N.Y. 247, 826 N.E.2d 802, 793 N.Y.S.2d 831 (2005). The

agreement language in the instant motion is very similar to the standard arbitration agreement

language for the brokerage firm's customer in PaineWebber, Incorporated v. Michael J. Bybyk

and Joyce O. Bybyk, 81 F3d 1193 (2nd Cir. 1996) (Graafeiland, dissenting). The agreement in

Bybyk provided for the determination of "any and all controversies… by arbitration," and the

agreement here provides that "any controversy . . . shall be settled by arbitration." Similar to the

agreement in Bybyk, the agreement here also contains a choice of law provision which provides

that: "[t]his agreement and its enforcement shall be governed by the laws of the State of New

York (emphasis added)." The court in Bybyk held that where an agreement contains both a

choice of law provision and an arbitration provision such as that contained in the agreement at

issue here, it is for the arbitrator, and not the court, to decide non-substantive issues of

arbitrability such as timeliness:

> [A] choice-of-law provision, when accompanied by an arbitration provision such
> as in the Agreement, "encompass[es] substantive principles that New York courts
> would apply, but not . . . special rules limiting the authority of the arbitrators."

Bybyk, 81 F3d at 1200 (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 115 S. Ct. 1212,

1219 (1995)).

As set forth above, the language contained in the agreement at issue in <u>Bybyk</u> and the agreement at issue in the instant matter, attached to the Brecher Declaration as <u>Exhibit A</u>, is analogous. In <u>Bybyk</u>, the court looked to the language of the agreement at issue and concluded:

> The parties' broad grant of power to the arbitrators is unqualified by any language carving out substantive eligibility issues (with or without specific reference to timeliness) for resolution by the courts. . . . An objective reading of the Agreement, therefore, leads us to conclude that the parties intended to arbitrate issues of arbitrability. Put another way, no draftsman seeking a six-year limitation on the scope of arbitrability would craft this language to accomplish that objective. If the Bybyks' claim is untimely, PaineWebber's remedy is to defend the arbitration action on timeliness grounds, not to enjoin arbitration altogether.

<u>Id</u>. The same can be said of the agreement at issue here. As evidenced by <u>Exhibit A</u>, the parties waived their rights to seek remedies in court and agreed that <u>any</u> controversies would be submitted to arbitration in accordance with the rules of the applicable exchange or self-regulatory organization elected by the client. In bold letters in Section 12(b) of their agreement attached as <u>Exhibit A</u> to the Brecher Declaration, an agreement drafted solely by Petitioner Goldman, Sachs, the parties specifically agreed that ". . . the parties are waiving their right to seek remedies in court . . . ." If the parties here had intended that timeliness issues pursuant to statutes of limitations or the six-year limitation on the scope of arbitrability be issues for the court, and not the arbitrators, to decide, the agreement would have been drafted differently.

Without reading the only Second Circuit case cited by Petitioners in their Memorandum of Law, <u>Shaw Group</u>, 322 F.2d 115, one would not know from the portion of <u>Shaw</u> quoted by Petitioners that the Court of Appeals vacated the district court's order enjoining arbitration, and denied relief similar to that sought here by Petitioners. In <u>Shaw</u>, the court specifically referenced the New York State Court of Appeals' attempts to reconcile its decisions regarding choice of law provisions and the incorporation of state arbitration law with the holdings of the Supreme Court,

as set forth in <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), but the <u>Shaw</u> court determined that it did not need to adopt this effort in deciding the issue before it, and in so deciding, cited to contrary authority set forth by a Southern District of New York Court in <u>Coleman & Co. Securities, Inc. v. Giaquinto Family Trust</u>, No. 00 Civ. 1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov. 9, 2000) (holding that a provision for the "agreement and its enforcement" to be governed by New York law did not evidence parties' intent to be bound by New York arbitration law). In deciding that the issue of attorneys' fees and costs was an issue to be determined by the arbitrators, and not the court, <u>Shaw</u> relied on the reasoning of <u>Bybyk</u>.

In their Memorandum of Law, Petitioners cite to <u>Shaw</u> in support of their argument that the court is the appropriate forum in which to determine the application of any limitations period. <u>Shaw</u>, however, did not enjoin the arbitration proceedings, and, in any event <u>Shaw</u> does not support Petitioners' proposition. In <u>Shaw</u>, the choice of law provision at issue did not contain the "enforcement" language upon which the New York State courts have relied in deciding that a choice-of-law provision in an arbitration agreement incorporates state arbitration law. The court in <u>Shaw</u>, therefore, did not have to decide the very issue that has differentiated federal court holdings from New York State court holdings. The court in <u>Bybyk</u>, however, did have to decide this issue because the arbitration agreement contained a choice-of-law provision containing "enforcement" language, and in doing so, concluded that:

> <u>Mastrobuono</u>, squarely on point, supports the Bybyks' contentions that, under the Federal Arbitration Act, they are not prevented by the New York choice of law provision from arbitrating issues of timeliness and attorneys' fees.

<u>Bybyk</u>, 81 F3d at 1200.

In his 2004 Mrzyglocki decision, Judge Haight, relying upon the Howsam and Mastrobuono decisions, among others, denied the same type of application as is made here by Petitioners, interpreting a similar arbitration agreement as is present in the instant matter: "Under well-settled United States Supreme Court and Second Circuit case law, the federal courts are generally obliged to refrain from interfering with the authority assigned to arbitrators by parties to arbitration agreements." 2004 U.S. Dist. LEXIS at 27-28.

### NEW YORK STATE COURTS HAVE HELD THAT WHERE FACTUAL ISSUES CONCERNING STATUTE OF LIMITATIONS ARE INTERTWINED WITH SUBSTANTIVE ALLEGATIONS OF FRAUD, IT IS FOR THE ARBITRATOR TO DECIDE, AND NOT THE COURTS

Naturally, Respondent contends her claims are not time-barred. There is even a dispute as to the correct date of the physical filing of Respondent's claims with the NASD which, if deemed material, would require an evidentiary hearing. Although Respondent has a signed receipt for the December 22, 2006 filing with the NASD, the filing date was erroneously entered by a NASD staff person on a later date. Such a gateway issue is clearly not the type of issue the Supreme Court in Howsam contemplated to be decided in court.

Should this Court determine that further proceedings are required here, Petitioner maintains, among other arguments, that Ms. Frankel and Goldman, Sachs had a continuing contractual duty to deal fairly with her, which they failed to do after December 22, 2000, after December 27, 2000, and after January 1, 2001, and that the fraud continued after December 22, 2000 and after December 27, 2000, six years prior to the filing date erroneously listed by the NASD. Petitioners admit that Ms. Frankel was still employed at Goldman, Sachs after December 27, 2000 and was still serving as Respondent's broker after December 27, 2000, which is still within six years of the filing date alleged by Petitioner for the Respondent's arbitration claims for common law fraud, breach of contract and breach of fiduciary duties.

13

In getting into disputed evidentiary matters, Petitioners will be seeking to have this Court determine disputed allegations, including even the correct filing date of the arbitration claims. These contested issues would require evidentiary hearings contemplated by the parties when they signed Exhibit A to the Brecher Declaration, in which they agreed to have the NASD arbitrators resolve "all controversies." "All controversies" would certainly include whether there was a continuing course of conduct by Petitioners such that the cause of action as against Frankel did not "accrue" until December 30, 2000, the date when Ms. Frankel left Goldman, Sachs or, as to Goldman, Sachs, did not "accrue" until January 18, 2001, when the contractual relationship between Goldman, Sachs and Respondent was terminated and the contractual and fiduciary duties Goldman, Sachs owed to Respondent ended. All of these dates are within six years of the filing of the Statement or Claim. All of these claims are for the arbitrators to decide. There is abundant decisional law supporting Respondent's argument that the "accrual" of the claims occurred on or after December 30, 2000.

But even if the Court was to decide these issues, and Respondent respectfully submits that this Court should not do so, upon review of applicable facts of the fraudulent conduct and improper behavior of Respondents, these issues of timeliness should be decided in favor of Respondent. In addition to Petitioners' failure to cite to highly relevant and controlling federal court decisions that are in conflict with the legal arguments they present, Petitioners compounded this impropriety by failing to cite to any of the New York State court decisions that held that where the allegations against the respondent broker are intertwined with the substance of a fraud claim, as is clearly the case here, it is the arbitrator and not the court that should determine the timeliness of the claims. See Corbo v. Les Chateau Associates, 127 AD2d 657 (2d Dept 1987);

Matter of Prudential Securities Inc. (Purello), 206 AD2d 713 (3d Dept 1994); Goldberg v. Parker, 221 A.D.2d 267, 634 N.Y.S.2d 81 (1st Dept 1995).

In Matter of Prudential Securities Inc. (Purello), similar to the instant matter, the petitioner moved for an order pursuant to New York CPLR 7503 permanently staying the arbitration commenced by respondent before the NASD based upon the six-year eligibility rule set forth in the NASD Code. The claims brought before the NASD included claims of fraud. In denying the petition, the court held:

> Here, as in Matter of Corbo v. Les Chateau Assocs. (supra), we find that "[w]hile factual issues concerning the Statute of Limitations may be tried by the court * * * in the instant case, these issues are intertwined with the ultimate substantive issues" (supra, at 658 [citations omitted]). Due to the continuing nature of these claims and the uncertainty of the date of the occurrence or event giving rise to these claims, leaving these issues to the arbitrator will permit a more efficient resolution.

Id., at 714.

The allegations of fraudulent conduct are clear and documented. Respondent contends that Frankel told numerous people, including Respondent, that she had a Ph.D. from an overseas university. Respondent has reason to believe that Frankel did not register for such studies, and that Frankel cannot substantiate Ph.D. studies, let alone a Ph.D. Frankel obtained Respondent's account under false pretenses, using fabricated phony performance charts purportedly showing Frankel' accounts as substantially outperforming the market. Copies of the phony performance charts were annexed as an exhibit to the Respondent's Statement of Claim, and the allegations of fraud are specific. The phony charts Frankel gave Respondent were instrumental in convincing Respondent to use Frankel as her broker, and were key to Frankel obtaining Respondent's account, and discretionary control over that account. Frankel then used her fraudulently obtained discretionary control to engage in unsuitable and unauthorized transactions and to grossly over

charge Respondent, imposing unreasonable and even unseemly commission charges. Frankel justified high commission rates by claiming she outperformed the market, and she used her phony charts to support this deceit. Respondent's specific contentions of fraud against Frankel are not untimely; Frankel was Respondents' broker at Goldman, Sachs until a date within six years of the filing of the arbitration claims, and the same is true as to the breach of fiduciary duties claims. Indeed, Frankel remained Respondent's broker until January 2004, with Respondent moving her account from Goldman, Sachs to Lehman Brothers, Inc., under Frankel's continuing care and control.

### RESPONDENT'S CLAIMS ARE NOT TIME BARRED PURSUANT TO THE DOCTRINES OF CONTINUING REPRESENTATION AND EQUITABLE TOLLING BASED UPON FRAUDULENT CONCEALMENT

Petitioners base their motion on a fiction by cutting off the pertinent time period as of December 19, 2000. This Petitioners cannot do because, as discussed herein, the applicable period as to Goldman, Sachs runs through January 18, 2001, the time when Respondent ended her relationship with Goldman, Sachs. Accordingly, since Respondent filed her Statement of Claim on December 22, 2006, her common law fraud, breach of contract, and breach of fiduciary duty claims were asserted well within the applicable six-year period, which did not expire as to Goldman, Sachs until January 2007, at the earliest. In addition, all of Respondent's claims against Petitioners are subject to equitable tolling due to Petitioners' fraudulent concealment. Simply stated, Goldman, Sachs learned of Ms. Frankel's misconduct and lies, and both Petitioners hid that knowledge from Respondent, despite the fact that they continued to owe duties to disclose such material facts to Respondent as a customer of Goldman, Sachs. During the same time period, Goldman, Sachs concealed from Respondent the fact that the trading in the account was unsuitable, that the account was not being supervised, and that red flag after red flag

was being ignored. The fraudulent concealment tolled all of Respondent's claims, and they accrued in and after January 2001, making all of the claims timely.

Goldman, Sachs continued to owe duties to Respondent up until the day Respondent's account left Goldman, Sachs in January 2001. Goldman, Sachs owed Respondent a duty of "fair dealing" from the moment that it approved the Respondent's account to the date that account transferred from Goldman, Sachs. See In re Mac Robbins Co., 1962 SEC 555 (1962); McDaniel v. Bear Stearns Co., Inc., 196 F. Supp. 2d 343 (S.D.N.Y. 2002) and NASD Rule 2310-2, all discussed below. This duty encompassed not only basic notions of fair dealing, but also compliance with industry rules and regulations, such as New York Stock Exchange ("NYSE") Rule 405 (know your customer and suitability). Goldman, Sachs also had a duty to supervise with respect to Respondent's account, from the moment the account entered the firm until the time it left. These duties owed by Goldman, Sachs did not end with Ms. Frankel's departure from Goldman, Sachs – they ran directly from Goldman, Sachs to Respondent. Thus, while Goldman, Sachs tries to focus solely on "transactions" which occurred in Respondent's account, Respondent's claims against Goldman, Sachs did not accrue until the end of the relationship in January 2001, when Goldman, Sachs' duties owed to Respondent ended. Because Respondent transferred her account to Lehman Brothers upon learning that Frankel had left Goldman, Sachs and then continued her relationship with Petitioner Frankel, Respondent's claims against Frankel did not accrue until Respondent ended her relationship with Frankel in January 2004.

It was early in the inception of the securities laws that the Securities and Exchange Commission ("SEC") mandated that a basic element of the relationship between a broker or dealer and their customers is the representation that the customers will be dealt with fairly and in accordance with the standards of the profession. In re Mac Robbins Co., 1962 S.E.C. Lexis 555

(1962) at *6, citing Duker v. Duker, 6 S.E.C. 386 (1939). *The failure of a broker or dealer to disclose that his or her conduct does not meet such standards operates as a fraud on customers.* Id.

Moreover, there is the duty imposed under the "shingle" theory. The shingle theory is:

> [t]he notion that a broker – dealer must be held to a high standard of conduct because by engaging in the securities business ('hanging out a shingle'), the broker – dealer implicitly represents to the world that the conduct of all its employees will be fair and meet professional norms.

Black's Law Dictionary 1410-11 (8th ed. 2004). These duties have been further set out by the NASD, and the NYSE. For example, NASD Rule 2310-2 requires all members to "adhere to the principles of good business practice in the conduct of [their] business affair[s], and imposes upon members a 'fundamental responsibility for fair dealing' with customers, requires members to 'deal fairly with the public,' and recognizes that brokers and dealers have an obligation of fair dealing in actions under the general anti-fraud provisions of the federal security laws." See McDaniel v. Bear Stearns Co., Inc., 196 F. Supp.2d 343, 360 (S.D.N.Y. 2002).

Accordingly, NASD arbitration panels and the Courts routinely recognize the on-going nature of the duties owed to a client throughout the relationship. For example, suitability is an ongoing obligation of a broker/dealer, such that a broker/dealer has an obligation to review suitability continuously and in light of changing client and market circumstances. NASD Rule 2310-2(4)(B) states: ". . . fraudulent activities, such as . . . non-disclosure or misstatement of material facts, manipulations and various deceptions, have been found in violation of Association Rules." Therefore, the existence of and the date of ending of the customer relationship is

determinative of the timing of when the on-going duty to disclose fraudulent activity or to correct misstatements of material facts ends.

In New York, claims against portfolio managers and investment advisors are subject to the "continuous representation" doctrine. See Hughes v. J.P. Morgan Chase Co., 01 Civ. 6087 (BSJ), 2004 U.S. Dist. Lexis 11497 (S.D.N.Y. 2004). See also Dymm v. Cahill, 730 F. Supp. 1245, 1263-64 (S.D.N.Y. 1990) (applying the continuous relationship doctrine to negligence claims against accountant providing investment advice and acting as investment advisor); Cohen v. Goodfriend, 642 F. Supp. 95 (EDNY 1986). Pursuant to that doctrine, when a course of conduct which includes the wrongful acts or omissions has run continuously and is related to the complaint, a claim accrues only at the end of the representation. Hughes, supra, at 10-11. The doctrine is premised on the trust relationship between the parties and the inequity of barring the client from suing based on the running of the statute of limitations during the life of the relationship. Id. at 11. The scope of the doctrine has been expanded on the theory that professionals, such as Goldman, Sachs, which have an on-going relationship with their clients, are in the best position to correct their misconduct. Id. at 11-12. Accordingly, under the continuous representation doctrine, the claims against Goldman, Sachs did not begin to run until the relationship between it and Respondent ended in January 2001. Similarly, the claims against Petitioner Frankel did not accrue until the relationship between Respondent and Frankel ended in January 2004. This is consistent, too, with NASD Rule 2310-2(4)(B).

Petitioners' duties to Respondent ran through their entire respective relationships with Respondent. For limitations purposes, Respondent's claims against Goldman, Sachs did not begin to run until at least January 2001, making these claims timely filed within the six-year

limitations periods. Similarly, Respondent's claims against Frankel did not begin to run until at least January 2004, making all these claims timely as well.

Fraudulent concealment tolls the statute of limitations. See, e.g., In re: Acquino, 186 Misc. 7, 13 (Sup. Ct. Bx. Co. 1945) ("It is unquestioned that fraud suspends the operation of the statute of limitations.") (citing Spallholz v. Sheldon, 216 N.Y. 205 (1915)). New York courts apply equitable tolling where, inter alia, the defendant conceals from the plaintiff the fact that there is a cause of action. Coleman v. Giaquinto, 236 F. Supp.2d, 288, 299 (S.D.N.Y. 2002); (Alevizopoulos and Assoc., Inc., v. Comcast International Holdings, Inc., 100 F.Supp.2d 178 (S.D.N.Y. 2000). To invoke fraudulent concealment, a plaintiff must show wrongful concealment by defendant of its actions, failure by plaintiff to discover the operative facts during the limitations period, and plaintiffs' due diligence in trying to discover the facts (unless the fraud is self-concealing in nature, as discussed below). See Dymm v. Cahill, 730 F. Supp. 1245, 1255-56 (S.D.N.Y. 1990). Where a plaintiff has shown a fiduciary duty, or other duty to disclose material information (both of which exist here), the plaintiff need not show an affirmative misrepresentation or even active concealment by the defendant, and silence in the face of a duty to speak establishes fraudulent concealment. Id. at 1256. Rather, where a defendant has a duty to disclose, the plaintiff only needs to "show that he remained in ignorance of the fraud of his fiduciaries without any fault or want of due diligence or care on his part." Id. (citation omitted). See also Klein v. Spear, Leeds & Kellog, 360 F. Supp. 743, 749 (S.D.N.Y. 1969) (same). There also can be a duty to disclose even absent a fiduciary duty. "A duty to disclose arises either where the parties are in a fiduciary relationship or 'where one party possesses superior knowledge not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Dymm, supra, 730 F. Supp. at 1253 n3, quoting Gruamman Allied Ind.,

Inc. v. Rohr Ind., Inc., 748 F.2d 729, 738-39 (2d Cir 1984). See also Standish-Parkin v. Lorillard

Tobacco Co., 12 A.D. 3d 301, 303 (1st Dep't 2004) (fraud may be predicated on acts of

concealment when the defendant had a duty to disclose material information).

The plaintiff can establish fraudulent concealment to toll the statute of limitations by

showing that the wrong itself was self-concealing. SEC v. Jones, 2006 U.S. Dist.Lexis 22800, at

*16-17 (S.D.N.Y. 2006). ("When an alleged violation is inherently self-concealing, an assertion

of such a scheme is sufficient and plaintiff need not plead any affirmative actions by a

defendant.") (citation omitted); Alevizopoulos and Assoc., Inc., v. Comcast International

Holdings, Inc., 100 F.Supp.2d at 184 (limitations period tolled where the fraud which furnishes

the basis of the action is self-concealing; defendants' failure to notify plaintiff of its actions is

sufficient); In re Sumitomo Copper Litigation, 120 F.Supp.2d 328, 346 (S.D.N.Y. 2000)

(limitations period tolled where the wrong, failing to disclose bid improprieties, was self-

concealing in nature).

The facts presented to date demonstrate a classic case of fraudulent concealment for

equitable tolling as to claims both against Ms. Frankel and Goldman, Sachs. In addition, this

fraudulent conduct was inherently "self-concealing." No amount of due diligence by

Respondent would have revealed this fraud when the relationships ended. The onus was on

Petitioners to be truthful with Respondent, not on Respondent to call Petitioners and ask if she

was being defrauded.

Respondent raises the foregoing issues related to continuous representation and equitable

tolling here in an effort to highlight existing disputes between the parties with respect to the dates

of accrual of the causes of action. It is respectfully submitted that such issues are for the

arbitrators to decide, and not for this Court.

21

## CROSS-MOTION TO DISMISS AND FOR RULE 11 SANCTIONS

Respondent respectfully submits that the Petitioners are not entitled to any relief from this Court, and for the reasons stated above, the proceedings should be dismissed. Based upon the baseless nature of Petitioners' Motion, compounded by the misleading use of authority in Petitioners' moving brief, and the failures to cite to controlling United States Supreme Court, Second Circuit and New York State court decisions adverse to the Motion, it is respectfully submitted that Rule 11 sanctions are appropriate and necessary to dissuade dilatory and wasteful court proceedings against an individual customer by a brokerage firm that has specifically contracted away that right and represented to its customers that arbitration will be the forum for "any controversy" between them.

Dated: New York, New York
       April 4, 2007

                              LAW OFFICES OF DAN BRECHER


                              /s/ Dan Brecher
                              Dan Brecher, Esq.
                              DB-5308
                              99 Park Avenue, 16th Floor
                              New York, New York 10016
                              (212) 286-0747
                              Attorneys for Respondent

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

GOLDMAN, SACHS & CO. and                    :
SOFIA FRANKEL,
                                            :
                    Petitioners,                    07 Civ. 1313 (LMM)
                                            :
                                                    MEMORANDUM AND ORDER
        - against -                         :

KATHERINE GRIFFIN, individually and         :
as Trustee of the Katherine Griffin
Living Trust,                               :

                    Respondent.             :

------------------------------------x

McKENNA, D.J.,

                              1.

        In December of 2006 (the exact date is disputed),
respondent commenced an arbitration before the National Association
of Securities Dealers, Inc. ("NASD") asserting claims of common law
fraud, breach of fiduciary duty and breach of contract against
petitioners Goldman, Sachs & Co. ("Goldman"), a brokerage firm, and
Sofia Frankel, a broker employed by Goldman, for losses resulting
from an alleged pattern of fraudulent conduct relative to
respondent's account prior to December 30, 2000, when Frankel left
Goldman for another brokerage firm (taking respondent's account
with her on January 18, 2001).

        Petitioners then commenced a proceeding in the Supreme
Court of the State of New York seeking a permanent stay of the
arbitration instituted by respondent, and respondent then removed

that proceeding to this Court on the basis of the diverse citizenship of the parties.

Petitioners move for a permanent stay of the arbitration (NASD Arbitration No. 06-6365) commenced by respondent "to the extent it asserts claims against Goldman" and "to the extent it asserts claims against Ms. Frankel and those claims relate to the period in which she worked at Goldman." (Not. of Mot. for Permanent Stay of Arbitration, at 1.) Petitioner cross-moves for dismissal.

A Trust, Estate and Guardian Account Agreement between respondent and Goldman (signed by respondent on July 23, 1999, and by Goldman on August 25, 1999) ("Agreement") (see Brecher Decl., Apr. 4, 2007, Ex. A), provides, in relevant part (in a format in which the respondent "Client" addresses Goldman) that "[t]his agreement and its enforcement shall be governed by the laws of the State of New York . . ." (Agreement, ¶ 11), that "[t]he parties are waiving their right to seek remedies in court, including the right to a jury trial" (id. ¶ 12(b)), and that "[a]ny controversy between you . . . or any of your . . . employees on the one hand, and Client . . . on the other hand, arising out of or relating to this agreement, the transactions contemplated hereby, or the accounts established hereunder, shall be settled by arbitration, in

2

accordance with the rules then obtaining of any one of [various organizations including the NASD], as Client may elect." (Id. ¶ 12.)

Petitioners contend that the last trade in respondent's Goldman account occurred on December 19, 2000, and that the arbitration was commenced on December 27, 2006, more than six years later, so that all of respondent's claims are barred by limitations, and that this Court, under Diamond Waterproofing Systems, Inc. v. 55 Liberty Owners Corp., 4 N.Y.3d 247 (2005), should so decide, and permanently stay the arbitration.

Respondent contends, citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), that the arbitrators, not this Court, should decide whether or not her claims are barred by limitations,[1] and that this Court should dismiss the petition.

The first issue, of necessity, is whether this Court or the arbitrator is to decide whether or not respondent's claims are barred by limitations.

2.

Petitioners' argument in this regard is straightforward and simple. In the present case the agreement to arbitrate provides that "[t]his agreement and its enforcement are to be

---

[1] Respondent also disputes that her claims are barred by limitations, challenging both the asserted date on which her claim arose and that on which the arbitration was commenced, and also arguing that the doctrines of continuing representation and equitable tolling based upon fraudulent concealment preclude the asserted time bar.

governed by the law of New York." (Agreement, ¶ 11.) New York's highest Court has said that "[a] choice of law provision, which states that New York law shall govern both 'the agreement and its enforcement,' adopts as 'binding New York's rule that threshold Statute of Limitations questions are for the courts.'" _Diamond_, 4 N.Y.3d at 253 (quoting _Matter of Smith Barney, Harris Upham & Co. v. Luckie_, 85 N.Y.2d 193, _cert. denied sub nom._ _Manhard v. Merrill Lynch, Pierce, Fenner & Smith, Inc._, 516 U.S. 811 (1995)). As appears in _Luckie_, 85 N.Y.2d at 201-02, the source of the New York rule that the court, rather than the arbitrator, is to decide a limitations issue is New York's Civil Practice Law & Rules § 7502(b).

If _Diamond_ governs, petitioners must prevail on the issue as to who decides the limitations question. Federal law, however, cannot be ignored, and requires the opposite conclusion.

### 3.

"Section 2 [of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration within the coverage of

the Act." <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, 460 U.S. 1, 24 (1983).[2]

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." <u>Id.</u> at 24-25 (footnote omitted).

In <u>Howsam</u>, the Supreme Court found that the issue whether an NASD time limit rule barred an arbitration should be decided by the arbitrator, not the court. The Court recognized both the federal policy favoring arbitration, 537 U.S. at 83 (citing <u>Moses H. Cone</u>, 460 U.S. 24-25) and also "the exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, <u>i.e.</u>, the '<u>question of arbitrability</u>,'" is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" <u>Id.</u> (quoting <u>AT&T</u>

_____

[2] Although the parties do not meaningfully argue the point, one way or the other, there does not appear to be any doubt at all that the FAA applies in the present case. The FAA applies to contracts "evidencing transactions in 'commerce.'" <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 401 (1967). In <u>Painewebber v. Bybyk</u>, 81 F.3d 1193, 1198 (2d Cir. 1996), the Second Circuit found an arbitration agreement quite similar to that in the present case to affect commerce and so bring it under the FAA. The "mere inclusion of a choice-of-law provision in an arbitration provision does not thereby incorporate state arbitration law." <u>Shaw Group, Inc. v. Triplefine Int'l Corp.</u>, 322 F.3d 115, 123 (2d Cir. 2003) (citing <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 60-64 (1995)). <u>See also</u>, <u>Robinson v. Bache & Co.</u>, 227 F. Supp. 456, 458 n.1 (S.D.N.Y. 1964) (Bonsal, J.).

5

Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986)) (emphasis in original) (other citation omitted). The Supreme Court then considered what a "question of arbitrability" was.

> The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

537 U.S. at 83-64.  The Court (on a review of a number of its cases) found that "a gateway dispute about whether the parties are bound by a given arbitration clause raised a 'question of arbitrability' for a court to decide," id., and also found "the phrase 'question of arbitrability' not applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would likely decide the gateway matter," noting that "the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'"  Id. (quoting Moses H. Cone, 460 U.S. at 24-25). The Supreme Court held that "without the help of a special arbitration disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule" and that "that presumption does not apply."  537 U.S. at 593.

6

Petitioners emphasize the fact that the language of the Agreement provides that both the Agreement "and its enforcement" are to be governed by New York law (Agreement, ¶ 11 (emphasis added)) (see Pet. Mem., Mar. 12, 2007, at 3; Pet. Mem. Apr. 20, 2007, at 2), and the fact that in Howsam, the time limitation at issue was not a state law rule, but an NASD rule. (See Pet. Mem. Apr. 20, 2007, at 3-4.)

These facts, however, are not persuasive of petitioners' position.

In Bybyk, a choice of law clause in substantially the same terms as those in the Agreement here -- "'[t]his agreement and its enforcement shall be construed and governed by the laws of the State of New York,'" Bybyk, 81 F.3d at 1196 -- did not persuade the Second Circuit that the applicability of an NASD time limitation should be decided by the court.

Nor does the fact that, here, it is state law time limitations that petitioners seek to enforce, suggest that a court, rather than the arbitrator, should decide the issue. In Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991), an arbitration was commenced against a brokerage firm, which obtained an order from the district court permanently enjoining the plaintiff from instituting or pursuing arbitration of his claim against the brokerage firm; the district court based its decision on the running of a three year state tort statute of limitations.

7

944 F.2d at 117.  The Second Circuit found the district court's decision (granting summary judgment on a churning claim on the ground that it was time-barred) somewhat unclear, but said that, if the district court "decided the statute of limitations question itself -- before examining the scope of the agreement -- that conflicts with the rule that it is up to the arbitrators, not the court, to decide the validity of time-bar defenses."  944 F.2d at 120-21 (citing Conticommodity Serv. V. Phillip & Lion, 613 F.2d 1222, 1224-25 (2d Cir. 1980)).  "Although Conticommodity involved a one-year time limitation set forth in the arbitration agreement itself, we stated emphatically that any limitations defense -- whether stemming from the arbitration agreement, arbitration association rule, or state statute -- is an issue to be addressed by the arbitrators."  944 F.2d at 121 (citing Conticommodity, 613 F.2d at 1224-25) (other citation omitted).  "It follows from these prior holdings that if the churning claim falls within the scope of the arbitration clauses in the Customer Agreements, the district court went beyond its authority in addressing the statute of limitations issue."  Id.

### 4.

In sum, the FAA applies to the arbitration agreement, Howsam and the other federal case law cited above governs, and Diamond does not govern.  Under the FAA and the governing case law,

the issue of whether respondent's claims are barred by any New York statute of limitation is for the arbitrator, not this Court.

For the foregoing reasons, petitioners' motion for a permanent stay of arbitration is denied, and respondent's motion for dismissal of this proceeding is granted.

Petition dismissed.

SO ORDERED.

Dated:  May *16*, 2007

_____
Lawrence M. McKenna
U.S.D.J.

9

**Exhibit E**

**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

Name of the Claimant
Katherine Griffin, individually and as trustee
of the Katherine Griffin Living Trust

Case Number: 06-05365

Names of the Respondents
Goldman, Sachs & Co.
Lehman Brothers Inc.
Sofia Frankel

Hearing Site: Washington, D.C.

Nature of the Dispute: Customer vs. Member and Associated Person.

## REPRESENTATION OF PARTIES

For Katherine Griffin, individually and as trustee of the Katherine Griffin Living Trust,
hereinafter referred to as "Claimant": Dan Brecher, Esq., Law Offices of Dan Brecher,
New York, New York.

For Respondents Goldman, Sachs & Co. ("Goldman") and Sofia Frankel ("Frankel") for
the time she was employed by Respondent Goldman: Michael J. Dell, Esq., Kramer
Levin Naftalis & Frankel LLP, New York, New York.

For Respondents Lehman Brothers Inc. ("Lehman") and Frankel for the time she was
employed by Respondent Lehman: Brian F. McDonough, Esq., Drinker Biddle & Reath,
LLP, New York, New York.

Respondents Goldman, Lehman, and Frankel are hereinafter collectively referred to as
"Respondents".

## CASE INFORMATION

Statement of Claim filed on or about: December 21, 2006.
Claimant signed the Uniform Submission Agreement: December 19, 2006.
Statement of Answer and Request for Expungement filed by Respondents Lehman and
Frankel on or about: March 13, 2007.
Respondent Frankel signed the Uniform Submission Agreement: April 4, 2007.
Respondent Lehman signed the Uniform Submission Agreement: April 2, 2007.
Statement of Answer filed by Respondents Goldman and Frankel on or about: June 1,
2007.
Respondent Goldman signed the Uniform Submission Agreement: June 11, 2007.
Respondents Goldman and Frankel filed a request that the Panel withdraw its Order
Denying Respondent Goldman's Motion to Dismiss ("Motion to Withdraw") on or about:
June 18, 2007.

Motion to Dismiss filed by Respondents Goldman and Frankel ("Motion to Dismiss") on or about: November 5, 2007.
Memorandum in Opposition to Motion to Dismiss filed on or about: December 14, 2007.
Reply Memorandum in Further Support of the Motion to Dismiss filed on or about: January 22, 2008.

## CASE SUMMARY

Claimant asserted the following causes of action: 1) common law fraud and statutory fraud; 2) breach of contract; 3) breach of fiduciary duties; 4) Respondent Lehman's negligent hiring and retention of Respondent Frankel; 5) negligence on the part of Respondents Lehman and Frankel; and, 6) breach of supervisory duties on the part of Respondent Lehman. The causes of action relate to alleged unauthorized trading and the purchase and sale of various securities in Claimant's accounts including but not limited to shares of stock of: WorldCom, Global Crossing, and eToys.

Unless specifically admitted in their respective Answers, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimant requested from Respondents Goldman and Frankel, jointly and severally: 1) $1,300,000.00 for Claimant's out-of-pocket losses; 2) $158,600.00 or more in commissions, margin interest and other charges to Claimant's account at Respondent Goldman; 3) $250,000.00 or such other amount that the undersigned arbitrators (the "Panel") determined represents the lost interest, profits, income, and gain that Claimant would have realized on the account, including lost income under the "well managed portfolio" theory of recovery; 4) punitive damages; 5) interest; 6) attorneys' fees; and, 7) costs.

Respondents Goldman and Frankel requested dismissal of the Statement of Claim, costs, expungement of this matter from Respondent Frankel's Central Registration Depository ("CRD") records, and such other and further relief as the Panel deemed just and proper.

Claimant requested from Respondents Lehman and Frankel, jointly and severally: 1) $823,500.00 for Claimant's out-of-pocket losses; 2) $32,300.00 or more in commissions, margin interest and other charges to Claimant's account at Respondent Lehman; 3) $250,000.00 or such other amount that the Panel determined represents the lost interest, profits, income, and gain that Claimant would have realized on the accounts, including lost income under the "well managed portfolio" theory of recovery; 4) punitive damages; 5) interest; 6) attorneys' fees; and, 7) costs.

Respondents Lehman and Frankel requested dismissal of the Statement of Claim and expungement of this matter from Respondent Frankel's CRD records.

## OTHER ISSUES CONSIDERED AND DECIDED

On or about June 12, 2007, the Panel issued an order which denied, without prejudice, Respondent Goldman's request for dismissal of the Statement of Claim contained in its ~Answer.

On or about July 17, 2007, the Panel issued an order which granted Respondent Goldman's Motion to Withdraw and vacated its order dated June 12, 2007, which denied, without prejudice, Respondent Goldman's motion to dismiss contained in its Answer.

In their Motion to Dismiss and Reply in support thereof, Respondents Goldman and Frankel asserted the following grounds for dismissal of Claimant's Statement of Claim: the Panel has the power to dismiss Claimant's claims without holding an evidentiary hearing; Claimant's claims against Respondents Goldman and Frankel are ineligible for arbitration because Claimant did not commence her action within the time period set forth in Rule 10304 of the Code of Arbitration Procedure (the "Code"); Rule 10304 does not have any qualification or exception to its six year time period; the eligibility period for Claimant to bring her claims began running no later than December 19, 2000 and Claimant brought this action on December 27, 2006; Claimant's claims are also time-barred by the applicable New York statutes of limitation; the Doctrine of Continuous Representation does not apply to this case; and, the Doctrine of Fraudulent Concealment does not apply to this case.

In her Memorandum in Opposition, Claimant asserted the following: it would be improper for the Panel to dismiss Claimant's claims without holding an evidentiary hearing; the statute of limitations begins to run when the fraud is discovered, not when the investment is first purchased; Claimant's claims against Respondents Goldman and Frankel are eligible for arbitration pursuant to Rule 10304 of the Code; Claimant's claims are not time barred by the New York statutes of limitations; Claimant's claims did not accrue until the relationship between Claimant and Respondent Goldman terminated; the Doctrine of Continuous Representation applies to Respondents Goldman and Frankel; and, the Doctrine of Fraudulent Concealment applies to this case. The Panel deferred ruling on the Motion to Dismiss until the evidentiary hearing.

On or about January 29, 2008, Claimant dismissed, with prejudice, her claims against Respondent Lehman and against Respondent Frankel for the time period she was employed by Respondent Lehman.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions (if any), the Panel has decided in full and final resolution of the issues submitted for determination as follows:

The Panel unanimously recommends expungement of this matter from the CRD records

of Respondent Sofia Frankel for her conduct during, first, her employment at Goldman and then at Lehman. The Panel found that consideration of the claims against Respondents Goldman and Frankel were time-barred under FINRA Rule 10304 and dismissed those claims, without prejudice. While consideration of the claims against Respondents Lehman and Frankel was not time-barred, that portion of the case was settled between the parties prior to the evidentiary hearing. The issues in question, therefore, became moot.

Accordingly, the Panel found that equity requires that this matter be expunged from Respondent Frankel's CRD records. With reference to the criteria for expungement listed under FINRA Rule 2130, the criteria assume that the substance of the claims had been considered at the evidentiary hearing. But, as noted, such consideration had been precluded by the time-barred nature of some of the claims and the settlement of the remainder. Consequently, the appropriate reference to Rule 2130 is its statement to the effect that "if there are no such findings [FINRA] be named as a party in any court or proceeding seeking or confirming expungement relief."

The Panel recommends the expungement of all references to the above-captioned arbitration from Respondent Frankel's registration records maintained by the CRD, with the understanding that pursuant to Notice to Members 04-16, Respondent Frankel must obtain confirmation from a court of competent jurisdiction before the CRD will execute the expungement directive.

Unless specifically waived in writing by FINRA, parties seeking judicial confirmation of an arbitration award containing expungement relief must name FINRA as an additional party and serve FINRA with all appropriate documents.

Pursuant to Rule 2130, the arbitration panel made no affirmative findings of fact.

Any and all claims for relief not specifically addressed herein, including Claimant's request for punitive damages, are denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
|  |  |
|---|---|
| Initial claim filing fee | = $500.00 |

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person at the time of the events giving rise to the dispute. Accordingly, Respondents Goldman and Lehman are parties and member firms.

Respondent Goldman:
|  |  |
|---|---|
| Member surcharge | = $2,800.00 |

| | |
|---|---|
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $5,000.00 |
| Total Member Fees | = $8,550.00 |

Respondent Lehman:

| | |
|---|---|
| Member surcharge | = $2,800.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $5,000.00 |
| Total Member Fees | = $8,550.00 |

## Adjournment Fees
Adjournments granted during these proceedings for which fees were assessed:

No adjournment fees were assessed during this proceeding.

## Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No three-day cancellation fees were assessed during this proceeding.

## Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court. Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction. These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the Panel.

No injunctive relief fees were assessed during this proceeding.

## Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted or each decision rendered on either a discovery-related motion on the papers or a contested motion for the issuance of a subpoena. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) Pre-hearing session with a single arbitrator @ $450.00/session | | | = $   450.00 |
| Pre-hearing conference: | September 17, 2007 | 1 session | |
| | | | |
| One (1) Pre-hearing session with the Panel @ $1,200.00/session | | | = $1,200.00 |
| Pre-hearing conference: | May 22, 2007 | 1 session | |
| | | | |
| One (1) Hearing session @ $1,200.00/session | | | = $1,200.00 |
| Hearing Date: | January 30, 2008 | 1 session | |

| | |
|---|---|
| Total Forum Fees | = $2,850.00 |

The Panel has assessed $1,200.00 of the forum fees jointly and severally to Respondents Goldman and Frankel.
The Panel has assessed $225.00 of the forum fees to Claimant.
The Panel has assessed $225.00 of the forum fees jointly and severally to Respondents.
The Panel has assessed $600.00 of the forum fees to Respondent Goldman.
The Panel has assessed $600.00 of the forum fees jointly and severally to Respondents Lehman and Frankel.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but are not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

### Fee Summary

Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $ 500.00 |
| Forum Fees | = $ 225.00 |
| Total Fees | = $ 725.00 |
| Less payments | = $ 725.00 |
| Balance Due FINRA Dispute Resolution | = $ 0.00 |

Respondent Goldman is solely liable for:

| | |
|---|---|
| Member Fees | = $8,550.00 |
| Forum Fees | = $ 600.00 |
| Total Fees | = $9,150.00 |
| Less payments | = $8,550.00 |
| Balance Due FINRA Dispute Resolution | = $ 600.00 |

Respondent Lehman is solely liable for:

| | |
|---|---|
| Member Fees | = $8,550.00 |
| Total Fees | = $8,550.00 |
| Less payments | = $8,550.00 |
| Balance Due FINRA Dispute Resolution | = $ 0.00 |

Respondents Goldman, Lehman and Frankel are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $ 225.00 |
| Total Fees | = $ 225.00 |
| Less payments | = $ 225.00 |
| Balance Due FINRA Dispute Resolution | = $ 0.00 |

Respondents Goldman and Frankel are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $1,200.00 |
| Total Fees | = $1,200.00 |
| Less payments | = $ 0.00 |

FINRA Dispute Resolution
Arbitration No. 06-05365
Award Page 7 of 7

Balance Due FINRA Dispute Resolution                    = $1,200.00

Respondents Lehman and Frankel are jointly and severally liable for:

| | | |
|---|---|---|
| Forum Fees | = $ | 600.00 |
| Total Fees | = $ | 600.00 |
| Less payments | = $ | 600.00 |
| Balance Due FINRA Dispute Resolution | = $ | 0.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Michael F. Halasz | - | Public Arbitrator, Presiding Chairperson |
| Jeanne E. Libit | - | Public Arbitrator |
| Byron P. Fusini | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures


_____/s/_____                                      _____
Michael F. Halasz                                      Signature Date
Public Arbitrator, Presiding Chairperson



_____/s/_____                                      _____
Jeanne E. Libit                                        Signature Date
Public Arbitrator



_____/s/_____                                      _____
Bryon P. Fusini                                        Signature Date
Non-Public Arbitrator



March 3, 2008_____
Date of Service (For FINRA Dispute Resolution use only)

Balance Due FINRA Dispute Resolution          = $1,200.00

Respondents Lehman and Frankel are jointly and severally liable for:

| Forum Fees | = $ | 600.00 |
| Total Fees | = $ | 600.00 |
| Less payments | = $ | 600.00 |
| Balance Due FINRA Dispute Resolution | = $ | 0.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| Michael F. Halasz | - | Public Arbitrator, Presiding Chairperson |
| Jeanne E. Libit | - | Public Arbitrator |
| Byron P. Fusini | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

_____
Michael F. Halasz
Public Arbitrator, Presiding Chairperson

2/29/?  ?
Signature Date

_____
Jeanne E. Libit
Public Arbitrator

_____
Signature Date

_____
Bryon P. Fusini
Non-Public Arbitrator

_____
Signature Date

_____
Date of Service (For FINRA Dispute Resolution use only)

FINRA Dispute Resolution
Arbitration No. 06-05365
Award Page 7 of 7

Balance Due FINRA Dispute Resolution                    = $1,200.00

Respondents Lehman and Frankel are jointly and severally liable for:

| Forum Fees | = $ | 600.00 |
| Total Fees | = $ | 600.00 |
| Less payments | = $ | 600.00 |
| Balance Due FINRA Dispute Resolution | = $ | 0.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

### ARBITRATION PANEL

| Michael F. Halasz | - | Public Arbitrator, Presiding Chairperson |
| Jeanne E. Libit | - | Public Arbitrator |
| Byron P. Fusini | - | Non-Public Arbitrator |

### Concurring Arbitrators' Signatures

_____
Michael F. Halasz
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Jeanne E. Libit
Public Arbitrator

2/29/08
Signature Date

_____
Bryon P. Fusini
Non-Public Arbitrator

_____
Signature Date

_____
Date of Service (For FINRA Dispute Resolution use only)

FINRA Dispute Resolution
Arbitration No. 06-05365
Award Page 7 of 7

Balance Due FINRA Dispute Resolution                    = $1,200.00

Respondents Lehman and Frankel are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $  600.00 |
| Total Fees | = $  600.00 |
| Less payments | = $  600.00 |
| Balance Due FINRA Dispute Resolution | = $    0.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Michael F. Halasz | - | Public Arbitrator, Presiding Chairperson |
| Jeanne E. Libit | - | Public Arbitrator |
| Byron P. Fusini | - | Non-Public Arbitrator |

### Concurring Arbitrators' Signatures

_____

Michael F. Halasz
Public Arbitrator, Presiding Chairperson

Signature Date


_____

Jeanne E. Libit
Public Arbitrator

Signature Date


Bryon P. Fusini
Non-Public Arbitrator

2/29/2008
Signature Date


Date of Service (For FINRA Dispute Resolution use only)

**Exhibit F**

NASD DISPUTE RESOLUTION, INC.

In the Matter of the Arbitration between

KATHERINE GRIFFIN, individually and as trustee of the
Katherine Griffin Living Trust,

                                 Claimant,

                                                              NASD No.

                  - against -

GOLDMAN, SACHS & CO., LEHMAN BROTHERS INC.
and SOFIA FRANKEL,

                                 Respondents.

## STATEMENT OF CLAIM

### PRELIMINARY STATEMENT

This Statement of Claim alleges that the Respondents engaged in activities that constitute

common law fraud, victimizing this Claimant and a number of other customers of Sofia Frankel

("Frankel"), a broker employed by Goldman Sachs from 1994 through 2000, who moved to

Lehman Brothers at the end of 2000. Frankel generated more than $20 million dollars in

commissions at Goldman Sachs and Lehman Brothers in just the four years from early 1997

through early 2001. And, including $14 million in "up-front" money paid to her by Lehman

Brothers when she joined that firm in late 2000, Frankel received $22 million from Goldman

Sachs and Lehman Brothers in that time. She "earned" this money solely through commissions

and her share of markups and markdowns she charged for "investing" the funds in her

customers' accounts in high margin in-and-out trading of hundreds of different securities. She

justified her high commissions through false representations and fraudulent charts purporting to

show the outstanding past performance of her customer accounts: Frankel charged four or more

times as much as the average broker at Respondent firms because she was presented as a "star"

1

broker who would produce exceptional results for her customers' accounts. The truth is that she took profits and deferred losses, and made false claims of outstanding performance.

Claimant Katherine Griffin is among a number of customers Frankel damaged by overcharging and lying to them, as described in this Statement of Claim. Frankel used the names and reputations of Goldman Sachs and Lehman Brothers, together with false representations and fraudulent performance charts purporting to show the outstanding past performance of her customer accounts, to obtain and maintain complete discretionary control over her customers' accounts, including Claimant's accounts, which she then traded on high margin, causing massive losses to most of the accounts of her largest customers. Frankel traded these accounts without an evident plan. She traded the accounts so frequently, charging such high commissions, markups/markdowns and other costs, and holding losses while taking profits, that her supervisors had to know she was engaged in improper activity which they failed to properly supervise and curtail.

Claimant relied upon the names and reputations of Goldman Sachs and Lehman Brothers, the misrepresentations as to Frankel's education and abilities, and the misrepresentations concerning the performance of accounts under her management, including those made in the fraudulent charts Respondents prepared and used, and, based upon this reliance, Claimant allowed Frankel to maintain discretionary control over her Goldman Sachs account until Frankel left Goldman Sachs and went to Lehman Brothers in December 2000. Claimant then followed Frankel to Lehman Brothers after Frankel became employed there. Frankel was the named broker on Claimant's Lehman Brothers account until January 2004.

As a result of Frankel's fraudulent and tortious actions, Claimant suffered out-of-pocket losses totaling approximately $1.3 million while the Respondents charged about $200,000 in

2

commissions and other excessive charges to the Claimant's accounts. The Claimant also suffered damages totaling $500,000 in lost earnings on her out-of-pocket losses. The Claimant should recover all $2 million of her claims, including the charges to her accounts during Frankel's fraudulent treatment of her accounts, in which the brokerage firm Respondents are complicit and should also be held responsible. Claimant also seeks punitive damages, based on the extensive, repeated and widespread fraudulent conduct of the Respondents, and also based on the Respondents' improper actions in efforts to cover up the fraudulent acts and to keep Claimant from learning of the common law fraud Frankel committed upon her.

## THE DOCUMENTED COMMON LAW FRAUD COMMITTED BY RESPONDENTS

1.      Sofia Frankel is an immigrant from Russia, who came to this country in or about 1987 in pursuit of what she called the "American Dream." In 1994, she joined Goldman Sachs as a newly registered broker in her first job in the securities industry. By 1999, she was telling her customers she was living the "American Dream." She also told many of her customers, including the Claimant, blatant falsehoods. She even claimed that she had a Ph.D. - she doesn't. Frankel, when confronted with her lies about her education, backtracked and now claims that she engaged in "Ph.D. studies." However, she now claims that she cannot remember the name of the professor she claims to have studied under. It appears that she was not registered anywhere that she claims with regard to her "Ph.D. studies." Her lack of regard for truth and her lack of obedience to rules, regulations and the obligations she assumed when she became a broker at Goldman Sachs will be quite evident at the hearings in this matter. Fortunately for Frankel, she entered the brokerage business in a rising market that encouraged speculation in technology stocks. Unfortunately for her customers, such as the Claimant, Frankel worked for the most

3

highly regarded firms in the securities industry, so, at the time, her false representations seemed believable to the Claimant, and to Frankel's other customers.

2.    At the hearing of these claims, it will be shown that Frankel utilized the same fraudulent methods in dealing with many of her customers that she used to defraud this Claimant. Frankel also showed other customers the fraudulent performance charts and she also insisted upon discretionary control over their accounts, gaining the customers' trust and confidence by promising to treat their assets entrusted to her control as if it was her own money. Then she proceeded to trade wildly, on high margin, and abandoned her customers when her co-employees at Lehman reported her fraud to their superiors. Unfortunately, despite all of the many "red flags" created by her fraudulent acts and improper activities, her superiors did nothing, notified no customers, and essentially condoned her outrageous treatment of her customers: at Goldman Sachs, because Frankel ingratiated herself with the compliance personnel and with her superiors; at Lehman Brothers, because of a sloppy supervision scheme and the apparent intention of sweeping the reported fraud and improper activities under the rug. The supervisors' behaviors here amount to nothing less than gross neglect of their duties. What raises Frankel's false statements beyond mere puffery to the level of common law fraud, even at the outset, is that in furtherance of her fraudulent scheme, in which Frankel obtained and maintained control over Claimant's Goldman Sachs account, and to justify her excessively high commissions, Frankel presented Ms. Griffin and numerous other customers with the performance charts, fraudulently portraying her financial acumen as having resulted in customers' accounts she controlled far outperforming even the strong market that was ongoing prior to the opening of the Claimant's Goldman Sachs account. Frankel continued this fraudulent practice at Lehman Brothers.

3.    In 1999, Katherine Griffin turned over more than $2.4 million to the discretionary control of Sofia Frankel, by setting up a trust account with Goldman Sachs for the Katherine Griffin Living Trust, bearing account number 001-10030-4 (the "Goldman Account"). These funds represented a substantial portion of Claimant's net worth. Frankel insisted upon discretionary control of the Goldman Account and then proceeded to trade the account, overcharging commissions, markups and markdowns. She made unauthorized trades, used excessive margin, and then she falsified records to cover-up her misdeeds. Frankel's illegal activities caused almost $2 million in total losses to Katherine Griffin as a result of Frankel's transactions in her account while at Goldman Sachs, with approximately $823,500 of lost value in these securities having occurred while the account was at Lehman Brothers.

4.    Katherine Griffin opened her Goldman Account with Frankel in July 1999. Although initially cautious about transferring funds from an existing account Katherine had maintained with a broker she "adored," David Parks, Katherine was won over by Frankel after their initial meeting where Frankel provided her with customer performance charts prepared by Goldman Sachs that purported to show that customers' accounts under Frankel's management and control had very substantially out-performed the market in the prior three years. Frankel made a practice of showing her clients performance charts that were titled "Composite Historical Equity Performance" (hereafter, "the Charts"). The Charts that were shown to Claimant, along with Frankel's business card which Frankel attached to the Charts, are annexed hereto as Exhibit A. The Charts were represented by Respondents Frankel and Goldman Sachs as being accurate and correct to one one-hundredth of one percent in their calculations of the performance of "the GS Team portfolio." However, the Charts Frankel used to obtain and maintain discretionary control over Claimant's account and to justify her high commission rates were materially false,

5

misleading and substantially inaccurate. The Charts had been prepared, with knowledge that they were false, (i) to induce customers to turn over their financial assets to the management and control of Frankel, (ii) to allow Frankel to maintain control over customers' accounts, and (iii) to justify the materially higher commissions Frankel charged her customers.

5.    Frankel made highly inaccurate, greatly exaggerated, and materially false and misleading claims of great success in her use of the Charts. Frankel's claims were false, and her supervisors knew, or should have known that she was lying to her customers. For example, the chart on the second page of the Charts that are annexed hereto as Exhibit A, makes the claim that $10 million invested at an unidentified point in 1995 in an undefined "GS Team portfolio" was worth $32,297,891 on 3/31/99. The truth is that the claimed "portfolio" for a "GS Team" was a fiction, concocted with fraudulent intent, and not one that was truly derived from Frankel's recommendations. Yet, in the Notes on the bottom of page 2 of Exhibit A, the Charts portray this as an actual "Past Performance" which "is not indicative of future results." The truth is that there was no such actual past performance either, and Respondents will not be able to honestly substantiate the claims in the Charts. Indeed, even the Charts' claimed actual percentage gain of 198.89% in the so-called "portfolio" does not support the growth performance represented to be $32,297,891 on 3/31/99. Another example of the fraudulent nature of the Charts is on page 3 of the Charts, in the first paragraph of which the Charts are falsely portrayed as detailing "results for the equity portion" (which is undefined) "of certain accounts," and then goes on to falsely claim that the Charts include performance of accounts which "are not discretionary accounts, however, all or most of the transactions effected therein resulted in [sic] Sophia's recommendations." This representation is also materially false because Frankel did not include the performance of non-discretionary accounts (plural) in compiling the Charts. The number of

6

accounts and the performance figures on this page are also false representations. For these and other reasons that will be presented at the hearings, the Charts are a fraud. The Charts that are Exhibit A hereto are charts shown to Claimant by Frankel to induce the turnover of Claimant's funds to Frankel's control, and that were handed to Claimant by Frankel prior to Claimant opening her Goldman Account.

6.    Frankel also sought to use phony customer composite performance charts at Lehman Brothers. Moving to Lehman Brothers in December 2000, Frankel sought to promote herself with similar disdain for the accuracy of her presentations to customers at Lehman Brothers. Relying upon the representations Frankel made, including those made through the use of charts, and the credibility and good name of Lehman Brothers, Claimant followed Frankel to Lehman Brothers, transferring her account from Goldman Sachs in January 2001, despite the $466,700 in realized losses and the substantial unrealized losses her account incurred under Frankel's management. Claimant's account number for her Lehman Brothers account was 831-01996-10 (the "Lehman Account"). Had Claimant known of Frankel's misrepresentations and improper acts, Claimant would have terminated her relationship with Frankel and would not have followed Frankel to Lehman Brothers. Instead, Claimant was lead to believe that Frankel was a gifted broker who had an ability to produce exceptional results in her customers' accounts and who had Claimant's best interests at heart. As a result of Claimant's reliance upon Respondents' misrepresentations, Claimant suffered approximately $2 million in losses.

7.    Frankel's deceit included lying to her customers, such as this Claimant, about new issues she sold to them. She lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities. Frankel violated internal Goldman Sachs rules as to

communications with customers and with the back office regarding sales of new issues. Frankel had a practice of purchasing new issues for these customers without first discussing the details of the purchases with the customers; an improper practice as to new issues, even for discretionary accounts such as the accounts at issue here. Frankel would indicate to the Goldman Sachs investment bankers for new issues and then after being informed of the actual allotments, Frankel would allocate them among her customers, without properly discussing the transactions first or without communicating with her customers at all, including the Claimant. And, when her allotment was less than the amount she indicated for, Frankel would change customers' allocations, but not in proportion to the amount indicated for each customer; this was in breach of applicable rules and regulations.

8.    Frankel lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities. Frankel was thereby allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice. Supervisors at Goldman Sachs did not take proper cautionary steps, and Frankel was permitted not only to ride out the collapsing market for technology stocks, but, at the end of 2000, having stuck her clients, including the Claimant, with substantial unrealized losses, Frankel then left Goldman Sachs for Lehman Brothers, and she was paid $14,000,000 just to join Lehman Brothers, and she was given an impressive title by Lehman Brothers, serving to further mislead Claimant. When Claimant's account was transferred out of Goldman Sachs, Claimant's out-of-pocket losses totaled approximately $466,000. While at Lehman Brothers, Claimant's account lost more than $823,500 from January 2001 through January 2004, the time period that it was under Frankel's supervision. Approximately 60% of

8

the Lehman Brothers losses occurred in early 2001, when Lehman Brothers learned of Frankel's fraudulent and improper acts, removed her from the Copeland Frankel Group, but failed to inform Claimant of any of these facts or occurrences.

9.    Claimant lost approximately $51,000 in two specific stocks, WorldCom and Global Crossing, listed in the settlement Goldman Sachs made with the United States Securities and Exchange Commission ("SEC") and with the New York Attorney General regarding the false reports issued by Goldman Sachs analysts. See Exhibit B.

10.    Claimant lost approximately $198,600 in eToys, Inc., a stock which was the subject of a recent New York Court of Appeals decision, attached hereto as Exhibit C, in which the Court imposed a fiduciary responsibility on Goldman Sachs to the issuer in an initial public offering of eToys, Inc. for which Goldman Sachs was the lead underwriter, holding that when underwriters serve as expert advisors they are obligated to reveal any conflicts of interest. The specific conflict of interest that is the subject of EBC I Inc. v. Goldman, Sachs & Co. involved sales by Goldman Sachs of its own eToys stock at a far higher price than the IPO and the related arrangements entered into between Goldman Sachs and certain of its customers whereby such customers were obligated to kick back to Goldman Sachs a portion of any profits that they made from the sale of eToys securities subsequent to the initial public offering.

11.    The unlawfulness of these schemes and the improprieties alleged here is all the more shocking for where they occurred: the most respected names on Wall Street - Goldman Sachs and Lehman Brothers. Indeed, the very success of Frankel's fraudulent activities was dependent on the respected nature of the Goldman Sachs and Lehman Brothers names – Frankel was selling Goldman Sachs and Lehman Brothers' brokerage services, with supposed

customized and personal investment advice. She was not represented to be a typical broker; Goldman Sachs and Lehman Brothers presented Frankel as a "star."

12.    Goldman Sachs specifically knew that Frankel was overcharging her customers and excessively trading customers' accounts while it was happening. Goldman Sachs not only did nothing to stop her, it supported and encouraged Frankel by knowingly permitting Frankel to tell customers, even those who complained about the high charges, that her performance, as shown in the Charts, among other reasons she gave, was justification for the high commissions she charged. Frankel claimed to her customers that it was her right to charge "old rates," that is, extra high commissions, because that was the price of sharing in the success she had created. Frankel used the fraudulent Charts to support her fleecing of customers through overtrading their accounts while charging excessively high commissions, throughout her employment with Goldman Sachs. All of this was with the knowledge and support of Frankel's laissez-faire supervisors. In the 18 months from August 1999 to December 2000 that Frankel controlled Claimant's Goldman Account, Goldman Sachs charged the Claimant substantially more than $158,000 in commissions, markups, markdowns and margin interest. The excessive commissions charged by Respondents, who then justified such commissions through the Charts shown to Claimant by Frankel, support a claim of common law fraud.

13.    By 1999, through some luck related to the bull market in technology stocks, in which Frankel promoted herself as a specialist and expert, and because she had been producing immense commissions from a limited number of accounts, and had made strong and successful efforts to befriend her supervisors, Frankel was able to bamboozle almost everyone. Yet, there were co-workers of Frankel who became aware of her excessive commission charges, and did not want to work with her. Indeed, her excessive charges and the huge commission income she

10

generated made her behavior particularly notorious at Goldman Sachs, which should have served as a red flag to her supervisors, even in 1999.

14.    Frankel's Goldman Sachs supervisors ignored a number of warning signs, including Frankel's lack of experience and training, the Charts that should have been questioned, her excessive commission charges, the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, the high turnover ratios in her customers' accounts, and customer complaints reporting unauthorized transactions by Frankel. By way of comparison to Frankel's limited experience as a broker, the average Smith Barney Citigroup broker is advertised as having 15 years of experience in the securities brokerage industry. At the time she gained discretionary control over the Claimant's Goldman Account, Frankel had been in the industry for less than five years. These were all "red flags" which Frankel's supervisors should have seen and acted upon, which they failed to do.

15.    Instead, Frankel's supervisors at Goldman Sachs promoted Frankel's performance to other brokers as a model to be imitated. Goldman Sachs' supervisors had Frankel address new associates to promote charging "old rates" and held her up to new associates as a broker to emulate. While many brokers were charging their customers with active accounts commissions of six cents a share, and less, and even after Goldman Sachs had distributed written instructions to its brokers encouraging lesser commission charges or fixed annual charges, or charging a maximum of $.125 a share in transactions for discretionary accounts, Goldman Sachs, nonetheless, encouraged and supported Frankel in charging her customers substantially higher rates than other brokers were charging their regular customers with active accounts. Frankel would often charge customers commissions of $.40, $.50, even $1.00 a share or more, even $4.00 a share, based on whether the customer made money on a

11

transaction; an improper practice. When Frankel's supervisors asked her questions about customers' positions, the high margin, or the substantial trading, Frankel lied to her supervisors; lies that could have been discovered by her supervisors speaking directly to the customers, such as the Claimant, to confirm what Frankel told her supervisors. The supervisors failed to speak to Claimant and other customers, as they should have done. One reason for this breakdown in supervision was that Frankel went out of her way to befriend her supervisors, particularly in the compliance department, where Frankel was even able to wangle a job at Goldman Sachs for her son.

16.      Frankel moved from Goldman Sachs to Lehman Brothers at the end of 2000, receiving an up-front payment of $14 million and a new and impressive job title from Lehman Brothers. Frankel lied to her customers, including the Claimant, and to Lehman Brothers and others, about the amount of assets under her management and about the performance of her customers' funds under her management (again using falsified numbers). She claimed credit for the control over, and the performance of, accounts she did not have. She claimed credit for transactions that she had not recommended. She also lied about the amount of money under her management.

17.      At Lehman Brothers, Frankel was quickly found to be a fraud, but, since early 2001, members of management at Lehman Brothers have sought to keep their knowledge of Frankel's fraudulent behavior hidden from her customers, including the Claimant. Respondents Lehman Brothers and Frankel asserted, in Exhibit D hereto, their filed answer in other similar proceedings, that Frankel has a clean record, that she is an honest broker who did nothing wrong, that Lehman Brothers could say nothing in response to the specific allegations of Frankel's improper creation and use of customer composite performance charts in soliciting business, that

12

it could say nothing in response to the specific allegations of Frankel's misrepresentations to Lehman Brothers that induced the up-front payment of $14 million to Frankel by Lehman Brothers, and that it could say nothing in regard to the discovery by Lehman Brothers of Frankel's improper acts and the removal of Frankel from her position as co-head of The Copeland Frankel Group in 2001. In a later answer in another arbitration proceeding, attached hereto as Exhibit E, Lehman Brothers asserts that it is not aware of Frankel's having used improper performance charts at Lehman Brothers, any improper sales practices at Lehman and any customer complaints against Frankel other than the existing arbitrations. What is of significance here, however, is what Lehman Brothers does not assert, namely, that it is unaware of Frankel using *any* performance charts at any time, and that it is unaware of *any* complaints against Frankel, including complaints from Frankel's co-workers. The answers provided by Respondents in preceding arbitrations evidence Respondents' continuing efforts to conceal the truth from Claimant, regulators and other customers.

18.    For the entire period Frankel managed Claimant's accounts at Goldman Sachs and, later, at Lehman Brothers, Frankel was negligent in the administration and handling of such accounts. Lehman Brothers was negligent in its supervision of Claimant's accounts and in its supervision of Frankel. Frankel, caught up in what Lehman Brothers now admits were, at the least, "internal issues" with her partners in The Copeland Frankel Group, did not attend to her duties in early 2001 with respect to Claimant's account, and Claimant's account was neglected for months, causing significant losses in value to it. From the time Claimant opened her account in January 2001 until April 20, 2001, Claimant's account lay dormant, as if it had been forgotten by Frankel and Lehman Brothers. It lost over half a million dollars during this time.

13

19.    Frankel has reaped substantial benefits from her overcharging of accounts of this Claimant, among others. She not only "earned" about $10 million from Goldman Sachs, she was paid a $14 million up-front signing bonus by Lehman Brothers in December 2000 just to leave Goldman Sachs and join Lehman Brothers. Thus, Frankel has received more than $24 million dollars from these two industry leaders, and she remains employed at Lehman Brothers despite the fact that both firms are specifically aware of the documented facts establishing that Frankel is a dishonest broker. Lehman Brothers continues to allow Frankel to solicit new customers from her multi-million dollar condominium in South Miami Beach, using her title as an officer of Lehman Brothers. Lehman Brothers continues to hide from Frankel's past customers, such as this Claimant, from her present customers, and from potential customers she continues to solicit from an uninformed public, what Lehman Brothers' supervisors and management knew in early 2001: her fraudulent representations, her improper preparation and use of customer composite performance charts, her gross overcharging of her customers while at Goldman Sachs, her unauthorized and improper trading in customers' accounts, her failure to comply with her supervisors' directions, her fraud on Lehman Brothers and other improper behavior for which she should have been fired. The reasons that Lehman Brothers continues to employ Frankel appear to be twofold: 1) to keep hidden from her customers the fact that their losses were the result of fraud; and 2) to recapture, through fees on her customers' accounts these past five years, the $14 million that Lehman Brothers paid Frankel to join it, as a result of negligently hiring her, a decision that contributed to the removal of the manager who engineered the hiring of Frankel. Both Goldman Sachs and Lehman Brothers made efforts to keep the facts they knew about Frankel's improper behaviors hidden from her customers. They continue to do so. For this, Goldman Sachs and Lehman Brothers should be sanctioned.

14

20.    But for the fraudulent acts of Frankel and the negligence of her supervisors at Goldman Sachs and Lehman Brothers, Claimant would not have opened, and then maintained, her accounts with Frankel at Goldman Sachs and then at Lehman Brothers. Accordingly, all losses in the accounts stem from Frankel's fraud, and all of her almost $1.3 million in out-of-pocket losses, and her lost income of $500,000, should be awarded to the Claimant. Because of the fraudulent acts of Frankel, and of her employers, Claimant should also be awarded the fraudulently obtained commissions, markups, markdowns, margin interest and other charges to her accounts, estimated to be approximately $200,000, for a total amount claimed of $2 million. Claimant also seeks punitive damages, interest, legal fees and costs in this matter.

## THE LAW

21.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 20 above.

22.    Based on the facts, the acts and the circumstances alleged herein, Respondents Goldman Sachs and Frankel are liable to Claimant for common law fraud, which includes a claim of unauthorized transactions, breach of contract, and breach of fiduciary duties. As to Lehman Brothers, a claim of negligent hiring and retention is alleged, in addition to common law fraud, which includes the covering up of Frankel's fraudulent acts, negligence, breach of contract, breach of fiduciary duties, and breach of supervisory duties, leading to further out-of-pocket losses while Claimant's accounts were at Lehman Brothers. Discussion of some of the relevant law as to these claims is set forth below. If Goldman Sachs, in its answer, contends that Claimant is alleging claims against Goldman Sachs under federal securities laws, or a claim for churning, that is not what Claimant is alleging. Respondents may seek to do so in motions to dismiss, and in doing so will be mischaracterizing this Statement of Claim. If they do so, it will

15

be to support claims by Respondents that a three-year statute of limitations should be applied to

federal securities law claims, which are not the claims alleged against Goldman Sachs herein.

The claims alleged herein against Goldman Sachs have six-year statutes of limitations. The

negligence claim is brought within three years of the continuing control over the account by

Respondents Frankel and Lehman Brothers. The federal securities law claims alleged herein are

only alleged against Frankel and Lehman Brothers, and all have been made within three years of

Frankel and Lehman Brothers' continued actions and control over Claimant's account.

**FIRST COUNT**
**THE COMMON LAW FRAUD OF GOLDMAN SACHS,**
**LEHMAN BROTHER AND FRANKEL**
**AND THE STATUTORY FRAUD OF LEHMAN BROTHERS AND FRANKEL**

23.    Claimant repeats and realleges each and every allegation contained in paragraphs

1 through 22 above.

24.    Respondents made willful misstatements and/or omissions of material fact in

communications with Claimant in an effort to deceive Claimant into opening accounts with the

Respondents, and, then, to further deceive Claimant as to the wrongful activities effected by

Respondents in the Claimant's accounts.

25.    False and fraudulent statements made to Claimant by Respondents Goldman

Sachs and Frankel include, but are not limited to, those specifically listed immediately below:

(i)    At all times, Respondents represented that Frankel was a knowledgeable,

experienced broker;

(ii)    At all times, Frankel represented that she had Claimant's best interests at

heart;

(iii)    In persuading Claimant to open an account with Goldman Sachs in or

around July 1999, Frankel falsely represented to Claimant, as she had done and would continue

16

to do with other customers, that she would invest her money like it was her own. Frankel told

Claimant that she did not need to be working and that she worked as a broker only because she

enjoyed making other people money, implying purely altruistic, non-monetary purposes behind

her work for Claimant and her other customers;

        (iv)    In or around July 1999, Frankel used materially false and misleading

Charts prepared by Goldman Sachs, and false statements regarding her qualifications and past

performance, to procure and obtain discretionary control over Claimant's account. The Charts

purported to show Frankel's great success with respect to the accounts she handled. The Charts

were highly inaccurate, greatly exaggerated, and materially false and misleading because, among

other reasons, they misrepresented the amount of assets under Frankel's management and the

performance of her customers' funds under her management. Thereafter, Frankel used these

same Charts and false statements to maintain control over Claimant's account and to justify her

high commissions charges to Claimant's account. Frankel's supervisors knew, or should have

known, that these statements, and therefore, the Charts, were materially false. The Charts are

discussed in detail in Paragraph 5 of this Statement of Claim;

        (v)    Frankel made numerous transactions in Claimant's account without first

discussing them with Claimant, including, but not limited to, purchases of initial public offerings

in the Account. Frankel lied to Claimant about the quality of a number of the initial public

offerings, the reasons and the basis for her recommendations, and, the procedures for indicating

for, obtaining and paying for the securities;

        (vi)    From July 1, 1999 through June 20, 2000, Goldman Sachs analysts made

false statements in their numerous reports recommending the purchase of "tech" stocks, such as

WorldCom and Global Crossing that were recommended and sold to Claimant in October 1999

17

and April 2000, respectively, when they specifically knew, and stated in internal communications within Goldman Sachs and to each other, that their reports and recommendations of these securities contained materially false statements and conclusions, were materially inaccurate, that the companies they were recommending were being recommended to customers because of pressures exerted by investment bankers at the firm, that the projections and forecasts were materially inaccurate, and that certain companies they were recommending were likely to fail;

(vii)    Frankel had a practice, with Claimant and with the accounts of her other customers, of not calling to get indications of interest from her customers as to securities offerings, but first made the transactions for customers and then called customers, and had other employees of Goldman Sachs call customers, and then falsified Respondents' records as to the dates when these calls were made;

(viii)    Frankel told others at Goldman Sachs that she had obtained prior authorization from clients to purchase the allocated amounts for which she indicated in Goldman Sachs initial public offerings, when the truth was that she had not discussed such purchases with the customers;

(vix)    In or about 1999 through 2000, Frankel was allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice; and

(x)    Respondents sold to Claimant approximately 3,000 shares of eToys, Inc. stock in or around October 1999, for which Claimant paid approximately $215,700. Claimant ultimately suffered losses of approximately $198,600 on these shares. In its sale of the eToys, Inc. stock to Claimant, Respondents failed to disclose to Claimant the conflict of interest existing

18

with respect to agreements entered into by Goldman Sachs with certain Goldman Sachs customers to share in profits made following the initial public offering of eToys, Inc. Such agreements had a manipulative effect on the price of the security, driving it up from its $20 per share offering price to the almost $72 per share price at which the stock was sold to Claimant.

26.    False and fraudulent statements made to Claimant by Respondents Lehman Brothers and Frankel include, but are not limited to, those specifically listed immediately below:

(i)    At all times, Lehman Brothers represented that Frankel was a knowledgeable, experienced, honest broker. Indeed, Respondent continues to represent, to this day, that Frankel is an honest and ethical broker. The truth is that she has a long history of mistreatment of her customers, including Claimant, and that she repeatedly misled her supervisors, she had a pattern of overcharging her customers, particularly the Claimant, she had engaged in a pattern of unauthorized trading in customer accounts, and she falsified documents, as described more fully herein, and as will be further evidenced through testimony to be adduced at the evidentiary hearings;

(ii)    At all times, Frankel and the Copeland Frankel Group represented that she had Claimant's best interests at heart;

(iii)    Lehman Brothers represented to Claimant that the trading in Claimant's Lehman Account and the recommendations of Frankel, The Copeland Frankel Group and The Global Capital Management Group would be and was for the benefit of, and appropriate for, Claimant, and was consistent with Claimant's needs and abilities;

(iv)    Lehman Brothers represented that the Account would be properly supervised;

19

(v) Frankel and The Copeland Frankel Group prepared and used fraudulent customer composite performance charts, falsely stating the performance results of customer accounts under management.

(vi) It is not alleged that Frankel prepared and used fraudulent customer composite performance charts with Lehman Brothers' prior knowledge or encouragement. However, when Lehman Brothers' management and supervisors discovered the improper behaviors of Frankel and of The Copeland Frankel Group, particularly that: (a) false performance charts were being used to solicit business, (b) Frankel had lied to management and had asked other employees to back up her lies in reference to grossly misrepresenting her book of business, and (c) customer accounts had been improperly managed by Frankel, Lehman Brothers kept that information hidden from Claimant, and from other customers of Frankel and of The Copeland Frankel Group; and

(vii) Lehman Brothers, to this day, condones Frankel's activities, through its misrepresentations and omissions in response to specific allegations of fraud of which Lehman Brothers was aware. Lehman Brothers denies that Frankel's dismissal from the Copeland-Frankel Group is related to many of the same misrepresentations and improper actions relied upon by Claimant and which resulted in Claimant's injuries. Lehman Brothers refuses to address other allegations made against it and Frankel, such as the internal complaints made to management by her co-workers in 2001, representations Frankel made to Lehman about her book of business and Lehman Brothers' knowledge of any use by Frankel of the Charts or any complaints against Frankel, including customer and internal complaints. Thus, Lehman Brothers not only condones Frankel's activities to this day, it also seeks to perpetuate Frankel's common law fraud through its denials, that are knowing falsehoods and omissions. By not even

20

responding to other contentions, Lehman Brothers effectively admits the truth of those allegations and seeks to avoid revealing, even now, the true reasons why Frankel was removed from her position in The Copeland Frankel Group. The actions of Lehman Brothers and Frankel amount to a cover-up of Frankel's fraudulent acts for which Claimant seeks economic sanctions.

27.    By reason of the excessive commissions and other charges to Claimant's accounts, the speculative nature of many of the transactions which were solicited and executed in Claimant's accounts through the fraud and fraudulent misrepresentations of Frankel, the excessive use of margin, and the similar transactions and improprieties in accounts of other customers of Frankel, which should have served as "red flags" to Frankel's supervisors, and all of the transactions having been approved by the principals and/or managers at Goldman Sachs and Lehman Brothers, and by reason of the fraudulent acts of Goldman Sachs' analysts and investment bankers with regard to the securities of corporations sold to Claimant on Respondents Goldman Sachs and Frankel's recommendations, the fraudulent acts of Goldman Sachs and Frankel with respect to the sale to Claimant of eToys, Inc., and the fraudulent acts of Frankel with respect to the initial offerings purchased for Claimant's Goldman Sachs Account, Goldman Sachs and Lehman Brothers knew of or should have known of the improper and fraudulent behavior of Frankel, and has, therefore, assisted or participated in the common law fraud and in these fraudulent misrepresentations.

28.    Respondents made these misrepresentations and omissions of material fact, and knew, or should have known, they were false and misleading. Respondents intended that Claimant rely upon the misrepresentations and omissions, and Claimant did rely upon them in dealing with the accounts.

21

29.    Claimant reasonably and justifiably relied on Respondents misrepresentations and omission, and, as a result of Respondents' common law fraud and misrepresentations, Claimant has been damaged in the amount of $2 million.

30.    Respondents Lehman Brothers and Frankel are liable to Claimant under Rule 10b-5, which makes it unlawful in connection with the purchase or sale of a security to: (a) make an untrue statement of material fact; (b) make a statement that is misleading because of the omission of a material fact; (c) employ any device, scheme, or artifice to defraud; or (d) engage in any practice that operates as a fraud or deceit. See Section 17 of the Securities Act of 1933, 15 U.S.C. §77q; Section 10(b) of the Securities Exchange Act of 194, 15 U.S.C. §77J; and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. §240.10b-5.

31.    Lehman Brothers is responsible as a primary violator pursuant to Section 20(a) of the Exchange Act.  Section 20(a) states that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Securities Exchange Act of 1934, 15 U.S.C. §78t.  Lehman Brothers participated in, knew, should have known, or otherwise was indifferent to and condoned, the scheme to defraud Claimant and for the cover-up by Frankel's supervisors after they learned of Frankel's fraudulent acts in early 2001.  Therefore, Lehman Brothers is liable to Claimant pursuant to Section 20(a) of the Exchange Act.

\

22

## SECOND COUNT
## <u>BREACH OF CONTRACT</u>

32.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 31 above.

33.    The foregoing activities which occurred with respect to Claimant's accounts while they were maintained and improperly administered at Goldman Sachs and Lehman Brothers constitute breaches of internal standards of conduct applicable to Respondents in dealing with the Claimant, which are stated in Goldman Sachs' and Lehman Brothers' own policy and procedures manuals or such other internal documents of Goldman Sachs and Lehman Brothers as exist and apply in these circumstances, as well as rules, regulations and procedures pursuant to NASD, NYSE and other regulatory standards.  These standards and procedures, among other standards and procedures customary in the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure Respondent's improper behavior.[1]

34.    The foregoing wrongful activities, which occurred in connection with the Claimant's accounts while maintained and improperly administered at Goldman Sachs and Lehman Brothers, constitute breaches of contractual duties owing by the Respondents to the Claimant, including, without limitation, the contractual duties of good faith and fair dealing with the Claimant, the contractual duty to "know your customer," and the contractual duties set forth in the customer agreements which specifically incorporate, as standards of measure of performance of said contractual duties, the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have not been complied with by Respondents.

23

## THIRD COUNT
## BREACH OF FIDUCIARY DUTIES

35.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 34 above.

36.    Respondents owed Claimant certain fiduciary duties, including the duty to use due care, to properly supervise Frankel, to know its customers, and not to engage in common law or statutory fraud with respect to Claimant's accounts and funds. The misconduct upon which Claimant's breach of fiduciary duties claim is founded is the very same misconduct which underlies Claimant's common law and statutory fraud claims. The fiduciary duties breached by Respondent have their genesis in the express contractual relationship between the parties and are directly related to the common law and statutory fraud asserted by Claimant; and, as such, the claim has a six-year statute of limitations.

37.    All of the foregoing activities, which occurred with respect to Claimant's accounts while maintained and improperly administered at Goldman Sachs and Lehman Brothers, constitute breaches of fiduciary duties due and owing to Claimant by Respondents, who were in positions of trust with respect to Claimant.

38.    Respondents breached their fiduciary duties owed to Claimant, and, as a result, Claimant has been damaged.

## FOURTH COUNT
## LEHMAN BROTHERS' NEGLIGENT HIRING AND RETENTION OF FRANKEL

39.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 38 above.

---

[1]    Mauriber v. Shearson/American Express, Inc., 567 F.Supp. 1231, 1238 (S.D.N.Y. 1983). Plaintiff's counsel in Mauriber is Claimant's counsel in the instant proceedings.

24

40.    It is well settled that an employer has a duty to exercise reasonable care to refrain from knowingly employing, or retaining in its employ, a person with known dangerous predilections in a position that would present a foreseeable risk of harm to others.[2] Section 317 of the Second Restatement of Torts provides that an employer is generally under a duty to exercise reasonable care to control employees from potentially harming others on the employer's premises or using the employer's property, even when those employees are not acting within the scope of their employment.

41.    An employer may be held liable for negligence in hiring and retaining an employee whom the employer knew, or in the exercise of reasonable care, should have known, was potentially harmful to others. Where an employer unreasonably overlooks an employee's history and an employee's propensity to engage in behavior that later causes harm to a complaining party, the employer will be held liable for its own negligence.

42.    That the employer followed its own protocol for hiring will not insulate the employer from liability.[3] The extent of an employer's duty to look into the backgrounds of those it hires is subject to considerations of public policy.[4] There is a public policy to protect brokerage firm customers from fraudulent practices of brokers. This is evidenced by the fact that New York common law supports the imposition of a fiduciary obligation upon brokers, that is, brokers, and the firms that employ them, occupy a position of trust and confidence, owing the highest degree of loyalty and fidelity to the customer. This position requires that employers diligently investigate the backgrounds of those brokers it seeks to employ.

---

[2]  Ray v. Metropolitan Transp. Auth., 221 A.D.2d 613, 634 N.Y.S.2d 160 (2d Dep't 1995); Haddock v. City of New York, 140 A.D.2d 91, 532, N.Y.S.2d 379 (1st Dep't 1988). *See also* Rochlin v. Alamo, 209 A.D.2d 499, 619 N.Y.S.2d 75 (2d Dep't 1994) (no notice of employee's alleged propensity to steal cars).
[3]  Mercer v. State of New York, 125 A.D.2d 376, 509 N.Y.S.2d 103 (2d Dep't 1986).
[4]  Stevens v. Lankard, 31 A.D.2d 602, 297 N.Y.S.2d 686, aff'd 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339.

43.    The huge commission income Frankel had generated from a small number of accounts should have served as a red flag to Lehman Brothers when it was seeking to employ Frankel. Lehman Brothers ignored a number of warning signs, including the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, her improper use of performance charts, the high turnover ratios in her customers' accounts, and customer complaints against Frankel alleging unauthorized transactions. These red flags, along with Frankel's exaggerated claims and discoverable lies, presented a foreseeable risk of injury to Lehman Brothers' customers, which Lehman Brothers had a duty to prevent in the exercise of due care.

44.    Both before and after hiring Frankel, Lehman Brothers' supervisors failed to properly investigate Frankel's representations. Lehman Brothers' supervisors failed to speak to Claimant and other customers, as they should have done.

45.    Lehman Brothers failed in its duty to exercise reasonable care to refrain from knowingly employing, and retaining in its employ, Frankel, a broker who presented a foreseeable risk of harm to others, and this failure resulted in harm to Lehman Brothers' customers, such as Claimant.

### FIFTH COUNT
### NEGLIGENCE ON THE PART OF LEHMAN BROTHERS AND FRANKEL

46.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 45 above.

47.    All of the foregoing activities, which occurred with respect to Claimant's Lehman Account while the Account was maintained and improperly administered, constitute negligence by Respondents Lehman Brothers and Frankel in the administration and handling of the Claimant's securities account. Lehman Brothers failed to use reasonable diligence in supervising the accounts of Frankel's customers, and its supervisors did not act as reasonable and prudent

26

supervisors would have acted toward Claimant, resulting in fraudulent representations. Frankel's

conduct called for diligent inquiry by Lehman Brothers; particularly, inquiry as to what Frankel

was telling her customers to support her history of an enormous amount of high cost, speculative

activity. See, e.g., <u>Cass v. Shearson Lehman Hutton</u>, No. 91-01484, 1994 WL1248585 (NASD

Dispute Resolution, Inc. Jan. 31, 1994). See also, <u>Aaron v. Paine Webber, Inc.</u>, No. 72-136-

1146-87 (Am. Arbitration Ass'n. June 28, 1989).

48.      For over three months after Claimant opened the Lehman Account and transferred

over $1.8 million in securities into the account in January 2001, Claimant's Account remained

inactive. Frankel, caught up in what Lehman Brothers now admits were, at the least, "internal

issues" with her partners in The Copeland Frankel Group, did not attend to her duties with

respect to Claimant's Lehman Account, causing significant losses in value to it. No transaction

was executed in Claimant's Lehman Account until approximately April 2001, as if the Account

had been forgotten by Frankel and Lehman Brothers. The Account dropped in value by over half

a million dollars during this time.

49.      There is authority that SRO rules establish a standard or duty of care owed by

securities firms to their customers and that violations of these rules may constitute negligence on

the part of the firms. <u>See e.g.</u>, <u>Csordas</u>, Fed. Sec. L. Rep. ¶ 97,230 (1992-93 Transfer Binder).

Customer claims of negligence may be based on conduct that violates an internal firm

compliance manual or directives, the rules of the exchange on which the securities are traded, or

the applicable NYSE or NASD rules. Frankel repeatedly and systematically violated her

employers' written internal rules. So did her supervisors. Failure to maintain a certain level of

competence in the supervision of an account may constitute negligence or a form of broker-

dealer malpractice. Additionally, a broker may be liable to her client for negligence when the

broker breaches the duty of care owed to the client and the client suffers damages as a proximate

cause of that breach. While violations of SRO rules are not causes of action in and of

themselves, failure to follow clearly defined rules and guidelines are indicia of actionable

carelessness and negligence. See e.g., Csordas, Fed. Sec. L. Rep. ¶ 97,230 (1992-93 Transfer

Binder).

50.     Courts typically hold firms to their own articulated standards of professionalism.

See e.g., Mihara, 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty).

The rule of thumb on negligence is to compare the firm's actions against the standards, customs

and usages of the industry, which place duties and obligations on the firm. Negligence can also

be demonstrated by a failure to follow the rules of the exchange on which the securities were

traded, the applicable NYSE and NASD rules, or even the firm's own compliance manual and

internal memoranda. In their dealings with this Claimant, the Respondents failed to follow rules,

regulations, the manuals and the internal memoranda of Lehman Brothers.

51.     Broker-dealers and their associated persons are held to high standards of honor.

A failure by a broker to abide by these industry standards is evidence of carelessness and

negligence. The level of care and skill of a stockbroker is high, and, in assessing a claim of

negligence, standards in the securities industry can be examined:

> Unless he represents that he has greater or less skill or knowledge, one
> who undertakes to render services in the practice of a profession or trade is
> required to exercise skill and knowledge normally possessed by members
> of that profession or trade in good standing in similar circumstances.

RESTATEMENT (SECOND) OF TORTS §299A. Respondents represented that they had even

greater skill and knowledge than other brokers in the industry, and should be held to such higher

standards. See, Cass v. Shearson Lehman Hutton, supra. and Aaron v. Paine Webber, Inc.,

supra.

28

52.    Federal securities laws, NYSE rules and NASD rules require brokerage firms to reasonably supervise their brokers for the purpose of preventing violations of the rules and regulations of the securities industry. Section 15 of the Exchange Act requires securities broker-dealer firms to establish adequate systems of supervision and to enforce these internal rules. 15 U.S.C. 78o. Courts have applied these provisions to require that broker dealers maintain proper systems of supervision and internal controls over their registered representatives. This is consistent with Section 15(b)(4)(E) of the Exchange Act which requires the SEC to discipline broker-dealers who fail "to reasonably supervise, with a view to preventing violations . . . ."

53.    The NASD has expanded this to require reasonable investigation and vigorous response to indications of problems with customers. The rules of the NASD and NYSE require brokerage houses to supervise their brokers' handling of accounts. See NASD Conduct Rule 3010 and NYSE Rule 405. NASD Conduct Rule 3010 requires member firms to establish and maintain a system to supervise the activities of each registered representative: "Each member shall establish . . . a system . . . that is reasonably designed to achieve compliance with applicable securities laws . . . and with the Rules of this Association." NASD Manual, Rule 3010, at 4831. Every broker-dealer also may use compliance manuals and written internal directives as methods of transmitting its own higher standards of professional conduct to its agents. Customer claims may be based on individual broker misconduct that violates an internal firm compliance guide. See e.g., Mihara, 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty). Here, Frankel violated a number of internal compliance guides published by her employer. If a firm has not enforced "a proper system of supervision and internal control," it has not acted in good faith under the applicable statute. Moscarelli v. Stamm, 288 F.Supp. 453, 460 n.5 (E.D.N.Y. 1968). In supervising Frankel, Lehman Brothers was worse than lax in enforcement

29

of its supervisory and internal control procedures:  Lehman Brothers was complicit in

encouraging, and then covering up, Frankel's fraudulent acts.

**SIXTH COUNT**
**BREACH OF SUPERVISORY DUTIES ON THE PART OF LEHMAN BROTHERS**

54.    Claimant repeats and realleges each and every allegation contained in paragraphs

1 through 53 above.

55.    Lehman Brothers failed in its affirmative duty to supervise its registered agents

and its affiliates and to reasonably prevent the total lack of attention to Claimant's Lehman

Account for the initial three months of the Account's existence during which the Account

dropped in value by approximately half a million dollars, the improper trading activity, excessive

charges, unsuitable transactions, Frankel's use of fraudulent Charts, and other improper

recommendations and transactions made to Claimant.  Lehman Brothers failed with regard to its

supervisory duties and responsibilities over Frankel and the Claimant's Lehman Account, and

Lehman Brothers is, accordingly, liable for the improper activity and improper administration

that occurred while the accounts were maintained at Lehman Brothers.  See, e.g., Shakeri v.

Merrill Lynch Pierce Fenner Smith, supra.  Frankel's supervisors did not curtail the use of

fraudulent performance charts, the unauthorized trading, and the cover-up of such unauthorized

trading, the excessive commissions, markups/markdowns and margin charges in Claimant's

accounts

56.    By virtue of the doctrine of respondeat superior, Respondent Lehman Brothers is

liable and responsible for the activities and conduct of its brokers, such as Frankel, its managers,

investment advisors, employees, agents, and persons otherwise under its control, insofar as its

brokers, managers, investment advisors, employees, agents and persons otherwise under its

30

control have caused or contributed to the losses and improper charges suffered by Claimant in the Lehman account while it was maintained at Lehman Brothers. As a direct and proximate result of Lehman Brothers' failure to supervise, Claimant suffered out-of-pocket losses and lost income on such out-of-pocket losses in an amount totaling approximately X million.

## PUNITIVE DAMAGES

57.    It is respectfully submitted that punitive damages are particularly appropriate here, where the pervasive pattern of fraud and the activities of the Respondents in seeking to cover-up their misconduct surely merit economic sanctions. Indeed, the fraudulent activity that occurred with respect to Claimant's accounts is precisely the type of activity that legislative bodies are seeking to prevent, such as by the direct affirmation of the authority of arbitrators to award punitive and/or treble damages to investor-claimants in securities arbitration. NASD arbitrators have the power to award appropriate punitive damages in reasoned amounts relative to the losses and the offensive nature of the acts proven. If the Respondents' unlawful behaviors detailed above do not result in proportionate sanctions to deter future violations of this type, then brokers will continue to "borrow" money from their clients by such gross overcharges and fraudulent recommendations, pocket the billions, and return only a small fraction of what they "earned" when challenged by the relatively few victims willing to endure the expenses and inconveniences of proceedings such as these.

## THE DAMAGES

Claimant seeks an award as against Goldman Sachs and Frankel, jointly and severally of:

(i)    1.3 million for Claimant's out-of-pocket losses;

(ii)   $158,600 or more in commissions, margin interest and other charges to Claimant's account at Goldman Sachs;

31

(iii)   $250,000, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimant would have realized on the account, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortious acts;

(iv)   punitive damages; and

(v)   interest, attorneys' fees and costs of these proceedings.

Claimant seeks an award against Lehman Brothers and Frankel, jointly and severally, of:

(i)   $823,500 for Claimant's out-of-pocket losses;

(ii)   $32,300 or more in commissions, margin interest and other charges to Claimant's account at Lehman Brothers;

(iii)   $250,000, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimant would have realized on the accounts, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortious acts;

(iv)   punitive damages; and

(v)   interest, attorneys' fees and costs of these proceedings.

Dated:   New York, New York
         December 21, 2006

Respectfully submitted,

LAW OFFICES OF DAN BRECHER

By: _____
Dan Brecher
Attorneys for Claimant
99 Park Avenue, 16th Floor
New York, New York 10016
(212) 286-0747

32

**Exhibit G**

~~NASD DISPUTE RESOLUTION, INC~~Dan Brecher, Esq.
~~In the Matter of the Arbitration between~~

~~KATHERINE GRIFFIN, individually and as trustee of~~
~~the Katherine Griffin Living Trust,~~

~~Claimant,~~

~~NASD No.~~

~~-against-~~

~~GOLDMAN, SACHS & CO., LEHMAN BROTHERS~~
~~INC. and SOFIA FRANKEL,~~

~~Respondents.~~

## ~~STATEMENT OF CLAIM~~

Law Offices of Dan Brecher
99 Park Avenue, 16th Floor
New York, New York 10016
Tel.: 212-286-0747
Attorney for Plaintiff

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

### ~~PRELIMINARY STATEMENT~~

| KATHERINE GRIFFIN, individually and as trustee of the Katherine Griffin Living Trust, | Case No. _____ |
|---|---|
| Plaintiff, | COMPLAINT FOR COMMON LAW FRAUD, BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTIES |
| - against - | |
| GOLDMAN, SACHS & CO., and SOFIA FRANKEL, | |
| Defendants. | TRIAL BY JURY DEMANDED |

## COMPLAINT

Plaintiff Katherine Griffin, individually and as Trustee of the Katherine Griffin Living Trust, by her attorneys, Law Offices of Dan Brecher, complains against Defendants Goldman, Sachs & Co. ("Goldman Sachs") and Sofia Frankel ("Frankel"), as follows:

## INTRODUCTION

1. ~~This Statement of Claim alleges that the Respondents~~Defendants engaged in activities that constitute common law fraud, victimizing this ~~Claimant~~Plaintiff and a number of other customers of ~~Sofia Frankel ("Frankel")~~Frankel, a broker employed by Goldman Sachs from 1994 through 2000, who moved to Lehman Brothers, Inc. ("Lehman Brothers") at the end of 2000. Frankel generated more than $20 million dollars in commissions at Goldman Sachs and Lehman Brothers in just the four years from early 1997 through early 2001. And, including $14 million in "up-front" money paid to her by Lehman Brothers when she joined that firm in late 2000, Frankel received $22 million from Goldman Sachs and Lehman Brothers in that time. She "earned" this money solely through commissions and her share of markups and markdowns she charged for "investing" the funds in her customers' accounts in high margin in-and-out trading of hundreds of different securities. She justified her high commissions through false representations and fraudulent charts purporting to show the outstanding past performance of her customer accounts: Frankel charged four or more times as much as the average broker at ~~Respondent firms~~Goldman Sachs and Lehman Brothers because she was presented as a "star" broker who would produce exceptional results for her customers' accounts. The truth is that she ~~took profits and deferred losses, and made false claims of outstanding performance~~had a practice of taking short term profits and letting the losses run, a practice that can have success in rising markets, but which can have disastrous results when markets deteriorate.

KL3 2650673 12650616 1

2.    ~~Claimant Katherine Griffin~~Plaintiff is among a number of customers Frankel damaged by overcharging and lying to them, as described in this ~~Statement of Claim~~Complaint. Frankel used the ~~names~~name and ~~reputations~~reputation of Goldman Sachs ~~and Lehman Brothers~~, together with false representations and fraudulent performance charts purporting to show the outstanding past performance of her ~~customer~~customers' accounts, to obtain and maintain complete discretionary control over her customers' accounts, including ~~Claimant's accounts~~Plaintiff's account, which she then traded on high margin, causing massive losses to most of the accounts of her largest customers.  Frankel traded these accounts without an evident plan.  She traded the accounts so frequently, charging such high commissions, markups/markdowns and other costs, and holding losses while taking profits, that her supervisors had to know she was engaged in improper activity which they failed to properly supervise and curtail.

3.    ~~Claimant~~Plaintiff relied upon the ~~names~~name and ~~reputations~~reputation of Goldman Sachs ~~and Lehman Brothers~~, the misrepresentations as to Frankel's education and abilities, and the misrepresentations concerning the performance of accounts under her management, including those made in the fraudulent charts ~~Respondents~~Defendants prepared and used, and, based upon this reliance, ~~Claimant~~Plaintiff allowed Frankel to maintain discretionary control over her Goldman Sachs account until Frankel left Goldman Sachs and went to Lehman Brothers in December 2000.  ~~Claimant then~~Relying upon the representations Frankel made, including her false claims of a Ph.D.  and those made through the use of charts, and the credibility and good name of Lehman Brothers, Plaintiff followed Frankel to Lehman Brothers ~~after Frankel became employed there.  Frankel was the named broker on Claimant's Lehman Brothers account until January 2004.~~, transferring her account from Goldman Sachs in January

~~2001, despite the $435,450 in realized losses and the substantial unrealized losses her account incurred under Frankel's management.~~

4. As a result of Frankel's fraudulent and ~~tortuous~~tortious actions, ~~Claimant~~Plaintiff suffered out-of-pocket losses totaling approximately ~~$1.3 million~~435,450 while the ~~Respondents~~Defendants charged ~~about $200,000~~approximately $101,000 in commissions and other excessive charges to the ~~Claimant's accounts. The Claimant~~Plaintiff's account. Plaintiff also suffered damages totaling $~~500,000~~300,000 in lost earnings on her out-of-pocket losses. ~~The Claimant~~Plaintiff should recover all $~~2 million~~836,450 of her claims, including the charges to her ~~accounts~~account during Frankel's fraudulent treatment of her ~~accounts~~account, in which ~~the brokerage firm Respondents are~~Goldman Sachs is complicit and should also be held responsible. ~~Claimant~~Plaintiff also seeks punitive damages, based on the extensive, repeated and widespread fraudulent conduct of the ~~Respondents~~Defendants, and also based on the ~~Respondents~~Defendants' improper actions in efforts to cover up the fraudulent acts and to keep ~~Claimant~~Plaintiff from learning of the common law fraud Frankel committed upon her.

## PARTIES

5. Plaintiff Katherine Griffin is a citizen and resident of the State of Maryland and the Trustee of the Katherine Griffin Living Trust.

6. Defendant Goldman Sachs is a nationally known and established broker/dealer in the securities industry, with a branch office located at 85 Broad Street, New York, New York, where Plaintiff funded her account with money and securities which are the subject of this Complaint.

7.    On information and belief, Defendant Sofia Frankel is a citizen and resident of the State of Florida.  On information and belief, at the time Plaintiff maintained her account with Goldman Sachs, Defendant Frankel was a citizen and resident of New York.

## JURISDICTION AND VENUE

8.    Subject matter jurisdiction is conferred on this Court through diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.    The transactions, statements, practices, and course of conduct alleged herein occurred within the Southern District of New York so that venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PRIOR FINRA ARBITRATION

10.    On December 22, 2006, Plaintiff filed a Statement of Claim with NASD Dispute Resolution, Inc. (now known as FINRA Dispute Resolution), bearing Arbitration Number 0605365 (the "FINRA Arbitration"), and captioned Katherine Griffin, individually and as trustee of the Katherine Griffin Living Trust v. Goldman, Sachs & Co., Lehman Brothers Inc. and Sofia Frankel.

11.    By Settlement Agreement executed by Plaintiff on January 17, 2008, the terms of which are confidential, Plaintiff settled her claims with Respondent Lehman Brothers and with Frankel, but solely for the period Frankel was employed at Lehman Brothers.

12.    By Award dated March 3, 2008, the Panel in the FINRA Arbitration granted Respondents Goldman Sachs and Frankel's motion to dismiss Claimant Griffin's claims, without prejudice, on the ground that the claims were time-barred under FINRA Rule 10304.  FINRA Rule 10304, entitled Time Limitation Upon Submission, states that "no dispute, claim, or

—5—

KL3 2650657 42650636 1

controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy." FINRA Rule 10304 goes on to state that dismissal of a claim under the Rule does not prohibit a party from pursuing the claim in court.

13.    At the hearings of the FINRA Arbitration held on January 30, 2008[1], the Chair stated on the record that the Panel's ruling was without prejudice and that the matter could be pursued by Plaintiff Griffin in court.

## THE DOCUMENTED COMMON LAW FRAUD COMMITTED BY ~~RESPONDENTS~~DEFENDANTS

14.    ~~1.~~ Sofia Frankel is an immigrant from Russia, who came to this country in or about 1987 in pursuit of what she called the "American Dream." In 1994, she joined Goldman Sachs as a newly registered broker in her first job in the securities industry. By 1999, she was telling her customers she was living the "American Dream." She also told many of her customers, including the ~~Claimant~~Plaintiff, blatant falsehoods. She even ~~claimed~~told her supervisors, fellow employees, and this Plaintiff that she had a Ph.D. - she doesn't. ~~Frankel, when confronted with her lies about her education, backtracked and now claims that she engaged in "Ph.D. studies." However, she now claims that she cannot remember the name of the professor she claims to have studied under. It appears that she was not registered anywhere that she claims with regard to her "Ph.D. studies." Her lack of regard for truth and her lack of obedience to rules, regulations and the obligations she assumed when she became a broker at Goldman Sachs will be quite evident at the hearings in this matter.~~ Fortunately for Frankel, she entered the brokerage business in a rising

---

[1] January 30, 2008 constitutes the only day of hearings in the FINRA Arbitration. On that day, Respondents Goldman Sachs and Frankel's motion to dismiss was heard and decided by the Panel. No evidentiary hearing took place, and no testimony was ever heard by the Panel. The Panel's decision to grant Respondents' motion to dismiss was based solely on its determination that Claimant's claims were time-barred under FINRA Rule 10304.

market that encouraged speculation in technology stocks.  Unfortunately for her customers, such

as the ~~Claimant~~Plaintiff, Frankel worked for the most highly regarded firms in the securities

industry, so, at the time, her false representations seemed believable to the ~~Claimant~~Plaintiff, and

to Frankel's other customers.

15.    ~~2.  At the hearing of these claims, it will be shown that~~ Frankel utilized the same

fraudulent methods in dealing with many of her customers that she used to defraud this

~~Claimant~~Plaintiff.  Frankel also told other customers that she had a Ph.D., and she also showed

other customers the fraudulent performance charts ~~and she.~~  Frankel also insisted upon

discretionary control over ~~their~~other customers' accounts, gaining the customers' trust and

confidence by promising to treat their assets entrusted to her control as if it was her own money.

~~Then she proceeded to trade wildly, on high margin, and abandoned her customers when her co-~~

~~employees at Lehman reported her fraud to their superiors.~~  Unfortunately, despite all of the

many "red flags" created by her fraudulent acts and improper activities, her superiors at Goldman

Sachs did nothing, notified no customers, and essentially condoned her outrageous treatment of

her customers~~: at Goldman Sachs.~~ because Frankel was generating substantial commission

income, and had ingratiated herself with the compliance personnel and with her superiors~~; at~~

~~Lehman Brothers, because of a sloppy supervision scheme and the apparent intention of~~

~~sweeping the reported fraud and improper activities under the rug~~.  The supervisors' behaviors

here amount to nothing less than gross neglect of their duties.  What raises Frankel's false

statements beyond mere puffery to the level of common law fraud, even at the outset, is that in

furtherance of her fraudulent scheme, in which Frankel obtained and maintained control over

~~Claimant's~~Plaintiffs' Goldman Sachs account, and to justify her excessively high commissions,

Frankel presented ~~Ms. Griffin~~Plaintiff and numerous other customers with the performance

charts, fraudulently portraying her financial acumen as having resulted in customers' accounts

she controlled far outperforming even the strong market that was ongoing prior to the opening of

the ~~Claimant~~Plaintiff's Goldman Sachs account. ~~Frankel continued this fraudulent practice at~~

~~Lehman Brothers~~.

~~3.~~   ~~In~~

16.   In July 1999, Katherine Griffin turned over more than $2.4 million to the

discretionary control of Defendant Sofia Frankel, by setting up a trust account with Goldman

Sachs for the Katherine Griffin Living Trust, bearing account number 001-10030-4 (the

"Goldman Sachs Account").  These funds represented a substantial portion of ~~Claimant's net~~

~~worth.  Frankel insisted upon discretionary control of the Goldman Account and then proceeded~~

~~to trade the account, overcharging commissions, markups and markdowns.  She made~~

~~unauthorized trades, used excessive margin, and then she falsified records to cover-up her~~

~~misdeeds.  Frankel's illegal activities caused almost $2 million in total losses to Katherine~~

~~Griffin as a result of Frankel's transactions in her account while at Goldman Sachs, with~~

~~approximately $823,500 of lost value in these securities having occurred while the account was~~

~~at Lehman Brothers.~~Plaintiff's net worth.  Although initially cautious about transferring funds

from an existing account Katherine had maintained with a broker she "adored," David Parks,

Katherine was won over by Frankel after their initial meeting where Frankel falsely represented

her education and other credentials, and provided Katherine with customer performance charts

prepared by Goldman Sachs that purported to show that customers' accounts under Frankel's

management and control had very substantially out-performed the market in the prior three years.

Frankel made a practice of showing her clients performance charts that were titled "Composite

Historical Equity Performance" (hereafter, "the Charts").

– 8 –

17. ~~4. Katherine Griffin opened her Goldman Account with Frankel in July 1999. Although initially cautious about transferring funds from an existing account Katherine had maintained with a broker she "adored," David Parks, Katherine was won over by Frankel after their initial meeting where Frankel provided her with customer performance charts prepared by Goldman Sachs that purported to show that customers' accounts under Frankel's management and control had very substantially out-performed the market in the prior three years. Frankel made a practice of showing her clients performance charts that were titled "Composite Historical Equity Performance" (hereafter, "the Charts").~~ The Charts that were shown to ~~Claimant~~Plaintiff, along with Frankel's business card which Frankel attached to the Charts, are annexed hereto as Exhibit A. The Charts were represented by ~~Respondents Frankel and Goldman Sachs~~the Defendants as being accurate and correct to one one-hundredth of one percent in their calculations of the performance of "the GS Team portfolio." However, the Charts Frankel used to obtain and maintain discretionary control over ~~Claimant's account~~Plaintiff's Account and to justify her high commission rates were materially false, misleading and substantially inaccurate. The Charts had been prepared, with knowledge that they were false, (i) to induce customers to turn over their financial assets to the management ~~arid~~and control of Frankel, (ii) to allow Frankel to maintain control over customers' accounts, and (iii) to justify the materially higher commissions Frankel charged her customers.

18. ~~5.~~ Frankel made highly inaccurate, greatly exaggerated, and materially false and misleading claims of great success in her use of the Charts. Frankel's claims were false, and her supervisors knew, or should have known, that she was lying to her customers. For example, the chart on the second page of the Charts that are annexed hereto as Exhibit A, makes the claim that $10 million invested at an unidentified point in 1995 in an undefined "GS Team portfolio" was

worth $32,297,891 on 3/31/99. The truth is that the claimed "portfolio" for a "GS Team" was a

fiction, concocted with fraudulent intent, and not one that was truly derived from Frankel's

recommendations. Yet, in the Notes on the bottom of page 2 of Exhibit A, the Charts portray

this as an actual "Past Performance" which "is not indicative of future results." The truth is that

there was no such actual past performance either, and ~~Respondents~~Defendants will not be able to

honestly substantiate the claims in the Charts. Indeed, even the Charts' claimed actual

percentage gain of 198.89% in the so-called "portfolio" does not support the growth performance

represented to be $32,297,891 on 3/31/99. Another example of the fraudulent nature of the

Charts is on page 3 of the Charts, in the first paragraph of which the Charts are falsely portrayed

as detailing "results for the equity portion" (which is undefined) "of certain accounts," and then

goes on to falsely claim that the Charts include performance of accounts which "are not

discretionary accounts, however, all or most of the transactions effected therein resulted in [sic]

Sophia's [sic] recommendations." This representation is also materially false because Frankel

did not include the performance of certain non-discretionary accounts (plural) in compiling the

Charts. This representation is also materially false because Frankel did include the performance

of a non-discretionary account, which she later claimed was not an account which traded based

upon her recommendations. The number of accounts and the performance figures on ~~this~~ page 3

of the Charts are also false representations. For these and other reasons ~~that will be presented at~~

~~the hearings~~, the Charts are a fraud. The Charts that are Exhibit A hereto are charts shown to

~~Claimant~~Plaintiff by Frankel to induce the turnover of ~~Claimant~~Plaintiff's funds to Frankel's

control, and that were ~~handed~~given to ~~Claimant~~Plaintiff by Frankel prior to ~~Claimant~~Plaintiff

opening her Goldman Sachs Account.

6. ~~Frankel also sought to use phony customer composite performance charts at Lehman Brothers. Moving to Lehman Brothers in December 2000, Frankel sought to promote herself with similar disdain for the accuracy of her presentations to customers at Lehman Brothers. Relying upon the representations Frankel made, including those made through the use of charts, and the credibility and good name of Lehman Brothers, Claimant followed Frankel to Lehman Brothers, transferring her account from Goldman Sachs in January 2001, despite the $466,700 in realized losses and the substantial unrealized losses her account incurred under Frankel's management. Claimant's account number for her Lehman Brothers account was 83101996-10 (the "Lehman Account"). Had Claimant known of Frankel's misrepresentations and improper acts, Claimant would have terminated her relationship with Frankel and would not have followed Frankel to Lehman Brothers. Instead, Claimant was lead to believe that Frankel was a gifted broker who had an ability to produce exceptional results in her customers' accounts and who had Claimant's best interests at heart. As a result of Claimant's reliance upon Respondents' misrepresentations, Claimant suffered approximately $2 million in losses.~~

19. <u>Frankel insisted upon discretionary control of the Goldman Sachs Account and then proceeded to trade the Account, overcharging commissions, markups and markdowns. She made unauthorized trades, used excessive margin, and then she falsified records to cover-up her misdeeds. Frankel's illegal activities caused almost $435,450 in total out-of-pocket losses to Katherine Griffin as a result of Frankel's transactions in her Goldman Sachs Account.</u>

20. ~~7.~~ Frankel's deceit included lying to her customers, such as this ~~Claimant~~<u>Plaintiff</u>, about new issues she sold to them. She lied to her customers about the quality of a number of the offerings, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities. Frankel violated internal Goldman Sachs rules as to

communications with customers and with the back office regarding sales of new issues. Frankel

had a practice of purchasing new issues for these customers without first discussing the details of

the purchases with the customers; an improper practice as to new issues, even for discretionary

accounts such as the ~~accounts~~account at issue here. Frankel would indicate to the Goldman

Sachs investment bankers for new issues and then after being informed of the actual allotments,

Frankel would allocate them among her customers, without properly discussing the transactions

first or without communicating with her customers at all, including the ~~Claimant~~Plaintiff. And,

when her allotment was less than the amount she indicated for, Frankel would change customers'

allocations, but not in proportion to the amount indicated for each customer; this was in breach of

applicable rules and regulations.

21.   ~~8.~~Frankel lied to her customers about the quality of a number of the offerings, the

reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining

and paying for the securities. Frankel was thereby allowed to make back-dated, false entries in

her records for prior periods, purporting to reflect discussions with customers that had not

actually taken place, an unlawful practice. Supervisors at Goldman Sachs did not take proper

cautionary steps, and Frankel was permitted not only to ride out the collapsing market for

technology stocks, but, at the end of 2000, having stuck her clients, including the

~~Claimant~~Plaintiff, with substantial unrealized losses, Frankel then left Goldman Sachs for

Lehman Brothers, and she was paid $14,000,000 just to join Lehman Brothers, and she was given

an impressive title by Lehman Brothers, serving to further mislead ~~Claimant. When Claimant's~~

~~account was transferred out of Goldman Sachs, Claimant's out-of-pocket losses totaled~~

~~approximately $466,000. While at Lehman Brothers, Claimant's account lost more than~~

~~$823,500 from January 2001 through January 2004, the time period that it was under Frankel's~~

supervision. Approximately 60% of the Lehman Brothers losses occurred in early 2001, when Lehman Brothers learned of Frankel's fraudulent and improper acts, removed her from the Copeland Frankel Group, but failed to inform Claimant of any of these facts or occurrences<u>Plaintiff</u>.

<u>22.</u>   9. ClaimantPlaintiff lost approximately $51,00070,470 in two specific stocks, WorldCom and Global Crossing, listed in the settlement Goldman Sachs made with the United States Securities and Exchange Commission ("SEC") and with the New York Attorney General regarding the false reports issued by Goldman Sachs analysts. <u>See</u> <u>Exhibit B</u>.

<u>23.</u>   10. ClaimantPlaintiff lost approximately $198,600137,940 in eToys, Inc., a stock which was the subject of a recent2005 New York Court of Appeals decision, attached hereto as <u>Exhibit C</u>, in which the Court imposed a fiduciary responsibility on Goldman Sachs to the issuer in an initial public offering of eToys, Inc. for which Goldman Sachs was the lead underwriter, holding that when underwriters serve as expert advisors they are obligated to reveal any conflicts of interest. The specific conflict of interest that is the subject of <u>EBC I Inc. v. Goldman, Sachs & Co.</u> involved sales by Goldman Sachs of its own eToys stock at a far higher price than the IPOIPO and the related arrangements entered into between Goldman Sachs and certain of its customers whereby such customers were obligated to kick back to Goldman Sachs a portion of any profits that they made from the sale of eToys securities subsequent to the initial public offering.

<u>24.</u>   11. The unlawfulness of these schemes and the improprieties alleged here is all the more shocking for where they occurred: <u>one of</u> the most respected names on Wall Street - Goldman Sachs and Lehman Brothers. Indeed, the very success of Frankel's fraudulent activities was dependent on the respected nature of the Goldman Sachs and Lehman Brothers names

—name – Frankel was selling Goldman Sachs and Lehman Brothers' brokerage services, with supposed customized and personal investment advice. She was not represented to be a typical broker; Goldman Sachs and Lehman Brothers presented Frankel as a "star."

25. 12. Goldman Sachs specifically knew that Frankel was overcharging her customers and excessively trading customers' accounts while it was happening. Goldman Sachs not only did nothing to stop her, it supported and encouraged Frankel by knowingly permitting Frankel to tell customers, even those who complained about the high charges, that her educational background, her skills and her performance, as shown in the Charts, among other reasons she gave, was justification for justified the high commissions she charged. Frankel claimed to her customers that it was her right to charge "old rates," that is, extra high commissions, because that was the price of sharing in the success she had created. Frankel used her false representations and the fraudulent Charts to support her fleecing of customers through overtrading their accounts while charging excessively high commissions, throughout her employment with Goldman Sachs. All of this was with the knowledge and support of Frankel's laissez-faire supervisors. In the 18 months from August 1999 to December 2000 that Frankel controlled Claimant Plaintiff's Goldman Sachs Account, Goldman Sachs charged the Claimant Plaintiff substantially more than $158,000 101,000 in commissions, markups, markdowns and margin interest. The excessive commissions charged by Respondents Defendants, who then justified such commissions through false representations and the Charts shown to Claimant Plaintiff by Frankel, support a claim of common law fraud.

26. 13. By 1999, through some luck related to the bull market in technology stocks, in which Frankel promoted herself as a specialist and expert, and because she had been producing immense commissions from a limited number of accounts, and had made strong and successful

—14—

efforts to befriend her supervisors, Frankel was able to bamboozle almost everyone. Yet, there were co-workers of Frankel who became aware of her excessive commission charges, and did not want to work with her. Indeed, her excessive charges and the huge commission income she generated made her behavior particularly notorious at Goldman Sachs, which should have served as a red flag to her supervisors, even in 1999.

27.    14. Frankel's supervisors at Goldman Sachs supervisors ignored a number of warning signs, including Frankel's lack of experience and training, her false claim of having a Ph.D., the Charts that should have been questioned, her excessive commission charges, the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, the high turnover ratios in her customers' accounts, and customer complaints reporting unauthorized transactions by Frankel. By way of comparison to Frankel's limited experience as a broker, the average Smith Barney Citigroup broker is advertised as having 15 years of experience in the securities brokerage industry. At the time she gained discretionary control over the ClaimantPlaintiff's Goldman Sachs Account, Frankel had been in the industry for less than five years. These were all "red flags" which Frankel's supervisors should have seen and acted upon, which they failed to do.

28.    15. Instead, Frankel's supervisors at Goldman Sachs promoted Frankel's performance to other brokers as a model to be imitated. Goldman Sachs' supervisors had Frankel address new associates to promote charging "old rates" and held her up to new associates as a broker to emulate. While many brokers were charging their customers with active accounts commissions of six cents a share, and less, and even after Goldman Sachs had distributed written instructions to its brokers encouraging lesser commission charges or fixed annual charges, which would have been much lower than the charges visited upon Plaintiffs, or charging a maximum of

–15–

$.125 a share in transactions for discretionary accounts, Goldman Sachs, nonetheless, encouraged and supported Frankel in charging her customers substantially higher rates than other brokers were charging their regular customers with active accounts.  Frankel would often charge customersPlaintiff commissions of $.40, $.50, even $1.00 a share or more, and even $4.002.00 a share, based on whether the customerPlaintiff made money on a transaction; an improper practice.  When Frankel's supervisors asked her questions about customers' positions, the high margin, or the substantial trading, Frankel lied to her supervisors; lies that could have been discovered by her supervisors speaking directly to the customers, such as the ClaimantPlaintiff, to confirm what Frankel told her supervisors.  The supervisors failed to speak to ClaimantPlaintiff and other customers, as they should have done.  One reason for this breakdown in supervision was that Frankel went out of her way to befriend her supervisors, particularly in the compliance department, where Frankel was even able to wangle a job at Goldman Sachs for her son.

16.    Frankel moved from Goldman Sachs to Lehman Brothers at the end of 2000, receiving an up-front payment of $14 million and a new and impressive job title from Lehman Brothers.  Frankel lied to her customers, including the Claimant, and to Lehman Brothers and others, about the amount of assets under her management and about the performance of her customers' funds under her management (again using falsified numbers).  She claimed credit for the control over, and the performance of, accounts she did not have.  She claimed credit for transactions that she had not recommended.  She also lied about the amount of money under her management.

17.    At Lehman Brothers, Frankel was quickly found to be a fraud, but, since early 2001, members of management at Lehman Brothers have sought to keep their knowledge of

–16–

~~Frankel's fraudulent behavior hidden from her customers, including the Claimant. Respondents Lehman Brothers and Frankel asserted, in Exhibit D hereto, their filed answer in other similar proceedings, that Frankel has a clean record, that she is an honest broker who did nothing wrong, that Lehman Brothers could say nothing in response to the specific allegations of Frankel's improper creation and use of customer composite performance charts in soliciting business, that it could say nothing in response to the specific allegations of Frankel's misrepresentations to Lehman Brothers that induced the up-front payment of $14 million to Frankel by Lehman Brothers, and that it could say nothing in regard to the discovery by Lehman Brothers of Frankel's improper acts and the removal of Frankel from her position as co-head of The Copeland Frankel Group in 2001. In a later answer in another arbitration proceeding, attached hereto as Exhibit E, Lehman Brothers asserts that it is not aware of Frankel's having used improper performance charts at Lehman Brothers, any improper sales practices at Lehman and any customer complaints against Frankel other than the existing arbitrations. What is of significance here, however, is what Lehman Brothers does not assert, namely, that it is unaware of Frankel using any performance charts at any time, and that it is unaware of any complaints against Frankel, including complaints from Frankel's co-workers. The answers provided by Respondents in preceding arbitrations evidence Respondents' continuing efforts to conceal the truth from Claimant, regulators and other customers.~~

~~18. For the entire period Frankel managed Claimant's accounts at Goldman Sachs and, later, at Lehman Brothers, Frankel was negligent in the administration and handling of such accounts. Lehman Brothers was negligent in its supervision of Claimant's accounts and in its supervision of Frankel. Frankel, caught up in what Lehman Brothers now admits were, at the least, "internal issues" with her partners in The Copeland Frankel Group, did not attend to her~~

KLJ 36.0637.12650616.1

~~duties in early 2001 with respect to Claimant's account, and Claimant's account was neglected for months, causing significant losses in value to it. From the time Claimant opened her account in January 2001 until April 20, 2001, Claimant's account lay dormant, as if it had been forgotten by Frankel and Lehman Brothers. It lost over half a million dollars during this time.~~

~~19. Frankel has reaped substantial benefits from her overcharging of accounts of this Claimant, among others. She not only "earned" about $10 million from Goldman Sachs, she was paid a $14 million up-front signing bonus by Lehman Brothers in December 2000 just to leave Goldman Sachs and join Lehman Brothers. Thus, Frankel has received more than $24 million dollars from these two industry leaders, and she remains employed at Lehman Brothers despite the fact that both firms are specifically aware of the documented facts establishing that Frankel is a dishonest broker. Lehman Brothers continues to allow Frankel to solicit new customers from her multi-million dollar condominium in South Miami Beach, using her title as an officer of Lehman Brothers. Lehman Brothers continues to hide from Frankel's past customers, such as this Claimant, from her present customers, and from potential customers she continues to solicit from an uninformed public, what Lehman Brothers' supervisors and management knew in early 2001: her fraudulent representations, her improper preparation and use of customer composite performance charts, her gross overcharging of her customers while at Goldman Sachs, her unauthorized and improper trading in customers' accounts, her failure to comply with her supervisors' directions, her fraud on Lehman Brothers and other improper behavior for which she should have been fired. The reasons that Lehman Brothers continues to employ Frankel appear to be twofold: 1) to keep hidden from her customers the fact that their losses were the result of fraud; and 2) to recapture, through fees on her customers' accounts these past five years, the $14 million that Lehman Brothers paid Frankel to join it, as a result of negligently hiring her, a~~

~~decision that contributed to the removal of the manager who engineered the hiring of Frankel.~~

~~Both Goldman Sachs and Lehman Brothers made efforts to keep the facts they knew about~~

~~Frankel's improper behaviors hidden from her customers. They continue to do so. For this,~~

~~Goldman Sachs and Lehman Brothers should be sanctioned.~~

29. ~~20.~~ But for the fraudulent acts of ~~Frankel and the negligence of her supervisors at~~

~~Goldman Sachs and Lehman Brothers, Claimant~~Defendants, Plaintiff would not have opened,

and then maintained, her ~~accounts~~Account with Frankel at Goldman Sachs ~~and then at Lehman~~

~~Brothers~~. Accordingly, all losses in the ~~accounts~~Goldman Sachs Account stem from

~~Frankel's~~Defendants' fraud, and all of ~~her almost $1.3 million~~Plaintiff's approximate $435,450

in out-of-pocket losses, and her lost income of $~~500,000,~~300,000 should be awarded to the

~~Claimant~~Plaintiff. Because of the fraudulent acts of Frankel, and of her ~~employers,~~

~~Claimant~~employer, Plaintiff should also be awarded the fraudulently obtained commissions,

markups, markdowns, margin interest and other charges to her ~~accounts~~Account, estimated to be

approximately $~~200,000,~~101,000, for a total amount claimed of $~~2 million. Claimant~~836,450.

Plaintiff also seeks punitive damages, interest, legal fees and costs in this matter.

### ~~THE LAW~~

~~21.     Claimant repeats and realleges each and every allegation contained in paragraphs 1~~

~~through 20 above.~~

~~22.     Based on the facts, the acts and the circumstances alleged herein, Respondents~~

~~Goldman Sachs and Frankel are liable to Claimant for common law fraud, which includes a~~

~~claim of unauthorized transactions, breach of contract, and breach of fiduciary duties. As to~~

~~Lehman Brothers, a claim of negligent hiring and retention is alleged, in addition to common law~~

~~fraud, which includes the covering up of Frankel's fraudulent acts, negligence, breach of~~

~~contract, breach of fiduciary duties, and breach of supervisory duties, leading to further out-of-pocket losses while Claimant's accounts were at Lehman Brothers. Discussion of some of the relevant law as to these claims is set forth below. If Goldman Sachs, in its answer, contends that Claimant is alleging claims against Goldman Sachs under federal securities laws, or a claim for churning, that is not what Claimant is alleging. Respondents may seek to do so in motions to dismiss, and in doing so will be mischaracterizing this Statement of Claim. If they do so, it will be to support claims by Respondents that a three-year statute of limitations should be applied to federal securities law claims, which are not the claims alleged against Goldman Sachs herein. The claims alleged herein against Goldman Sachs have six-year statutes of limitations. The negligence claim is brought within three years of the continuing control over the account by Respondents Frankel and Lehman Brothers. The federal securities law claims alleged herein are only alleged against Frankel and Lehman Brothers, and all have been made within three years of Frankel and Lehman Brothers' continued actions and control over Claimant's account.~~

### FIRST COUNT
### ~~THE~~DEFENDANTS' COMMON LAW FRAUD ~~OF GOLDMAN SACHS, LEHMAN BROTHER AND FRANKEL~~
### AND THE STATUTORY FRAUD OF LEHMAN BROTHERS AND FRANKEL

30. ~~23. Claimant~~Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through ~~22~~29 above.

31. ~~24. Respondents~~Defendants made willful misstatements and/or omissions of material fact in communications with ~~Claimant~~Plaintiff in an effort to deceive ~~Claimant~~Plaintiff into opening ~~accounts~~an account with the ~~Respondents~~Defendants, and, then, to further deceive ~~Claimant~~Plaintiff as to the wrongful activities effected by ~~Respondents~~Defendants in the ~~Claimant's accounts~~Goldman Sachs Account.

32. ~~25.~~ False and fraudulent statements made to ~~Claimant by Respondents Goldman Sachs and Frankel~~<u>Plaintiff by Defendants</u> include, but are not limited to, those specifically listed immediately below:

      (i)    At all times, ~~Respondents~~<u>Defendants</u> represented that Frankel was a knowledgeable, experienced broker;

      (ii)    At all times, Frankel represented that she had ~~Claimant~~<u>Plaintiff</u>'s best interests at heart;

      (iii)    In persuading ~~Claimant~~<u>Plaintiff</u> to open an account with Goldman Sachs in or around July 1999, Frankel falsely represented to ~~Claimant~~<u>Plaintiff</u>, as she had done and would continue to do with other customers, that she would invest her money like it was her own. Frankel told ~~Claimant~~<u>Plaintiff</u> that she did not need to be working and that she worked as a broker only because she enjoyed making other people money, implying purely altruistic, non-monetary purposes behind her work for ~~Claimant~~<u>Plaintiff</u> and her other customers;

      (iv)    In or around July 1999, Frankel used materially false and misleading Charts prepared by ~~Goldman Sachs~~<u>Defendants</u>, and false statements regarding her qualifications and past performance, to procure and obtain discretionary control over ~~Claimant's account~~<u>Plaintiff's Goldman Sachs Account</u>. The Charts purported to show Frankel's great success with respect to the accounts she handled. The Charts were highly inaccurate, greatly exaggerated, and materially false and misleading because, among other reasons, they misrepresented the amount of assets under Frankel's management and the performance of her customers' funds under her management. Thereafter, Frankel used these same Charts and false statements to maintain control over ~~Claimant's account~~<u>Plaintiff's Goldman Sachs Account</u> and to justify her high commissions charges to ~~Claimant's account~~<u>the Account</u>. Frankel's supervisors knew, or should

have known, that these statements, and therefore, the Charts, were materially false. The Charts are discussed in detail in ~~Paragraph 5~~Paragraphs 17 through 18 of this ~~Statement of Claim~~Complaint;

(v)     Frankel made numerous transactions in ~~Claimant's account~~Plaintiff's Goldman Sachs Account without first discussing them with ~~Claimant~~Plaintiff, including, but not limited to, purchases of initial public offerings ~~in the Account. Frankel lied to Claimant about the quality of a number of the~~such as Allscripts (500 shares on March 10, 2000), Bookham (1000 shares on September 26, 2000), Level 3 Communications (1000 shares on January 29, 2000) and Global Crossing (1000 shares on April 14, 2000), to name a few. In fact, contrary to what is reported on the internal records of Goldman Sachs, Frankel never spoke to Plaintiff about any of the more than 50 purchases of initial public offerings~~, the reasons and the basis for her recommendations, and, the procedures for indicating for, obtaining and paying for the securities~~ for Plaintiff's Goldman Sachs Account;

(vi)    From July 1, 1999 through June 20, 2000, Goldman Sachs analysts made false statements in their numerous reports recommending the purchase of "tech" stocks, such as WorldCom and Global Crossing that were recommended and sold to ~~Claimant~~Plaintiff in October 1999 and April 2000, respectively, when they specifically knew, and stated in internal communications within Goldman Sachs and to each other, that their reports and recommendations of these securities contained materially false statements and conclusions, were materially inaccurate, that the companies they were recommending were being recommended to customers because of pressures exerted by investment bankers at the firm, that the projections and forecasts were materially inaccurate, and that certain companies they were recommending were likely to fail;

(vii)  Frankel had a practice, with ~~Claimant~~Plaintiff and with the accounts of her other customers, of not calling to get indications of interest from her customers as to securities offerings, but first made the transactions for customers and then called customers, and had other employees of Goldman Sachs call customers, and then falsified ~~Respondents~~Defendants' records as to the dates when these calls were made~~;~~.  Plaintiff received no such calls.

(viii)  Frankel told others at Goldman Sachs that she had obtained prior authorization from clients to purchase the allocated amounts for which she indicated in Goldman Sachs initial public offerings, when the truth was that she had not discussed such purchases with the customers, including Plaintiff;

(ix)    ~~(vix)~~ In or about 1999 through 2000, Frankel was allowed to make back-dated, false entries in her records for prior periods, purporting to reflect discussions with customers that had not actually taken place, an unlawful practice; ~~and~~

(x)    ~~Respondents~~Defendants sold to ~~Claimant~~Plaintiff approximately 3,000 shares of eToys, Inc. stock in or around October 1999, for which ~~Claimant~~Plaintiff paid approximately $~~215,700.  Claimant~~215,750.  Plaintiff ultimately suffered losses of approximately $~~198,600~~137,940 on these shares.  In its sale of the eToys, Inc. stock to ~~Claimant, Respondents~~Plaintiff, Defendants failed to disclose to ~~Claimant~~Plaintiff the conflict of interest existing with respect to agreements entered into by Goldman Sachs with certain Goldman Sachs customers to share in profits made following the initial public offering of eToys, Inc.  Such agreements had a manipulative effect on the price of the security, driving it up from its $20 per share offering price to the almost $72 per share price at which the stock was sold to ~~Claimant.~~Plaintiff;

26.    False and fraudulent statements made to Claimant by Respondents Lehman Brothers and Frankel include, but are not limited to, those specifically listed immediately below:

(i)    At all times, Lehman Brothers represented that Frankel was a knowledgeable, experienced, honest broker.  Indeed, Respondent continues to represent, to this day, that Frankel is an honest and ethical broker.  The truth is that she has a long history of mistreatment of her customers, including Claimant, and that she repeatedly misled her supervisors, she had a pattern of overcharging her customers, particularly the Claimant, she had engaged in a pattern of unauthorized trading in customer accounts, and she falsified documents, as described more fully herein, and as will be further evidenced through testimony to be adduced at the evidentiary hearings;

(ii)    At all times, Frankel and the Copeland Frankel Group represented that she had Claimant's best interests at heart;

(iii)    Lehman Brothers represented to Claimant that the trading in Claimant's Lehman Account and the recommendations of Frankel, The Copeland Frankel Group and The Global Capital Management Group would be and was for the benefit of, and appropriate for, Claimant, and was consistent with Claimant's needs and abilities;

(iv)    Lehman Brothers represented that the Account would be properly supervised;

(v)    Frankel and The Copeland Frankel Group prepared and used fraudulent customer composite performance charts, falsely stating the performance results of customer accounts under management.

(vi)    It is not alleged that Frankel prepared and used fraudulent customer composite performance charts with Lehman Brothers' prior knowledge or encouragement.

–24–

However, when Lehman Brothers' management and supervisors discovered the improper behaviors of Frankel and of The Copeland Frankel Group, particularly that: (a) false performance charts were being used to solicit business, (b) Frankel had lied to management and had asked other employees to back up her lies in reference to grossly misrepresenting her book of business, and (c) customer accounts had been improperly managed by Frankel. Lehman Brothers kept that information hidden from Claimant, and from other customers of Frankel and of The Copeland Frankel Group; and

      (vii)   Lehman Brothers, to this day, condones Frankel's activities, through its misrepresentations and omissions in response to specific allegations of fraud of which Lehman Brothers was aware. Lehman Brothers denies that Frankel's dismissal from the Copeland Frankel Group is related to many of the same misrepresentations and improper actions relied upon by Claimant and which resulted in Claimant's injuries. Lehman Brothers refuses to address other allegations made against it and Frankel, such as the internal complaints made to management by her co-workers in 2001, representations Frankel made to Lehman about her book of business and Lehman Brothers' knowledge of any use by Frankel of the Charts or any complaints against Frankel, including customer and internal complaints. Thus, Lehman Brothers not only condones Frankel's activities to this day, it also seeks to perpetuate Frankel's common law fraud through its denials, that are knowing falsehoods and omissions. By not even responding to other contentions, Lehman Brothers effectively admits the truth of those allegations and seeks to avoid revealing, even now, the true reasons why Frankel was removed from her position in The Copeland Frankel Group. The actions of Lehman Brothers and Frankel amount to a cover-up of Frankel's fraudulent acts for which Claimant seeks economic sanctions.

(xi)     Frankel had a practice of holding losses while taking profits in Plaintiff's Goldman Sachs Account, and falsely represented to Plaintiff her investment philosophy and practice; and

(xii)     Frankel fraudulently represented to Plaintiff, at their first meeting, that she had a Ph.D.

33.     ~~27.~~ By reason of the excessive commissions and other charges to ~~Claimant's accounts~~Plaintiff's Goldman Sachs Account, the speculative nature of many of the transactions which were solicited and executed in ~~Claimant's accounts~~Plaintiff's Account through the fraud and fraudulent misrepresentations of Frankel, the excessive use of margin, and the similar transactions and improprieties in accounts of other customers of Frankel, which should have served as "red flags" to Frankel's supervisors, and all of the transactions having been approved by the principals and/or managers at Goldman Sachs ~~and Lehman Brothers~~, and by reason of the fraudulent acts of Goldman ~~Sachs~~'s analysts and investment bankers with regard to the securities of corporations sold to ~~Claimant on Respondents Goldman Sachs and Frankel's~~Plaintiff on Defendants' recommendations, the fraudulent acts of ~~Goldman Sachs and Frankel~~Defendants with respect to the sale to ~~Claimant~~Plaintiff of eToys, Inc., and the fraudulent acts of Frankel with respect to the initial offerings purchased for ~~Claimant~~Plaintiff's Goldman Sachs Account, Goldman Sachs ~~and Lehman Brothers~~ knew of or should have known of the improper and fraudulent behavior of Frankel, and has, therefore, assisted or participated in the common law fraud and in these fraudulent misrepresentations.

34.     ~~28. Respondents~~Defendants made these misrepresentations and omissions of material fact, and knew, or should have known, they were false and misleading. ~~Respondents~~Defendants intended that ~~Claimant~~Plaintiff rely upon the misrepresentations and

–26–

omissions, and ~~Claimant~~Plaintiff did rely upon them in dealing with the ~~accounts~~Goldman Sachs Account.

35. 29. ~~Claimant~~Plaintiff reasonably and justifiably relied on ~~Respondents~~Defendants' misrepresentations and omission, and, as a result of ~~Respondents~~Defendants' common law fraud and misrepresentations, ~~Claimant~~Plaintiff has been damaged in the amount of $~~2 million.~~836,450.

~~30.    Respondents Lehman Brothers and Frankel are liable to Claimant under Rule 10b5, which makes it unlawful in connection with the purchase or sale of a security to: (a) make an untrue statement of material fact; (b) make a statement that is misleading because of the omission of a material fact; (c) employ any device, scheme, or artifice to defraud; or (d) engage in any practice that operates as a fraud or deceit. See Section 17 of the Securities Act of 1933. 15 U.S.C. §77q; Section 10(b) of the Securities Exchange Act of 194,15 U.S.C. §77J; and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. §240.10b-5.~~

~~31.    Lehman Brothers is responsible as a primary violator pursuant to Section 20(a) of the Exchange Act. Section 20(a) states that:~~

> ~~[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.~~

~~Securities Exchange Act of 1934, 15 U.S.C. §78t. Lehman Brothers participated in, knew, should have known, or otherwise was indifferent to and condoned, the scheme to defraud Claimant and for the cover-up by Frankel's supervisors after they learned of Frankel's fraudulent~~

~~acts in early 2001. Therefore, Lehman Brothers is liable to Claimant pursuant to Section 20(a) of the Exchange Act.~~

## SECOND COUNT
## BREACH OF CONTRACT

<u>36.</u>    ~~32.~~ ~~Claimant~~<u>Plaintiff</u> repeats and realleges each and every allegation contained in paragraphs 1 through ~~31~~<u>35</u> above.

<u>37.</u>    ~~33.~~ The foregoing activities which occurred with respect to ~~Claimant's accounts~~<u>Plaintiff's Account</u> while ~~they were~~<u>it was</u> maintained and improperly administered at Goldman Sachs ~~and Lehman Brothers~~ constitute breaches of internal standards of conduct applicable to ~~Respondents~~<u>Defendants</u> in dealing with the ~~Claimant~~<u>Plaintiff</u>, which are stated in Goldman Sachs' ~~and Lehman Brothers'~~ own policy and procedures manuals or such other internal documents of Goldman Sachs ~~and Lehman Brothers~~ as exist and apply in these circumstances, as well as rules, regulations and procedures pursuant to NASD, NYSE, and other regulatory standards. These standards and procedures, among other standards and procedures customary in the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure ~~Respondent's~~<u>Defendants'</u> improper behavior.[12]

<u>38.</u>    ~~34.~~ The foregoing wrongful activities, which occurred in connection with the ~~Claimant's accounts~~<u>Plaintiff's Account</u> while maintained and improperly administered at Goldman Sachs ~~and Lehman Brothers~~, constitute breaches of contractual duties owing by the ~~Respondents~~<u>Defendants</u> to the ~~Claimant~~<u>Plaintiff</u>, including, without limitation, the contractual duties of good faith and fair dealing with the ~~Claimant~~<u>Plaintiff</u>, the contractual duty to "know

---

[12] <u>Mauriber v. Shearson/American Express, Inc.</u>, 567 F. Supp. 1231, 1238 (S.D.N.Y. 1983). Plaintiff's counsel in <u>Mauriber</u> is ~~Claimant~~<u>Plaintiff</u>'s counsel in the instant proceedings.

your customer," and the contractual duties set forth in the customer agreements which specifically incorporate, as standards of measure of performance of said contractual duties, the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have not been complied with by ~~Respondents~~Defendants.

39.   Specifically, Defendant Goldman Sachs breached the terms set forth in Paragraph 1 of the Trust, Estate and Guardian Agreement, signed by Plaintiff on July 23, 1999 and by Defendant Goldman on August 25, 1999 (the "Account Agreement").  Pursuant to Paragraph 1, all transactions under the Account Agreement must be "in accordance with the rules and customs of the exchange or market and its clearing house, if any, where the transactions are executed and in conformity with the applicable law and regulations of governmental authorities and future amendments or supplements thereto."  The wrongful activities set forth in the Complaint constitute breaches of Paragraph 1 of the Account Agreement.

40.   Defendants breached several provisions of the Trading Authorization Agreement [For Goldman Sachs Representatives] (the "Discretionary Trading Agreement"), dated July 23, 1999.  Specifically, pursuant to the Discretionary Trading Agreement, purchases of securities where Goldman Sachs was a participant in any registered public offering were not to be executed on a discretionary basis.  Although Defendants executed numerous purchases of initial public offerings for which Goldman Sachs was an underwriter, Defendants did not contact Plaintiff prior to executing such purchases, and did, therefore, execute such purchases with discretion.

41.   Pursuant to the Discretionary Trading Agreement, Defendants agreed to not execute transactions prohibited by Goldman Sachs' other policies and procedures applicable to discretionary and nondiscretionary transactions generally.  The wrongful activities set forth in the Complaint, which occurred in connection with the Plaintiff's Account while maintained and

improperly administered at Goldman Sachs, constitute breaches of this specific provision of the Discretionary Trading Agreement.

### THIRD COUNT
### BREACH OF FIDUCIARY DUTIES

42. 35. ~~Claimant~~Plaintiff repeats and realleges each and every allegation contained in paragraphs 1̲1̲ through 34̲41̲ above.

43. 36. ~~Respondents~~Defendants owed ~~Claimant~~Plaintiff certain fiduciary duties, including the duty to use due care, to properly supervise Frankel, to know its customers, and not to engage in common law or statutory fraud with respect to ~~Claimant's accounts~~Plaintiff's Account and funds. The misconduct upon which ~~Claimant~~Plaintiff's breach of fiduciary duties claim is founded ~~is~~includes the very same misconduct which underlies ~~Claimant~~Plaintiff's common law and statutory fraud claims. The fiduciary duties breached by ~~Respondent~~Defendants have their genesis in the express contractual relationship between the parties and are directly related to the common law and statutory fraud asserted by ~~Claimant~~Plaintiff; and, as such, the claim has a six-year statute of limitations.

44. 37. All of the foregoing activities, which occurred with respect to ~~Claimant's accounts~~Plaintiff's Goldman Sachs Account while maintained and improperly administered at Goldman Sachs ~~and Lehman Brothers~~, constitute breaches of fiduciary duties due and owing to ~~Claimant~~Plaintiff by ~~Respondents~~Defendants, who were in positions of trust with respect to ~~Claimant~~Plaintiff.

45. 38. ~~Respondents breached their fiduciary duties owed to Claimant, and, as a result, Claimant has been damaged.~~Defendants breached their fiduciary duties owed to Plaintiff, and, as a result, Plaintiff has been damaged.

KL3 3630657.1̲2650636.1

### FOURTH COUNT
## LEHMAN BROTHERS' NEGLIGENT HIRING AND RETENTION OF FRANKEL

39. Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 38 above.

40. It is well settled that an employer has a duty to exercise reasonable care to refrain from knowingly employing, or retaining in its employ, a person with known dangerous predilections in a position that would present a foreseeable risk of harm to others.[2] Section 317 of the Second Restatement of Torts provides that an employer is generally under a duty to exercise reasonable care to control employees from potentially harming others on the employer's premises or using the employer's property, even when those employees are not acting within the scope of their employment.

41. An employer may be held liable for negligence in hiring and retaining an employee whom the employer knew, or in the exercise of reasonable care, should have known, was potentially harmful to others. Where an employer unreasonably overlooks an employee's history and an employee's propensity to engage in behavior that later causes harm to a complaining party, the employer will be held liable for its own negligence.

42. That the employer followed its own protocol for hiring will not insulate the employer from liability.[3] The extent of an employer's duty to look into the backgrounds of those it hires is subject to considerations of public policy.[4] There is a public policy to protect brokerage firm customers from fraudulent practices of brokers. This is evidenced by the fact that

[2] Ray v. Metropolitan Transp. Auth., 221 A.D.2d 613, 634 N.Y.S.2d 160 (2d Dep't 1995); Haddock v. City of New York, 140 A.D.2d 91, 532, N.Y.S.2d 379 (1st Dep't 1988). See also Rochlin v. Alamo, 209 A.D.2d 499, 619 N.Y.S.2d 75 (2d Dep't 1994) (no notice of employee's alleged propensity to steal cars).
[3] Mercer v. State of New York, 125 A.D.2d 376, 509 N.Y.S.2d 103 (2d Dep't 1986).
[4] Stevens v. Lankard, 31 A.D.2d 602, 297 N.Y.S.2d 686, aff'd 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339.

–31–

New York common law supports the imposition of a fiduciary obligation upon brokers, that is, brokers, and the firms that employ them, occupy a position of trust and confidence, owing the highest degree of loyalty and fidelity to the customer. This position requires that employers diligently investigate the backgrounds of those brokers it seeks to employ.

43.   The huge commission income Frankel had generated from a small number of accounts should have served as a red flag to Lehman Brothers when it was seeking to employ Frankel. Lehman Brothers ignored a number of warning signs, including the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, her improper use of performance charts, the high turnover ratios in her customers' accounts, and customer complaints against Frankel alleging unauthorized transactions. These red flags, along with Frankel's exaggerated claims and discoverable lies, presented a foreseeable risk of injury to Lehman Brothers' customers, which Lehman Brothers had a duty to prevent in the exercise of due care.

44.   Both before and after hiring Frankel, Lehman Brothers' supervisors failed to properly investigate Frankel's representations. Lehman Brothers' supervisors failed to speak to Claimant and other customers, as they should have done.

45.   Lehman Brothers failed in its duty to exercise reasonable care to refrain from knowingly employing, and retaining in its employ, Frankel, a broker who presented a foreseeable risk of harm to others, and this failure resulted in harm to Lehman Brothers' customers, such as Claimant.

### FIFTH COUNT
### NEGLIGENCE ON THE PART OF LEHMAN BROTHERS AND FRANKEL

46.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 45 above.

KL3 3650637 12650616.1

47.    All of the foregoing activities, which occurred with respect to Claimant's Lehman Account while the Account was maintained and improperly administered, constitute negligence by Respondents Lehman Brothers and Frankel in the administration and handling of the Claimant's securities account.  Lehman Brothers failed to use reasonable diligence in supervising the accounts of Frankel's customers, and its supervisors did not act as reasonable and prudent supervisors would have acted toward Claimant, resulting in fraudulent representations.  Frankel's conduct called for diligent inquiry by Lehman Brothers: particularly, inquiry as to what Frankel was telling her customers to support her history of an enormous amount of high cost, speculative activity.  See, e.g., Cass v. Shearson Lehman Hutton, No. 91-01484, 1994 WL1248585 (NASD Dispute Resolution, Inc. Jan. 31, 1994).  See also, Aaron v. Paine Webber, Inc., No. 72-136-1146-87 (Am. Arbitration Ass'n. June 28, 1989).

48.    For over three months after Claimant opened the Lehman Account and transferred over $1.8 million in securities into the account in January 2001, Claimant's Account remained inactive. Frankel, caught up in what Lehman Brothers now admits were, at the least, "internal issues" with her partners in The Copeland Frankel Group, did not attend to her duties with respect to Claimant's Lehman Account, causing significant losses in value to it.  No transaction was executed in Claimant's Lehman Account until approximately April 2001, as if the Account had been forgotten by Frankel and Lehman Brothers.  The Account dropped in value by over half a million dollars during this time.

49.    There is authority that SRO rules establish a standard or duty of care owed by securities firms to their customers and that violations of these rules may constitute negligence on the part of the firms.  See e.g., Csordas, Fed. Sec. L. Rep. 97,230 (1992-93 Transfer Binder).  Customer claims of negligence may be based on conduct that violates an internal firm

KL3 2650637 12650636.1

compliance manual or directives, the rules of the exchange on which the securities are traded, or the applicable NYSE or NASD rules. Frankel repeatedly and systematically violated her employers' written internal rules. So did her supervisors. Failure to maintain a certain level of competence in the supervision of an account may constitute negligence or a form of broker-dealer malpractice. Additionally, a broker may be liable to her client for negligence when the broker breaches the duty of care owed to the client and the client suffers damages as a proximate cause of that breach. While violations of SRO rules are not causes of action in and of themselves, failure to follow clearly defined rules and guidelines are indicia of actionable carelessness and negligence. See e.g., Csordas, Fed. Sec. L. Rep. ¶ 97,230 (1992-93 Transfer Binder).

50.    Courts typically hold firms to their own articulated standards of professionalism. See e.g., Mihara, 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty). The rule of thumb on negligence is to compare the firm's actions against the standards, customs and usages of the industry, which place duties and obligations on the firm. Negligence can also be demonstrated by a failure to follow the rules of the exchange on which the securities were traded, the applicable NYSE and NASD rules, or even the firm's own compliance manual and internal memoranda. In their dealings with this Claimant, the Respondents failed to follow rules, regulations, the manuals and the internal memoranda of Lehman Brothers.

51.    Broker-dealers and their associated persons are held to high standards of honor. A failure by a broker to abide by these industry standards is evidence of carelessness and negligence. The level of care and skill of a stockbroker is high, and, in assessing a claim of negligence, standards in the securities industry can be examined:

> Unless he represents that he has greater or less skill or knowledge,
> one who undertakes to render services in the practice of a

–34–

~~profession or trade is required to exercise skill and knowledge normally possessed by members of that profession or trade in good standing in similar circumstances.~~

~~RESTATEMENT (SECOND) OF TORTS §299A. Respondents represented that they had even greater skill and knowledge than other brokers in the industry, and should be held to such higher standards. See, Cass v. Shearson Lehman Hutton, supra, and Aaron v. Paine Webber, Inc., supra.~~

~~52.    Federal securities laws, NYSE rules and NASD rules require brokerage firms to reasonably supervise their brokers for the purpose of preventing violations of the rules and regulations of the securities industry. Section 15 of the Exchange Act requires securities broker-dealer firms to establish adequate systems of supervision and to enforce these internal rules. 15 U.S.C. 78o. Courts have applied these provisions to require that broker dealers maintain proper systems of supervision and internal controls over their registered representatives. This is consistent with Section 15(bX4)(E) of the Exchange Act which requires the SEC to discipline broker-dealers who fail "to reasonably supervise, with a view to preventing violations . . . ."~~

~~53.    The NASD has expanded this to require reasonable investigation and vigorous response to indications of problems with customers. The rules of the NASD and NYSE require brokerage houses to supervise their brokers' handling of accounts. See NASD Conduct Rule 3010 and NYSE Rule 405. NASD Conduct Rule 3010 requires member firms to establish and maintain a system to supervise the activities of each registered representative: "Each member shall establish . . . a system ... that is reasonably designed to achieve compliance with applicable securities laws . . . and with the Rules of this Association." NASD Manual, Rule 3010, at 4831. Every broker-dealer also may use compliance manuals and written internal directives as methods of transmitting its own higher standards of professional conduct to its agents. Customer claims may be based on individual broker misconduct that violates an internal firm compliance guide.~~

See e.g., Mihara. 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty). Here, Frankel violated a number of internal compliance guides published by her employer. If a firm has not enforced "a proper system of supervision and internal control," it has not acted in good faith under the applicable statute. Moscarelli v. Stamm. 288 F.Supp. 453, 460 n.5 (E.D.N.Y. 1968). In supervising Frankel, Lehman Brothers was worse than lax in enforcement of its supervisory and internal control procedures: Lehman Brothers was complicit in encouraging, and then covering up, Frankel's fraudulent acts.

### SIXTH COUNT
### BREACH OF SUPERVISORY DUTIES ON THE PART OF LEHMAN BROTHERS

54.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 53 above.

55.    Lehman Brothers failed in its affirmative duty to supervise its registered agents and its affiliates and to reasonably prevent the total lack of attention to Claimant's Lehman Account for the initial three months of the Account's existence during which the Account dropped in value by approximately half a million dollars, the improper trading activity, excessive charges. unsuitable transactions, Frankel's use of fraudulent Charts. and other improper recommendations and transactions made to Claimant. Lehman Brothers failed with regard to its supervisory duties and responsibilities over Frankel and the Claimant's Lehman Account, and Lehman Brothers is, accordingly, liable for the improper activity and improper administration that occurred while the accounts were maintained at Lehman Brothers. See, e.g., Shakeri v. Merrill Lynch Pierce Fenner Smith, supra. Frankel's supervisors did not curtail the use of fraudulent performance charts, the unauthorized trading, and the cover-up of such unauthorized trading, the excessive commissions, markups/markdowns and margin charges in Claimant's accounts.

56. ~~By virtue of the doctrine of respondent superior, Respondent Lehman Brothers is liable and responsible for the activities and conduct of its brokers, such as Frankel, its managers, investment advisors, employees, agents, and persons otherwise under its control, insofar as its brokers, managers, investment advisors, employees, agents and persons otherwise under its control have caused or contributed to the losses and improper charges suffered by Claimant in the Lehman account while it was maintained at Lehman Brothers. As a direct and proximate result of Lehman Brothers' failure to supervise, Claimant suffered out-of-pocket losses and lost income on such out-of-pocket losses in an amount totaling approximately X million.~~

## PUNITIVE DAMAGES

<u>46.</u>   ~~57.~~ It is respectfully submitted that punitive damages are particularly appropriate here, where the pervasive pattern of fraud and the activities of the ~~Respondents~~<u>Defendants</u> in seeking to cover-up their misconduct surely merit economic sanctions. Indeed, the fraudulent activity that occurred with respect to ~~Claimant's accounts~~<u>Plaintiff's Goldman Sachs Account</u> is precisely the type of activity that legislative bodies are seeking to prevent, such as by the direct affirmation of the authority of ~~arbitrators~~<u>courts</u> to award punitive and/or treble damages to investor ~~claimants in securities arbitration. NASD arbitrators have the power to award appropriate punitive damages in reasoned amounts relative to the losses and the offensive nature of the acts proven. If the Respondents~~<u>plaintiffs. If the Defendants</u>' unlawful behaviors detailed above do not result in proportionate sanctions to deter future violations of this type, then brokers will continue to "borrow" money from their clients by such gross overcharges and fraudulent recommendations, pocket the billions, and return only a small fraction of what they "earned" when challenged by the relatively few victims willing to endure the expenses and inconveniences of proceedings such as these.

KL3 2650657 42650636 1

## THE DAMAGES

~~Claimant seeks an award as against Goldman Sachs and Frankel, jointly and severally of:~~

(i) ~~1.3 million for Claimant's out-of-pocket losses;~~

(ii) ~~$158,600 or more in commissions, margin interest and other charges to Claimant's account at Goldman Sachs;~~

(iii) ~~$250,000, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimant would have realized on the account, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortuous acts;~~

(iv) ~~punitive damages; and~~

(v) ~~interest, attorneys' fees and costs of these proceedings.~~

~~Claimant seeks an award against Lehman Brothers and Frankel, jointly and severally, of:~~

WHEREFORE, Plaintiff prays for judgment as follows:

(i) ~~$823,500 for Claimant's out-of-pocket losses;~~ As to First Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

(ii) ~~$32,300 or more in commissions, margin interest and other charges to Claimant's account at Lehman Brothers;~~ As the Second Count, Plaintiff prays for judgment against all Defendants in the amount to be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs; and

(iii) ~~$250,000, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimant would have realized on the accounts, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortuous acts~~ As to the Third Count, Plaintiff prays for judgment against all Defendants in the amount to

KL3 2650677 12650636 1

be determined at trial, but not less than $836,450, plus punitive damages, attorneys' fees and costs;

      (iv)     punitive damages; and

      (v)     interest, attorneys' fees and costs of these proceedings.

Dated:  New York, New York December
       March 21, 20062008

               Respectfully submitted,

**LAW OFFICES OF DAN BRECHER**

           By: _____

           Dan Brecher
           Attorneys for Claimant (DB-5308)
           99 Park Avenue, 16th Floor
           New York, New York NY 10016
           (212) 286-0747

KL3 2650677.12650676.1

Document comparison done by DeltaView on Thursday, April 03, 2008 10:02:07 AM

| Input: | |
|---|---|
| Document 1 | PowerDocs://KL3/2650637/1 |
| Document 2 | PowerDocs://KL3/2650636/1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 277 |
| Deletions | 313 |
| Moved from | 10 |
| Moved to | 10 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 610 |

**Exhibit H**

*Period Covering:*
*Dec 1 00 to Dec 31 00*

*Account Number:*
*001–10030◄*

*Statement of Account for:*

## KATHERINE A. GRIFFIN
## LIVING TR. U/A DTD. 12/2/94
## KATHERINE A. GRIFFIN, TTEE.

*Your Goldman Sachs team:*

Sofia Frankel
PCS Professional

Goldman, Sachs & Co.
One New York Plaza
New York, NY 10004
212–357–1287

Josephine Linden, Regional Manager

www.gs.com

KATHERINE A. GRIFFIN
LIVING TR. U/A DTD. 12/2/94
KATHERINE A. GRIFFIN, TTEE.
11601 SPRINGRIDGE RD
POTOMAC MD 20854

CONFIDENTIAL

GSKG 000343

# GENERAL INFORMATION

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001–10030–4

Account Name: KATHERINE A. GRIFFIN

## CONTENTS

SUMMARY .................................................. 3
HOLDINGS ................................................. 4
ACTIVITY ................................................. 9
TAX LOTS ................................................ 11
REALIZED GAINS AND LOSSES ............................... 15
INCOME AND EXPENSES ..................................... 18
DEPOSITS AND WITHDRAWALS ................................ 22
REPORT DESCRIPTIONS AND DISCLOSURES ..................... 23

## ACCOUNT INFORMATION

**ACCOUNT NUMBER**
001–10030–4

**BASE CURRENCY**
US DOLLARS

**DUPLICATE COPIES OF THIS ACCOUNT STATEMENT ARE BEING SENT TO:**

THE PRIVATE CONSULTING GROUP
ATTN: JEANNE CARR
1400 N 14TH ST
ARLINGTON VA 22209

## SPECIAL MESSAGES

**Why wait for the mail?**
See your statements online on the Goldman Sachs Wealth Management Web
site @ https://portfolio.gs.com. To enroll please call your Private Wealth Management
Professional or 1 (877) iINVESTOR. You can also use our state of the art Web site
for 24 hour access to your account information, quotes, news and research. GS Wealth
Management is a site that will redefine your standards.

CONFIDENTIAL

GSKG 000344

# SUMMARY

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

## ASSET ALLOCATION

| | Percentage of Portfolio | Market Value |
|---|---|---|
| CASH AND CASH EQUIVALENTS | (21.17) | (381,066.58) |
| EQUITIES | 121.17 | 2,066,635.77 |
| TOTAL | 100.00 | 1,705,569.19 |

## CHANGES IN ACCOUNT VALUE

| | Market Value |
|---|---|
| MARKET VALUE AS OF Dec 1 00 (INCLUDING ESTIMATED ACCRUALS) | 1,832,832.09 |
| INTEREST CHARGED | (2,382.68) |
| DIVIDENDS RECEIVED | 835.94 |
| CHANGE IN MARKET VALUE | (125,716.16) |
| MARKET VALUE AS OF Dec 31 00 (INCLUDING ESTIMATED ACCRUALS) | 1,705,569.19 |

## TAX SUMMARY

| | Current Month | Year to Date |
|---|---|---|
| **REPORTABLE INCOME** | | |
| DIVIDENDS | 820.00 | 21,985.16 |
| FOREIGN DIVIDENDS RECEIVED | 18.75 | 2,385.44 |
| INTEREST EARNED ON CREDIT BALANCE | | 73.36 |
| FOREIGN TAX WITHHELD FROM FOREIGN DIVIDENDS | (2.81) | (37.05) |
| **NON-REPORTABLE INCOME** | | |
| INTEREST CHARGED ON DEBIT BALANCE | (2,382.68) | (12,090.80) |
| PARTNERSHIP DISTRIBUTIONS | | 2,637.50 |
| **REALIZED CAPITAL GAINS** | | |
| SHORT TERM REALIZED GAIN (LOSS) | (30,703.42) | 31,300.87 |
| | | Total |
| **UNREALIZED CAPITAL GAINS** | | |
| CURRENT UNREALIZED GAIN (LOSS) | | (757,106.23) |



Page 3 of 23

The summary information in this statement may include assets not held by Goldman Sachs.

CONFIDENTIAL

# HOLDINGS

**Period Covering:** Dec 1 00 to Dec 31 00  
**Account Number:** 001-10030-4  
**Account Name:** KATHERINE A. GRIFFIN

## CASH AND CASH EQUIVALENTS

### CASH BALANCE

| | Quantity | Market Price | Market Value / Accrued Income | Unit Cost | Adjusted Cost / Original Cost | Unrealized Gain (Loss) | Yield to Maturity in Percentage | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| US DOLLARS | (361,066.58) | | (361,066.58) | | (361,066.58) | 0.00 | | | |
| TOTAL CASH BALANCE | | | (361,066.58) | | | | | | |
| TOTAL CASH AND CASH EQUIVALENTS | | | (361,066.58) | | (361,066.58) | | | | |

## EQUITIES

### COMMON STOCKS

| | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Dividend Yield | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| 3COM CORP (COMS) | 5,000.00 | 8.5000 | 42,500.00 | 10.8750 | 54,375.00 | (11,875.00) | | | 06 |
| AMAZON.COM INC CMN (AMZN) | 2,000.00 | 15.5925 | 31,125.00 | 38.5000 | 77,000.00 | (45,875.00) | | | 06 |
| AT HOME CORP SER A CMN CLASS A (ATHM) | 1,000.00 | 5.5312 | 5,531.20 | 42.2500 | 42,250.00 | (36,718.80) | | | 06 |
| AT&T WIRELESS GROUP CMN (AWE) | 2,000.00 | 17.3125 | 34,625.00 | 29.5000 | 59,000.00 | (24,375.00) | | | 06 |
| BOOKHAM TECHNOLOGY PLC SPONSORED ADR (BKHM) | 1,000.00 | 13.1250 | 13,125.00 | 47.1700 | 47,170.00 | (34,045.00) | | | 06 |
| CAPSTONE TURBINE CORP CMN (CPST) | 500.00 | 28.0000 | 14,000.00 | 16.0000 | 8,000.00 | 6,000.00 | | | 06 |
| CHARTER COMMUNICATIONS, INC COMMON STOCK CLASS A (CHTR) | 3,000.00 | 22.6875 | 68,062.50 | 19.0000 | 57,000.00 | 11,062.50 | | | 06 |
| CHINA MOBILE HONG KONG LTD SPONSORED ADR CMN (CHL) | 1,000.00 | 27.1250 | 27,125.00 | 30.7700 | 30,770.00 | (3,645.00) | | | 06 |
| CISCO SYSTEMS, INC. CMN (CSCO) | 1,000.00 | 38.2500 | 38,250.00 | 66.3750 | 66,375.00 | (28,125.00) | | | 06 |

CONFIDENTIAL

GSKG 000346

**HOLDINGS**

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

## EQUITIES

### COMMON STOCKS (Continued)

| | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Dividend Yield | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| COMMERCE ONE INC CMN (CMRC) | 1,000.00 | 25.3125 | 25,312.50 | 32.8750 | 32,875.00 | (7,562.50) | | | 08 |
| COMMUNITY HEALTH SYS INC CMN (CYH) | 1,000.00 | 35.0000 | 35,000.00 | 28.1880 | 28,188.00 | 6,812.00 | | | 08 |
| CORIO INC CMN (CRIO) | 400.00 | 2.0625 | 825.00 | 14.0000 | 5,600.00 | (4,775.00) | | | 08 |
| CORNING INCORPORATED (GLW) | 1,000.00 | 52.8125 | 52,812.50 | 71.2500 | 71,250.00 | (18,437.50) | 0.4500 | 240.00 | 08 |
| COSINE COMMUNICATIONS INC CMN (COSN) | 200.00 | 13.8750 | 2,775.00 | 23.0000 | 4,600.00 | (1,825.00) | | | 08 |
| ECHOSTAR COMMUNICATIONS CORP CL A CLASS A (DISH) | 2,500.00 | 22.7500 | 56,875.00 | 75.4690 | 188,518.00 | (131,641.00) | | | 08 |
| ELI LILLY & CO CMN (LLY) | 1,000.00 | 93.0625 | 93,062.50 | 68.3440 | 68,344.00 | 24,718.50 | 1.2000 | 1,120.00 | 08 |
| EQUINIX, INC. CMN (EQIX) | 1,000.00 | 4.3750 | 4,375.00 | 12.0000 | 12,000.00 | (7,625.00) | | | 08 |
| EXPEDIA INC COMMON STOCK (EXPE) | 500.00 | 9.5625 | 4,781.25 | 14.0000 | 7,000.00 | (2,218.75) | | | 08 |
| GENERAL DYNAMICS CORP (GD) | 1,000.00 | 78.0000 | 78,000.00 | 63.0000 | 63,000.00 | 15,000.00 | 1.3300 | 1,040.00 | 08 |
| GLOBAL CROSSING LTD CMN (GX) | 1,000.00 | 14.3125 | 14,312.50 | 33.0000 | 33,000.00 | (18,687.50) | | | 08 |
| IMPSAT FIBER NETWORKS, INC. COMMON STOCK (IMPT) | 200.00 | 4.3750 | 875.00 | 17.0000 | 3,400.00 | (2,525.00) | | | 08 |
| INFOSPACE INC CMN (INSP) | 3,000.00 | 8.8437 | 26,531.10 | 31.2660 | 93,797.00 | (67,265.90) | | | 08 |
| INTEL CORP CMN (INTC) | 5,000.00 | 30.0625 | 150,312.50 | 37.3130 | 186,563.00 | (36,250.50) | 0.2600 | 400.00 | 08 |
| MATRIXONE INC CMN (MONE) | 500.00 | 18.1875 | 9,093.75 | 25.0000 | 12,500.00 | (3,406.25) | | | 08 |
| METLIFE INC CMN (MET) | 2,000.00 | 35.0000 | 70,000.00 | 14.2500 | 28,500.00 | 41,500.00 | | | 08 |

*Page 5 of 23*

CONFIDENTIAL

GSKG 000347

# HOLDINGS

**Period Covering:** Dec 1 00 to Dec 31 00  **Account Number:** 001—10030→  **Account Name:** KATHERINE A. GRIFFIN

## EQUITIES

### COMMON STOCKS (Continued)

| | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Dividend Yield | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| MICROSOFT CORP. CMN (MSFT) | 2,500.00 | 43.3750 | 108,437.50 | 112.0000 | 280,000.00 | (171,562.50) | | | 06 |
| MICROTUNE INC CMN (TUNE) | 250.00 | 16.5625 | 4,140.63 | 16.0000 | 4,000.00 | 140.63 | | | 06 |
| MILLENNIUM PHARMACEUTICALS INC | 4,000.00 | 61.8750 | 247,500.00 | 36.2710 | 145,084.00 | 102,416.00 | | | 06 |
| NET2000 COMMUNICATIONS INC CMN (NTKX) | 1,000.00 | 1.7187 | 1,718.70 | 20.0000 | 20,000.00 | (18,281.30) | | | 06 |
| NETRO CORPORATION (NTRO) | 500.00 | 6.9375 | 3,468.75 | 82.5000 | 41,250.00 | (37,781.25) | | | 06 |
| NETWORK PLUS CORP COMMON STOCK (NPLS) | 1,000.00 | 2.5000 | 2,500.00 | 29.0000 | 29,000.00 | (26,500.00) | | | 06 |
| NEXTEL PARTNERS INC CMN CLASS A (NXTP) | 1,000.00 | 16.8125 | 16,812.50 | 20.0000 | 20,000.00 | (3,187.50) | | | 06 |
| NIKU CORP CMN (NIKU) | 2,750.00 | 7.3125 | 20,109.38 | 20.9770 | 57,688.00 | (37,578.62) | | | 06 |
| NIPPON TELEG & TEL SPON ADR SPONSORED ADR CMN (1 ADR = 1/200 COMMON SHS) (NTT) | 1,000.00 | 35.5875 | 35,587.50 | 43.8900 | 43,890.00 | (8,302.50) | 0.5300 | 192.00 | 06 |
| NORTEL NETWORKS CORP CMN (NT) | 1,000.00 | 32.0625 | 32,062.50 | 74.1300 | 74,130.00 | (42,067.50) | 0.2300 | 75.00 | 06 |
| ORACLE CORPORATION (ORCL) | 6,000.00 | 29.0625 | 174,375.00 | 18.6250 | 111,750.00 | 62,625.00 | | | 06 |
| ORGANIC INC CMN (OGNC) | 500.00 | 0.8125 | 406.25 | 20.0000 | 10,000.00 | (9,593.75) | | | 06 |
| PALM INC. CMN (PALM) | 7,916.00 | 28.3125 | 224,121.75 | 31.4960 | 249,312.00 | (25,190.25) | | | 06 |
| PARAMETRIC TECHNOLOGY CORP (PMTC) | 3,000.00 | 13.4375 | 40,312.50 | 29.1880 | 87,563.00 | (47,250.25) | | | 06 |
| PETROCHINA CO LTD SPONSORED ADR (PTR) | 3,000.00 | 16.5625 | 49,687.50 | 16.4400 | 49,320.00 | 367.50 | 4.3000 | 2,139.00 | 06 |
| ROYAL KPN N.V. SP ADR (KPN) | 1,000.00 | 11.1250 | 11,125.00 | 14.4800 | 14,480.00 | (3,355.00) | 3.8200 | 426.00 | 06 |
| SANTA FE INTERNATIONAL CORP ORDINARY SHARES (SDC) | 1,000.00 | 32.0625 | 32,062.50 | 34.5000 | 34,500.00 | (2,437.50) | 0.4000 | 130.00 | 06 |

*Page 6 of 23*

CONFIDENTIAL

GSKG 000348

HOLDINGS

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001–10030–4

Account Name:
KATHERINE A. GRIFFIN

EQUITIES

| | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Dividend Yield | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| **COMMON STOCKS (Continued)** | | | | | | | | | |
| SONERA CORPORATION ADS (1 ADS = 1ORD) (SNRA) | 2,000.00 | 17.3750 | 34,750.00 | 25.5970 | 51,194.00 | (16,444.00) | | | 06 |
| SOUTHERN ENERGY INC. CMN (SOE) | 250.00 | 28.3125 | 7,078.13 | 22.0000 | 5,500.00 | 1,578.13 | | | 01 |
| STORAGENETWORKS INC. CMN (STOR) | 1,000.00 | 24.8125 | 24,812.50 | 34.0000 | 34,000.00 | (9,187.50) | | | 06 |
| THE GOLDMAN SACHS GROUP, INC. CMN (GS) | 100.00 | 108.9375 | 10,893.75 | 99.7500 | 9,975.00 | 918.75 | 0.4400 | 48.00 | 01 |
| TYCOM LTD. CMN (TCM) | 1,000.00 | 22.3750 | 22,375.00 | 32.0000 | 32,000.00 | (9,625.00) | | | 06 |
| UNIVERSAL ACCESS INC CMN (UAXS) | 500.00 | 8.0000 | 4,000.00 | 14.0000 | 7,000.00 | (3,000.00) | | | 06 |
| WORLDCOM INC CMN (WCOM) | 2,250.00 | 14.0625 | 31,640.63 | 48.0000 | 108,000.00 | (76,359.37) | | | 06 |
| **TOTAL COMMON STOCKS** | | | 2,039,165.27 | | 2,800,709.00 | (761,543.73) | 0.2836 | 5,810.00 | |
| **OTHER** | | | | | | | | | |
| EL PASO ENERGY PARTNERS LTD PARTNERSHIP (EPN) | 1,000.00 | 27.4375 | 27,437.50 | 23.0000 | 23,000.00 | 4,437.50 | 8.0100 | 2,200.00 | 06 |
| **TOTAL OTHER** | | | 27,437.50 | | 23,000.00 | 4,437.50 | 8.0100 | 2,200.00 | |
| **DIVIDENDS EX NOT PAID** | | | | | | | | | |
| US DOLLARS | | | 33.00 | | | | | | |
| **TOTAL DIVIDENDS EX NOT PAID** | | | 33.00 | | | | | | |

CONFIDENTIAL

GSKG 000349

Period Covering:  Account Number:  Account Name:
Dec 1 00 to Dec 31 00   001-10030-4   KATHERINE A. GRIFFIN

# HOLDINGS

## EQUITIES

| | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Dividend Yield | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| **TOTAL EQUITIES** | | | 2,066,635.77 | | 2,823,709.00 | (757,108.23) | 0.3861 | 8,010.00 | |

## SUMMARY OF HOLDINGS

| | Market Value | Percentage of Portfolio | Adjusted Cost / Original Cost | Unrealized Gain (Loss) | Estimated Annual Income |
|---|---|---|---|---|---|
| **TOTAL CASH AND CASH EQUIVALENTS** | (381,066.58) | (21.17) | (381,066.58) | | |
| **TOTAL EQUITIES** | 2,066,635.77 | 121.17 | 2,823,709.00 | (757,106.23) | 8,010.00 |
| **TOTAL ACCOUNT** | 1,705,569.19 | 100.00 | 2,462,642.42 2,462,642.42 | (757,106.23) | 8,010.00 |

Page 8 of 23

CONFIDENTIAL

**ACTIVITY**

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

## SECURITIES PURCHASED

| | Trade Date | Settlement Date | Quantity | Price | Net Settlement Amount Accrued Interest | Account Type |
|---|---|---|---|---|---|---|
| COMMERCE ONE INC CMN DE DISCRETION EXERCISED | Dec 19 00 | Dec 22 00 | 1,000.00 | 32.875000 | (32,875.00) | 06 |
| TOTAL SECURITIES PURCHASED | | | | | (32,875.00) | |

## SECURITIES SOLD

| | Trade Date | Settlement Date | Quantity | Price | Net Settlement Amount Accrued Interest | Account Type |
|---|---|---|---|---|---|---|
| ASK JEEVES INC DE DISCRETION EXERCISED | Dec 06 00 | Dec 11 00 | (250.00) | 11.812500 | 2,953.03 | 06 |
| AXCELIS TECHNOLOGIES, INC. CMN AVG PRICE IN ACCORD WITH THE CLIENTS INSTRUCTIONS DE DISCRETION EXERCISED | Dec 06 00 | Dec 11 00 | (1,000.00) | 7.343800 | 7,343.55 | 06 |
| TOTAL SECURITIES SOLD | | | | | 10,296.58 | |

## INTEREST CHARGED

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| INTEREST CHARGED | Dec 29 00 | | (2,382.88) | 06 |
| TOTAL INTEREST CHARGED | | | (2,382.88) | |

CONFIDENTIAL

GSKG 000351

Period Coverage:  
Dec 1 00 to Dec 31 00

Account Number:  
001-10030-4

Account Name:  
KATHERINE A. GRIFFIN

## ACTIVITY

### DIVIDENDS RECEIVED

| | Effective Date | Quantity | | Amount | Account Type |
|---|---|---|---|---|---|
| INTEL CORP CMN DIVIDEND ON  5,000 SHS @  .02000000 | Dec 01 00 | | | 100.00 | 03 |
| ELI LILLY & CO CMN DIVIDEND ON  1,000 SHS @  .26000000 | Dec 11 00 | | | 260.00 | 03 |
| METLIFE INC CMN DIVIDEND ON  2,000 SHS @  .20000000 | Dec 15 00 | | | 400.00 | 03 |
| CORNING INCORPORATED DIVIDEND ON  1,000 SHS @  .06000000 | Dec 29 00 | | | 60.00 | 03 |
| FOREIGN SOURCE INCOME ON DIVIDEND ON  1,000 SHS @  .01875000 NORTEL NETWORKS CORP CMN | Dec 29 00 | | | 18.75 | 03 |
| FOREIGN TAX WITHHELD ON 1,000 SHS FOR TAX REPORTING NORTEL NETWORKS CORP CMN | Dec 29 00 | | | (2.81) | 03 |
| TOTAL DIVIDENDS RECEIVED | | | | 835.94 | |

### INTEREST CHARGED ON DEBIT BALANCE
INTEREST PERIOD FROM NOV. 30 TO DEC. 28, 2000

| | Start Date | End Date | Net Balance | Rate Charged (in percentage) | In Settlement Currency Net Settlement Amount |
|---|---|---|---|---|---|
| US DOLLARS (USD) | | | | | |
| Interest Charged | Nov 30 00 | Nov 30 00 | 336,941.42 | 8.75000% | (81.90) |
| Interest Charged | Dec 01 00 | Dec 10 00 | 336,941.42 | 8.75000% | (818.71) |
| Interest Charged | Dec 11 00 | Dec 14 00 | 326,284.84 | 8.75000% | (317.22) |
| Interest Charged | Dec 15 00 | Dec 21 00 | 325,884.84 | 8.75000% | (554.45) |
| Interest Charged | Dec 22 00 | Dec 28 00 | 356,759.84 | 8.75000% | (610.39) |
| TOTAL US DOLLARS | | | | | (2,382.68) |

Page 10 of 23

CONFIDENTIAL

GSKG 000352

**Period Covering:** Dec. 1 00 to Dec. 31 00

**Account Number:** 001-10030-4    **Account Name:** KATHERINE A. GRIFFIN

# TAX LOTS

## EQUITIES

| | Date Acquired or Sold Short | Holding Period | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|---|
| **COMMON STOCKS** | | | | | | | | |
| 3COM CORP (COMS) | Dec 15 99 | LT | 3,000.00 | 8.5000 | 25,500.00 | 9.610 | 28,829.06 | (3,329.06) |
| | Mar 24 00 | 84 | 2,000.00 | 8.5000 | 17,000.00 | 12.773 | 25,546.25 | (8,546.25) |
| **Position Total** | | | 5,000.00 | | 42,500.00 | | 54,375.31 | (11,873.51) |
| AMAZON.COM INC CMN (AMZN) | Aug 17 00 | 230 | 2,000.00 | 15.5625 | 31,125.00 | 38.500 | 77,000.00 | (45,875.00) |
| AT HOME CORP SER A CMN CLASS A (ATHM) | Sep 30 99 | LT | 1,000.00 | 5.5313 | 5,531.00 | 42.250 | 42,250.00 | (36,719.00) |
| AT&T WIRELESS GROUP CMN (AWE) | Apr 26 00 | 117 | 2,000.00 | 17.3125 | 34,625.00 | 29.500 | 59,000.00 | (24,375.00) |
| BOOKHAM TECHNOLOGY PLC SPONSORED ADR (BKHM) | Sep 19 00 | 263 | 1,000.00 | 13.1250 | 13,125.00 | 47.170 | 47,170.00 | (34,045.00) |
| CAPSTONE TURBINE CORP CMN (CPST) | Jun 28 00 | 180 | 500.00 | 28.0000 | 14,000.00 | 16.000 | 8,000.00 | 6,000.00 |
| CHARTER COMMUNICATIONS, INC COMMON STOCK CLASS A (CHTR) | Nov 08 99 | LT | 3,000.00 | 22.6875 | 68,063.00 | 19.000 | 57,000.00 | 11,063.00 |
| CHINA MOBILE HONG KONG LTD SPONSORED ADR CMN (CHL) | Oct 31 00 | 305 | 1,000.00 | 27.1250 | 27,125.00 | 30.770 | 30,770.40 | (3,645.40) |
| CISCO SYSTEMS, INC. CMN (CSCO) | Aug 10 00 | 223 | 1,000.00 | 38.2500 | 38,250.00 | 66.375 | 66,375.00 | (28,125.00) |
| COMMERCE ONE INC CMN (CMRC) | Dec 19 00 | 354 | 1,000.00 | 25.3125 | 25,313.00 | 32.875 | 32,875.00 | (7,562.00) |
| COMMUNITY HEALTH SYS INC CMN (CYH) | Oct 30 00 | 304 | 1,000.00 | 35.0000 | 35,000.00 | 28.188 | 28,187.50 | 6,812.50 |
| CORIO INC CMN (CRIO) | Jul 20 00 | 202 | 400.00 | 2.0625 | 825.00 | 14.000 | 5,600.00 | (4,775.00) |
| CORNING INCORPORATED (GLW) | Nov 02 00 | 307 | 1,000.00 | 52.8125 | 52,813.00 | 71.250 | 71,250.00 | (18,437.00) |
| COSINE COMMUNICATIONS INC CMN (COSN) | Sep 25 00 | 269 | 200.00 | 13.8750 | 2,775.00 | 23.000 | 4,600.00 | (1,825.00) |

CONFIDENTIAL

GSKG 000353

**TAX LOTS**

Period Covering:
Dec 1 00 to Dec 31 00

Account Number:
001-10030-1

Account Name:
KATHERINE A. GRIFFIN

## EQUITIES

### COMMON STOCKS

| | Date Acquired or Sold Short | Holding Period | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|---|
| ECHOSTAR COMMUNICATIONS CORP CL A CLASS A (DISH) | Mar 28 00 | 88 | 2,500.00 | 22.7500 | 56,875.00 | 75.406 | 188,615.75 | (131,540.75) |
| ELI LILLY & CO CMN (LLY) | Oct 21 99 | LT | 1,000.00 | 93.0625 | 93,063.00 | 68.344 | 68,343.85 | 24,719.15 |
| EQUINIX, INC. CMN (EQIX) | Aug 10 00 | 223 | 1,000.00 | 4.3750 | 4,375.00 | 12.000 | 12,000.00 | (7,625.00) |
| EXPEDIA INC COMMON STOCK (EXPE) | Nov 03 99 | LT | 500.00 | 9.5625 | 4,781.00 | 14.000 | 7,000.00 | (2,219.00) |
| GENERAL DYNAMICS CORP. (GD) | Sep 25 00 | 289 | 1,000.00 | 78.0000 | 78,000.00 | 63.000 | 63,000.00 | 15,000.00 |
| GLOBAL CROSSING LTD CMN (GX) | Apr 10 00 | 101 | 1,000.00 | 14.3125 | 14,313.00 | 33.000 | 33,000.00 | (18,687.00) |
| IMPSAT FIBER NETWORKS, INC. COMMON STOCK (IMPT) | Jan 31 00 | 32 | 200.00 | 4.3750 | 875.00 | 17.000 | 3,400.00 | (2,525.00) |
| INFOSPACE INC CMN (INSP) | Jul 27 00 | 209 | 1,000.00 | 8.8438 | 8,844.00 | 37.161 | 37,160.60 | (28,296.60) |
| | Aug 24 00 | 237 | 2,000.00 | 8.8438 | 17,688.00 | 28.328 | 56,656.20 | (38,968.20) |
| **Position Total** | | | 3,000.00 | | 26,532.00 | | 93,786.80 | (67,264.80) |
| INTEL CORP CMN (INTC) | Sep 24 99 | LT | 5,000.00 | 30.0625 | 150,313.00 | 37.313 | 186,562.50 | (36,249.50) |
| MATRIXONE INC CMN (MONE) | Feb 29 00 | 60 | 500.00 | 18.1875 | 9,094.00 | 25.000 | 12,500.00 | (3,406.00) |
| METLIFE INC CMN (MET) | Apr 04 00 | 95 | 2,000.00 | 35.0000 | 70,000.00 | 14.250 | 28,500.00 | 41,500.00 |
| MICROSOFT CORP. CMN (MSFT) | Mar 24 00 | 84 | 2,500.00 | 43.3750 | 108,438.00 | 112.000 | 280,000.00 | (171,562.00) |
| MICROTUNE INC CMN (TUNE) | Aug 04 00 | 217 | 250.00 | 16.5625 | 4,141.00 | 18.000 | 4,500.00 | 141.00 |
| MILLENNIUM PHARMACEUTICALS INC (MLNM) | Mar 28 00 | 85 | 4,000.00 | 61.8750 | 247,500.00 | 36.271 | 145,084.40 | 102,415.60 |
| NET2000 COMMUNICATIONS INC CMN (NTKX) | Mar 09 00 | 66 | 1,000.00 | 1.7188 | 1,719.00 | 20.000 | 20,000.00 | (18,281.00) |



CONFIDENTIAL

GSKG 000354

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

# TAX LOTS

## EQUITIES

### COMMON STOCKS (Continued)

| | Date Acquired or Sold Short | Holding Period | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|---|
| NETRO CORPORATION (NTRO) | Mar 17 00 | 77 | 500.00 | 6.9375 | 3,469.00 | 82.50 | 41,250.00 | (37,781.00) |
| NETWORK PLUS CORP COMMON STOCK (NPL8) | Apr 06 00 | 97 | 1,000.00 | 2.5000 | 2,500.00 | 29.000 | 29,000.00 | (26,500.00) |
| NEXTEL PARTNERS INC CMN CLASS A (NXTP) | Feb 22 00 | 54 | 1,000.00 | 16.8125 | 16,813.00 | 20.000 | 20,000.00 | (3,187.00) |
| NIKU CORP CMN (NIKU) | Feb 28 00 | 60 | 250.00 | 7.3125 | 1,828.00 | 24.000 | 6,000.00 | (4,172.00) |
| | May 22 00 | 143 | 1,000.00 | 7.3125 | 7,313.00 | 18.500 | 18,500.00 | (11,187.00) |
| | Sep 06 00 | 250 | 1,500.00 | 7.3125 | 10,969.00 | 22.125 | 33,187.50 | (22,218.50) |
| Position Total | | | 2,750.00 | | 20,110.00 | | 57,687.50 | (37,577.50) |
| NIPPON TELEG & TEL SPON ADR SPONSORED ADR CMN (1 ADR = 0200 COMMON SHS) (NTT) | Oct 23 00 | 297 | 1,000.00 | 35.6875 | 35,688.00 | 43.890 | 43,890.00 | (8,202.00) |
| NORTEL NETWORKS CORP CMN (NT) | Sep 08 00 | 252 | 1,000.00 | 32.0625 | 32,063.00 | 74.130 | 74,130.26 | (42,067.26) |
| ORACLE CORPORATION (ORCL) | Nov 29 99 | LT | 6,000.00 | 29.0625 | 174,375.00 | 18.625 | 111,750.00 | 62,625.00 |
| ORGANIC, INC CMN (OGNC) | Feb 09 00 | 41 | 500.00 | 0.8125 | 406.00 | 20.000 | 10,000.00 | (9,594.00) |
| PALM INC, CMN (PALM) | Dec 15 99 | LT | 4,449.58 | 28.3125 | 125,979.00 | 27.443 | 122,108.44 | 3,870.56 |
| | Mar 01 00 | 61 | 500.00 | 28.3125 | 14,156.00 | 38.000 | 19,000.00 | (4,844.00) |
| | Mar 24 00 | 84 | 2,966.42 | 28.3125 | 83,987.00 | 36.478 | 108,203.75 | (24,216.75) |
| Position Total | | | 7,916.00 | | 224,122.00 | | 249,312.19 | (25,190.19) |
| PARAMETRIC TECHNOLOGY CORP (PMTC) | Dec 30 99 | LT | 3,000.00 | 13.4375 | 40,313.00 | 29.188 | 87,562.50 | (47,249.50) |
| PETROCHINA CO LTD SPONSORED ADR (PTR) | Mar 30 00 | 90 | 3,000.00 | 16.5625 | 49,688.00 | 16.440 | 49,320.00 | 368.00 |
| ROYAL KPN N.V. SP ADR (KPN) | Nov 20 00 | 325 | 1,000.00 | 11.1250 | 11,125.00 | 14.480 | 14,480.00 | (3,355.00) |
| SANTA FE INTERNATIONAL CORP ORDINARY SHARES (SDC) | Jun 27 00 | 179 | 1,000.00 | 32.0625 | 32,063.00 | 34.500 | 34,500.00 | (2,437.00) |
| SONERA CORPORATION ADS (1 ADS = 1 ORD) (SNRA) | Oct 12 99 | LT | 2,000.00 | 17.3750 | 34,750.00 | 25.597 | 51,194.00 | (16,444.00) |

CONFIDENTIAL

GSKG 000355

**TAX LOTS**

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001–10030–⌐
Account Name: KATHERINE A. GRIFFIN

## EQUITIES

### COMMON STOCKS (Continued)

| | Date Acquired or Sold Short | Holding Period | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|---|
| SOUTHERN ENERGY INC. CMN (SOE) | Sep 28 00 | 270 | 250.00 | 28.3125 | 7,078.00 | 22.000 | 5,500.00 | 1,578.00 |
| STORAGENETWORKS INC. CMN (STOR) | Nov 20 00 | 325 | 1,000.00 | 24.8125 | 24,813.00 | 34.000 | 34,000.00 | (9,187.00) |
| THE GOLDMAN SACHS GROUP, INC. CMN (GS) | Aug 01 00 | 214 | 100.00 | 106.9375 | 10,694.00 | 99.750 | 9,975.00 | 719.00 |
| TYCOM LTD. CMN (TCM) | Jul 26 00 | 208 | 1,000.00 | 22.3750 | 22,375.00 | 32.000 | 32,000.00 | (9,625.00) |
| UNIVERSAL ACCESS INC CMN (UAXS) | Mar 16 00 | 76 | 500.00 | 8.0000 | 4,000.00 | 14.000 | 7,000.00 | (3,000.00) |
| WORLDCOM INC CMN (WCOM) | Sep 30 99 | LT | 2,250.00 | 14.0625 | 31,641.00 | 48.000 | 108,000.00 | (76,359.00) |
| TOTAL COMMON STOCKS | | | | | 2,039,175.00 | | 2,800,707.96 | (761,532.96) |

### OTHER

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EL PASO ENERGY PARTNERS LTD PARTNERSHIP (EPN) | Jul 24 00 | 206 | 1,000.00 | 27.4375 | 27,438.00 | 23.000 | 23,000.00 | 4,438.00 |
| TOTAL OTHER | | | | | 27,438.00 | | 23,000.00 | 4,438.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TOTAL PORTFOLIO | | | | | 2,066,613.00 | | 2,823,707.96 | (757,094.96) |

CONFIDENTIAL

GSKG 000356

Period Covering:
**Dec 1 00 to Dec 31 00**

Account Number: Account Name:
**001-10030-4    KATHERINE A. GRIFFIN**

# REALIZED GAINS AND LOSSES

## YEAR TO DATE GAINS AND LOSSES

| | Date Acquired or Sold Short | Date Sold or Covered | Quantity | Sale Proceeds | Cost Basis | FX Gain (Loss) | Total Gain (Loss) | Holding Period |
|---|---|---|---|---|---|---|---|---|
| YAHOO! INC. CMN | Oct 12 99 | Jan 19 00 | 500.00 | 179,737.75 | 87,875.00 | 0.00 | 91,862.75 | ST |
| INTERNATIONAL HOME FOODS INC CMN | Dec 16 99 | Mar 24 00 | 2,000.00 | 27,719.06 | 30,000.00 | 0.00 | (2,280.94) | ST |
| TELLABS INC. | Feb 24 00 | Apr 06 00 | 5,000.00 | 277,490.75 | 251,250.00 | 0.00 | 26,240.75 | ST |
| NEUBERGER BERMAN INC | Oct 22 99 | May 16 00 | 5,000.00 | 175,657.20 | 121,265.40 | 0.00 | 54,391.80 | ST |
| ESTEE LAUDER COS INC CLA CMN CLASS A | Aug 30 99 | Jun 05 00 | 900.00 | 41,597.15 | 40,960.44 | 0.00 | 636.71 | ST |
| KONINKLIKE AHOLD NV SPONSORED ADR NEW | May 15 00 | Jun 05 00 | 1,000.00 | 27,100.33 | 23,760.00 | 0.00 | 3,340.33 | ST |
| LEVEL 3 COMMUNICATIONS INC CMN | Feb 23 00 | Jun 05 00 | 1,000.00 | 85,184.66 | 107,875.00 | 0.00 | (22,690.34) | ST |
| COR THERAPEUTICS INC CMN | Apr 10 00 | Jun 08 00 | 2,500.00 | 197,580.91 | 196,843.75 | 0.00 | 737.16 | ST |
| ALLSCRIPTS, INC. | Mar 06 00 | Jun 16 00 | 500.00 | 14,374.52 | 36,500.00 | 0.00 | (22,125.48) | ST |
| DYNEGY INC NEW CMN CLASS A | Apr 18 00 | Jun 16 00 | 2,000.00 | 155,919.75 | 110,000.00 | 0.00 | 45,919.75 | ST |
| ELECTRONIC DATA SYSTEMS CORP | Feb 17 00 | Jun 16 00 | 1,000.00 | 38,794.31 | 69,687.50 | 0.00 | (30,893.19) | ST |
| KINDER MORGAN ENERGY PARTNERS L.P. UNITS REP L.P. INTS | Mar 28 00 | Jun 16 00 | 2,000.00 | 77,712.38 | 79,500.00 | 0.00 | (1,787.62) | ST |
| PACKAGING CORP OF AMERICA COMMON STOCK | Jan 27 00 | Jun 16 00 | 3,000.00 | 31,740.80 | 36,000.00 | 0.00 | (4,259.20) | ST |
| TIBCO SOFTWARE INC. | Mar 21 00 | Jun 16 00 | 2,000.00 | 156,369.78 | 212,000.00 | 0.00 | (55,630.22) | ST |
| TAIWAN SEMICONDUCTOR MFG LTD ADS (1 ADS=5 ORDS) NON CONVERTIBLE | Jun 01 00 | Jul 28 00 | 1,000.00 | 27,936.56 | 35,750.00 | 0.00 | (7,813.44) | ST |
| DOLLAR TREE STORES INC | Aug 02 00 | Aug 08 00 | 1,000.00 | 40,311.15 | 40,000.00 | 0.00 | 311.15 | ST |

Page 15 of 23

CONFIDENTIAL

GSKG 000357

| Period Covering: | Account Number: | Account Name: |
|---|---|---|
| Dec 1 00 to Dec 31 00 | 001-10030-4 | KATHERINE A. GRIFFIN |

# REALIZED GAINS AND LOSSES

## YEAR TO DATE GAINS AND LOSSES

| | Date Acquired or Sold Short | Date Sold or Covered | Quantity | Sale Proceeds | Cost Basis | FX (Gain/Loss) | Total Gain (Loss) | Holding Period |
|---|---|---|---|---|---|---|---|---|
| YAHOO! INC. CMN | Oct 12 99 | Sep 07 00 | 1,000.00 | 105,746.47 | 87,875.00 | 0.00 | 17,871.47 | ST |
| ADELPHIA COMMUNICATIONS CP CLA CMN CLASS A | Oct 01 99 | Sep 08 00 | 1,000.00 | 31,186.46 | 57,000.00 | 0.00 | (25,813.54) | ST |
| ATMI INC | Mar 29 00 | Sep 08 00 | 1,000.00 | 25,374.15 | 45,000.00 | 0.00 | (19,625.85) | ST |
| ENTRUST TECHNOLOGIES | Feb 23 00 | Sep 08 00 | 1,000.00 | 26,999.10 | 82,000.00 | 0.00 | (55,000.90) | ST |
| GIGAMEDIA LIMITED. ORD CMN | Feb 17 00 | Sep 08 00 | 500.00 | 5,156.07 | 13,500.00 | 0.00 | (8,343.93) | ST |
| INFINEON TECHNOLOGIES AG ADR SPONSORED ADR CMN 1 ADR = 1 SHARE | Mar 13 00 | Sep 08 00 | 500.00 | 29,265.88 | 16,960.00 | 0.00 | 12,305.88 | ST |
| ORACLE CORPORATION | Nov 29 90 | Sep 08 00 | 2,000.00 | 174,244.19 | 74,500.00 | 0.00 | 99,744.19 | ST |
| TELIGENT, INC. COMMON STOCK CLASS A | Apr 03 00 | Sep 08 00 | 1,000.00 | 14,937.00 | 50,000.00 | 0.00 | (35,063.00) | ST |
| ASK JEEVES INC | Mar 13 00 | Dec 06 00 | 250.00 | 2,953.03 | 19,000.00 | 0.00 | (16,046.97) | ST |
| AXCELIS TECHNOLOGIES, INC. CMN | Jul 10 00 | Dec 06 00 | 1,000.00 | 7,343.55 | 22,000.00 | 0.00 | (14,656.45) | ST |

CONFIDENTIAL

GSKG 000358

# REALIZED GAINS AND LOSSES

Period Covering:
Dec 1 00 to Dec 31 00

Account Number:
001-10030-4

Account Name:
KATHERINE A. GRIFFIN

## YEAR TO DATE GAINS AND LOSSES

| | Date Acquired or Sold Short | Date Sold or Covered | Quantity | Sale Proceeds | Cost Basis | FX Gain (Loss) | Total Gain (Loss) | Holding Period |
|---|---|---|---|---|---|---|---|---|
| **SHORT TERM GAINS** | | | | 1,404,651.53 | 1,051,289.59 | | 353,361.94 | |
| **SHORT TERM LOSSES** | | | | 573,781.43 | 895,812.50 | | (322,031.07) | |
| **NET SHORT TERM GAINS (LOSSES)** | | | | 1,978,432.96 | 1,947,102.09 | 0.00 | 31,330.87 | |



Page 17 of 23

CONFIDENTIAL

INCOME AND EXPENSES

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001–10030–4

Account Name: KATHERINE A. GRIFFIN

## YEAR TO DATE DIVIDENDS RECEIVED

| | Pay Date | Ex.Date | Type | Dividend Rate | Quantity | Amount | In Settlement Currency Received at Goldman Sachs | Foreign Tax Withheld |
|---|---|---|---|---|---|---|---|---|
| **US DOLLARS** | | | | | | | | |
| CORNING INCORPORATED | Dec 29 00 | Dec 14 00 | CASH | 0.060000 | 1,000.00000 | 60.00 | 60.00 | |
| DYNEGY INC NEW CMN CLASS A | Jun 15 00 | May 26 00 | CASH | 0.150000 | 2,000.00000 | 300.00 | 300.00 | |
| EL PASO ENERGY PARTNERS LTD PARTNERSHIP | Aug 15 00 | Jul 27 00 | CASH | 0.537500 | 1,000.00000 | 537.50 | 537.50 | |
| | Nov 15 00 | Oct 27 00 | CASH | 0.550000 | 1,000.00000 | 550.00 | 550.00 | |
| Security Total | | | | | | 1,087.50 | 1,087.50 | |
| ELECTRONIC DATA SYSTEMS CORP | Jun 12 00 | May 11 00 | CASH | 0.150000 | 1,000.00000 | 150.00 | 150.00 | |
| ELI LILLY & CO CMN | Mar 10 00 | Feb 11 00 | CASH | 0.260000 | 1,000.00000 | 260.00 | 260.00 | |
| | Jun 09 00 | May 11 00 | CASH | 0.260000 | 1,000.00000 | 260.00 | 260.00 | |
| | Sep 11 00 | Aug 11 00 | CASH | 0.260000 | 1,000.00000 | 260.00 | 260.00 | |
| | Dec 11 00 | Nov 13 00 | CASH | 0.260000 | 1,000.00000 | 260.00 | 260.00 | |
| Security Total | | | | | | 1,040.00 | 1,040.00 | |
| ESTEE LAUDER COS INC CL A CMN CLASS A | Jan 07 00 | Dec 14 99 | CASH | 0.050000 | 900.00000 | 45.00 | 45.00 | |
| | Apr 04 00 | Mar 14 00 | CASH | 0.050000 | 900.00000 | 45.00 | 45.00 | |
| Security Total | | | | | | 90.00 | 90.00 | |
| FEDERAL PORTFOLIO INSTITUTIONAL LIQ ASSET | Jan 03 00 | Dec 31 99 | REIN | | | 6,164.91 | 6,164.91 | |
| | Feb 01 00 | Jan 31 00 | REIN | | | 6,760.09 | 6,760.09 | |
| | Mar 01 00 | Feb 29 00 | REIN | | | 6,791.24 | 6,791.24 | |
| | Apr 03 00 | Mar 31 00 | REIN | | | 4,152.44 | 4,152.44 | |
| | May 01 00 | Apr 30 00 | REIN | | | 2.54 | 2.54 | |
| | Jul 03 00 | Jun 30 00 | REIN | | | 502.76 | 502.76 | |
| | Aug 01 00 | Jul 31 00 | REIN | | | 67.14 | 67.14 | |
| | Sep 01 00 | Aug 31 00 | REIN | | | 0.02 | 0.02 | |
| | Oct 02 00 | Sep 30 00 | REIN | | | 14.43 | 14.43 | |
| Security Total | | | | | | 24,475.57 | 24,475.57 | |
| GENERAL DYNAMICS CORP. | Nov 10 00 | Oct 04 00 | CASH | 0.260000 | 1,000.00000 | 260.00 | 260.00 | |
| INTEL CORP CMN | Mar 01 00 | Feb 03 00 | CASH | 0.030000 | 2,500.00000 | 75.00 | 75.00 | |
| | Jun 01 00 | May 03 00 | CASH | 0.030000 | 2,500.00000 | 75.00 | 75.00 | |
| | Sep 01 00 | Aug 03 00 | CASH | 0.020000 | 5,000.00000 | 100.00 | 100.00 | |

Page 18 of 23

CONFIDENTIAL

GSKG  000360

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

# INCOME AND EXPENSES

## YEAR TO DATE DIVIDENDS RECEIVED

| Security | Pay Date | Ex.Date | Type | Dividend Rate | Quantity | Amount | In Settlement Currency Received at Goldman Sachs | Foreign Tax Withheld |
|---|---|---|---|---|---|---|---|---|
| **US DOLLARS** | | | | | | | | |
| | Dec 01 00 | Nov 03 00 | CASH | 0.020000 | 5,000.0000 | 100.00 | 100.00 | |
| **Security Total** | | | | | | 350.00 | 350.00 | |
| KINDER MORGAN ENERGY PARTNERS L.P. UNITS REP L.P. INTS | May 15 00 | Apr 27 00 | CASH | 0.775000 | 2,000.0000 | 1,550.00 | 1,550.00 | |
| METLIFE INC CMN | Dec 15 00 | Nov 03 00 | CASH | 0.200000 | 2,000.0000 | 400.00 | 400.00 | |
| NEUBERGER BERMAN INC | Jan 25 00 | Jan 07 00 | CASH | 0.100000 | 5,000.0000 | 500.00 | 500.00 | |
| | May 16 00 | Apr 28 00 | CASH | 0.100000 | 5,000.0000 | 500.00 | 500.00 | |
| **Security Total** | | | | | | 1,000.00 | 1,000.00 | |
| NORTEL NETWORKS CORP CMN | Dec 29 00 | Nov 30 00 | CASH | 0.018750 | 1,000.0000 | 18.75 | 15.94 | 2.81 |
| PETROCHINA CO LTD SPONSORED ADR | Oct 16 00 | Sep 15 00 | CASH | 0.712800 | 3,000.0000 | 2,138.40 | 2,138.40 | |
| SANTA FE INTERNATIONAL CORP ORDINARY SHARES | Oct 16 00 | Sep 27 00 | CASH | 0.032500 | 1,000.0000 | 32.50 | 32.50 | |
| SONERA CORPORATION ADS (1 ADS = 1ORD) | Apr 10 00 | Mar 23 00 | CASH | 0.114145 | 2,000.0000 | 228.29 | 174.05 | 54.24 |
| THE GOLDMAN SACHS GROUP, INC. CMN | Nov 20 00 | Oct 19 00 | CASH | 0.120000 | 100.0000 | 12.00 | 12.00 | |
| **TOTAL US DOLLARS** | | | | | | 33,193.01 | 33,135.96 | 57.05 |

CONFIDENTIAL

GSKG 000361

Period Covering:
Dec 1 00 to Dec 31 00

Account Number:    Account Name:
001-10030-4    KATHERINE A. GRIFFIN

# INCOME AND EXPENSES

## YEAR TO DATE MISCELLANEOUS INCOME AND EXPENSES

| | Date | Transaction Type | In Settlement Currency | |
| --- | --- | --- | --- | --- |
| | | | Quantity | Amount |
| OTHER EXPENSES<br>ANNUAL CUSTODY FEE | Jan 19 00 | OTHER EXPENSE | | (1,000.00) |
| INTEREST ON CREDIT BALANCE<br>INTEREST PAID | Jan 31 00 | CR BAL INT | | 1.62 |
| INTEREST ON CREDIT BALANCE<br>INTEREST PAID | Apr 28 00 | CR BAL INT | | 0.53 |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Apr 28 00 | DB BAL INT | | (1,370.61) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | May 31 00 | DB BAL INT | | (2,819.44) |
| INTEREST ON CREDIT BALANCE<br>INTEREST PAID | Jun 30 00 | CR BAL INT | | 71.21 |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Jun 30 00 | DB BAL INT | | (614.49) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Jul 31 00 | DB BAL INT | | (51.09) |
| IN LIEU OF FRACTION (INCOME)<br>695642107<br>PALM INC.<br>CMN | Aug 10 00 | FRACTION INC | | 1.54 |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Aug 31 00 | DB BAL INT | | (1,150.18) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Sep 29 00 | DB BAL INT | | (965.46) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Oct 31 00 | DB BAL INT | | (879.58) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Nov 30 00 | DB BAL INT | | (1,857.27) |
| INTEREST ON DEBIT BALANCE<br>INTEREST CHARGED | Dec 29 00 | DB BAL INT | | (2,382.68) |

Page 20 of 23

CONFIDENTIAL

GSKG 000362

Period Covering:
Dec 1 00 to Dec 31 00

Account Number: 001-10030-4

Account Name: KATHERINE A. GRIFFIN

## INCOME AND EXPENSES

| Date | Transaction Type | In Settlement Currency | |
|---|---|---|---|
| | | Quantity | Amount |

### YEAR TO DATE MISCELLANEOUS INCOME AND EXPENSES

| | | | |
|---|---|---|---|
| TOTAL INCOME | | | 74.90 |
| TOTAL EXPENSE | | | (13,090.80) |
| NET YEAR TO DATE MISCELLANEOUS INCOME / EXPENSE | | | (13,015.90) |

CONFIDENTIAL

GSKG 000363

**Period Covering:**
Dec 1 00 to Dec 31 00

**Account Number:** 001-10030-4    **Account Name:** KATHERINE A. GRIFFIN

# DEPOSITS AND WITHDRAWALS

## YEAR TO DATE DEPOSITS AND WITHDRAWALS

| | Date | Process Date | Transaction Type | Fair Market Value | Quantity | Deposit | Withdrawals |
|---|---|---|---|---|---|---|---|
| **US DOLLARS (USD)** | | | | | | *In Settlement Currency* | |
| REACAT TFR CRD CASH BAL FROM BEAR STEARNS SECURITIES | Jan 03 00 | | CASH DEPOSIT | | | 9,199.90 | |
| FUNDS RECEIVED AT CHASE FED FUNDS | Jan 19 00 | | CASH DEPOSIT | | | 624.18 | |
| REACAT TFR CRD CASH BAL FROM BEAR STEARNS SECURITIES | Jan 25 00 | | CASH DEPOSIT | | | 6.90 | |
| CRR BK AMERICA CK#20058884 | Mar 27 00 | | CASH DEPOSIT | | | 1,656.66 | |
| CRR UNION BK CA CK#25269 | May 25 00 | | CASH DEPOSIT | | | 1,050.00 | |
| CRR BK OF AMERICA CK#2067092 | May 25 00 | | CASH DEPOSIT | | | 1,716.88 | |
| CITIBANK FEDERAL SAVINGS BANK 82019969 | Jun 27 00 | | CASH WITHDRAWAL | | | | (440,000.00) |
| **TOTAL US DOLLARS** | | | | | | 14,255.52 | (440,000.00) |

## TOTAL DEPOSITS AND WITHDRAWALS

| | Date | Process Date | Transaction Type | Fair Market Value | Quantity | Deposit | Withdrawals |
|---|---|---|---|---|---|---|---|
| | | | | | | *In Settlement Currency* | |
| MTD TOTAL CASH | | | | | | 0.00 | 0.00 |
| MTD TOTAL SECURITY | | | | | | 0.00 | 0.00 |
| **MONTH TO DATE TOTALS** | | | | | | 0.00 | 0.00 |
| YTD TOTAL CASH | | | | | | 14,255.52 | (440,000.00) |
| YTD TOTAL SECURITY | | | | | | 0.00 | 0.00 |
| **YEAR TO DATE TOTALS** | | | | | | 14,255.52 | (440,000.00) |

*Page 22 of 23*



**CONFIDENTIAL**

GSKG 000364

Period Covering:
Dec 1 00 to Dec 31 00

Account Number:
001-10030-4

# REPORT DESCRIPTIONS AND DISCLOSURES

## REPORT DESCRIPTIONS

**GENERAL INFORMATION**
Your statements contain specific account information and special messages are included in this report. Specific account information includes the base currency of your account and a list of other recipients (if any) of your statement.

**SUMMARY**
The Summary report includes a graphic representation of the account's asset allocation, categorized in the account value from the previous statement and of an income tax summary of transactions presented in a format analogous to IRS Form 1099. In addition, this section includes a year to date summary of net realized capital gains and losses as well as unrealized capital gains and losses in your portfolio.

### IF YOUR STATEMENT IS NOT CORRECT
If your statement is not correct, please notify us immediately. It should be retained for your future reference.

**ACCOUNT TYPES**
00. Non Interest          03. Dividend/Interest Income          07. Short
01. Cash                  04/05. Other                          08. Repurchase Agreement
02. Principal             06. General Margin                    09. Other

For your convenience, the short account (type 07) has been segregated from other account types throughout this statement.

This statement contains information regarding your Goldman, Sachs & Co. ('GS') holdings and/or certain of your other funds held away from GS. Information concerning GSAM funds and other funds, including money market funds, held away from GS have been supplied by the funds transfer agent and is furnished for your convenience, and GS makes no representation concerning the accuracy of this information. See the relevant prospectus or offering materials for details regarding the operation of these funds. Positions which are not held in the possession of GS are not covered by SIPC insurance applicable to GS holdings, nor by other insurance provided by private sources on behalf of customers of GS.

**PRICING**
Prices, some of which are provided by pricing services, are not guaranteed for accuracy, or as realizable values. Prices derived from sources available upon request. Valuations for certain private GS and GSAM funds are based on reported asset values and may not reflect possible secondary market values. Please refer to the relevant offering documents for additional information.

**SECURITY INTEREST** (for accounts with this relationship only) This also constitutes confirmation to you and, if applicable, ARGN (the entity/of the security interest of ARGN in the securities referred to herein. Such security interest has been recorded on our books and records.

**WHEN-ISSUED TRANSACTIONS**
Any transactions in when issued securities are displayed in the Activity report.

**HOLDINGS**
The Holdings section of your report details your holdings by asset class beginning with cash and cash equivalents, and then, when appropriate, your fixed income, equity, convertible securities, commodities and other holdings.

**TAX LOTS**
This report details specific tax lots comprising your investments including the date of purchase and cost basis, to enable you to incorporate the aging of your investments into your asset management decisions. The information in this section is arranged by asset class, and segregated within each asset class alphabetically and then chronologically. The information contained in this report may come from sources other than GS, and, accordingly, we cannot represent that such information is accurate or complete.

**ACTIVITY**
All activity during the relevant period is detailed in the Activity report. Transactions are listed chronologically by type beginning with securities purchased and sold, then currencies. Cash deposits and withdrawals, securities deposits and withdrawals, interest received/paid, dividends received/paid, fees and other debits and credits

**RATINGS**
The NASD rule based upon current information which may be changed, suspended or withdrawn by the rating agencies due to changes in, or unavailability of, financial information. Although we have obtained the ratings from agencies considered reliable, we do not guarantee the accuracy or currency of the ratings. The information provided by the agencies does not indicate that an issuer is on the agency's watch list or other similar list.

An independent verification of the accuracy and the summary of the ratings should be made in connection with investment decisions. The description of methodology employed in assigning ratings may be found in the rating agencies' manuals.

**ESTIMATED ANNUAL INCOME**
Your estimated annual income is derived from information provided by standard statistical sources. We cannot guarantee the accuracy of such information. Since the interest and dividend rates are subject to change at any time, they should not be relied upon exclusively for making investment decisions.

**RIGHTS CONNECTED WITH MARGINED SECURITIES**
When you pledge your own current information which may be changed, suspended acting as collateral in that account may be used, lent or pledged by GS in accordance with SEC rules. When this happens, certain rights of your ownership related to such securities may be transferred to GS or transferred by us to others. In certain circumstances, such pledges may limit, in whole or in part, your ability to exercise voting rights with respect to such securities, and you may be offered the right to vote fewer shares than you own.
Where you have multiple accounts with the firm, compliance with margin requirements will be computed on the basis of your combined margin transactions and collateral on deposit with the firm as required by applicable regulation.

**FEE BASED INVESTMENT ADVISORY ACCOUNTS**
Please be advised that you may terminate at any time by written notice to GS the authorization to seek your consent for the investment management fee; your failure to so advise will constitute a continuation of your authorization.

**REALIZED GAINS AND LOSSES**
Capital gains and losses are realized in your account since the beginning of the calendar year are presented chronologically and are identified as short or long term capital gains. The information contained in this report may come from sources other than GS and, accordingly, we cannot represent that such information is accurate or complete.

**INCOME AND EXPENSE**
The Income and Expense report details by currency dividends, interest and miscellaneous income and expenses received/paid for the year. The information contained in this report may come from sources other than GS and, accordingly, we cannot represent that such information is accurate or complete.

**DEPOSITS AND WITHDRAWALS**
The Deposits and Withdrawals report details all cash deposits/withdrawn and securities received/delivered for the year. The information contained in this report may come from sources other than GS and, accordingly, we cannot represent that such information is accurate or complete.

**NASD RULE 2280 NOTIFICATION**
The NASD maintains a toll free hotline program toll free hotline number is 1 800 289 9999 and their web site address is http://www.nasdr.com/. An investor brochure describing the public disclosure is available via the hotline number or the web site above.

**MISCELLANEOUS**
This is a combined statement of your general account and of a special memorandum account maintained for you under section 220.5 of Regulation T issued by the Federal Reserve Board of the United States of America. The permanent record of the separate account as required by regulation T is available for your inspection upon request.
All statements will be rendered on a "trade date basis". Trades not made but settled in the current period will be listed in the Securities Purchased and Sold section of the Activity report and will already be included in the trade date basis.

A financial statement of this organization is available for your personal inspection at its offices, or a copy of it will be mailed upon your request. Any two credit balance reflected in your account when you satisfy which, although properly accounted for on our books of record, are not segregated and may be used in the conduct of business. The understanding of GS is that credit balances held in your account are payable to you upon demand although properly accounted (net of any debits) are changes to your financial situation or your investment objectives change.

**TRANSACTION CHARGES**
Further information on commissions and other charges on options and other transactions is included in confirmations previously furnished to you. Upon request, this information will be promptly made available to you.

**INSURANCE COVERAGE**
For Goldman, Sachs & Co. securities brokerage customer accounts, the firm provides insurance to seek your consent for both securities (net of any debits) and cash, which fully protects clients against insolvency by Goldman, Sachs & Co.

## DISCLOSURES

CONFIDENTIAL

GSKG 000365

*Period Covering:*
*Jan 1 01 to Jan 31 01*

*Account Number:*
*001-10030-4*

*Statement of Account for:*

# KATHERINE A. GRIFFIN
# LIVING TR. U/A DTD. 12/2/94
# KATHERINE A. GRIFFIN, TTEE.

*Your Goldman Sachs team:*

Sofia Frankel
PCS Professional

Goldman, Sachs & Co.
One New York Plaza
New York, NY 10004
212-357-1287

Josephine Linden, Regional Manager

www.gs.com

KATHERINE A. GRIFFIN
LIVING TR. U/A DTD. 12/2/94
KATHERINE A. GRIFFIN, TTEE.
11601 SPRINGRIDGE RD
POTOMAC MD 20854

**CONFIDENTIAL**

GSKG 000366

**Period Covering:**
Jan 1 01 to Jan 31 01

**Account Number:**
001-10030-4

**Account Name:**
KATHERINE A. GRIFFIN

# SUMMARY

## ACCOUNT INFORMATION

| ACCOUNT NUMBER | BASE CURRENCY | MANDATE |
|---|---|---|
| 001-10030-4 | US DOLLARS | |

## ASSET ALLOCATION

| | Percentage of Portfolio | Market Value |
|---|---|---|
| CASH AND CASH EQUIVALENTS | 100.00 | 416.72 |
| TOTAL | 100.00 | 416.72 |

## TAX SUMMARY

| | Current Month | Year to Date |
|---|---|---|
| **REPORTABLE INCOME** | | |
| DIVIDENDS | 32.50 | 32.50 |
| INTEREST EARNED ON CREDIT BALANCE | 2.97 | 2.97 |
| **NON-REPORTABLE INCOME** | | |
| INTEREST CHARGED ON DEBIT BALANCE | (1,684.96) | (1,684.96) |

## CHANGES IN ACCOUNT VALUE

| | Market Value |
|---|---|
| MARKET VALUE AS OF Jan 01 01 | 1,705,969.19 |
| CASH DEPOSITS | 383,165.29 |
| CASH WITHDRAWALS | (32.50) |
| SECURITIES WITHDRAWALS | (2,224,315.25) |
| INTEREST RECEIVED | 2.97 |
| INTEREST CHARGED | (1,684.96) |
| DIVIDENDS RECEIVED | 32.50 |
| CHANGE IN MARKET VALUE | 137,879.48 |
| MARKET VALUE AS OF Jan 31 01 | 416.72 |

Page 2 of 10

4 Additional copies of this statement have been distributed. Please contact your account representative for details

The summary information in this statement may include assets not held by Goldman Sachs.

CONFIDENTIAL

GSKG 000367

Period Covering:
Jan 1 01 to Jan 31 01

Account Number:
001–10030–4

Account Name:
KATHERINE A. GRIFFIN

# HOLDINGS

## CASH AND CASH EQUIVALENTS

| | Quantity | Market Price | Market Value | Estimated Annual Income | Account Type |
|---|---|---|---|---|---|
| **CASH BALANCE** | | | | | |
| US DOLLARS | 416.72 | | 416.72 | | |
| TOTAL CASH BALANCE | | | 416.72 | | |
| | | | | | |
| **TOTAL CASH AND CASH EQUIVALENTS** | | | 416.72 | | |

## SUMMARY OF HOLDINGS

| | Market Value | Market Value | Percentage of Portfolio | Estimated Annual Income |
|---|---|---|---|---|
| TOTAL CASH AND CASH EQUIVALENTS | 416.72 | 416.72 | 100.00 | |
| TOTAL ACCOUNT | 416.72 | 416.72 | 100.00 | |

Page 3 of 10

CONFIDENTIAL

GSKG 000368

Period Covering: Jan 1 01 to Jan 31 01
Account Number: 001-10030-4
Account Name: KATHERINE A. GRIFFIN

# ACTIVITY

## CASH DEPOSITS

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| REACAT TFR DEB CASH BAL TO LEHMAN BROTHERS, INC. | Jan 18 01 | | 363,165.29 | 06 |
| TOTAL CASH DEPOSITS | | | 363,165.29 | |

## CASH WITHDRAWALS

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| REACAT TFR CRD CASH BAL TO LEHMAN BROTHERS, INC. | Jan 24 01 | | (32.50) | 02 |
| TOTAL CASH WITHDRAWALS | | | (32.50) | |

## SECURITIES WITHDRAWALS

| | Effective Date | Quantity | Price | Value | Account Type |
|---|---|---|---|---|---|
| 3COM CORP REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (5,000.00) | 10.750 | (53,750.00) | 06 |
| AMAZON.COM INC CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,000.00) | 17.31250 | (34,625.00) | 06 |
| AT HOME CORP SER A CMN CLASS A REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 6.50 | (6,500.00) | 06 |
| AT&T WIRELESS GROUP CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,000.00) | 25.970 | (51,940.00) | 06 |
| BOOKHAM TECHNOLOGY PLC SPONSORED ADR REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 15.43750 | (15,437.50) | 06 |
| CAPSTONE TURBINE CORP CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 41.0 | (20,500.00) | 06 |
| CHARTER COMMUNICATIONS, INC COMMON STOCK CLASS A REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (3,000.00) | 22.625 | (67,875.00) | 06 |

CONFIDENTIAL

GSKG 000369

**ACTIVITY**

Period Covering:
Jan 1 01 to Jan 31 01

Account Number: 001–10030–4    Account Name: KATHERINE A. GRIFFIN

## SECURITIES WITHDRAWALS

| | Effective Date | Quantity | Price | Value | Account Type |
|---|---|---|---|---|---|
| CHINA MOBILE HONG KONG LTD SPONSORED ADR CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 31.860 | (31,860.00) | 06 |
| CISCO SYSTEMS, INC. CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 37.43750 | (37,437.50) | 06 |
| COMMERCE ONE CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 30.56250 | (30,562.50) | 06 |
| COMMUNITY HEALTH SYS INC CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 25.060 | (25,060.00) | 06 |
| CORIO INC CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (400.00) | 3.890625 | (1,556.25) | 06 |
| CORNING INCORPORATED REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 56.710 | (56,710.00) | 06 |
| COSINE COMMUNICATIONS INC CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (200.00) | 16.50 | (3,300.00) | 06 |
| ECHOSTAR COMMUNICATIONS CORP CL A CLASS A REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,500.00) | 30.87500 | (77,187.50) | 06 |
| EL PASO ENERGY PARTNERS LTD PARTNERSHIP REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 29.140 | (29,140.00) | 06 |
| ELI LILLY & CO CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 78.80 | (78,800.00) | 06 |
| EQUINIX, INC. CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 5.93750 | (5,937.50) | 06 |
| EXPEDIA INC COMMON STOCK REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 17.8750 | (8,937.50) | 06 |
| GENERAL DYNAMICS CORP. REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 70.860 | (70,860.00) | 06 |
| GLOBAL CROSSING LTD CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 22.020 | (22,020.00) | 06 |
| IMPSAT FIBER NETWORKS, INC. COMMON STOCK REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (200.00) | 8.56250 | (1,712.50) | 06 |
| INFOSPACE INC CMN REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (3,000.00) | 5.281250 | (15,843.75) | 06 |

Page 5 of 10

CONFIDENTIAL

GSKG 000370

Period Covering:
Jan 1 01 to Jan 31 01

Account Number:
001-10030-4

Account Name:
KATHERINE A. GRIFFIN

# ACTIVITY

## SECURITIES WITHDRAWALS

| | Effective Date | Quantity | Price | Value | Account Type |
|---|---|---|---|---|---|
| INTEL CORP CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (5,000.00) | 37.6 | (185,000.00) | 06 |
| MATRIXONE INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 35.1250 | (17,562.50) | 06 |
| METLIFE INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,000.00) | 32.820 | (65,640.00) | 06 |
| MICROSOFT CORP CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,500.00) | 61.06250 | (152,656.25) | 06 |
| MICROTUNE INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (250.00) | 13.8750 | (3,468.75) | 06 |
| MILLENNIUM PHARMACEUTICALS INC REACATS TRANSFER TO<br>LEHMAN BROTHERS, INC. | Jan 18 01 | (4,000.00) | 50.1250 | (200,500.00) | 06 |
| NET2000 COMMUNICATIONS INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 5.18750 | (5,187.50) | 06 |
| NETRO CORPORATION REACATS TRANSFER TO<br>LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 8.250 | (4,125.00) | 06 |
| NETWORK PLUS CORP COMMON STOCK<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 10.31250 | (10,312.50) | 06 |
| NEXTEL PARTNERS INC CMN CLASS A<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 20.750 | (20,750.00) | 06 |
| NIKU CORP CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,750.00) | 10.750 | (29,562.50) | 06 |
| NIPPON TELEG & TEL SPON ADR SPONSORED ADR CMN<br>(1 ADR = 1/200 COMMON SHS) REACATS TRANSFER TO<br>LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 35.010 | (35,010.00) | 06 |
| NORTEL NETWORKS CORP CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 38.230 | (38,230.00) | 06 |
| ORACLE CORPORATION REACATS TRANSFER TO<br>LEHMAN BROTHERS, INC. | Jan 18 01 | (6,000.00) | 29.1250 | (174,750.00) | 06 |
| ORGANIC INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 1.40625 | (703.12) | 06 |

CONFIDENTIAL

GSKG 000371

**ACTIVITY**

Period Covering:
Jan 1 01 to Jan 31 01

Account Number: 001–10030–4

Account Name: KATHERINE A. GRIFFIN

## SECURITIES WITHDRAWALS

| | Effective Date | Quantity | Price | Value | Account Type |
|---|---|---|---|---|---|
| PALM INC. CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (7,916.00) | 27.1250 | (214,721.50) | 06 |
| PARAMETRIC TECHNOLOGY CORP CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (3,000.00) | 14.8750 | (44,625.00) | 06 |
| PETROCHINA CO LTD SPONSORED ADR<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (3,000.00) | 17.45 | (52,350.00) | 06 |
| ROYAL KPN N.V. SP ADR REACATS TRANSFER TO<br>LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 16.510 | (16,510.00) | 06 |
| SANTA FE INTERNATIONAL CORP ORDINARY SHARES<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 33.90 | (33,900.00) | 06 |
| SONERA CORPORATION ADS (1 ADS = 1ORD)<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,000.00) | 20.4750 | (40,975.00) | 06 |
| SOUTHERN ENERGY INC. CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (250.00) | 24.30 | (6,075.00) | 01 |
| STORAGENETWORKS INC. CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 27.93750 | (27,937.50) | 06 |
| THE GOLDMAN SACHS GROUP, INC. CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (100.00) | 113.750 | (11,375.00) | 01 |
| TYCOM LTD. CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (1,000.00) | 28.30 | (28,300.00) | 06 |
| UNIVERSAL ACCESS INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (500.00) | 16.01 | (8,000.00) | 06 |
| WORLDCOM INC CMN<br>REACATS TRANSFER TO LEHMAN BROTHERS, INC. | Jan 18 01 | (2,250.00) | 21.56250 | (48,515.62) | 06 |

**TOTAL SECURITIES WITHDRAWALS** (2,224,315.25)

Page 7 of 10

CONFIDENTIAL

GSKG 000372

# ACTIVITY

Period Covering:
Jan 1 01 to Jan 31 01

Account Number: 001-10030-4
Account Name: KATHERINE A. GRIFFIN

## INTEREST RECEIVED

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| INTEREST PAID | | | | |
| | Jan 31 01 | | 2.97 | 06 |
| TOTAL INTEREST RECEIVED | | | 2.97 | |

## INTEREST CHARGED

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| INTEREST CHARGED | | | | |
| | Jan 31 01 | | (1,684.96) | 06 |
| TOTAL INTEREST CHARGED | | | (1,684.96) | |

## DIVIDENDS RECEIVED

| | Effective Date | Quantity | Amount | Account Type |
|---|---|---|---|---|
| SANTA FE INTERNATIONAL CORP ORDINARY SHARES | | | | |
| DIVIDEND ON    1,000 SHS @   .032500000 | Jan 16 01 | | 32.50 | 03 |
| TOTAL DIVIDENDS RECEIVED | | | 32.50 | |

## INTEREST EARNED ON CREDIT BALANCE

INTEREST PERIOD FROM DEC. 29 TO JAN. 30, 2001

| | Start Date | End Date | Net Balance | Rate Paid (in percentage) | In Settlement Currency Net Settlement Amount |
|---|---|---|---|---|---|
| US DOLLARS (USD) | | | | | |
| Interest Earned | Jan 18 01 | Jan 22 01 | 2,131.21 | 3.87000% | 1.18 |
| Interest Earned | Jan 23 01 | Jan 23 01 | 2,131.21 | 3.84000% | 0.23 |

CONFIDENTIAL

GSKG 000373

Period Covering:
Jan 1 01 to Jan 31 01

Account Number:    Account Name:
001-10030-4    KATHERINE A. GRIFFIN

ACTIVITY :

## INTEREST EARNED ON CREDIT BALANCE
INTEREST PERIOD FROM DEC. 29 TO JAN. 30, 2001

| | Start Date | End Date | Net Balance | Rate Paid (in percentage) | In Settlement Currency Net Settlement Amount |
|---|---|---|---|---|---|
| US DOLLARS (USD) | | | | | |
| Interest Earned | | | | | |
| Interest Earned | Jan 24 01 | Jan 29 01 | 2,098.71 | 3.84000% | 1.34 |
| | Jan 30 01 | Jan 30 01 | 2,098.71 | 3.73000% | 0.22 |
| TOTAL US DOLLARS | | | | | 2.97 |

## INTEREST CHARGED ON DEBIT BALANCE
INTEREST PERIOD FROM DEC. 29 TO JAN. 30, 2001

| | Start Date | End Date | Net Balance | Rate Charged (in percentage) | In Settlement Currency Net Settlement Amount |
|---|---|---|---|---|---|
| US DOLLARS (USD) | | | | | |
| Interest Charged | | | | | |
| Interest Charged | Dec 29 00 | Jan 03 01 | 361,095.58 | 8.75000% | (526.56) |
| Interest Charged | Jan 04 01 | Jan 15 01 | 361,095.58 | 8.25000% | (992.93) |
| | Jan 16 01 | Jan 17 01 | 361,094.06 | 8.25000% | (165.47) |
| TOTAL US DOLLARS | | | | | (1,684.96) |

Page 9 of 10

CONFIDENTIAL

GSKG  000374

# REPORT DESCRIPTIONS AND DISCLOSURES

Period Coverage:
Jan 1 01 to Jan 31 01

Account Number:
001-10030-4

## REPORT DESCRIPTIONS

**SUMMARY**
The Summary report includes a graphic representation of the account's asset allocation, changes in the account value from the previous statement and an income tax summary of income presented in a format analogous to IRS Form 1099. In addition, this section indicates a year to date summary of net realized capital gains and losses as well as unrealized capital gains and losses in your portfolio.

**HOLDINGS**
The Holdings section of your report details your holdings by asset class beginning with cash and cash equivalents, and then, when appropriate, your fixed income, equity, convertible securities, commodities and other holdings.

**ACTIVITY**
All activity during the relevant period is detailed in the Activity report. Transactions are listed chronologically by type, beginning with securities purchased and sold, then currencies. Cash deposits and withdrawals, interest received/paid, dividends received/paid, fees and other debits and credits.

## DISCLOSURES

**IF YOUR STATEMENT IS NOT CORRECT**
If your statement is not correct, please notify us immediately. It should be retained for your future reference.

**ACCOUNT TYPES**
00. Non Interest       03. Dividend/Interest Income       07. Short
01. Cash               04/05. Other                       08. Repurchase Agreement
02. Principal          06. General Margin                 09. Other

For your convenience, the short account (type 07) has been segregated from other account types throughout this statement.

This statement contains information regarding your Goldman, Sachs & Co. ("GS") holdings and/or certain of your other funds held away from GS. Information concerning GSAM funds and other funds held away from GS, including certain information provided by the funds transfer agent and is furnished away from GS have been supplied by the funds transfer agent and is furnished for your convenience, and GS makes no representation concerning the accuracy of this information. See the relevant prospectus or offering materials for details regarding the operation of these funds. Positions which are not held in the possession of GS are not covered by SIPC insurance applicable to GS holdings, nor by other insurance provided by private sources on behalf of customers of GS.

**PRICING**
Prices, some of which are provided by pricing services, are not guaranteed for accuracy, or as realizable values. Pricing method information is available upon request. Valuations for certain private GS and GSAM funds are based on reported asset values and may not reflect possible secondary market values. Please refer to the relevant offering documents for additional information.

**SECURITY INTEREST**
This also constitutes your confirmation to you and I, from you, of the security interest of AFON in the securities referred to herein. Such security interest has been recorded on our books and records.

**WHEN-ISSUED TRANSACTIONS**
Any transactions in "when issued" securities are displayed in the Activity report.

**RATINGS**
Ratings are based upon current information which may be changed, suspended or withdrawn by the rating agencies due to changes in, or unavailability of, financial information. Although we have obtained the ratings from agencies considered reliable, we do not guarantee the accuracy or currency of the ratings. The information provided by the agencies does not indicate that an issuer is on the agency's "watch list" or under similar review.

An independent verification of the accuracy and the currency of the ratings should be made in connection with investment decisions. The description of the ratings methodology employed in assigning ratings may be found in the rating agencies' manuals.

**ESTIMATED ANNUAL INCOME**
Your estimated annual income is derived from information provided by standard statistical sources. We can not guarantee the accuracy of such information. Since the interest and dividend rates are subject to change at any time, they should not be relied upon exclusively for making investment decisions.

**RIGHTS CONNECTED WITH MARGINED SECURITIES**
When you pledge securities in your margin account, some or all of the securities acting as collateral in that account may be used, lent or pledged by GS in accordance with SEC rules. When this happens, certain rights of your ownership related to such securities may be transferred to GS or transferred by us to others. In certain circumstances, such pledges may limit, in whole or in part, your ability to exercise voting rights with respect to such securities, and you may be offered the right to vote fewer shares than you own.

Where you have multiple accounts with the firm, compliance with margin requirements will be computed on the basis of your combined margin transactions and collateral on deposit with the firm as required by applicable regulation.

**FEE BASED INVESTMENT ADVISORY ACCOUNTS**
Please be advised that the authorization to debit your account for the investment management fee, your failure to so advise will constitute a continuation of your authorization.

**NASD RULE 2280 NOTIFICATION**
The NASD regulation's public disclosure program toll free hotline number is 1 800 289 9999 and their web site address is http://www.nasd.com/. An investor brochure describing the public disclosure is available via the hotline number or the web site.

**MISCELLANEOUS**
This is a combined statement of your general account and of a special memorandum account as maintained for you under section 220.5 of Regulation T issued by the Board of Governors of the Federal Reserve System. The available for the separate account as required by regulation T is available for your review upon request.

All statements are maintained on a "trade date basis". Trades not made but settled in the current period will be listed in the Securities Purchased and Sold section of the Activity report and will already be included in the trade date basis.

A financial statement of this organization is available for your personal inspection at its offices, or a copy of it will be mailed upon your request. Any free credit balances represent funds payable upon demand which, although properly accounted for on our books of record, are not segregated and may be used in the conduct of business. The understanding of GS that credit balances held in your account are pending reinvestment. Please advise us promptly if there are changes to your financial situation or if your investment objectives change.

**TRANSACTION CHARGES**
Further information on commissions and other charges on options and other transactions is included in confirmations previously furnished to you. Upon request, this information will be promptly made available to you.

**INSURANCE COVERAGE**
For Goldman, Sachs & Co., securities brokerage customer accounts, the firm provides unlimited coverage for both securities (net of any debits) and cash, which fully protects clients against insolvency by Goldman, Sachs & Co.

Page 10 of 10

CONFIDENTIAL

GSKG 000375

**Exhibit I**

# Trust, Estate and Guardian Account Agreement

Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004-2456

212-902-1000



Title of Account: *Katherine A. Griffin Living Trust*

Account Number: *001-10030-4-105*

To: Goldman, Sachs & Co.

This agreement sets forth our respective rights and obligations in connection with your accepting a cash or margin account or accounts designated in the above-referenced manner ("Client".) The agreements and obligations of Client set forth herein shall be deemed the agreements and obligations of the account or accounts established hereunder and of the undersigned, acting in the capacity indicated. This agreement is in addition to (and in no way limits or restricts) any of the provisions of or the rights which you or any of your affiliates may have under any other agreements between you or any of your affiliates and Client. You and Client hereby agree to the following with respect to any of Client's accounts with you and all transactions with you:

**1. Exchange or Market.** All transactions under this agreement shall be in accordance with the rules and customs of the exchange or market and its clearing house, if any, where the transactions are executed and in conformity with applicable law and regulations of governmental authorities and future amendments or supplements thereto.

**2. General Lien; Delivery of Collateral.** Client agrees that all securities and other property, and the proceeds thereof, and any other obligations, whether or not due, which you or any of your affiliates may hold for Client or which are, or may become, due to Client (either individually or jointly with others or in which Client has any interest) and all rights Client may have against you or any of your affiliates shall be subject to a general lien, security interest and right of set-off for the discharge of all Client's obligations to you or any of your affiliates. Client further agrees that you may, in your discretion at any time and from time to time, require Client to deliver collateral to margin and secure Client's performance of obligations to you and your affiliates with respect to spot, forward, option, swap and other transactions involving or relating to foreign exchange. Such collateral shall be delivered, within one business day of your request, in such amount and form and to such account or recipient as you shall specify. You may, in your discretion and without notice to Client, deduct any amounts from Client's account and apply or transfer any of Client's securities and other property interchangeably between any of Client's accounts, each of which unreservedly guarantees all obligations of Client. Client acknowledges that you and each of your affiliates act as agents for each other in respect of the rights subject to lien as described above.

**3. Payment and Settlement.** Client agrees that all cash account transactions will be handled on a cash basis and Client shall pay for any security purchased for Client's account, and deliver any securities sold for Client's account, on or before the settlement date. Client agrees to pay on demand all balances owing with respect to Client's account. Client warrants that no sale of securities is contemplated before the securities are paid for as provided above and that each item sold will be owned by Client at the time of sale.

**4. Default.** In the event of default by Client or any obligation under any transaction or agreement with you or any of your affiliates, if Client shall become bankrupt, insolvent or subject to any bankruptcy, reorganization, insolvency or similar proceeding, or if for any reason you or any of your affiliates deem it advisable for your or their protection, you or any of your affiliates may, without notice or demand to Client, and at such times and places as you may determine, cancel, terminate, accelerate, liquidate and/or close-out any or all transactions and agreements between Client and you or any of your affiliates, pledge or sell any securities or other property which you or any of your affiliates may hold for Client or which is due to Client (either individually or jointly with others) and apply the proceeds to the discharge of the obligation, set-off, and recoup any obligations to Client against any obligations to you or any of your affiliates, exercise all rights of a secured creditor in respect of all collateral in which you or your affiliates have a security interest or right of set-off, cover any open positions of Client (by buying in or borrowing securities or otherwise) and take such other actions as you or any of your affiliates deem appropriate provided that if applicable law would stay or otherwise impair the ability of your or any of your affiliates to take any such action upon any such bankruptcy, reorganization, insolvency or similar proceeding, you and the applicable affiliate(s) will be deemed to have taken such action with respect to the cancellation, termination, acceleration, liquidation and/or close-out of transactions, and the application of appropriate set-offs, and if and to the extent you deem it appropriate, the sale or disposition of securities or other assets of Client, the exercise of rights of a secured creditor, and the application of proceeds immediately prior to such bankruptcy, reorganization, insolvency or similar proceeding. Client shall remain liable for any deficiency and shall promptly reimburse you and your affiliate for any loss or expense incurred thereby, including losses sustained by reason of an inability to borrow any securities or other property sold for Client's account.

**5. Interest, Fees.** Client agrees to pay interest charges which may be imposed by you in accordance with your usual custom, with respect to late payments in conjunction with any transaction, including for securities purchased, in Client's account and prepayments in Client's account (i.e., the crediting of the proceeds of sale prior to settlement date or prior to receipt by you of the item sold in good deliverable form). Client acknowledges receipt of the enclosed document entitled "Interest Charges to Clients" and agrees to be bound thereby. Client agrees to pay promptly any amount which may become due in order to meet requests for additional deposits or marks to market with respect to any transactions including unissued securities purchased or sold by Client. Client agrees to pay promptly any custody or other fees which may be imposed by you with respect to the account.

**6. Sale Orders.** Except as provided in the last sentence of this Section 6, the giving of each sell order by Client shall constitute a designation of the sale as "long" and a certification that the securities to be sold are owned by Client and, if such securities are not in your possession, the placing of such order shall constitute a warranty by Client that Client shall deliver such securities to you on or before settlement date. If Client maintains a margin account, Client agrees to designate all sell orders as either "long" or "short".

**7. Reports, Statements.** Reports or confirmations of the execution of orders and statements of Client's account shall be conclusive if not objected to in writing within ten (10) days after forwarding by you to Client by mail or otherwise. Communications mailed, electronically transmitted or otherwise sent to Client at the address specified in your records shall, until three (3) business days after you have received notice in writing of a different address, be deemed to have been forwarded by you when sent and the Client waives all claims resulting from failure to receive such communications.

**8. Custodial Arrangements.** If you act as custodian for the securities and other property in Client's account, you are authorized to register such securities in your name or the name of your nominee, or cause such securities to be registered in the name of, or in the name of the nominee of, a recognized depository or clearing organization. Client understands that when

you hold on Client's behalf bonds or preferred stocks which are callable in part by the issuer, such securities will be subject to your impartial lottery allocation system in which the probability of Client's securities being selected as called is proportional to the holdings of all clients of such securities held in bulk by or for you. Client further understands that you will withdraw such securities from any depository prior to the first date on which such securities may be called unless such depository has adopted an impartial lottery system which is applicable to all participants. Client may withdraw uncalled securities prior to a partial call subject to compliance with applicable margin requirements and the terms of any agreements between you and Client. You are authorized to withdraw securities sold or otherwise disposed of, and to credit Client's account with the proceeds thereof or make such other disposition thereof as Client may direct. You are further authorized to collect all income and other payments which may become due on Client's securities, to surrender for payment maturing obligations and those called for redemption and to exchange certificates in temporary form for like certificates in definitive form, or, if the par value of any shares is changed, to effect the exchange for new certificates. It is understood and agreed by Client that although you will use reasonable efforts to effect the authorization set forth in the preceding sentence, you will incur no liability for your failure to effect the same.

**9. Termination.** Client and you agree that the accounts maintained hereunder may be terminated by you or Client at any time effective upon the giving of notice of such termination to Client or to you, as the case may be. All applicable provisions will survive the termination of the account and this agreement. Without limiting the foregoing, upon any such termination, the provisions of this agreement shall remain in effect with respect to all securities and other property then held in such account or accounts and all transactions and agreements then outstanding between Client and you or any of your affiliates.

**10. Orders, Recommendations, Punching.** Client acknowledges that, on occasion, you may not be in a position to make a recommendation or render an opinion with respect to any security. Client agrees that: i) you may, in your sole discretion and without prior notice to Client, refuse to accept or execute any order from Client and, in such case, you shall endeavor to give Client notice of such refusal as soon as practical; ii) you may submit Client's orders jointly with orders for other clients and you need not designate any of Client's eligible orders as "individual" when submitting orders via the DOT system and; iii) the average price for executions resulting from bunched orders will be assigned to Client's account.

**11. Governing Law, Successor and Assigns, Waiver.** This agreement and its enforcement shall be governed by the laws of the State of New York and its provisions shall cover individually and collectively all accounts which Client may maintain with you. This agreement is binding upon and inures to the benefit of you, your affiliates, Client, and our respective legal representatives, successors and assigns. Neither you nor Client may assign its rights or delegate its obligations under this agreement, in whole or in part, without the prior written consent of the other party, except for an assignment and delegation by you of all of your rights and obligations hereunder to a successor entity that assumes substantially all of your assets and businesses (including all of the obligations under this agreement) by contract, operation of law or otherwise and that is a registered broker-dealer under relevant Securities and Exchange Commission rules. Upon any such delegation and assumption of obligations by such successor entity, you shall be relieved of and fully discharged from all your obligations hereunder, whether such obligations arose before or after the date of such delegation and assumption. No waiver of any provision of this agreement shall be deemed a waiver of any other provision, nor a continuing waiver of the provision or provisions so waived. All waivers and modifications must be in writing.

**12. Arbitration.**

(a) **Arbitration is final and binding on the parties.**

(b) **The parties are waiving their right to seek remedies in court, including the right to a jury trial.**

(c) **Pre-arbitration discovery is generally more limited than and different from court proceedings.**

(d) **The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.**

(e) **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

Any controversy between you (together with any of your affiliates also involved in such controversy) or any of your or their Managing Directors, officers, directors or employees on the one hand, and Client or Client's agents on the other hand, arising out of or relating to this agreement, the transactions contemplated hereby, or the accounts established hereunder, shall be settled by arbitration, in accordance with the rules then obtaining of any one of the American Arbitration Association or The New York Stock Exchange, Inc., or any other exchange of which you are a member, or the National Association of Securities Dealers, Inc. or The Municipal Securities Rulemaking Board, as Client may elect. If Client does not make such election by registered mail addressed to you at your main office within ten (10) days after receipt of notification from you requesting such election, then Client authorizes you to make such election on behalf of Client. The award of the arbitrator shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the Client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

GSTEGAA  8/97

**Please See Reverse Side**

**13. Client Representations.** The undersigned represents that he or she is of legal age. Client further represents that no one except the Client has an interest in Client's account unless such interest is revealed in the title of such account and in any such case, Client has the interest indicated in such title. Client warrants that you will be kept informed of any changes in the information supplied to you herein or otherwise in connection with your establishing and maintaining an account or accounts for Client.

**14. Power and Authority.** In the case of multiple fiduciaries, you may accept the instructions of any one fiduciary on behalf of all fiduciaries for any matter relating to Client's account. Without limiting the generality of the foregoing, each of the undersigned has full power and authority on behalf of the Client: (a) to make purchases and sales for Client's account, (b) to withdraw funds, securities and other property from Client's account; (c) to give and receive instructions, demands, notices, confirmations, reports, statements of account and communications of every kind; (d) to execute this agreement and other agreements relating to the foregoing matters and to terminate, modify, or waive any of the provisions thereof, and (e) generally to deal with you on behalf of Client's account, either individually or in our joint names, as fully and completely as if each alone were interested therein, all without notice to the other or others. Notwithstanding the foregoing, in the case of multiple fiduciaries, each of the fiduciaries agrees that you may, in your sole discretion: (i) require joint instruction from some

or all of the fiduciaries before taking any action hereunder and (ii) if you should receive instructions from any one or more of the fiduciaries which are, in your opinion, in conflict with instructions received from any other fiduciary(ies), comply with any of such instructions and/or advise Client of the apparent conflict and/or take no action as to any such instructions until you receive instructions from any one or more of the fiduciaries which are satisfactory to you. The authority conferred herein shall remain in force until written notice of the revocation, signed by Client, is received at your New York office.

**15. Ownership.** Client agrees that all funds, securities and other property held for the account and the proceeds thereof shall be held for the account in the manner indicated in the account title, with all the legal and equitable rights of every nature and kind, and subject to all the obligations and conditions, that such form of ownership imposes. In the event of the death, resignation or incompetency of any one of the fiduciaries, or other change which affects the manner in which the property in the account is held, you shall immediately be given written notice thereof and, in addition to the actions permitted under any agreements relating to Client's account, you are authorized to take such action, require such documents and tax waivers, and retain such portion of or restrict transactions in the account, all as you may deem advisable.

---

### MARGIN

**No margin account will be established for the Client unless and until the account is approved for margin transactions by Goldman, Sachs & Co.**

## Please complete Section 16 only if Client wishes to apply for a margin account.

**16. Margin.** Section 16 applies to transactions effected in a securities margin account which has been established by you. The provisions of Section 16 are in addition to the other provisions contained in this agreement.

a) Client represents and warrants to you that Client has had an opportunity to discuss with you the risks associated with the use of margin and that the use of margin is authorized by law and any governing documents, is suitable for the Client, and is consistent with Client's investment objectives as supplied to you, including, if applicable, the designation of safety of principal as Client's primary investment objective.

b) Client agrees to maintain margins for Client's account as you may require from time to time. Client agrees to pay interest charges which are imposed, in accordance with your usual custom, with respect to Client's account and to pay on demand any debit balance owing with respect to Client's account.

c) Client agrees that securities and other property in Client's account may be carried in your general loans and may be pledged or hypothecated separately or in common with other securities and any other property for the sum due to you thereon or for a greater sum and without retaining in your possession and control for delivery a like amount of similar securities or other property and that certain rights of ownership, including the right to vote such securities, may be transferred to you or by you to others.

**By signing here, Client indicates a desire to apply for a securities margin account, agrees to abide by all provisions in Section 16, and acknowledges that Client's securities may be loaned to Goldman, Sachs & Co. or to others.**

| | |
|---|---|
| Signature: _Katherine N Joffe_ | Date: _7. 23 99_ |
| Signature: | Date: |
| Signature: | Date: |
| Signature: | Date: |

---

### SECTIONS 17-22 MUST BE COMPLETED ON BEHALF OF THE ACCOUNT

**17. Association of Fiduciaries and Beneficiaries.** Check all applicable boxes and provide an explanation below if any fiduciary or beneficiary of this account is associated with any of the entities listed below, or if an immediate family member of any fiduciary or beneficiary (spouse, brother, sister, parents, children, mother-in-law, father-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law), or other person, who supports any fiduciary or beneficiary to a material extent, is associated with any of the following entities:

☐ an exchange;

☐ a member or member organization of any exchange or the NASD or any broker-dealer;

☐ a bank, savings and loan institution, trust company, insurance company; or

☐ an investment company, an investment advisory firm or other institutional investment entity.

Explanation: _____

_____

_____

**18. Financial Information of Trust, Estate or Beneficiary.**

| | Below $250,000 | $250,000 to $500,000 | $ 500,000 to $1,000,000 | Over $1,000,000 |
|---|---|---|---|---|
| Total Net Worth | ☐ | ☐ | ☐ | ☑ |
| Annual Income | ☑ | ☐ | ☐ | ☐ |
| Total Net Liquid Assets | ☐ | ☐ | ☐ | ☑ |

---

**Please See Next Page**

CONFIDENTIAL

*001- 10030-4*

**19. Investment Objectives.** While individual transactions may vary, Client's investment objectives with respect to securities transactions are set forth below. Such information does not apply to other transactions with you or with any of your affiliates. *Please rank all applicable objectives in order of preference ("1" indicates the highest preference, "5" indicates the lowest preference).*

*2* **Growth:** Client is more interested in having the market value of the portfolio grow over the long term than in current income from portfolio; Client is prepared to accept additional risk to principal to achieve this growth.

*5* **Income:** Client is more interested in obtaining a steady stream of current income from the portfolio than in growth of the portfolio.

*4* **Safety of Principal:** Client is interested primarily in preserving the value of the account assets, and is willing to forego more growth or higher income.

*1* **Trading Profits:** Client wants to take advantage of short-term trading opportunities, which may involve establishing and then liquidating positions quickly.

*3* **Speculation:** Client is interested in taking above-average risks to principal in an attempt to achieve above-average returns.

The above information regarding Client's investment objectives represents Client's current preference and supersedes any indications of such preferences that Client may have previously provided to you with respect to securities transactions other than information specifically supplied with respect to options transactions.

**20. Orders Placed by Others.** If you are authorizing someone to place orders on your behalf, please indicate the person's name below and complete the enclosed trading authorization.

_____

**21. Disclosure to Issuers.** Client understands that you may be required to disclose to securities issuers the name, address and securities positions with respect to securities held in the Client's account in your or your nominee's name unless you are notified that Client objects. Client hereby notifies you that Client wishes such disclosure to be made.

☐ **CLIENT SHOULD CHECK THIS BOX IF CLIENT DOES NOT CONSENT TO SUCH DISCLOSURE.**

**22. Payment Agreement.** You are authorized to rely on the payment instructions set forth below until written notice believed by you in good faith to be genuine of any changes regarding such instructions is received by you. In addition, when so instructed, you may, but you are not required to, follow payment instructions which differ from the instructions set forth below with respect to specified transactions; provided, however, that only Client or a person with trading authorization over Client's account may authorize the transfer of funds to an account which is not in the name of the trust, estate, or guardian account established hereunder.

**Payment Instructions:**

Name of Bank or Other Recipient:
_____

Address:
_____

Name of Account:
_____

Account Number:
_____

Contact Name and Telephone Number (if applicable):
_____

The following persons are among those authorized to transfer funds:
_____
_____
_____

By signing below, Client acknowledges receipt of a copy of this Trust, Estate and Guardian Account Agreement. A predispute arbitration clause is contained in Section 12 hereof.

| Signature: *Katherine A. Griffin* | Date: *7-23-99* |
| Please Print Name: *KATHERINE A. GRIFFIN* | |

| Signature: | Date: |
| Please Print Name: | |

| Signature: | Date: |
| Please Print Name: | |

| Signature: | Date: |
| Please Print Name: | |

**For Goldman, Sachs & Co. use only**

| Account Representative Receiving Account | Manager Reviewing Account |
| Date *08/19/99* | Date *8/25/99* |

ACCT/CL/PNC/101

**Exhibit J**

# Trading Authorization

## (For Goldman Sachs Representatives)

Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004-2456
212-902-1000



| Title of Account | *Katherine A. Griffin Living Trust* | Account Number | *001-10030-4-105* |
|---|---|---|---|

**To: Goldman, Sachs & Co.**

The undersigned hereby authorizes (print names of at least two Goldman Sachs representatives):

1. *Sofia Frankel*

2. *Jeffrey Goldenberg*

3. _____

4. _____

and such other persons who are now or who may hereafter become members of the same client team as the above-named persons, or their or Goldman Sachs' designees, as his or her agent and attorney-in-fact, individually or collectively, to buy, sell, trade, tender, exchange and otherwise deal in stocks, bonds and any other forms of securities or instruments (including short sales and other margin transactions if a margin account has been applied for on behalf of the undersigned and approved, and puts, calls and other options, if option approval has been applied for on behalf of the undersigned and approved), in accordance with Goldman Sachs' policies governing discretionary accounts, for the undersigned's account (the "Account").

While individual transactions may vary, my general investment objectives, in order of preference, are as follows (please indicate the objectives applicable to your Account, using "1" to indicate your highest preference through "5" to indicate your lowest):

☐**2** **growth** (I am more interested in having the market value of my portfolio grow over the long term than I am in current income from my portfolio; I am prepared to accept additional risk to principal to achieve this growth.)

☐**5** **income** (I am more interested in obtaining a steady stream of current income from my portfolio than I am in growth of my portfolio.)

☐**4** **safety of principal** (I am interested primarily in preserving the value of my assets, and I am willing to forego more growth or higher income.)

☐**1** **trading profits** (I want to take advantage of short-term trading opportunities, which may involve establishing and then liquidating positions quickly.)

☐**3** **speculation** (I am interested in taking above-average risks to principal in an attempt to achieve above-average returns.)

The above information regarding my investment objectives represents my current preference and supersedes any indications of such preferences that I may previously have provided to Goldman Sachs other than information specifically supplied with respect to options transactions. If margin transactions are contemplated, I acknowledge that I have had an opportunity to discuss with you the risks associated with the use of margin and that the use of margin is consistent with my investment objectives, including, if applicable, the designation of safety of principal as my primary investment objective.

If the above information regarding my investment objectives changes, at the time of such change I will orally advise the Goldman Sachs representatives referred to above and, at the same time, I will provide written notice of the change in investment objectives. You are entitled to rely on the foregoing information and other information which I have provided to you until your receipt of a written notice of the change in such information.

I understand that, in accordance with Goldman Sachs' policies, the following transactions will not be executed by you on a discretionary basis:

(i) the purchase of securities where Goldman Sachs is a participant in any registered public offering;

(ii) the purchase of debt securities which are unrated or which are rated by either Moody's or S&P as below investment grade (Baa-1/BBB) unless a) the debt securities have been pre-refunded with U.S. Government or U.S. Government agency securities; b) the debt securities appear in the High Yield Recommended List published in the *Private Client Focus* (including any additional issues of the same entity which have equivalent or higher published ratings); or c) the debt securities are convertible, without the payment of cash or other consideration, into equity securities which are rated as "market performers" or better by the Research Department.

(iii) private placements including products of the Special Investment Group and other OTC, customized derivative financial transactions;

(iv) warrants and listed options as follows: a) warrants other than the purchase or sale of equity warrants with an original purchase price of $20 or more; b) listed options other than selling listed calls against securities the client owns, selling listed puts against cash or cash equivalents sufficient to pay for securities that may be put to the client, buying listed puts against securities the client owns.

(v) index options, swaps, OTC options, forwards, futures, stripped securities (other than government securities), collateralized

GSTAR4 8/96                    **Please See Reverse Side**

mortgage obligations, fixed income derivative securities (e.g., I/O's, P/O's or inverse floaters) or commodities trading;

(vi) transactions involving control or restricted securities;

(vii) foreign currency transactions other than those necessary to settle a foreign securities transaction; and,

(viii) the purchase of funds administered or advised by Goldman Sachs Asset Management, other than certain money market funds managed by Goldman Sachs Asset Management/ILA/ITA that have a constant $1.00 per unit net asset value.

I further understand that you may modify the foregoing discretionary trading policies, without my consent, or notice to me. I also understand that Goldman Sachs will rely upon recently published ratings of securities in complying with the above-described or any other restrictions or policies.

I further understand that the Firm has other policies and procedures applicable to discretionary and nondiscretionary transactions generally (e.g., to ensure compliance with insider trading prohibitions or other provisions of the federal securities laws) and that you will not execute transactions prohibited thereby. I further understand that you may modify, without my consent or notice to me, such Firm policies and procedures.

The undersigned hereby agrees that Goldman Sachs may submit orders jointly on behalf of the Account and the accounts of other of Goldman Sachs' customers and you need not designate any of the Account's eligible orders via the DOT system. The undersigned also agrees that the average price of executions resulting from such orders will be assigned to the Account. The undersigned hereby further agrees that Goldman Sachs may execute orders for other customer accounts or proprietary accounts along with orders on the same side of the market for the Account, and that, in such situation, the Account will be assigned a portion of such executions reflective of the customer's share of

the outstanding orders in accordance with Goldman Sachs' policies. The undersigned hereby further agrees that Goldman Sachs may act as principal or as agent, and may cross orders on behalf of the Account with orders for the accounts of other Goldman Sachs' customers or proprietary accounts. The undersigned further understands that Goldman Sachs may receive additional compensation as a result of the investment of cash balances in certain money market funds managed or advised by Goldman Sachs that the Account may make.

This authorization: (a) is a continuing one, and shall not be affected by the subsequent incompetence or disability of the undersigned and shall remain in full force and effect until 24 hours after the receipt at Goldman Sachs of written notice of the undersigned's revocation thereof or written notice of the undersigned's death, and such revocation or notice shall cancel all outstanding unexecuted orders which can be cancelled, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation, and all transactions initiated prior to Goldman Sachs' receipt of said notice of the undersigned's death shall be binding on the undersigned's estate; (b) shall inure to the benefit of Goldman Sachs and any successor firm or firms; (c) shall be binding upon the undersigned's executors, administrators and legal representatives to the extent specifically provided herein; and (d) is in addition to (and in no way limits or restricts) any of the provisions of, or the rights which Goldman Sachs may have under, any other agreement or agreements between Goldman Sachs and the undersigned relating to the Account, including, without limitation, those provisions relating to the arbitration of disputes.

**The Account and transactions therefor and all documents pertaining thereto, including without limitation this trading authorization, shall be governed by the laws of the State of New York, without reference to choice of law rules.**

| Signature | _Katherine A. [signature]_ | Date | 23 July 1999 |
|---|---|---|---|
| Please Print Name | KATHERINE A. GRIFFIN | | |
| Signature | | Date | |
| Please Print Name | | | |